UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
DORIS TSE,

                    Plaintiff,

          v.                               10 Civ. 7207 (DAB)
                                                OPINION
NEW YORK UNIVERSITY,

                    Defendant.
----------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Doris Tse ("Plaintiff" or "Tse") brings this
action against New York University ("Defendant" or "NYU"),
alleging violations of the Americans with Disability Act ("ADA"),
42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act,
29 U.S.C. § 701 et seq., New York State Human Rights Law
("NYSHRL"), and New York City Human Rights Law ("NYCHRL").
Plaintiff maintains that NYU discriminated against her on the
basis of her disability, subjected her to a hostile work
environment, and impermissibly retaliated against her.
Defendants now move, pursuant to Rule 56 of the Federal Rules of
Civil Procedure, for Summary Judgment.

     For the reasons below, Defendant's Motion for Summary
Judgment ("Motion") is GRANTED in part and DENIED in part.


I.   BACKGROUND

     The following facts are undisputed unless otherwise noted.

A.  Tse's Departmental Positions at NYU and the Structure
    of Those Departments

Tse worked at NYU from 1994 to April 4, 2011, initially
working in the Department of Pathology before being transferred
to the Department of Medicine in 2000.  (Def. 56.1 Stmt. ¶ 1; Pl.
56.1 Stmt. ¶ 1.) At both Departments, she was a non-tenure track
research professor.  (Def. 56.1 Stmt. ¶ 1; Pl. 56.1 Stmt. ¶ 1.)

Dr. Fred Valentine ("Valentine"), who was the Director of
the Flow Cytometry Core ("Core") within NYU's Center for AIDS
Research ("CFAR" or "Center"), hired Tse in 1994.  (Def. 56.1
Stmt. ¶ 4.) The Core provided flow cytometry services for AIDS
investigators.  (Id. ¶ 7.) After NYU promoted Valentine as
Director of CFAR, he appointed Tse to replace him as the Core's
Director in 1999.  (Id. ¶ 10.) In January 2006, Tse was promoted
to Associate Professor of Medicine as a research professor, but
she continued to serve as the Core's Director.  (Id. ¶ 23.)

Until 2007, Tse reported to Dr. Joel Ernst ("Ernst"), the
Director of the Department of Medicine's Infectious Diseases and
Immunology Division; after 2007, she reported to Valentine.
(Id. ¶ 21.) Both Valentine and Ernst reported to Dr. Martin
Blaser ("Blaser"), the Chair of the Department of Medicine.  (Id.
¶ 20-21; Pl. 56.1 Stmt. ¶ 19-21.) Valentine, Blaser, and Dr.
Vivian Lee ("Lee"), who was NYU Langone Medical Center's Vice

2

President and the School of Medicine's Vice Dean for Science, took part in certain hiring and firing decisions.

The CFAR relies upon the National Institute of Health ("NIH") to fund the Center and the Core.  (Def. 56.1 Stmt. ¶ 5.) NIH funding is obtained by submitting grant applications.  (Id. ¶ 6.) These grant applications are made by the institutions, with individuals acting as the principal investigators; Tse was the principal investigator for the Core.  (Id. ¶ 60.)


B.    Tse's Health and Service as the Core's Director

As the Core's Director, Tse oversaw the provision of flow cytometry services, managed and hired employees, and operated the Core within its annual budget, among other duties.  (Def. 56.1 Stmt. ¶ 13; Pl. 56.1 Stmt. ¶ 13.) To provide those flow cytometry services, the Aria and Aria II machines were used, with the Aria being installed in 2007 and the Aria II in 2009.  (Def. 56.1 Stmt. ¶¶ 15-17.) In addition to Tse, the Core's staff included a lab manager, undergraduate students, and postdoctoral fellows. (Id. ¶ 29; Pl. 56.1 Stmt. ¶ 29.)

In 1997 Plaintiff developed severe acute arthritis, and in 1999 she was diagnosed with Lupus.  (Def. 56.1 Stmt. ¶ 8; Pl. 56.1 Stmt. ¶ 8; Tse Dep. at 16.) Valentine became aware of her medical conditions sometime thereafter.  (Tse Dep. at 17-19;

3

Valentine Dep. at 48-50.) After Valentine and Tse discussed that
her conditions required someone to assist with the Aria machines,
Valentine hired people to help.  (Valentine Dep. at 50-51.) Tse's
staff operated the Aria and Aria II, with her spending no more
than an hour a week using the machinery because, by 2007, she
lost the fine manual dexterity necessary to operate them.   (Def.
56.1 Stmt. ¶ 18; Pl. 56.1 Stmt. ¶ 18.) Until her removal as Core
Director, all of the accommodations requested and given to Tse
were for her role as Director of the Core.

>    C.   Tse's Allegations that She Was Deprived Accommodations
>         While Serving as the Core's Director

It was not until 2009 that Tse alleges that NYU began to
deprive her of accommodations as Core Director by eliminating her
laboratory assistants.  When Valentine and others at NYU were
creating a budget to incorporate into the 2009 NIH grant
proposal, Tse took issue with how much money would be allocated
to her laboratory assistants.  (Cerasia Decl. Ex. B; Risman Decl.
Ex. S.) Valentine wanted to hire Michael Gregory ("Gregory"), who
previously had worked at the Core and had more experience than
typical postdoctoral fellows, to serve as a full-time operator of
the machines.   (Def. 56.1 Stmt. ¶ 36.) Tse, however, wanted to
continue with the status quo of having postdoctoral fellows as

her disability accommodation.   (Pl. 56.1 Stmt. ¶ 53.)

On June 2, 2009, she emailed Valentine about her concerns about the Core's budget's provision of laboratory assistants; she wrote that if the Department "of Medicine administrators [cannot] incorporate my proposed budget, then you need to appoint another Director."  (Cerasia Decl. Ex. B.) Tse also complained to Lee regarding the budget.  On June 3, 2009, Lee responded, explaining

> [budgetary] issues you are raising are not considered grievable under [the] faculty handbook . . . . [and Valentine] is the PI and so, ultimately, it is his responsibility that the services are run satisfactorily.  If you and he disagree about how the core should be run then you need to reach a resolution between yourselves . . . . If you cannot, then it will be [Valentine's] decision as to whether to accept your requirement or to identify a new Core Director.

(Risman Decl. Ex. S, at 2.) On June 5, 2009, Valentine and Lee discussed, via email, appointing a new Director or co-Directors. (Cerasia Decl. Ex. B.) In that same email, when discussing how the changes at the Core would implicate the budget, Valentine wrote, "The CFAR certainly cannot afford to hire a manager [in addition to Tse] from our current budgets.  If the school cannot help then we will bumble along with Doris until she finds some other reason to quit.  That would free up about $70,000." (Risman Decl. Ex. S, at 3.)

Ultimately, Gregory was hired.  He had a higher salary than the lower-compensated postdoctoral fellows who served as

laboratory assistants.  (Def. 56.1 Stmt. ¶ 103.) Tse contested this hiring decision because she thought the postdoctoral fellows should continue as her accommodation, as opposed to Gregory––whom Defendant felt sufficiently met her needs.  (Id. ¶ 105; Pl. 56.1 Stmt. ¶ 103.) In June 2009, as a compromise, Lee and Valentine also included two postdoctoral fellows in the budget through June 2010.  (Def. 56.1 Stmt. ¶ 104.)

Plaintiff submitted an accommodation request at the end of 2009, persisting in seeking postdoctoral students instead of a fulltime lab technician at the CFAR.  On December 16, 2009, Reginald Odom ("Odom"), NYU's Vice President for Employee and Labor Relations, wrote an email to Tse: "I have been informed that you would like to request an accommodation . . . . Please contact my office . . . so that we can set up a meeting to discuss the details of your accommodation request."  (Risman Decl. Ex. R, at 1.) They met several times, and Plaintiff had her rheumatologist submit a letter, which supported her request to reinstate postdoctoral fellows in connection with her Director role.  (Id. at 2.)

After one of the two postdoctoral fellows left the Core, Tse requested the appointment of a new fellow on February 2, 2010. (Pl. 56.1 Stmt. ¶ 105.) Valentine approved that request on February 4, 2010––the same day that he submitted, to various NYU

6

directors and administrators, two potential letters notifying Tse
that she would be removed as the Core's Director. (Id. ¶ 104.) On
March 9, 2010, Valentine retracted the approval after discovering
there were insufficient funds to approve the appointment of a
postdoctoral fellow. (Risman Decl. Ex. R, at 8.)

> D. **Events Leading to Her Removal as the Core's Director
>    and Allegations of Discrimination**

Prior to September 2008, there is no indication that
Valentine or anyone at NYU expressed concern with Tse's
management of the Core and the Core's services. (Def. 56.1 Stmt.
¶ 45; Pl. 56.1 Stmt. ¶ 45.) On September 24, 2008, Valentine
emailed Tse, writing, "My major concern is how your efforts on
this grant will effect the operating of the CFAR Core since even
without this additional work the Core is not providing services
up to its potential." (Risman Decl. Ex. N, at 5.) The next day,
he explained, "[M]y concern is only that your major
responsibility is running the CFAR Core . . . . [F]or whatever
reasons, the core is currently not able to offer all of the
services to the many investigators whose needs supported the
application for the Aria. . . . Do you feel that you currently
have an optimally functioning user-friendly Core?" (Id. at 7.)
When Tse requested clarification, he responded, "You regularly

7

state that you are too busy to do this or that, and during the past few months we have been dependent on the working schedules of students, the regular retraining of new technicians to replace those who have gone on to school." (Id. at 9.)

On November 14, 2008, Valentine informed Tse of his concerns with the reliability of the Core's data production. (Id. at 11.) He expressed his unease about delays and timing of the data production and about her coordinating repairs in December 2008 and January 2009, respectively. (Id. at 13-16.) On February 5, 2009, Valentine wrote, "As a separate subject, which we have discussed many times, it is totally inappropriate for a service core to have its ability to run samples dependent upon an undergraduate's class and exam schedules." (Id. at 17.) Tse responded within an hour, claiming that only Valentine and his staff had a problem with interns and that she was "quite tired of the continual, baseless, and disparaging complaints over the last several months that is bordering on harassment." (Id. at 18.)

In April 2009 and May 2009, Valentine again notified Plaintiff of his concerns about "not retaining any reliable compensated data from the Aria" because the Aria was repeatedly breaking down. (Def. 56.1 Stmt. ¶ 46; Pl. 56.1 Stmt. ¶ 46; Tse Dep. 136; Risman Decl. Ex. Q, at 6-8.) Additionally, on more than one occasion Valentine and Blaser discussed Valentine's

8

concerns about Plaintiff.  (Def. 56.1 Stmt. ¶ 48.) By June 2009, Valentine recommended that Tse be removed as the Core's Director. (Id. ¶ 50.)

Plaintiff, however, asserts that Valentine's written notifications and actions "resulted from his discriminatory animus toward her beginning around September 2008." (Pl. 56.1 Stmt. ¶ 46.) This animus, Tse asserts, was evident when Valentine demanded that Tse fix the Aria and when he threatened to take the Aria--which Tse referred to as "her baby"--away from Plaintiff because she was a "bad mother."[1]  (Id.  ¶ 46.) At no point in time did Valentine explicitly reference her disability.  (Tse Dep. 196, 197, 99.)

She also claims she was discriminated against in June 2009 when Zinsner asked her to perform certain tasks concerning the CFAR's NIH grant renewal application shortly before it was due to be submitted.  (Id. ¶ 93.) However, Plaintiff admits to knowing of the deadline well in advance but contends that, because of Zisner's delay in giving her a budget, which was necessary to complete her section of the application, she could not complete

---

[1] Tse believes that the demand to fix the Aria demonstrated animus because Valentine knew she could not fix the Aria due to her disability.  (Tse Dep. 192-99.)

it in advance.[2]  The reason for the delay was ongoing budget
negotiations and discussions; Tse participated in some of them.[3]
(Cerasia Decl. Ex. B; Risman Decl. Ex. S.) During the
discussions, Tse indicated her concern with the Core's staffing,
especially since her disability prevented her from conducting
significant laboratory work.  (Cerasia Decl. Ex. B; Risman Decl.
Ex. S, at 1.)

On July 24, 2009, Tse filed a complaint against NYU with the
New York State Division of Human Rights ("NYSDHR") and the Equal
Employment Opportunity Commission ("EEOC").  (Def. 56.1 Stmt. ¶
84.) Her complaint related to her concern about accommodations
while she was the Core's Director and not to her later concern
about extramural funding.  Although it is unclear whether Blaser
or Valentine knew that Tse filed the complaints, neither made
derogatory or negative comments to her about the complaints.
(Id. ¶¶ 85-88; Pl. 56.1 Stmt. ¶¶ 85-88.)

_____

[2] On May 26, 2009, Tse received the Core budget from
Zinszner, which was necessary for Tse to complete her section of
the grant proposal.  Zinszner told her that Plaintiff's section
was due that same day.  Plaintiff did not meet that deadline.
The next day, Zinszner gave Tse three business days to complete
her section.  However, the budget issues were not resolved until
June 3, and Plaintiff completed the Core proposal on June 9.
(Pl. 56.1 Stmt. ¶ 93.)

[3] Between April 18, 2009 and June 3, 2009 Plaintiff,
Valentine, Lee, Cribben, and others engaged in several email
conversations about budgetary concerns regarding the NIH grant
application.  (Cerasia Decl. Ex. B; Risner Decl. Ex. S.)

10

Tse also claims she was discriminated against in late 2009 and early 2010 while renovations at the Department of Medicine, including renovations of her office, occurred.  (Def. 56.1 Stmt. ¶ 94.) In particular, she states she was given "an unreasonably short period of time" to vacate her office and move to a temporary location. (Id. ¶ 94; Tse Dep. 57.) Plaintiff received notice in August 2009 that renovations on the building's floor where her office was located would begin, and in response Plaintiff requested at least one week's notice before the renovation started in the wing where her office was located. (Cerasia Decl. Ex. E.) Blaser notified Plaintiff on December 22, 2009 that her office would be relocated on January 1, 2010.  (Pl. 56.1 Stmt. ¶ 95.) He instructed her to discuss the move's logistics with Valentine and Nunez, yet Tse claims she received insufficient assistance, which was completed on January 6, 2010.[4] (Id. ¶ 95; Risman Decl. Ex. V, at 4.) Being housed in the temporary office and lab, Plaintiff contends also evidenced discrimination because they were inadequate.  (Tse Dep. 57-58.) She returned to her office in May 2010.  (Pf. 56.1 Stmt. ¶ 95.)

Although Valentine recommended Tse's removal as the Core's Director in June 2009, it was not until 2010 that several

---

[4] Plaintiff never asserted that she requested, let alone was denied, help from Valentine or Nunez.

11

Department of Medicine managers, including Valentine, decided to remove her.[5]  (Def. 56.1 Stmt. ¶ 51.) After obtaining approval from, among others, from Blaser, Lucy Cribben ("Cribben"), an Administrator for the Department of Medicine, and Odom, Valentine notified Tse of the decision in a letter, dated March 4, 2010 but emailed on March 10, 2010; her removal went into effect April 1, 2010. (Id. ¶ 49; Cerasia Decl. Ex. O.) The letter referenced his concerns about her management and her inability to perform her duties as its Director. (Def. 56.1 Stmt. ¶ 49.) After Tse's removal as the Core's Director, no one was hired to replace her because the Director position was administratively eliminated following unsuccessful funding of the CFAR's 2009 NIH grant application.[6] (Def. 56.1 Stmt. ¶ 57.)

    E.    Funding for Her Faculty Position

    NYU requires research-track professors, like Tse, to secure extramural support, such as grants, for their research and to

_____

    [5] Although Defendant notified Tse of her removal in a letter dated March 4, 2010, the letter effectively culminated the June 2009 discussions between Valentine and Lee about the "gradual decision" to remove Tse and Lee's desire to "keep her on for another year" despite Valentine wanting her removed in June 2009. (Valentine Dep. 70; Def. 56.1 Stmt. ¶ 50.)

    [6] The NIH released its decision on December 14, 2009. (Risman Decl. Ex. O, at 1.) As a result of the unsuccessful application, the CFAR only received half of its requested funding.  (Def. 56.1 Stmt. ¶ 57.)

support a percentage of their salary, which was fifty, fifty-five, and sixty percent in 2009, 2010, and 2011, respectively. (Id. ¶¶ 60, 62-64.) If research professors lacked funding to support their salaries, the Department of Medicine's policy was to terminate their employment.  (Id. ¶ 82.)

Prior to her removal as the Core's Director, Tse met this requirement through the aforementioned NIH grants.[7]  ( Pl. 56.1 Stmt. ¶ 63.) In fact, she received a letter in September 2009, congratulating her for obtaining 100 percent of her salary from extramural grants.  (Id. ¶ 63.)

When Valentine notified Tse of her removal as the Core's Director, he explained that CFAR would fund her salary through May 31, 2010 but that, after May 2010, she would need to obtain funding from other sources to receive full NYU benefits.  (Def. 56.1 Stmt. ¶ 49.) This is because CFAR provided sixty-five percent of Plaintiff's salary while she was the Core's Director. (Pl. 56.1 Stmt. ¶ 65.) Accordingly, Tse needed to find other sources of extramural support for her salary after May 2010.

 Because the NIH awarded fifty percent of the CFAR's requested amount, the Core still received extramural support between 2010 and 2011.  However, since Tse no longer was the

_____

[7] Because of prior successful grants, the CFAR——and thereby Tse——had NIH funding through June 2010.  (Tse Dep. 281-83.)

Core's Director, she could no longer use the grant to meet the extramural funding requirement despite having helped secure it. For that reason, NYU offered to provide her with time and support to help her secure funding.[8] (Def. 56.1 Stmt. ¶ 66.)

F. Tse's Long-Term Disability Application

After Tse notified Odom of her removal as Director, they discussed her options going forward, including seeking Long-Term Disability ("LTD") benefits. (Odom Dep. 31-34.) They had multiple discussions about her LTD applications following her removal, and at one meeting, Odom explained,

> [W]e talked about options, you know, related to long-term disability. . . . I believe that we were talking about was that with the Core role removed . . . , she was left with her faculty role and there's an expectation on . . . research faculty that they support themselves, from a salary perspective, to some degree with grant dollars. So eliminating the Core was a significant hit financially for Dr. Tse . . . because it was the major portion of her salary. So she now was left with this kind of obligation to . . . make up her salary through other research and have to apply for grants and do other things to support her salary. . . . [W]e talked about long-term disability as an option if she couldn't perform the functions of the role."

(Odom Dep. 33-34.)

---

[8] The Parties dispute whether such help was given. Although Defendant gave Plaintiff and office and a laboratory to conduct her experiments, she claims they were inadequate because they were too small to fit her equipment and lacked air-conditioning. (Pl. 56.1 Stmt. ¶ 67.)

On April 16, 2010, Plaintiff emailed Odom, writing, "Any word on the Long Term Disability?" (Odom Dep. Ex. 4.) Odom responded, telling her to speak to the Director of the Benefits Department, Margaret Meagher ("Meagher"). (Id.) That same day, Plaintiff emailed Meagher, seeking an appointment to apply for LTD benefits. (Risman Decl. Ex. X, at 1.) Tse explained that she had been disabled since 2007 but able to perform her duties as Core Director with accommodations. (Id.) When she was terminated as Core Director, these accommodations ended shortly thereafter.

She formally applied for LTD benefits in May 2010, requesting sixty-five percent of her salary. (Def. 56.1 Stmt. ¶ 70.) Tse also notified Blaser that she was seeking LTD leave on May 13, 2010, explaining,

> [p]erforming laboratory experiments on biohazardous specimens . . . requires a level of manual dexterity and fine control I no longer have, which precludes increasing my time and effort on collaborative projects with Drs. W. Rom, J. Reibman, and B. Young or generating preliminary data that is needed to apply for independent funding from extramural sources.

(Odom Dep. Ex. 5.)

The LTD application asked, "Date you were first unable to work due to this medical condition," and she wrote June 1, 2010. (Id. ¶ 71.) The application explained that "she was provided accommodations . . . . because of loss of funding in May 2010[,] she was no longer able to have that provided," which left her

15

unable to work.  (Risman Decl. Ex. X, at 4.) In reality, that was also when she lost the job which provided the accommodation. There is nothing in the record to suggest that, after her removal as Director, Tse asked for a new accommodation to be able to apply for extramural funding.  However, to help her complete the LTD application, on May 3, 2010, Tse emailed Odom and Meagher; Plaintiff wrote,

> My disability dates back to May 2008 with the first round of hand surgery, but I did not need to file LTD claims as my duties did not include performing experiments on a regular basis prior to 06/01/10.  You may want to co-ordinate with Reggie Odom re: ADA accommodation issues.

(Odom Dep. Ex. 4.)

While NYU and the LTD benefits provider were undergoing negotiations, NYU continued to pay her salary through April 4, 2011.  (Def. 56.1 Stmt. ¶ 72.) After her employment with NYU ended, Tse began receiving LTD benefits on April 5, 2011; she continues to receive them.  (Id. ¶ 73.)


G.    Tse's Termination of her Employment at NYU

In August 2010, Tse, Blaser, Cribben, and Odom met to discuss Plaintiff's prospects of obtaining extramural funding and to discuss what NYU could do to support her salary.  (Id. ¶¶ 75-76.) During that discussion, Tse told them that "between the time I was removed . . . as the Core director and when we met, that

16

there was no opportunity for me to secure extramural funding, because I cannot do the experiments that we needed to produce what we call preliminary data in order to secure extramural funding." (Tse Dep. 101-02.) She explained that she could not secure funding because she could not conduct experiments.[9] (Tse Dep. 102-03.) In response, Blaser and Odom discussed her seeking 100% of her salary from LTD benefits so that she could continue receiving an income. (Def. 56.1 Stmt. ¶ 76; Pl. 56.1 Stmt. ¶ 76; Tse Dep. 101-02.)

Plaintiff was unable to secure any extramural funding between April 1, 2010 and April 4, 2011 despite having submitted a grant application on July 19, 2010. (Def. 56.1 Stmt. ¶ 77; Pl. 56.1 Stmt. ¶ 77.) However, Plaintiff claims the reason she could not receive funding was because she could not perform the necessary experiments without accommodations. Again, there is nothing in the record to indicate that Tse ever asked for accommodations to apply for extramural funding. Tse did continue conducting research projects with other faculty members who had laboratory staff. (Def. 56.1 Stmt. ¶ 78; Pl. 56.1 Stmt. ¶ 78.)

After August 31, 2010, Tse's extramural funding dropped to five percent, so Blaser and NYU's Human Resources Department

---

[9] Although Tse claims that the reason she could not conduct experiments was because of her disability, it is unclear whether she communicated this to Blaser and Odom. (Tse Dep. 102-03.)

17

decided to terminate Tse's employment.   (Def. 56.1 Stmt. ¶¶ 75,
81.) Blaser also consulted with Cribben; she approved the
decision.   (Id. ¶ 75.) In a letter dated January 4, 2011, Blaser
notified Plaintiff that NYU would terminate her employment,
effective April 4, 2011.   (Id. ¶ 81.)

       H.   The Instant Suit

       Before being terminated, Tse filed this lawsuit on September
17, 2010.   She filed an Amended Complaint on April 4, 2011.
Plaintiff alleges she suffered hostile work environment and
retaliation under the ADA, Rehabilitation Act, NYSHRL, and
NYCHRL.   (Am. Compl. ¶¶ 63-126.) On April 10, 2012, Defendant
filed the instant Motion, which was fully submitted on November
21, 2012.

II.  DISCUSSION

       A.   Legal Standard for Summary Judgment

       A district court should grant summary judgment when there is
"no genuine dispute as to any material fact," and the moving
party is entitled to judgment as a matter of law.   Fed. R. Civ.
P. 56(a); Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir.
2008).   Summary judgment is appropriate only when, after drawing
all reasonable inferences in favor of a non-movant, no reasonable

trier of fact could find in favor of that party.  <u>Melendez v.</u>
<u>Mitchell</u>, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he
mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient; there must be
evidence on which the jury could <u>reasonably</u> find for the
plaintiff."  <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d
Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 252 (1986)).  The non-movant may not rely upon speculation
or conjecture to overcome a motion for summary judgment.  <u>Burgess</u>
<u>v. Fairport Cent. Sch. Dist.</u>, 371 F. App'x 140, 141 (2d Cir.
2010).  Instead, when the moving party has documented particular
facts in the record, "the opposing party must come forward with
specific evidence demonstrating the existence of a genuine
dispute of material fact."  <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d
288, 292 (2d Cir. 2010) (citing <u>Anderson</u>, 477 U.S. at 249).
Genuine issues of material fact cannot be created by merely
conclusory allegations or unsubstantiated speculation.  <u>Victor v.</u>
<u>Milicevic</u>, 361 F. App'x 212, 214 (2d Cir. 2010); <u>Melendez</u>, 394 F.
App'x at 740.  Thus, unsupported allegations in the pleadings
cannot create a material issue of fact.  <u>Weinstock v. Columbia</u>
<u>Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000).

19

    B.   Judicial Estoppel

    Defendant asserts that Tse is estopped from raising her
disability discrimination claims because, when she applied for
LTD benefits, she certified that she was "unable to work due to
[her] medical condition" since June 1, 2010.  (Def.'s Mot. Summ.
J. 10; Risman Decl. Ex. X, at 2.) Since Tse receives LTD
benefits, Defendant contends she is estopped from arguing she was
qualified for any position at NYU.  (Def.'s Mot. Summ. J. 10.)

    The Supreme Court has held that the pursuit and receipt of
disability benefits "does not automatically estop the recipient
from pursuing an ADA claim."  Cleveland v. Policy Mgmt. Sys.
Corp., 526 U.S. 795, 797 (1999).  However, for the recipient
"[t]o survive . . . summary judgment, she must explain why that
[disability benefits] contention is consistent with her ADA claim
that she could 'perform the essential functions' of her previous
job, at least with 'reasonable accommodation.'"  Id. at 798;
DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010)
("[B]efore applying judicial estoppel to factual claims in ADA
cases, a court must carefully consider the contexts in which
apparently contradictory statements are made to determine if
there is, in fact, direct and irreconcilable contradiction."
(quotations and citation omitted)).  ADA plaintiffs have "wide
latitude to overcome apparent conflicts between their SSDI

                              20

applications and their statements alleging discriminatory

discharge." Parker v. Columbia Pictures Indus., 204 F.3d 326,

332 (2d Cir. 2000).

Defendant incorrectly claims that Plaintiff never proffered

any explanation for the contradictory nature between her LTD

benefits claim and her ADA claim.  (Def.'s Mot. Summ. J. 10-11.)

While applying for disability benefits, Tse asserted that she

previously was "provided accommodations" where someone "was doing

the work she could not do and because of loss of funding in May,

2010 [sic] she was no longer able to have that provided," which

left her unable to work.  (Risman Decl. Ex. X, at 4.) Indeed, Tse

consistently has claimed she can perform her essential job

functions with the aid of laboratory assistants, and prior to

June 2010, she did just that.  Tse's explanation sufficiently

demonstrates the consistency between her LTD benefits and her ADA

claim.  See DeRosa, 595 F.3d at 105 (holding that the plaintiff's

claim that he could perform his job duties by working from home

was not inconsistent with writing on his disability application

that he was "unable to grab, reach, or commute"); see also Morse

v. JetBlue Airways Corp., – F. Supp. 2d – , No. 09 Civ. 5075,

2013 WL 1294629, at *12 (E.D.N.Y. Mar. 31, 2013) (holding

estoppel was inapplicable because there was no conflict since the

"plaintiff maintained that she was able to perform her role . . .

21

with a reasonable accommodation"). Plaintiff, therefore, is not estopped from bringing her disability discrimination claims.

### C.   Disability Discrimination Claims

#### 1.   Timeliness of Discrimination Claims

Defendant asserts that Plaintiff's discrimination claims should be dismissed because she did not include a disability discrimination claim in her Amended Complaint. (Reply 3 n.2.) "A party cannot assert a cause of action for the first time in response to a summary judgment motion." Greenidge v. Allstate Ins. Co., 312 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2004); Rojo v. Deutsche Bank, 487 F. App'x 586, 588-89 (2d Cir. 2012). This is because "the central purpose of a complaint is to provide the defendant with notice of the claims asserted against it." Greenidge v. Allstate Ns. Co., 446 F.3d 356, 361 (2d Cir. 2006).

Even where a plaintiff does not have a clearly labeled claim, a plaintiff may still provide sufficient notice. See Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 89 (2d Cir. 2010) (finding the plaintiff provided sufficient notice of a retaliation claim where the complaint stated, "Defendants ignored . . . [her requests], and instead actively created a more challenging and dangerous work environment for her"). Here, although Plaintiff's Amended Complaint did not have clearly

22

labeled disability discrimination claims, she did reference being discriminated against while asserting her hostile work environment claims.  See, e.g., Am. Compl. ¶ 68 ("NYU violated the ADA by discriminating against Dr. Tse and subjecting Dr. Tse to a hostile work environment."); see also Am. Compl. ¶¶ 84, 100, 116.  Plaintiff also twice pleaded that she sought accommodations, both before and after her removal as Director, but was denied them.  (Am. Compl. ¶¶ 50, 58.) Because Tse raised her claim before her Opposition to Summary Judgment and Defendant had adequate notice of the claim, her failure to accommodate claim was timely raised.  Ragusa, 381 F. App'x at 89 ("While [plaintiff's] complaint might have been clearer in articulating this theory of retaliation, . . . it was sufficient to place defendants on notice that she intended to pursue such an argument.").

However, beyond her statement that NYU "discriminat[ed] against Dr. Tse," Plaintiff never pleaded any facts alleging she was disparately treated on the basis of her disability.  Because failure to accommodate is a form of disability discrimination,[10]

---

[10] "To establish discrimination under . . . the ADA, plaintiffs have three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  Quad Enters. Co., LLC v. Town of Southold, 369 F. App'x 202, 205 (2d Cir. 2010) (quoting Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565,

that bald statement cannot provide Defendant with sufficient notice of her disparate treatment claim. The Court, therefore, will not address her disparate treatment claims brought pursuant to the ADA, NYSHRL, and NYCHRL. Rojo, 487 F. App'x at 588 ("We have refused to address the merits of claims raised for the first time at that stage of the litigation.").

Finally, the Court deems all her Rehabilitation Act claims abandoned. "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." Plahutnik v. Daikin Am., Inc., No. 10 Civ. 1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6, 2012); Jain v. McGraw-Hill Cos., Inc., 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011) (holding the plaintiff abandoned six claims when her brief failed to respond to the defendants' arguments on those claims). Nowhere in her Opposition does Plaintiff refer to her claims brought pursuant to the Rehabilitation Act, let alone

---

573 (2d Cir. 2003)). Although the NYCHRL disability discrimination claims must be analyzed separately, Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009), the court refuses to consider disability discrimination under the NYCHRL because Plaintiff never pleaded facts alleging "she has been treated less well than other employees because of their [disability]." Mihalik v. Credit Agricole Cheuvreux N.A., Inc., 715 F.3d 102, 110 (2d Cir. 2013) (citation omitted). Nonetheless, as will be discussed infra Section II.D.3, because NYCHRL hostile work environment and discrimination claims are analyzed under the same provision of the NYCHRL and because issues of severity and frequency are only relevant for damages, this Court will consider whether Defendant treated Plaintiff less well o the basis of her disability in infra Section II.D.3.

oppose Defendant's Motion with respect to the Act.  She thereby

has abandoned all her Rehabilitation Act claims.  <u>Petrisch v.</u>

<u>HSBC Bank USA, Inc.</u>, No. 07 Civ. 3303, 2013 WL 1316712, at *17

(E.D.N.Y. Mar. 28, 2013) (holding the plaintiff abandoned her

NYCHRL claim because she "conspicuously le[ft] out the NYCHRL").


        2.   Legal Standard for Failure to Accommodate

             Disability Discrimination

    Failure to accommodate claims may be brought under the ADA,

NYSHRL, and NYCHRL.  To establish a <u>prima</u> <u>facie</u> case of

disability discrimination for failure to accommodate under the

ADA, NYSHRL, and NYCHRL, a plaintiff must show

> (1) Plaintiff is a person with a disability under the
> meaning of the [statute]; (2) an employer covered by
> the statute had notice of his disability; (3) with
> reasonable accommodation, plaintiff could perform the
> essential functions of the job at issue; and (4) the
> employer has refused to make such accommodations.

<u>McBride v. BIC Consumer Prods. Mfg. Co., Inc.</u>, 583 F.3d 92, 97

(2d Cir. 2009) (citation omitted); <u>Noel v. BNY-Mellon Corp.</u>, No.

11-4478-CV, 2013 WL 978725, at *1 (2d Cir. Mar. 14, 2013);

<u>Benimovich v. Fieldston Operating LLC</u>, No. 11 Civ. 780, 2013 WL

1189480, at *8 (S.D.N.Y. Mar. 22, 2013); <u>Debell v. Maimoides Med.</u>

<u>Ctr.</u>, No. 09 Civ. 3491, 2011 WL 4710818, at *5 (E.D.N.Y. Sept.

20, 2011).

Reasonable accommodations may include "modification of job
duties and schedules, alteration of the facilities in which a job
is performed, acquisition of devices to assist the performance of
job duties," McBride, 583 F.3d at 97, "provision of qualified
readers or interpreters, and other similar accommodations." 42
U.S.C. § 12111(9)(B)). "Once the plaintiff has demonstrated that
there is a 'plausible accommodation, the costs of which,
facially, do not clearly exceed its benefits,' the defendant
bears the burden of proving that the requested accommodation is
not reasonable." McElwee v. Cnty. of Orange, 700 F.3d 635, 642
(2d Cir. 2012) (citation omitted).


             3.   Merits of Tse's Failure to Accommodate Claim
        Plaintiff claims that Defendant failed to provide reasonable
accommodations while she was the Core Director and after her
removal.

        Defendant concedes it is subject to the ADA, NYSHRL, and
NYCHRL.  For purposes of this Motion, NYU avers Plaintiff is
disabled.  Plaintiff has also established the third element.  She
worked as the Core's Director for eleven years and was a research
professor for seventeen years, with much of her employment
coinciding with her disability.  As Director, she hired and
supervised employees, oversaw the provision of flow cytometry

services, and operated the Core within its annual budget.  As a research professor, she performed experiments and conducted studies in order to secure extramural funding.[11]  Because of her disability, she could not use the Core's Aria and Aria II machines, instead needing laboratory assistants to manipulate them.  With the aid of laboratory assistants, Tse was able to perform and was qualified to perform the essential functions of both positions.

With respect to Tse's assertion that she was denied a reasonable accommodation while she was the Core's Director, her claim fails because Defendant provided a reasonable accommodation by hiring Gregory to operate the machines.  "Employees are not entitled to hold out for the most beneficial accommodation, and the employer need not offer the accommodation that the employee

---

[11] Defendants assert that, while Tse was only a research faculty member, the provision of a laboratory assistant who performs experiments would eliminate an essential function of her job.  (Def.'s Reply 5-6.) EEOC regulations define "essential functions" as "the fundamental job duties of the employment," which "does not include marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  As a research faculty member, Tse was not hired to perform experiments; rather, she conceived of studies and research goals, created experiments, conducted and oversaw experiments, analyzed data, and wrote papers describing the experiments' results.  Performing experiments, therefore, was just one component of her job and not a fundamental duty; any other interpretation would mean that all her undergraduate laboratory assistants thereby would be qualified to perform an essential function of the jobs of NYU research professors.

prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." Waltzer v. Triumph Apparel Corp., No. 09 Civ. 288, 2010 WL 565428, at *6 (S.D.N.Y. Feb. 18, 2010) (internal citations and punctuation omitted); Cosme v. Henderson, 287 F.3d 152, 158 (2d Cir. 2002) ("[T]o avoid . . . liability the employer need not offer the accommodation the employee prefers.").

Although Plaintiff asserts Gregory was not a reasonable accommodation because of his high salary and because she wanted postdoctoral fellows instead, that does not make NYU's provision of Gregory as an accommodation unreasonable since he was capable of operating the laboratory machinery, which was the only accommodation Tse needed. Moreover, Plaintiff was provided with two postdoctoral fellows until the end of May 2010—two months after her removal. Accordingly, Defendant's Motion for Summary Judgment regarding Plaintiff's failure to accommodate claim while Tse was the Core's Director is granted.

However, her failure to accommodate claim survives regarding the time between June 1, 2010 and her termination on April 4, 2011. After Tse was removed as the Core's Director, she lost all her accommodations, including Gregory and the postdoctoral fellows. "[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an

accommodation is needed."  <u>Graves v. Finch Pruyn & Co., Inc.</u>, 457
F.3d 181, 184 (2d Cir. 2006).  Tse notified Defendant of her
accommodation need in December 2009 with respect to her position
as the Core's Director.  After her removal, she continued to have
laboratory assistants until the end of May 2010 because they were
provided for in the CFAR budget.  However, there is no evidence
on the basis of the record that Tse ever requested an
accommodation for her position as a research faculty member or
for helping her secure extramural funding.

Even if the employee does not request an accommodation, "an
employer has a duty reasonably to accommodate an employee's
disability if the disability is obvious——which is to say, if the
employer knew or reasonably should have known that the employee
was disabled."  Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135
(2d Cir. 2008); Peterson v. Pan Am Sys., Inc., No. 12 Civ. 1857,
at *4 n. 11 (E.D.N.Y. Aug. 28, 2013) ("This obviousness might
well be found given Plaintiff's allegations that he communicated
with Defendants regarding the severity of his injury and his work
limitations.")

Tse communicated her physical limitations even after her
removal as the Core's Director.  In March 2010, Plaintiff and
Odom discussed "long-term disability as an option if she couldn't
perform the functions of the [research faculty] role."  (Odom

Dep. 33-34.) On May 3, 2010, she emailed Odom and Meagher, discussing her disability, explaining she "did not need to file LTD claims [in May 2008] as my duties did not include performing experiments on a regular basis prior to 06/01/10." (Odom. Dep. Ex. 4.) On May 13, 2010, she wrote a letter to Blaser, which stated, "Performing laboratory experiments on biohazardous specimens . . . requires a level of manual dexterity and fine control I no longer have, which precludes . . . generating preliminary data that is needed to apply for independent funding from extramural sources." (Odom Dep. Ex. 5.) Finally, at an August 2010 meeting with Odom, Blaser, and Cribben, Tse told them, that after her removal as Director, "there was no opportunity for me to secure extramural funding, because I cannot do the experiments that we needed to produce what we call preliminary data in order to secure extramural funding." (Tse Dep. 101-02.) Based on these facts, there is an issue of material fact as to whether her disability was obvious.

If a reasonable jury finds that Tse's disability was obvious, where an accommodation is possible and a plaintiff is qualified for the position, the "failure to engage in a sufficient interactive process" may establish a failure to accommodate claim. McBride, 583 F.3d at 100-02; Brady, 531 F.3d at 135. Accordingly, a jury could find that Defendant failed to

30

engage in a sufficient interactive process after Tse's loss of
postdoctoral fellows beginning on June 1, 2010.[12]  <u>See</u> <u>Morse v.</u>
<u>JetBlue Airways Corp.</u>, – F. Supp. 2d – , 2013 WL 1294629, at *26
(E.D.N.Y. Mar. 31, 2013) (denying summary judgment where the
employer failed to engage in an interactive process); <u>Casseus v.</u>
<u>Verizon N.Y., Inc.</u>, 722 F. Supp. 2d 326, 351 (E.D.N.Y. 2010)
(same).

　　　　"Once the plaintiff has demonstrated that there is a
'plausible accommodation, the costs of which, facially, do not
clearly exceed its benefits,' the defendant bears the burden of
proving that the requested accommodation is not reasonable."
<u>McElwee v. Cnty. of Orange</u>, 700 F.3d 635, 642 (2d Cir. 2012)
(citation omitted).  Tse has met her burden given that she
received accommodations while she was the Core's Director.  NYU,
however, does not argue that providing laboratory assistants when
she only was a research professor was an unreasonable
accommodation or an undue hardship.

　　　　Accordingly, Defendant's Motion for Summary Judgment with

---

[12] Although Defendant accurately asserts that it was not
precluded from removing her as Director, it still may have had a
responsibility to determine whether continuing those
accommodations were still reasonable in light of her research
faculty position.  <u>See</u> <u>Felix v. New York City Transit Auth.</u>, 154
F. Supp. 2d 640, 658 (S.D.N.Y. 2001) ("[T]he ADA regulations
contemplate shifting the burden to the employer to initiate an
interactive process." (citing  29 C.F.R. § 1630.2(o)(3))).

respect to Tse's failure to accommodate claim for the time between June 1, 2010 and her termination is DENIED.

        D.    Hostile Work Environment Claim

            1.    Legal Standards Under the ADA and NYSHRL

        To establish a hostile work environment claim under the ADA and NYSHRL, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[13]   Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir. 2012) (quotations and citation omitted); Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010).  Demonstrating a hostile work environment requires "objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an

_____

        [13] Although the Second Circuit has not yet held that a hostile work environment claim is actionable under the ADA, this Court assumes that Plaintiff can bring a hostile work environment claim under the ADA.   See Margherita v. FedEx Exp., 511 F. App'x 71, 73 (2d Cir. 2013) ("Assuming that the ADA provides a basis for a hostile work environment claim, an issue not yet decided by this Court, [the plaintiff] has failed to present sufficient evidence to support this claim."); Stephens v. Thomas Pub. Co., Inc., 279 F. Supp. 2d 279, 285 (S.D.N.Y. 2003) (allowing an ADA hostile work environment claim survive defendants' motion for summary judgment).

objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Rivera, 702 F.3d at 694.

In determining whether a plaintiff demonstrated the objective element, a court examines "the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the [employee's work] performance." Hayut v. State Univ. of New York, 352 F.3d 733, 745 (2d Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was extraordinarily severe." Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano, 294 F.3d at 374 (quotations and citation omitted).

> 2.   Analysis of ADA and NYSHRL Hostile Work
>       Environment Claims

Tse alleges that the hostile work environment is evidenced

by Valentine's "fix the Aria" and "bad mother" statements, which
verbally attacked her because of her physical inability to fix
the machine.[14]   (Pl.'s Opp'n 22-23.) These statements "do not
rise to the level of altering the conditions of employment"
because they are too isolated and not sufficiently serious.
Douglass v. Rochester City Sch. Dist., — F. App'x — , 2013 WL
2257831, at *1 (2d Cir. May 22, 2013); Thompson v. City of New
York, No. 03 Civ. 4182, 2006 WL 2457694, at *5 (S.D.N.Y. Aug. 10,
2006) ("A few harsh words do not rise to the level of an
actionable offense."); Jessamy v. City of New Rochelle. New York,
292 F. Supp. 2d 498, 511-12 (S.D.N.Y. 2003) ("[C]onduct that can
be categorized as a few isolated incidents, teasing, casual
comments or sporadic conversation will not be deemed to create a
hostile work environment.").  Moreover, those statements do not
demonstrate that Valentine made those statements in reference to
her disability, especially since Tse managed the Aria and could
instruct others to fix the machine.

     Plaintiff's additional factual allegations fail to support

---

[14] Although Tse claims her "staff was incessantly targeted
by Dr. Valentine," she provides no specific support for that
allegation; thereby her conclusory assertion does not satisfy the
requirement to provide admissible evidence to demonstrate hostile
work environment.  See Douglass, 2013 WL 2257831, at *1.  The
same holds true for her allegation that Valentine repeatedly
yelled at her, as she only refers to his two aforementioned
statements.

her claim.  She asserts hostile work environment was evidenced
when (1) NYU employees ignored Tse's disability limitations when
she was not given appropriate temporary laboratory space in 2009,
(2) she was not offered assistance or time to move her office and
laboratory, and (3) she was given insufficient advance notice
that the NIH grant application was due in June 2009.  (Pl.'s
Opp'n 23-24.) Although moving to a temporary space undoubtably
was tedious and difficult, that move and the lack of help does
not establish a hostile work environment, especially since other,
non-disabled, faculty members had to make similar moves and Tse
does not claim she requested help only to be denied.  See Rosario
v. City of New York, No. 11 Civ. 9008, 2013 WL 782408, at *9
(S.D.N.Y. Jan. 9, 2013) (explaining that although the employer's
requirements may be "tedious", "[a] reasonable person would not
find those requirement to be 'hostile'"); Hinton v. City Coll. of
New York, No. 05 Civ. 8951, 2008 WL 591802, at *19 (Feb. 29,
2008) (explaining that while the plaintiff "complains about her
classrooms and teaching schedules, she points to no evidence"
connecting them to "sexist animus").

Plaintiff's notice regarding the NIH grant application
deadline also does not create a hostile environment because she
had ample notice and has not alleged that the notice or deadline
were imposed on account of her disability.  See Johnson v. City

35

of New York, No. 10 Civ. 6294, 2012 WL 1076008, at * 7 (S.D.N.Y.
Mar. 28, 2012) ("There is still no suggestion that any
improprieties in his paychecks were at all related to his
disability.").  Moreover, the CFAR budget needed to be completed
before the NIH grant application was completed, and thereby the
deadline was not because of Tse's disability but rather because
of external forces, including Tse's ongoing budget negotiations.
Mitchell-Miranda v. City of New York, No. 08 Civ. 4031, 2011 WL
1210202, at *8 (S.D.N.Y. Mar. 24, 2011) ("The plaintiff also
offers no evidence suggesting that the City defendants' request
[, which was] . . . consistent with the [its] policy . . . , was
motivated by pregnancy discrimination rather than an effort to
enforce the requirements of [the employer's] directives.").

     Taking all of Plaintiff's allegations and examining them
based on the totality of the circumstances, Tse has failed to
establish a hostile work environment.  See De La Cruz v. City of
New York, 783 F. Supp. 2d, 622, 644 (S.D.N.Y. 2011) (holding that
allegations of work reassignment, schedule changes, increased
scrutiny of plaintiff's work, and a supervisor's stray remarks
were insufficient to establish hostile work environment).
Moreover, none of the conduct occurred due to her disability.
See Alfano, 294 F.3d at 377-78.  Defendant's Motion for Summary
Judgment with respect to Plaintiff's hostile work environment

claims is GRANTED under both the ADA and NYSHRL.

### 3.  NYCHRL Hostile Work Environment Claim

Hostile work environment claims brought pursuant to the NYCHRL "are analyzed under the same provision . . . as discrimination claims." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012); Williams, 872 N.Y.S.2d at 37. With hostile work environment claims, "the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct." Mihalik, 715 F.3d at 114.  Rather, to prevail, a plaintiff must "prove[] by a preponderance of the evidence that she has been treated less well than other employees because of her [protected status]."  Id. at 110; Williams, 872 N.Y.S.2d at 39.  "[Q]uestions of severity and frequency," which under the ADA and NYSHRL are analyzed in hostile work environment claims, are "reserved for consideration of damages."  Williams, 872 N.Y.S.2d at 39.  Nonetheless, "a defendant is entitled to summary judgment based on the conduct's triviality only if a reasonable jury could not interpret the alleged comments as anything 'more than petty slights or trivial inconveniences.'" Mihalik, 715 F.3d at 114 (quoting Williams, 872 N.Y.S.2d at 41).

Tse's hostile work environment claim brought pursuant to the NYCHRL also fails.  As previously explained, Plaintiff never

37

alleges that her laboratory move, temporary laboratory space, or budget deadline were imposed because of her protected status. See Mihalik, 715 F.3d at 110; see also Williams, 872 N.Y.S.2d at 39.  The only instances that could form the basis of Plaintiff's claims are Valentine's two stray comments for Tse to "fix the Aria" and that she was "a bad mother."  These two comments are "nothing more than petty slights . . . and thus are not actionable."  Williams, 872 N.Y.S.2d at 41.  Moreover, the comments "may be viewed by a reasonable employee as a function of [Valentine's] management style, unrelated to . . . discrimination."  Short v. Deutsche Bank Secs., Inc., 913 NY.S.2d 64, 67 (1st Dep't 2010).

Nor was she removed as Director because of her disability given that Valentine recommended in June 2009, after several months of documented warnings and complaints that related directly to her management of the Core, that she be removed. Plaintiff's emphasis on the "bumble" comment does not establish she was treated less well on the basis of her disability.  This is especially true because, read in context, that email was written in response to Tse's threat to quit if she was not given the accommodations she desired and Valentine's inability to hire a manager to help Tse run the Core because of Plaintiff's high salary.  Finally, because Valentine and Lee had already decided

to remove Tse in June 2009, even though Valentine submitted two potential letters notifying Tse that she would be removed as Director on the same day, that he approved Tse's request for an appointment of a new postdoctoral fellow, that coincidence does not establish she was removed on the basis of her disability. This is because he——as a compromise even though Tse had no right to the postdoctoral fellows as an accommodation——had already approved the two postdoctoral fellows through June 2010.

While keeping in mind the "uniquely broad and remedial" purposes of the NYCHRL, the conduct alleged is "far from a borderline" violation.  Price v. Mount Sinai Hosp., No. 07 Civ. 11318, 2010 WL 4910218, at *6 (S.D.N.Y. Nov. 23, 2010); Williams, N.Y.S.2d at 41.  Accordingly, interpreting the facts in the light most favorable to Plaintiff, she cannot demonstrate "by a preponderance of the evidence that she has been treated less well than other employees because of her [disability]."  Williams, 872 N.Y.S.2d at 39.


    E.    Retaliation Claim

    Plaintiff alleges her removal and termination were retaliation for filing claims with the NYSDHR and EEOC and for requesting reasonable accommodations.


39

### 1. Legal Standards

Even where a plaintiff's discrimination claim fails, a retaliation claim may survive.  See, e.g., Treglia v. Town of Manlius, 313 F.3d 713 (2d Cir. 2002); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999). The familiar three-step McDonnell Douglas burden-shifting framework applies to retaliation claims alleged under the ADA and NYSHRL.  Rosinski v. Am. Axle & Mfg., Inc., 402 F. App'x 535, 538 (2d Cir. 2010); Katz v. Adecco USA, Inc., 845 F. Supp. 2d 539, 551 (S.D.N.Y. 2012).  A plaintiff first must establish a prima facie case of retaliation.  Rosinski, 402 F. App'x at 538.  "If the plaintiff demonstrates a prima facie case, that gives rise to a presumption of unlawful discrimination or retaliation, and the burden of production shifts to the defendant, who is required to offer a legitimate, nondiscriminatory rationale for its actions." Id.  If the defendant provides a legitimate reason, the plaintiff burden of persuasion the shifts to the plaintiff.  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Hicks,

40

593 F.3d at 164 (quotations and citations omitted); Katz, 845 F.
Supp. 2d at 551.  Under the ADA, protected activities include
filing a complaint with the EEOC and seeking reasonable
accommodations.[15]  Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263
F.3d 208, 223 (2d Cir. 2001); Weixel v. Bd. of Educ. of City of
New York, 287 F.3d 138, 149 (2d Cir. 2002);  Gioia v. Forbes
Media LLC, No. 09 Civ. 6114, 2011 WL 4549607, at *10-11 (S.D.N.Y.
Sept. 30, 2011).

### 2.    Plaintiff's Prima Facie Case

#### a.    Retaliation for Filing Claims with the NYSDHR and the EEOC

Defendant does not contest that Plaintiff engaged in a
protected activity when she filed complaints with the NYSDHR and
the EEOC on July 24, 2009.  Nonetheless, Plaintiff was not
removed as Director nor terminated from her employment in
retaliation for filing those complaints.

Valentine recommended that Tse be removed as the Core's
Director in June 2009, and on June 5, 2009, Valentine and Lee

---

[15] The Second Circuit has not determined whether seeking a
reasonable accommodation is a protected activity under NYSHRL and
NYCHRL; however, some district courts have held such activity is
not protected.  See Gioia, 2011 WL 4549607, at *11 (collecting
cases).

discussed appointing a new Director or co-Directors for the Core.
Thus, the decision to remove Plaintiff as Director "could not
have been in retaliation for acts not yet taken." Gregory v.
Daly, 243 F.3d 687, 701 (2d Cir. 2001); Pinero v. Long Island
State Veterans Home, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005)
("There can be no inference of retaliatory animus where the
adverse employment action occurred prior to the protected
activity."); McFarlane v. Chao, No. 04 Civ. 4871, 2007 WL
1017604, at *22 n.4 (S.D.N.Y. Mar. 30, 2007). Accordingly,
Plaintiff's claim that she was removed as Director in retaliation
for filing claims with the NYSDHR and EEOC fails because she
cannot establish her prima facie case.[16]

    Plaintiff also fails to establish her prima facie case that
she was terminated for filing claims with the NYSDHR and EEOC.
Although Tse has met the first three elements of her prima facie
case, she fails to demonstrate a causal connection between her
protected activity and her termination, of which she was notified
in a letter dated January 4, 2011.

    "The causal connection needed for proof of a retaliation

_____

    [16] Although the NYCHRL claim needs to be evaluated
separately, "retaliation claims under the NYCHRL . . . require
the employer's awareness of the protected activity." Mayers v.
Emigrant Bancorp, Inc., 796 F. Supp. 2d 434, 450 n.22 (S.D.N.Y.
2011). Thus, Plaintiff's NYCHRL claim fails as well.

claim can be established indirectly by showing that the protected
activity was closely followed in time by the adverse action."
Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001)
(internal quotation marks and citations omitted).  The Second
Circuit has not established a temporal bright line, but courts
have held that gaps shorter than the seventeen-month gap here
vitiate a causal connection.  See, e.g., Dayes v. Pace Univ., 2
F. App'x 204, 208 (2d Cir. 2001) (seven months insufficient);
Castro v. Local 1199, Nat'l Health & Human Servs. Employees
Union, 964 F. Supp. 719, 728 (S.D.N.Y. 1997) (one year
insufficient).

Because there is no "bright line to define the outer limits
beyond which a temporal relationship is too attenuated . . . [a
court may] exercise its judgment about the permissible inferences
that can be drawn from temporal proximity in the context of
particular cases."  Espinal v. Goord, 558 F.3d 119, 130 (2d Cir.
2009); Gorman-Bakos v. Cornell Co-op Extension of Schenectady
Cnty, 252 F.3d 545, 554 (2d Cir. 2001) (collecting cases where
factual circumstances allow for a causal connection even when
there is a lengthy time period between the protected activity and
the adverse action).  In her Opposition, Plaintiff cites to no
evidence demonstrating there was a causal connection between her
July 24, 2009 NYSDHR and EEOC complaints and her termination, nor

43

can the Court find an permissible causal inferences that can be drawn.[17]

Even if Plaintiff established her prima facie case, Defendants offered a legitimate reason for her termination. After August 31, 2010, Tse's extramural funding dropped to five percent.  NYU required research-track professors to secure extramural support for a percentage of their salary, which was fifty-five and sixty percent in 2010 and 2011, respectively. Since Tse's her extramural support dropped below NYU's requisite level, NYU had a legitimate reason for terminating her.

Plaintiff failed to meet her burden at the third step of the McDonnell-Douglass framework: she provides no evidence that would be sufficient for a rational factfinder to conclude her that her protected activity was either the "motivating factor" or "but-for cause" of her termination.[18]  Accordingly, Defendant's Motion for

---

[17] Because she cannot establish a causal connection between her NYSDHR and EEOC complaints and her termination, her NYCHRL claim fails as well.  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  Mihalik, 715 F.3d at 112 (citations omitted).  "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives.'"  Id. at 113 (citations omitted).

[18] The Supreme Court's recent decisions in Gross and Nassar may implicate the causation necessary to prevail on an ADA retaliation claim.  See Gross v. FBL Fin. Servs., Inc., 557 U.S.

Summary Judgment with respect to Plaintiff's claim that she was terminated in retaliation for filing her NYSDHR and EEOC complaints is GRANTED.

> **b.   Retaliation for Requesting Reasonable Accommodations**

Defendant correctly argues that Plaintiff's claim that she was retaliated against for requesting reasonable accommodations is not considered by this Court because Tse did not raise that claim until her Opposition to Summary Judgment.  (Def.'s Reply 9.)  "A party cannot assert a cause of action for the first time in response to a summary judgment motion."  <u>Greenidge v. Allstate</u>

---

167, 176 (2009); <u>Univ. of Texas Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. -- , 133 S.Ct. 2517, 2534 (2013).  Prior to Gross and Nassar, the Second Circuit held that a plaintiff may meet her burden by "point[ing] to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation," Cifra 252 F.3d at 216, by "com[ing] forward with evidence establishing that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against him."  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932 (2d Cir. 2010).  The Nassar Court held that a plaintiff claiming retaliation under Title VII must show her "protected activity was a but-for cause of the alleged adverse action by the employer."  133 S.Ct. at 2524.  The Second Circuit has not yet articulated what standard now applies for ADA retaliation claims, yet Plaintiff's claim would fail under either standard.

Ins. Co., 312 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2004).

Indeed, Plaintiff's Amended Complaint never alleges she was retaliated against for making her request.  The closest she comes to making such a claim is when she alleges that her protected activity included "oppos[ing] the discriminatory employment practices of NYU . . . [and] requesting aid and intervention through [NYU's] dispute resolution mechanisms."  (Am. Compl. ¶¶ 73, 89, 105, 121.) This allegation, however, refers to Lee's June 3, 2009 email explaining that the budgetary issues Tse was "are not considered grievable under [the] faculty handbook."  (Risman Decl. Ex. S, at 2.) The dispute resolution mechanisms in no way relate to her accommodation request.

Plaintiff, therefore, raised this claim for the first time in her Opposition.  Accordingly, the Court will not consider Plaintiff's claim that she was retaliated against for requesting for accommodations.  See Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006) ("The complaint does not make any reference to Allstate's alleged failure to disclaim coverage under the second policy."); Mauro v. S. New England Telecomm., Inc., 208 F.3d 385, 386 n.1 (2d Cir. 2000) (upholding the district court's refusal to consider a claim first alleged in a plaintiff's opposition papers).

III. Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, as follows:

(1) Defendant's Motion for Summary Judgment is GRANTED as to all of Plaintiff's Rehabilitation Act claims;

(2) Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's disparate treatment disability discrimination, hostile work environment, and retaliation claims brought under the ADA, NYSHRL, and NYCHRL; and

(3) Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's failure to accommodate claims brought under the ADA, NYSHRL, and NYCHRL while Plaintiff was the Core's Director, but DENIED as to Plaintiff's failure to accommodate claims brought under the ADA, NYSHRL, and NYCHRL between June 1, 2010 and her termination on April 4, 2011.

Proposed Requests to Charge and Proposed Voir Dire shall be submitted by November 12, 2013. A Joint Pre-trial Statement ("JPTS") shall be submitted by November 12, 2013. The JPTS shall conform to the Court's Individual Practices and Supplemental Trial Procedure Rules. Memoranda of Law addressing those issues

47

raised in the JPTS shall be submitted by November 12, 2013.

Responses to the Memoranda shall be submitted by November 26, 2013.  There shall be no replies.

SO ORDERED.

DATED:    New York, New York

          September 19, 2013


          _____
          Deborah A. Batts
          United States District Judge