G6D5tse1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DORIS TSE,

4                  Plaintiff,

5            v.                              10 Civ. 7207 (DAB)

6  NEW YORK UNIVERSITY,

7                  Defendant.

8  ------------------------------x

9                                      June 13, 2016
                                       10:35 a.m.
10 Before:

11                  HON. DEBORAH A. BATTS,

12                                      District Judge

13                       APPEARANCES

14 DORIS TSE, Pro Se

15 CERASIA & DEL REY-CONE, LLP
        Attorneys for Defendant
16 BY:  EDWARD CERASIA, II
            – and –
17      DANIEL T. DREISEN, in-house counsel, New York University

18

19

20

21

22

23

24

25

G6D5tse1

| | |
|---|---|
| 1 | (Trial resumed) |
| 2 | THE COURT:  Doris Tse versus New York University. |
| 3 | Is the plaintiff ready? |
| 4 | MS. TSE:  Yes, I am. |
| 5 | THE COURT:  Good morning, Dr. Tse. |
| 6 | MS. TSE:  Good morning, your Honor. |
| 7 | THE COURT:  On behalf of New York University we have |
| 8 | Mr. Ed Cerasia. |
| 9 | MR. CERASIA:  Good morning, your Honor. |
| 10 | THE COURT:  And Daniel Driesen. |
| 11 | MR. DRIESEN:  Yes, ma'am.  Good morning. |
| 12 | THE COURT:  Good morning. |
| 13 | So, we can commence.  Who is the first witness? |
| 14 | MS. TSE:  Before we do, I would like to request |
| 15 | permission to question the witness from here rather than the |
| 16 | lectern because I am afraid I will not be able to stand for |
| 17 | more than 30 minutes. |
| 18 | THE COURT:  You certainly may. |
| 19 | MS. TSE:  Thank you. |
| 20 | THE COURT:  Just make sure you use the microphone. |
| 21 | MR. DRIESEN:  I will get him, your Honor. |
| 22 | THE COURT:  Good morning.  Please, step forward. |
| 23 | Good morning.  Would you remain standing and raise |
| 24 | your right hand? |
| 25 | MARTIN BLASER, |

G6D5tse1                          Blaser - direct

1           called as a witness by the Plaintiff,

2           having been duly sworn, testified as follows:

3                THE COURT:  Now, would you take that microphone and

4    direct it more to you, and you can pull your chair in and make

5    yourself comfortable.

6                THE WITNESS:  Okay.

7                THE COURT:  Would you state and spell your full name?

8                THE WITNESS:  My name -- excuse me.  My name is Martin

9    Blaser.  B-L-A-S-E-R.

10                THE COURT:  And how do you spell Martin?

11                THE WITNESS:  Martin.  M-A-R-T-I-N.

12                THE COURT:  Thank you.

13                You may, proceed.

14   DIRECT EXAMINATION

15   BY MS. TSE:

16   Q.  Hello, Dr. Blaser.

17   A.  Good morning.

18   Q.  Good morning.  We know each other well?

19                THE COURT:  Dr. Tse, do me a favor; move the

20   microphone a little closer to you?

21                MS. TSE:  Is this better?

22                THE COURT:  Yes.

23   BY MS. TSE:

24   Q.  I am Doris Tse and I am representing myself, the plaintiff.

25   Have you testified in court before?

G6D5tse1                    Blaser - direct

1    A.  I have.

2    Q.  Most of my questions will be yes or no.  You will be

3    presented with exhibits.  If you need more time to look them

4    over, please, let me know.

5         Dr. Blaser, what is your current position at the NYU

6    School of Medicine?

7    A.  I am the Muriel and George Singer Professor of

8    Translational Medicine, Professor of Microbiology, and I direct

9    the Human Microbiome -- M-I-C-R-O-B-I-O-M-E -- Program at NYU.

10        THE COURT:  Let me just interrupt for a second.

11        Dr. Blaser, we are not scientifically oriented so

12   whenever you say anything scientific of at least three

13   syllables, please be sure to spell it for us?

14        THE WITNESS:  I will.  Thank you.

15        THE COURT:  Thank you.

16   BY MS. TSE:

17   Q.  What was your position at the NYU School of Medicine from

18   April 2010 through April 2011?

19   A.  I served as the Chair of the Department of Medicine.

20   Q.  Were you deposed on September 28th, 2011 by Dr. Tse's

21   counsel at the offices of Seyfarth & Shaw in New York?

22   A.  I don't remember the precise date, but that sounds about

23   right.

24        MS. TSE:  Please accept Exhibit 1, Blaser deposition,

25   into evidence?

G6D5tse1                        Blaser – direct

1              THE COURT:  Well, that is not necessarily how we do

2   things.

3              If you have certain parts of the deposition that you

4   would like to use to question Dr. Blaser, that's fine, but the

5   deposition is not in replacement of his testimony since he is

6   here today.  So, would you just ask him whatever questions

7   directly and he can answer?

8              MS. TSE:  Yes, your Honor.

9   BY MS. TSE:

10  Q.  You testified that there were about a thousand faculty

11  members under your supervision at the time; is that correct?

12  A.  Yes; more than a thousand.

13  Q.  Please describe your responsibilities to the faculty

14  members in your department.

15  A.  As chair of medicine I had multiple responsibilities.  I

16  was appointed by the Dean of the School of Medicine which in

17  the School of Medicine he was the ultimate authority.

18              As Chair of Medicine I had responsibility to students,

19  house staff, staff, and faculty to help them in their career

20  development, have a safe and honest workplace, and to

21  adjudicate disputes.

22  Q.  And the Dean at that time would be Dr. Steven Abramson?

23  A.  The Dean of the School of Medicine at that time was

24  Dr. Robert Grossman.

25  Q.  Okay.

1         And where does Dr. Steven Abramson, who is the vice

2    Dean of faculty, fit into all of this?

3    A.  The Dean of the School of Medicine had appointed a number

4    of vice deans for different areas and Dr. Abramson was the Vice

5    Dean for Faculty and Education.

6    Q.  Were you Dr. Tse's supervisor before and after she was

7    removed as the CFAR flow cytometry -- C-Y-T-O-M-E-T-R-Y -- core

8    director on April 1st, 2010?

9         THE COURT:  Dr. Tse --

10   Q.  I will repeat the question.  I'm sorry.

11        Were you Dr. Tse's supervisor before and after she was

12   removed as the CFAR flow cytometry core director on April 1st,

13   2010?

14   A.  Yes.  Dr. Tse was -- you -- were a member of the Department

15   of Medicine, of the faculty of the Department of Medicine, and

16   ultimately under my responsibility.

17   Q.  Can we present this to Dr. Blaser?  That would be Exhibit

18   2.

19        THE COURT:  Bear with me just one second.

20        Do you have it, Mr. Cerasia?

21        MR. CERASIA:  Yes.  I have no objection.

22        THE COURT:  You may present it.

23        MR. CERASIA:  Your Honor, sorry.  May I be heard about

24   something?

25        THE COURT:  Certainly.

G6D5tse1                            Blaser - direct

1              MR. CERASIA:  I notice this exhibit is different.

2      Dr. Tse submitted new exhibits today and it looks like she has

3      underlined all of her exhibits.  I will state that I don't

4      believe any of this underlining was in the original exhibit.  I

5      think she did that with all of them, from what I can gather, in

6      certain parts of them.

7              MS. TSE:  I just wanted it easier.  It is just to

8      facilitate the questioning of the witnesses so they won't have

9      to read through the entire document.

10             THE COURT:  Although they do have a right to do so, if

11     they want to.

12             MS. TSE:  Yes, I understand.

13             After I direct them to the underlined portions they,

14     of course, are totally free to read the entire piece.

15             THE COURT:  Do you --

16             MS. TSE:  Yes, I do have a question.

17             THE COURT:  Bear with me just one second.  Did you

18     offer this in evidence?

19             MS. TSE:  Yes.  JPTS Exhibit number for that was 9E.

20             THE COURT:  And it is now Plaintiff's Exhibit 2?

21             MS. TSE:  Yes.  I didn't realize I would cause so much

22     trouble.  I eliminated about half of the exhibits that was in

23     the JPTS because I was asked to streamline so streamline, I did

24     streamline.  I just didn't realize that I should have kept the

25     original exhibit numbers.

1           THE COURT:  But you have provided a key?

2           MS. TSE:  Yes.  There is a key on the front page.

3           THE COURT:  All right.

4           MS. TSE:  And a copy was given to Mr. Cerasia as well.

5           THE COURT:  All right.  So, Plaintiff's Exhibit 2

6   received in evidence.

7           MS. TSE:  Thank you.

8           (Plaintiff's Exhibit 2 received in evidence)

9   BY MS. TSE:

10  Q.  May I continue, Dr. Blaser?

11  A.  Yes, please.

12  Q.  So, you were Dr. Tse's supervisor before and after she was

13  removed as the CFAR flow cytometry core director.  Was CFAR a

14  division within the Department of Medicine from April 2010

15  through April 2011?

16  A.  The answer is a little complex because the CFAR function at

17  the level of the school and at the level of the department.

18  CFAR was a school-wide center.  Administratively, it was housed

19  in the Department of Medicine.

20  Q.  So you were not directly responsible for or had

21  jurisprudence over the operation of the CFAR?

22          THE COURT:  I'm sorry.  I don't understand the

23  question.

24          MS. TSE:  Dr. Blaser just said that CFAR was

25  administratively a division within the Department of Medicine

G6D5tse1                         Blaser - direct

 1  which would put CFAR under his purview.  The question I have is

 2  operationally, was the CFAR also under your purview.

 3          THE COURT:  Before you answer that, I'm not getting a

 4  feed.

 5          (Pause)

 6          THE COURT:  All right.  The last question before I

 7  interrupted was:  So, you were not directly responsible for, or

 8  had jurisprudence over the operation of the CFAR?

 9          THE WITNESS:  So, again, to reiterate, the

10  administrative system was complex.  The CFAR was a unit of the

11  School of Medicine.  The dean appointed Dr. Valentine as the

12  Director of the CFAR but, administratively, the CFAR was housed

13  within the Department of Medicine.  So we helped the CFAR with

14  all of the work on hiring, purchasing, all the administrative

15  aspects.  And of course Dr. Valentine and yourself also were

16  members of the Department of Medicine.

17  BY MS. TSE:

18  Q.  So, Dr. Valentine was under your supervision or you were

19  Dr. Valentine's supervisor?

20  A.  Yes, but he was also under the direct supervision of the

21  dean as CFAR director.

22  Q.  Was that why he copied you on the letter?

23  A.  I don't -- well, as a matter of form, for administrative

24  purposes that would be normal for him to copy me.

25  Q.  Exhibit 3 is a letter you wrote in 2005 to Dr. Glickman who

G6D5tse1                         Blaser - direct

1   was then the Dean of the School of Medicine.

2             May I approach, your Honor?

3             THE COURT:  You may.

4   Q.  When you have a chance to examine the letter, please, let

5   us know.  And read the underlined section and anything else

6   that you want to report.

7             THE COURT:  Well, you have to read it to yourself,

8   Dr. Blaser, until it is offered and received in evidence.

9   A.  I have finished reading it.

10            THE COURT:  Is that your signature on the document?

11            THE WITNESS:  That is.

12            MS. TSE:  Please admit Exhibit 3 into evidence.

13            THE COURT:  Any objection?

14            MR. CERASIA:  I don't, your Honor, but I did note that

15  we had one in the pretrial order but at this point I will

16  withdraw the objection.

17            THE COURT:  All right.

18            MR. CERASIA:  It is a little old, but --

19            THE COURT:  All right.

20            MR. CERASIA:  -- compared to the events here.

21            THE COURT:  So that the letter dated May 9th, 2005, it

22  is Plaintiff's Exhibit 3, it is received in evidence.

23            (Plaintiff's Exhibit 3 received in evidence)

24  BY MS. TSE:

25  Q.  Please read the underlined section or anything else that

G6D5tse1                          Blaser - direct

1    you would like to report.

2    A.  It is important to note that Dr. Tse was seriously injured

3    in an automobile accident in 1997 and was diagnosed with SLE in

4    1999.  The letter has prompted hospitalization on several

5    occasions and has also required high-dose corticosteroid

6    therapy.  Despite these difficulties, Dr. Tse contributes

7    substantially to the research programs in the Department of

8    Medicine and School of Medicine and exhibits recognized

9    expertise in creative initiative.  Despite the hiatus due to

10   illness, she has taught and published continuously.

11   Q.  So, it is safe to say that since 2005 you were aware of

12   Dr. Tse's medical impairments?

13   A.  Yes.

14   Q.  And despite these limitations Dr. Tse was promoted to

15   associate research professor around September 2005.  Do you

16   remember that as such?

17   A.  I don't remember the date.

18   Q.  Okay.

19            May I approach, your Honor?

20            THE COURT:  You may.  What exhibit are you looking at?

21            MS. TSE:  Exhibit 4.  They're in sequential order.

22   That makes it more convenient but it messes everything else up.

23   The document is Bates stamped NYU 003538.

24   BY MS. TSE:

25   Q.  You may not have seen that before because it's actually

G6D5tse1                              Blaser – direct

1    produced by human resources.

2              THE COURT:  Any objection, Mr. Cerasia?

3              MR. CERASIA:  I don't, your Honor.

4              THE COURT:  All right.  Plaintiff's Exhibit 4 received

5    in evidence.

6              (Plaintiff's Exhibit 4 received in evidence).

7    BY MS. TSE:

8    Q.  Exhibit 5 is an e-mail that Dr. Tse sent to you in March

9    2007.

10             May I?  That's Exhibit 5?

11             THE COURT:  Do you have any questions for Dr. Blaser

12   on Exhibit 4?

13             MS. TSE:  No.  No.  That's just to confirm my

14   promotion in 2005.

15             THE COURT:  All right.

16             Turning to Exhibit 5.

17             MS. TSE:  I mean, yes, Exhibit 5.  That exhibit was

18   Bates stamped Plaintiff's Exhibit 004.

19             THE COURT:  Any objection, Mr. Cerasia?

20             MR. CERASIA:  I do, your Honor.  I just believe it is

21   irrelevant.  It is an e-mail from 2007.

22             MS. TSE:  It confirms that NYU was aware of Dr. Tse's

23   impairments from that --

24             THE COURT:  I think your other exhibits, especially

25   the one signed by Dr. Blaser, makes it very clear that they

G6D5tse1                          Blaser - direct

1      were aware of your disabilities.

2                  MS. TSE:  This one is a request for accommodation.

3                  THE COURT:  But this is not the relevant time period,

4      is it?

5                  MS. TSE:  No, but it goes to show that NYU not only

6      has received a request for accommodations from me before the

7      time period but they have responded to and provided me with the

8      requested accommodation.

9                  THE COURT:  But this was not during a time period that

10     is at issue, correct?

11                 MS. TSE:  Yes, that's correct.

12                 THE COURT:  All right.  Objection sustained as to

13     Plaintiff's Exhibit 5.

14     BY MS. TSE:

15     Q.  Exhibit 6 is a letter that I sent you on May 13th, 2010

16     Bates stamped NYU 003909.

17                 May I approach, your Honor?

18                 THE COURT:  You may.

19     Q.  We are looking at Exhibit 6.  The letter was also copied to

20     Dr. Abramson and Reggie Odom, the VP of Employee Relations.

21     Would you authenticate this letter for the Court?

22     A.  This is a letter addressed to me on May 13th, 2010.  It is

23     likely that I received it.

24                 THE COURT:  But at this moment you don't have any

25     present recollection you received it?

G6D5tse1                              Blaser - direct

1              THE WITNESS:  I don't have a recollection of this

2      letter but I have a recollection about this issue, about

3      permanent long-term disability.

4              THE COURT:  All right, so --

5      Q.  Nonetheless, would you mind reading the boxed section?

6              THE COURT:  Wait, wait, wait.

7              MS. TSE:  I'm sorry, your Honor.  I didn't mean to

8      interrupt.

9              THE COURT:  Mr. Cerasia?

10             MR. CERASIA:  I have no objection, your Honor.

11             THE COURT:  All right.  Plaintiff's Exhibit 6 received

12     in evidence.

13             (Plaintiff's Exhibit 6 received in evidence)

14             THE COURT:  You may proceed.

15     BY MS. TSE:

16     Q.  Please read the boxed paragraph to the Court.

17     A.  I am hereby requesting long-term disability leave

18     pertaining to 65 percent of my time and effort at NYUSM

19     starting June 1, 2010.  Performing laboratory equipped

20     experiments on biohazardous specimens (human fluids and tissue

21     isolates) requires a level of manual dexterity and fine control

22     I no longer have which precludes increasing my time and effort

23     on collaborative projects with Drs. W. Rom, R-O-M, J. Reibman,

24     R-E-I-B-M-A-N and G. Young for generating preliminary data that

25     is needed to apply for independent funding from extramural

G6D5tse1                           Blaser - direct

1    sources.

2    Q.  Do you consider that you were duly informed then by Dr. Tse

3    that she could not fulfill the responsibilities of her position

4    because of her disability?

5    A.  That's a legal question.  I don't know if I can answer

6    that.  It is clear that you were requesting long-term

7    disability leave and, as I remember, the department was quite

8    supportive of your request.

9    Q.  The letter specifically says that, "Performing laboratory

10   experiments requires a level of manual dexterity and fine hand

11   control I no longer have."

12            Now, can you please explain to the Court why one would

13   need manual dexterity and fine hand control to do experiments

14   and also why I would need preliminary data in order to apply

15   for independent funding?

16            MR. CERASIA:  I am just going to object to the extent

17   it is compound, your Honor.

18            THE COURT:  Yes.  The objection to form is sustained.

19            Who is the gentleman who just came in?

20            MR. GASBURY:  Your Honor, I am a member of the bar.  I

21   am just here to observe.

22            THE COURT:  Thank you.

23            MR. GASBURY:  My name is Gasbury.

24            THE COURT:  Thank you.

25   BY MS. TSE:

G6D5tse1                          Blaser - direct

1    Q.  Let me simplify that.

2              First, can you explain to the Court why -- and if you

3    don't agree, say so -- performing laboratory experiments

4    requires manual dexterity and fine control of the hands?

5    A.  I'm certain that the kinds of experiments you were

6    performing would have required manual dexterity.

7    Q.  Okay.

8    A.  I am certain of that.

9    Q.  And please then explain to the Court why generating

10   preliminary data is essential to applying for extramural

11   funding on projects that are independent of the CFAR?

12   A.  Most grants to the NIH require -- they don't absolutely

13   require but it is important to have preliminary data to support

14   the hypothesis being tested in the grant.  So, preliminary data

15   is important but it can come from a variety of sources.

16   Q.  And if you have been removed from a particular project you

17   would pretty much -- like Dr. Tse -- have to start out fresh;

18   is that right?

19             MR. CERASIA:  Objection.

20             THE COURT:  Sustained as to form.

21   BY MS. TSE:

22   Q.  All right.  Let me rephrase that.

23             Since I was removed as the CFAR cytometry flow core

24   director which was 65 percent of my effort at the school, in

25   order for me to replenish that 65 percent effort I would have

G6D5tse1                         Blaser - direct

1   to apply and get funded on new research projects; is that

2   right?

3   A.   I think the answer is a little complicated.

4        You told us, you informed us that you had a disability

5   and wanted long-term disability which the department was

6   supportive of and, as I understood it, your request for 65

7   percent disability isn't really possible.  The department and

8   the school supported you for a hundred percent disability.  So,

9   based on your condition the department wanted -- wanted to help

10  you obtain the disability support to the maximum extent that

11  you were entitled to.

12       As a member of the non-tenured research track at the

13  university all your efforts have to be supported by grant

14  support and that grant support could come from grants that you

15  wrote or grants that another member of the faculty wrote that

16  would include your efforts in one form or another that would

17  help support your salary.

18  Q.   Which was the case in May 2010 and I will be providing

19  evidence to support that allegation.  But, meanwhile, let's

20  continue with Dr. Blaser.

21       You testified that your graduate student MaryAnn Pohl

22  worked with Dr. Tse; is that correct?

23  A.   That's correct.

24  Q.   And the project required using flow cytometry to study

25  bacteria; is that right?

G6D5tse1                          Blaser - direct

1    A.   That's correct.

2    Q.   And, together with MaryAnn, Dr. Tse developed what was

3    considered an innovative methodology at that time to allow her

4    to study the bacteria; is that correct?

5              MR. CERASIA:  Your Honor, I'm just going to lodge an

6    objection because I believe this is a fair time outside of the

7    2010 to '11 time period.

8              THE COURT:  Yes.

9              Dr. Tse, what is the relevance of this line of

10   questioning?

11             MS. TSE:  To provide evidence that I am competent

12   because that was called into question at the pretrial

13   conference.

14             THE COURT:  That you were competent?

15             MS. TSE:  Yes.  This goes to show that I could perform

16   my job if I was provided with the necessary accommodations, my

17   job as a research scientist at NYU.

18             THE COURT:  All right, I will allow this.

19   BY MS. TSE:

20   Q.   All right, let me run that question by you again.

21             And, together with MaryAnn, we developed what was then

22   an innovative methodology to allow her to study bacteria using

23   flow cytometry; is that right?

24   A.   This work goes back many years, as you know, and as you

25   know, MaryAnn was a graduate student working under my

G6D5tse1                          Blaser - direct

supervision and we had a problem that required flow cytometry

and I recommended to MaryAnn that she contact you to work with

you on developing methodologies to study bacteria.  I know that

MaryAnn worked with you.  I don't know whether she operated the

flow machine or you operated the flow machine or a third person

operated the flow machine, but the work, in total, was quite

satisfactory and it led to publication and certainly, in my

mind, there was no question about your competence, technically.

Q.  And, the results of this project, if you will recall, were

published in the Journal of Experimental Medicine which is a

highly prestigious journal around December 2009; is that about

right?

A.  That's correct.

Q.  All right.

        I am going to present you with Exhibit 2 again, that

is the letter of termination from Dr. Valentine.

        May I, your Honor?

        THE COURT:  Certainly.

        MR. CERASIA:  Help me out.  What is the new number of

that exhibit, Dr. Tse?

        MS. TSE:  That is Exhibit 2.

        MR. CERASIA:  Oh, you are re-showing it.

        MS. TSE:  Yes.

Q.  So, we are talking about four months between a publication

in a prestigious journal and your testimony just now that I am

G6D5tse1                          Blaser – direct

competent.  Please explain to the Court why you did not find it

strange that within three short months after a 15-year career

at NYU, Dr. Tse had somehow degenerated to the level of

incompetence alleged by Dr. Valentine in the termination

letter?

          THE COURT:  Sustained.  Objection sustained.

          MR. CERASIA:  Thank you.

          MS. TSE:  I did not receive reasonable accommodations

from the school until I was removed as director of the CFAR

flow cytometry core, and with your permission, we can skip over

Dr. Blaser's explanation but I would like to include, in

consideration, that that is a causal connection to failure to

accommodate on the part of my employer.

          (Continued on next page)

G6D3TSE2                          Blaser - direct

1            THE COURT:  Okay.  This is a letter that Dr. Blaser

2     was copied on but he did not write it.  It was signed by

3     Dr. Valentine.  Asking him why Dr. Valentine thought this is

4     not appropriate.

5            MS. TSE:  All right.  I will rephrase it then.

6     Q.  Did you find it strange, upon reading this letter, that

7     Dr. Tse had become incompetent within three short months?

8     Dr. Valentine's letter was dated March 4.  2010.

9            MR. CERASIA:  Objection.

10           THE COURT:  Sustained.

11           MS. TSE:  I was asking for Dr. Blaser's opinion,

12    because after I was removed as the CFAR flow cytometry core, he

13    essentially became my direct supervisor.

14           THE COURT:  So is your question to Dr. Blaser did he

15    consider you incompetent in March of 2010?

16           MS. TSE:  Yes.

17           THE COURT:  But this is in relation to the CFAR from

18    which you had been removed?

19           MS. TSE:  Yes.  And whether he considered incompetence

20    was the basis for my removal.

21           THE COURT:  That's too vague, Dr. Tse.  I assume

22    you're talking about the second paragraph of Exhibit 2, which

23    states "On multiple occasions I," meaning Dr. Valentine, "have

24    articulated my concerns about your ability to manage the core.

25    But despite these discussions, you have been unable to

G6D3TSE2                          Blaser - direct

1    successfully perform your duties as director, CFAR flow

2    cytometry core.  For this reason, and in order to improve the

3    chances of success in our approaching reapplication for the

4    CFAR, your role as director of the CFAR flow cytometry core is

5    terminated as of April 1st, 2010."

6         So, there are two separate issues here, Dr. Tse.

7    Whether or not you were competent as director of the CFAR flow

8    cytometry core is not really relevant to whether or not you

9    were denied an accommodation.

10        MS. TSE:  The causal connection there is that when I

11   was the director of the CFAR flow cytometry core, the budget

12   provided not only for 65 percent of my salary, but also for

13   salary, and I will be supporting -- I will be providing

14   evidence to show that, it also supported the salary of three,

15   sometimes more, laboratory staff.

16        THE COURT:  Yes, but, I'm sorry to interrupt you, but

17   the problem here is that this letter is addressed to your

18   ability to manage the work of the CFAR flow cytometry core.

19   And that is not really relevant to whether or not they denied

20   you an accommodation.

21        Now, I know that you feel that because you didn't need

22   it before you were removed, that there is a causal connection.

23   But, for purposes of what we are on trial for now, the question

24   is whether after the time you were removed, you were provided a

25   reasonable accommodation.  So, I don't really know that this

G6D3TSE2                          Blaser - direct

1    letter is of use here.

2              MS. TSE:  All right.  I will continue then with what I

3    have.

4              We were up to Exhibit 6, which we will make do with

5    Dr. Blaser's testimony that he worked with me, or his graduate

6    student worked with me when I was the director of the flow

7    cytometry core, and he has no reason to consider that I was

8    incompetent and I could not fulfill my job expectations at the

9    NYU School of Medicine as an assistant research professor in

10   that respect.

11   Q.  Is that correct?

12             THE COURT:  It is a little premature.  We're not doing

13   summations at this point.  You're only asking questions of this

14   witness to support your case.  So, I believe you've asked

15   everything that you -- or have you asked everything that you

16   wanted on Plaintiff's Exhibit 6?

17             MS. TSE:  No.  Yes, I have.  And oh, I have one more

18   question for Dr. Blaser.

19   Q.  You testified that you worked with Mr. Odom regarding my

20   faculty appointment.

21             THE COURT:  You mean just now today?

22             MS. TSE:  No, no, back in the date of the letter.  May

23   of 2010.

24   Q.  And that was why I had copied the letter to Mr. Odom.  But

25   when you testified during your deposition, you said that you

G6D3TSE2                      Blaser - direct

1    had worked with Mr. Odom --

2              THE COURT:  Why don't we not worry about what he said

3    in his deposition, but just ask him the question now whether he

4    worked with Mr. Odom.

5              MS. TSE:  All right.  I will rephrase the question.

6    Q.  Do you remember working with Mr. Odom from human resources

7    at the time that my continuing appointment in the department

8    came up?

9    A.  I worked with Mr. Odom for many years over a number of

10   different issues, and certainly we worked together with

11   relation to your situation.

12   Q.  Did he make you aware, because he was aware, and I will be

13   providing --

14             THE COURT:  Wait.  Dr. Blaser doesn't know what

15   Mr. Odom was aware of.

16             MS. TSE:  All right.  I will rephrase.

17   Q.  Were you aware that after I was removed as the CFAR flow

18   cytometry core director, and specifically during your

19   discussions with Mr. Odom, did he make you aware that I would

20   require laboratory assistants in order to perform my duties as

21   an associate research professor, specifically to meet the

22   school's requirement for extramural funding?

23   A.  I don't believe --

24             MR. CERASIA:  Objection, your Honor.

25             THE COURT:  Sustained.  It is a compound question.

G6D3TSE2                    Blaser - direct

1    Let's talk about what Dr. Blaser knew, and then if you have

2    reason to believe that he had learned something from Mr. Odom,

3    you can put that question.

4    Q.  Okay.  Were you aware by May 13 or before, right after I

5    was removed as the flow cytometry core director, which started

6    April 1st, 2010, that I would require laboratory assistants in

7    order to continue my job as an assistant research professor in

8    medicine, and meet the required extramural funding standards of

9    the school?

10          MR. CERASIA:  I have the same objection, your Honor.

11   I think there's two questions in there at least.

12   Q.  You just explained --

13          THE COURT:  Wait.  Dr. Blaser, were you aware that

14   Dr. Tse would need laboratory assistants in order to continue

15   in her job as an assistant research professor in medicine?

16          THE WITNESS:  I'm not certain.  I'm not certain

17   whether I was aware of that or not.  Whether that specific

18   issue was brought to my attention.  I knew that Dr. -- with her

19   removal as core director, Dr. Tse, in order to stay on the

20   faculty, would have to bring in salary support from a number --

21   from any one of different sources.  She at that time had

22   partial support, up to 35 percent.  And I don't know -- I was

23   not aware of her exact situation vis-a-vis trying to cover the

24   rest.  But, in general, our expectation is that everyone would

25   try to cover the rest.

G6D3TSE2                        Blaser - direct

1              THE COURT:  So, at this time, you were not aware that

2       she needed laboratory assistants in order to be able to make

3       the requirements of extramural funding.

4              THE WITNESS:  During that time period, which is some

5       time ago, I know that Dr. Tse was talking about doing

6       experiments herself.  And I don't know at which point this came

7       up that she would need assistants or not.

8              THE COURT:  All right.

9       BY MS. TSE:

10      Q.  So at the time that I was removed as the core director,

11      which was April 1st, 2010, you may not have been aware that I

12      needed laboratory assistants or reasonable accommodations in

13      the form of laboratory assistants in order to meet the school's

14      required extramural funding or REF, but --

15             THE COURT:  No.  Answer that yes or no, please,

16      Dr. Blaser, and then if you want to --

17             MS. TSE:  No, I'm sorry.  Shall I rephrase the

18      question?  Yes.

19      Q.  At the time I was removed as the flow cytometry core

20      director, by Dr. Valentine, April 1st, 2010, did you realize

21      that, upon that happening, I would require laboratory

22      assistants in order to fulfill my job expectations, which is --

23             THE COURT:  No.  That's a good spot there.

24             Dr. Blaser, can you answer that yes or no?

25      A.  I don't think that I knew that you needed laboratory

G6D3TSE2                        Blaser - direct

1    assistants.

2    Q.  You just explained to the Court that as a research

3    scientist, I would need preliminary data in order to apply for

4    grants from the NIH, for example.

5    A.  I explained to the Court that preliminary data is usually

6    needed.  And that it could come from your own efforts or it

7    could come from your colleagues like Dr. Rom or Dr. Reibman or

8    Dr. Young in their applications, plus your past publication

9    record.

10            So, I don't think it was absolutely necessary that you

11   do the experiments.  But, that there was a constellation of

12   efforts and data that could help support a grant proposal.

13   Q.  But on May 13, 2010, when I sent you the letter, which is

14   Exhibit 6, did you then realize that I needed laboratory

15   assistants?

16   A.  Your letter said that you're requesting long-term

17   disability because it requires a level of manual dexterity and

18   fine control I no longer have.  And I accepted that at face

19   value.

20   Q.  All right.  So you did not interpret that letter to mean

21   that if I had the laboratory assistants that I needed to

22   generate preliminary data, I would be given the opportunity to

23   apply for grants and meet the school's REF?

24   A.  That's not what your letter says.  Your letter requests

25   being put on disability leave.  Which I was supportive of,

G6D3TSE2                        Blaser - direct

1    based on your statement that you no longer had hand control.

2    Q.  And Mr. Odom did not convey to you that I was applying for

3    long-term disability because I no longer have the laboratory

4    assistants that I needed to do my job?

5    A.  I don't remember what he said to me or not.  But I don't

6    remember that you ever came to me and said "I need laboratory

7    assistants to do my job."  It's possible you did, I have no

8    memory of that.

9    Q.  Did Mr. Odom explain to you that I would be considered a

10   qualified individual under the Americans with Disabilities Act?

11   A.  I don't remember if he said that or not.

12   Q.  So, he most likely did not convey to you that, as my

13   employer, NYU would be responsible to provide me with

14   reasonable accommodations for my medical impairments, which you

15   were aware of?

16            MR. CERASIA:  Objection.

17            THE COURT:  Sustained as to form.

18            MS. TSE:  I will rephrase that.

19   Q.  Since Mr. Odom did not convey to you that I am a qualified

20   individual under the ADA, did he convey to you that NYU, as my

21   employer, has legal obligations to me as such an individual?

22   A.  In general, over the years with the large department of

23   medicine, I've had many dealings with the human resources staff

24   of the school.  And as far as I knew, they were always in touch

25   with legal requirements, they were very careful to take care of

G6D3TSE2                    Blaser - direct

1    all legal requirements.

2              So, I don't have any memory one way or the other

3    whether he made that statement or not.

4    Q.  All right.  We will move on.  When you were the department

5    chair, you relied on Ms. Cribben, Ms. Lucy Cribben, because she

6    has responsibility for budgeting and balancing the books.  Does

7    that sound right?

8    A.  Ms. Cribben was the department administrator for many

9    years, and she had many responsibilities for budget, personnel,

10   and having the department run well and in full compliance.

11   Q.  Exhibit 8 is a letter that you sent to me September 2009 on

12   my required extramural funding.

13             MS. TSE:  May I approach, your Honor?

14             THE COURT:  You may.

15   Q.  The exhibit was Bate stamped plaintiff's 0117.  Can you

16   authenticate that, Dr. Blaser?

17   A.  This appears to be an authentic letter.

18             MS. TSE:  Please admit that into evidence, that would

19   be Exhibit 8.

20             THE COURT:  Any objection?

21             MR. CERASIA:  No objection, your Honor.

22             THE COURT:  Plaintiff's Exhibit 8 received in

23   evidence.

24             (Plaintiff's Exhibit 8 received in evidence)

25   Q.  Please read the underlined text to the Court.

G6D3TSE2                          Blaser - direct

1          THE COURT:  This would be on page two?

2          MS. TSE:  That would be on page two.

3     A.  The underlined text says "Your current salary for 2008/2009

4     academic year is $104,058."  The second underlined text about

5     two line -- two paragraphs later is "Your current support on

6     extramural funding is $104,058 which meets the AEC performance

7     standards."

8     Q.  So that's 100 percent of my salary was derived from

9     extramural support.

10    A.  That's correct.

11    Q.  Thank you.  Did Ms. Cribben, who was in charge of keeping

12    the books, so to speak, inform you that Dr. Tse's REF remained

13    at 100 percent until May 31, 2010, before she lost 65 percent

14    of her salary support from the NIH when she was removed as the

15    flow cytometry core director?

16    A.  I don't remember whether she informed me or not.  But, we

17    understood that when you were removed as core director, that

18    you would not -- you would no longer be 100 percent supported

19    by grants.

20         MS. TSE:  Exhibit 10 is a printout of a policy on

21    performance expectations for research faculty.  This version

22    was approved by the provost in 2008 and was revised at the

23    request of faculty counsel June 30, 2011.  So, it was active

24    during the period when Dr. Tse's REF came into question,

25    April 2010, through her termination in April 2011.

G6D3TSE2                        Blaser - direct

1           May I approach, your Honor?

2           THE COURT:  You may.  Let Dr. Blaser have an

3   opportunity to review it.

4           THE WITNESS:  I have the document, but I do not

5   believe it applies to you.

6   Q.  All right.  We will go through it and you can explain to

7   the Court your position.

8           THE COURT:  Mr. Cerasia?

9           MR. CERASIA:  No objection.

10          MS. TSE:  On the page Bate stamped -- can we please

11  admit the exhibit into evidence so I can continue with

12  Dr. Blaser?

13          THE COURT:  Any objection, Mr. Cerasia?

14          MR. CERASIA:  No objection.

15          THE COURT:  Plaintiff's Exhibit 10 received in

16  evidence.

17          (Plaintiff's Exhibit 10 subject to connection received

18  in evidence)

19  Q.  On the page Bate stamped NYU 003084, can you please read

20  paragraph B1 one to the Court.

21  A.  Let me remind you, Dr. Tse, that this policy has to do with

22  tenured faculty members and not to faculty members on the

23  research track.

24  Q.  Please just read the paragraph.

25          THE COURT:  Well, I think that Dr. Blaser's made an

1    important point in terms of the relevance of this document.

2    Would you care to make an offer of proof to the Court as to why

3    you think it is relevant?

4           MS. TSE:  Specifically, because paragraph B1 required

5    extramural funding, first paragraph, "Full-time research

6    activity.  A research faculty member who is full-time in the

7    basic science departments or a full-time researcher in a

8    clinical department is expected to provide from extramural

9    funding at least 60 percent of total compensation or a higher

10   percentage if preexisting agreements or promulgated

11   departmental policies exist requiring a higher percentage."

12          Nowhere did it say that it has to be a tenured member

13   of the faculty.  As a matter of fact, on the face page of the

14   document, it is a policy on performance expectations for

15   research faculty, and it did not specify whether the faculty

16   member has to be tenured or not.  As a matter of fact, if the

17   research member is tenured, there are different policies that

18   apply.

19          THE WITNESS:  My understanding, my understanding, and

20   the general understanding of this policy is that it dealt with

21   full-time tenured faculty members.

22          THE COURT:  Let me interrupt you.  Is there anything

23   within this document that you can point me to that suggests it

24   is for tenured faculty or limited to tenured faculty?

25          THE WITNESS:  I don't -- I would have to read it line

1    by line.

2              THE COURT:  In fact, we're going to take a little

3    break to give you time to look through this document to see if

4    there is anything that you can point the Court to that supports

5    your testimony that it was only for tenured faculty.

6              So, let's take a 10-minute recess.  Please feel free

7    to step down from the witness stand.  Sit in the back of the

8    courtroom and read.  And I'll be back in 10 minutes.  No

9    discussions while I'm gone.

10             THE WITNESS:  Can I go to the men's room?

11             THE COURT:  Yes.

12             THE WITNESS:  Thank you.

13             MR. CERASIA:  Your Honor, may I ask what your general

14   schedule is as far as breaks and lunch?

15             THE COURT:  I usually take one morning break, one

16   afternoon break, and a lunch break around 1 o'clock.

17             MR. CERASIA:  Thank you.

18             THE COURT:  More or less, depending on where we are in

19   the testimony.

20             MR. CERASIA:  I understand.  Thank you.

21             (Recess)

22             (In open court)

23             THE COURT:  Please be seated.  Dr. Blaser, have you

24   had an opportunity to review the document?

25             THE WITNESS:  I have.

G6D3TSE2                              Blaser - direct

1              THE COURT:  Can you refer the Court to anything that

2       indicates it is for tenured faculty only?

3              THE WITNESS:  Your Honor, you asked me to tell the

4       truth, the whole truth, and nothing but the truth.

5              THE COURT:  Yes, I did, I did.

6              THE WITNESS:  So although I did not find anything in

7       this document that says tenure, it's clear to me that this is

8       about tenured faculty only.  You can ask many other witnesses,

9       there may be other documents that say tenure, this is not all

10      research faculty.  This is tenured research faculty.  But it is

11      not written in this document.  There are statements about

12      departmental policies, there are statements about individual

13      agreements, and also about part-time research activity that

14      modify it as well.

15             THE COURT:  So --

16             THE WITNESS:  So I guess my point was that this

17      document does is not the whole truth.

18             THE COURT:  Well, the document is the whole truth.  It

19      may not be the whole explanation.  But as far as it goes, there

20      is nothing in the document that say it is for tenured faculty

21      only.

22             THE WITNESS:  I could not find anything.

23             THE COURT:  It is reasonable that people might differ

24      on whether it only applies to tenured faculty.

25             THE WITNESS:  I don't believe that that was the

G6D3TSE2                    Blaser - direct

1   definition that people on the street that the faculty had in

2   general.  This was -- this came about through a long and

3   contentious process over a period of years involving the salary

4   of tenured faculty members.  It followed something called the

5   Artman report which is here.

6           And let me just say that in many of these things,

7   errors have been made.  But, the intent of the document, as I

8   understood it, is that it dealt with tenured faculty members,

9   and I was not alone in that.

10          THE COURT:  Well, under the circumstances,

11   Mr. Cerasia, do you wish to be heard on this?

12          MR. CERASIA:  I do, your Honor.  I think, as

13   Dr. Blaser said, that this document in practice was applied to

14   tenured faculty.  And I haven't heard any foundation from

15   Dr. Tse to show or suggest it was applied to non-tenured

16   research faculty such as herself.

17          So even though the document doesn't have the word

18   "tenured" in it, as Dr. Blaser said, it was the understanding

19   from him and others it applied only to tenured faculty, and

20   there has been no proffer or evidence that it applied to

21   non-tenured faculty research like Dr. Tse.

22          THE COURT:  Dr. Tse, can you make an offer of proof to

23   the Court that corroborates your belief that it did apply to

24   non-tenured faculty?

25          MS. TSE:  Just by the written text in the document.

1    And at this point, perhaps it would help if Dr. Blaser can

2    explain to the Court the difference between a tenured faculty

3    member and a non-tenured faculty member.

4              THE WITNESS:  Simple request, complicated answer.

5              MR. CERASIA:  Your Honor, may I be heard?  That's a

6    very broad question.  Does she mean with respect to employment?

7    Because there is a lot of differences between, as your Honor

8    knows from experience, between tenured and non-tenured faculty

9    members.

10             I guess the question is does it relate as to

11   somebody's employment and protections, so to speak, of

12   employment between faculty or tenured and non-tenured.  So it

13   is a very broad question.

14             THE COURT:  I think as Mr. Cerasia has narrowed it,

15   that would be relevant.

16             MS. TSE:  I am specifically referring to the REF and

17   the protection for faculty members who have succeeded to meet

18   the REF for the previous three years.  And according to the

19   document, should be protected under safe harbor.

20   A.  So, at American universities, tenure is awarded to an

21   individual based on national recognition for a body of

22   scholarly work.  Tenure is considered a privilege for someone

23   who has achieved that recognition.  And with that recognition

24   there are certain -- there are certain quid pro quos for

25   reaching that level, including certain level of salary support,

1    academic freedom, etc.

2           Universities, as they have grown, have developed

3    non-tenure tracks to fulfill other obligations, including

4    clinical tracks for teaching that involve primarily in the care

5    of patients at medical schools; educational tracks, teaching

6    only; and research tracks, research only.

7           Tenured faculty have privileges, including support of

8    salary, that non-tenured faculty do not have.

9           It is my understanding, and was certainly over the

10   time with the development of this policy, that the issue of REF

11   really was only an issue for the tenured faculty.  Because the

12   non-tenured faculty had an obligation to raise 100 percent of

13   their salary all the time, whether through educational,

14   clinical, or research efforts.

15          THE COURT:  Dr. Tse, let me ask you as an offer of

16   proof, how did you come in to possession of this document?

17          MS. TSE:  It was discovered.  I came across it in

18   discovery.  And then it was distributed as well.

19          THE COURT:  Was it distributed to you while you were

20   on the faculty?

21          MS. TSE:  I am trying to look through.  I cannot say

22   without looking through my records as to whether I have

23   received it.

24          THE COURT:  Because I think that that might be

25   significant in establishing whether NYU thought it applied to

G6D3TSE2                          Blaser - direct

 1   you.

 2          MS. TSE:  I will see what I can find, but at this

 3   point, I cannot say for sure --

 4          THE COURT:  All right.

 5          MS. TSE:  -- that I have received it directly.

 6          THE COURT:  All right.  Now, what I would like to do

 7   to be efficient, I am going to say that Plaintiff's Exhibit

 8   10 -- have I already received this in evidence?

 9          MS. TSE:  Yes, you did.

10          THE COURT:  I will now say that it is received subject

11   to connection.  Which means that should its relevance be

12   established later on, it will be received in full.  But right

13   now it's received subject to connection.

14          Now, do you have many questions on this document for

15   Dr. Blaser?

16          MS. TSE:  I do have some additional ones.

17          THE COURT:  In terms of an estimate of time, how much

18   more time do you think you need to talk or question Dr. Blaser

19   on this particular document?

20          MS. TSE:  One or two more questions.

21          THE COURT:  Fine.

22          MS. TSE:  At the moment.

23   Q.  All right.  So to try and see if we can resolve the issue

24   of who the policy applies to, given that the policy doesn't say

25   so in so many words, can I refer you back to Exhibit 8, which

G6D3TSE2                    Blaser - direct

 1   is your letter to me regarding my REF.  Do you still have that

 2   exhibit?

 3   A.  Yes, I do.

 4   Q.  Somewhere in there, which is not underscored, but if we go

 5   to the third paragraph starting with the dean's letter, now, it

 6   says to the second sentence into the paragraph, "Each full-time

 7   faculty member in the clinical departments is expected to have

 8   achieved extramural funding support for at least 50 percent of

 9   the portion of his or her salary allocated to conduct research

10   as of September 2008 and continuing thereafter in accordance

11   with increasing percentages for subsequent years."

12        And once again, given that it's not stated clearly,

13   the REF applies to both tenured as well as non-tenured faculty?

14   A.  That's a question for me?

15   Q.  Yes.  I'm sorry.

16   A.  Yes, so, this letter of 2009 came as the policy was being

17   developed.  It was being developed over a series of years.  And

18   our position for you and for everyone in the department who was

19   on the research track is that they had to achieve 100 percent

20   of their salary just as you had in that year.  And this "at

21   least 50 percent" was probably an error because it really was

22   100 percent.

23   Q.  Okay.  Exhibit 9 is actually an earlier version of Exhibit

24   10 and I think what we --

25        THE COURT:  Bear with me just a second.  Dr. Blaser,

G6D3TSE2                      Blaser - direct

1   on Exhibit 8, are you saying that that reference to 50 percent

2   of the portion of his or her salary is a mistake?

3              THE WITNESS:  I believe so.

4              THE COURT:  Was a corrective letter sent out?

5              THE WITNESS:  I don't know.

6              THE COURT:  This was under your signature, correct?

7              THE WITNESS:  That's correct.

8              THE COURT:  All right.  I'm sorry.

9              THE WITNESS:  Yes.  Let me also say we had hundreds of

10  these letters.  And it was a time when it was evolving.  But, I

11  believe that if you discuss it with other witnesses, you will

12  find that the school's policy for people on the research track

13  was quite clear.  Despite this letter.

14             THE COURT:  I'm sorry for the interruption, Dr. Tse,

15  please continue.

16  Q.  By "quite clear," what exactly do you mean?  Because the

17  reason why I pose that question --

18             THE COURT:  No.  You've asked him a question.  Let him

19  answer it.

20  A.  As a matter of practice, our understanding was that members

21  of the non-tenured research track had to have 100 percent

22  support for their salary.  This is how the department operated

23  for the full time that I was chair of medicine.  And I don't

24  believe there was any dispute about that.

25  Q.  How do you convey that information to the faculty member?

G6D3TSE2                          Blaser - direct

1   Because besides the letter that we are looking at, Exhibit 8, I

2   have received letters previous to that, and it would state the

3   percentage of the portion of my salary that is allocated to

4   conducting research, in my case that would be 100 percent, and

5   the REF.  Are you telling me now that that's incorrect?  Or

6   cannot be taken seriously?

7              MR. CERASIA:  Objection.

8              THE COURT:  No, I'll allow the question.

9   A.  From my role as an administrator when errors were made, I

10  accept responsibility.  Although, I will say that in general,

11  it was well known by both faculty and administration that

12  people on the research track had to raise 100 percent of their

13  salary, which was different from people on the tenured track.

14  Q.  It is now getting even more confusing, because first you

15  said that Exhibit 10 applies only to tenured faculty.  And now

16  you said that research faculty is different from tenured

17  faculty.  And Exhibit 10 specifically states on the face page

18  that it is a policy on performance expectations for research

19  faculty.

20             MR. CERASIA:  Objection, your Honor.  That's

21  argumentative.

22             THE COURT:  Is that a question?

23             MS. TSE:  Yes.  It is a question, because I am asking

24  or I am pointing out to Dr. Blaser his conflicting statements.

25             THE COURT:  This isn't the time for that.  I agree

G6D3TSE2                      Blaser - direct

1    with Mr. Cerasia that that's argumentative.  Ask a question of

2    Dr. Blaser.  Don't argue with him.

3    Q.  Then can you please explain to the Court how research

4    faculty knows or knew, because we are going back to 2010, 2011,

5    whether they are meeting their REF or not?  When each year, we

6    get a letter saying that you are expected to meet this certain

7    percentage or to support a certain percentage of your salary,

8    when that is actually not the case.

9    A.  Dr. Tse, I'm not aware of any other case in which a

10   research faculty member protested that they should not be held

11   accountable to 100 percent of their salary.  Not over the 12

12   years that I was department chair.  I don't believe you raised

13   that objection either.

14             THE COURT:  Dr. Tse, I think we should move on.

15             MS. TSE:  Yes.  Given that we have issues which cannot

16   be answered regarding Exhibit 10, I will not discuss further

17   Exhibit 9, but would like to reserve the option of submitting

18   that later on.

19             THE COURT:  Well, the difficulty of course is that

20   Dr. Blaser's time here in court is somewhat limited, which is

21   why I said that if you had additional questions for him on

22   Exhibit 10, it would make sense to ask him now, while he is

23   here.  And of course if it turns out that Exhibit 10 is not

24   relevant and therefore not received in evidence, then his

25   testimony about it would be stricken as well.

G6D3TSE2                         Blaser - direct

1          MS. TSE:  Understood.  Dr. Abramson, who most likely

2     issued this policy, because he is the vice dean for education

3     faculty and academic affairs, will be testifying on Wednesday.

4          THE COURT:  All right.

5     Q.  We will go on to Exhibit 11 which, that was excerpted from

6     an NIH grant application that was submitted by Dr. Reibman in

7     July 2010.

8          MS. TSE:  May I approach, your Honor?

9          THE COURT:  You may.

10          MR. CERASIA:  To the extent this is being offered,

11     your Honor, I have no objection to 11.

12          THE COURT:  Plaintiff's Exhibit 11 received in

13     evidence.

14          (Plaintiff's Exhibit 11 received in evidence)

15          THE WITNESS:  Yes.

16     Q.  Does that confirm for you, Dr. Blaser, that Dr. Tse was

17     trying to the best of her ability to use data that was

18     generated previously, "previous" meaning before, she was

19     removed as the flow cytometry core director to apply for

20     extramural funding?

21     A.  Exhibit 11 --

22          MR. CERASIA:  Objection, your Honor.

23          THE COURT:  I'm not sure I understand the question,

24     Dr. Tse.  So I'll sustain the objection as to form.

25     Q.  All right.  Let me point out the relevant information here.

G6D3TSE2                          Blaser – direct

1    Face page, section 14, this is a typical application form for

2    NIH grants.  On page 14, the project director principal

3    investigator was Dr. Joan Reibman.  Is that correct?

4    A.  Yes.

5              THE COURT:  Paragraph 14?

6              THE WITNESS:  Item 14.

7              MS. TSE:  Yes, item 14.

8    Q.  And the second page, under profile, senior or key person,

9    the boxes in blue, Doris Tse in the top box, and project row

10   PDPI, which is abbreviation for project director project

11   investigator.

12   A.  I'm sorry.  What is your question?

13   Q.  My question is can you confirm to the Court that I have

14   been, in the best ability, without laboratory assistants,

15   nonetheless applied for extramural funding?

16             MR. CERASIA:  Objection.

17             THE COURT:  I'm not sure I understand the question.

18   Are you asking him to confirm what this document says?

19             MS. TSE:  Yes.  Which is evidence that I was, with

20   best of intentions, applying for extramural funding to meet

21   NYU's REF.

22             THE COURT:  Well, I think the document speaks for

23   itself.  So it is not clear what additional information about

24   this document Dr. Blaser can give me.

25             MS. TSE:  All right.  We'll move on to Exhibit 12.

1    May I approach, your Honor?

2              THE COURT:  You may.

3              MS. TSE:  This is a letter from you to Dr. Tse dated

4    January 4, 2011.  It's Bate stamped NYU 003227.  So this is a

5    letter that you sent to Dr. Tse.

6              THE COURT:  No objection?

7              MR. CERASIA:  No objection, your Honor.

8              THE COURT:  Plaintiff's Exhibit 12 received in

9    evidence.

10             (Plaintiff's Exhibit 12 received in evidence)

11   A.  Yes, I've reviewed it.

12   Q.  This is a letter that you sent to Dr. Tse terminating her

13   appointment as associate professor of medicine in research.

14   You did not articulate the reason for her termination in the

15   letter?

16   A.  That's correct.

17   Q.  We will move on to exhibit 13.  Bate stamped NYU 003690 and

18   that is a memorandum from Dr. Abramson to department chairs.

19             MS. TSE:  May I, your Honor?

20             THE COURT:  Yes.

21             MR. CERASIA:  I have no objection to Plaintiff Exhibit

22   13.

23             THE COURT:  Plaintiff's Exhibit 13 received in

24   evidence.

25             (Plaintiff's Exhibit 13 received in evidence)

G6D3TSE2                        Blaser - direct

1   A.  Yes, I've reviewed it.

2   Q.  All right.  So, at the time that you terminated Dr. Tse's

3   appointment, did you realize that she belonged to what is known

4   as a protected class?

5   A.  This letter was very --

6           MS. TSE:  Sorry.  I'm sorry.  That was a reminder for

7   me to take my medication.

8           THE COURT:  Do you need to do it now?

9           MS. TSE:  No, I can wrap up with Dr. Blaser before.

10          THE COURT:  Okay.

11  A.  This letter states that in recent weeks we have -- this is

12  from 2007.  "We've had a number of inquiries with respect to

13  policy regarding notification of non-reappointment for

14  non-tenured faculty who are not on a tenured track."  And it

15  continues "under these provisions, appointment to a non-tenured

16  position shall be for a definite period of time not exceeding

17  one academic year unless otherwise specified, and shall

18  automatically terminate at the close of that period, unless

19  there is official notice of renewal.  Under this provision, no

20  notice of non-reappointment is required.  We recommend,

21  however, as a matter of good practice, that three months'

22  notice of non-reappointment be given to faculty on the

23  full-time clinician investigator/educator and research/educator

24  tracks.

25          "In this connection, this is to advise you that you

G6D3TSE2                         Blaser – direct

1    should review your full-time non-tenure eligible faculty

2    annually, and send written notice to those individuals whom you

3    do not intend to reappoint after August 31, 2007."  It says

4    "There may be individuals for whom you may extend their

5    appointment beyond September 1st, 2007 if that is required to

6    provide three months' notice.  Since these appointments

7    terminate automatically, it is not necessary to state a reason

8    for non-reappointment.  The non-reappointment, however, cannot

9    be based on unlawfully discriminatory factors such as gender,

10   race, age, or retaliation for exercising protective activity,

11   such as complaining about harassment or violations of law.

12          "In the event a non-reappointment is challenged, the

13   chair should be prepared to articulate a non-discriminatory

14   reason."

15          And that -- that's the -- I can read the rest of the

16   text if you wish.

17          (Continued on next page)

18

19

20

21

22

23

24

25

G6D5tse3                          Blaser - direct

1    BY MS. TSE:

2    Q.  No, that's quite all right.

3            Since you testified earlier that you were not aware

4    that Dr. Tse was a qualified individual under the ADA, did you

5    then -- did you not consider it necessary to articulate a

6    non-discriminatory reason for her termination?

7            MR. CERASIA:  Objection.

8            THE COURT:  Sustained.

9            MS. TSE:  May I rephrase?

10           THE COURT:  Sure.

11   Q.  You testified earlier that --

12   A.  Today or in my deposition?

13   Q.  Today.

14   A.  Uh-huh.

15   Q.  -- that you were not aware that Dr. Tse was a qualified

16   individual under the Americans with Disabilities Act?

17           THE COURT:  I don't think he testified that he did not

18   know.  I think one of the exhibits suggested he did know about

19   your condition.  I think he testified that he isn't sure about

20   whether he was told by Mr. Odom.

21   BY MS. TSE:

22   Q.  I interpret that to mean that Dr. Blaser did not understand

23   the legal ramifications of that status where Dr. Tse was

24   concerned; is that correct?

25   A.  I don't understand your question.

G6D5tse3                        Blaser - direct

1   Q.  All right, we will try it again.

2              From my May 13th, 2010 letter and also from the letter

3   that you wrote Dr. Glickman in 2005, you were clearly aware

4   that I have a medical impairment?

5              THE COURT:  The question should be were you aware.

6   Q.  Were you aware that I have -- or Dr. Tse -- had medical

7   impairments which could affect her performance as a member of

8   the research faculty?

9              MR. CERASIA:  Objection.

10             THE COURT:  Can you answer that, Dr. Blaser?

11             THE WITNESS:  I'm not exactly sure what your question

12  means.

13             THE COURT:  Then don't answer it.

14             THE WITNESS:  Okay.

15             THE COURT:  Dr. Tse, what are you trying to ask?

16             MS. TSE:  I'm trying to establish whether Dr. Blaser

17  was aware that I was a disabled individual, or more

18  specifically, I had medical impairments that could affect my

19  performance as a member of the NYU faculty.  Dr. Blaser is a

20  physician so it is not difficult to -- for him to project from

21  an individual's medical issues to their ability to perform in

22  the job.

23             THE WITNESS:  I was not privy to your medical records

24  but it was a matter of record that you had a disability, and I

25  think in one or two of the earlier letters we said that you

G6D5tse3                          Blaser - direct

1    performed very well regardless of your disability.

2    BY MS. TSE:

3    Q.  And in your opinion, what changed?

4            MR. CERASIA:  Objection.

5            THE COURT:  Sustained.

6    Q.  All right.  I will rephrase that.

7            What, in your opinion, caused me to fail to meet my

8    REF?

9    A.  You're -- as a non-tenured faculty member your REF was 100

10   percent.  When you were dismissed as core director you had a

11   big hole in your salary and you had the opportunity to -- in

12   fact, usually as a matter of practice we gave people three

13   months of notice.  In your case I think we gave you about nine

14   months, in total, to try to come up with a situation where you

15   could be funded.  When you requested long-term disability, the

16   department supported that request to try to help you.  So, once

17   you lost the position as core director, then in order to stay

18   on the faculty at 100 percent funding you had to find

19   alternative sources of support, as with every other member of

20   the research faculty.

21   Q.  And besides common understanding, as you put it, could you

22   produce anything in writing, a notice, to members of the

23   research faculty in your department that that is what the

24   school expects them to do?

25           MR. CERASIA:  Objection.

G6D5tse3                          Blaser - direct

 1              THE COURT:  Bear with me a second.

 2              (Pause)

 3              THE COURT:  Dr. Tse, would you rephrase that question?

 4              MS. TSE:  Yes.  Of course, your Honor.

 5    BY MS. TSE:

 6    Q.  So far --

 7              THE COURT:  No, no, don't sum up.  Just ask a specific

 8    question.  Refer to part of the document if necessary, but just

 9    focus in on this particular document.

10    Q.  Would you be able to produce any documents or notices or

11    e-mails that you distributed to members of the research faculty

12    in your department because it is your responsibility to do so

13    to show the Court that they were expected to come up with 100

14    percent REF?

15              MR. CERASIA:  Objection.

16              THE COURT:  Mr. Cerasia, state the basis for the

17    objection?  Maybe this will help move this along.

18              MR. CERASIA:  Well, I think there is a couple

19    questions in there but she is asking him about discovery

20    matters.  It is her obligation and burden of proof to come

21    forward with documents showing what her requirements were or

22    what her requirements were not.  But to ask him now to produce

23    documents or scroll in his head documents that he can produce

24    to your Honor is much too late.  That's what discovery was for

25    if she wanted to pursue that.

G6D5tse3                          Blaser - direct

1          MS. TSE:  Objections, your Honor --

2          MR. CERASIA:  He has already testified that every --

3     since the 12 years he was the chair of the department that

4     every non-tenured faculty member was required to come up with

5     100 percent of his or her funding to support salary.

6          THE COURT:  Okay.  Bear with me one second.

7          (pause)

8          MR. CERASIA:  Your Honor, one other thing?

9          THE COURT:  Sure.

10         MR. CERASIA:  I don't think, prior to these questions

11    being asked, that anywhere throughout this entire case there

12    was ever a contention that Dr. Tse didn't know that she needed

13    100 percent funding.  Even if she is now contending that it was

14    50 percent or 60 percent she has never contended that during

15    the time period in question she had more than 35 percent of

16    extramural funding support.  So, it seems to me we are arguing

17    over an irrelevant point.

18         THE COURT:  Well, I tend to agree with you.

19         I am looking at the 56.1 statements of NYU,

20    particularly paragraphs 63, 64, and 66 which would suggest that

21    it was not always 100 percent that they were -- the non-tenured

22    research faculty were expected to come up with.  But, any of

23    the numbers contained in here certainly don't go below the

24    threshold of 50 percent.

25         So, Dr. Tse, where are we going with this line of

G6D5tse3                        Blaser - direct

1   questioning?

2            MS. TSE:  Basically, I would just like or I believe

3   that we need to determine where things stood at the time I was

4   terminated.  When presented --

5            THE COURT:  Where what things stood at the time you

6   were terminated?

7            MS. TSE:  When presented with Exhibit 10 which would

8   have provided safe harbor --

9            THE COURT:  If it applies to you.

10           MS. TSE:  Yes, Dr. Blaser is claiming that it does not

11  apply to non-tenured faculty but nowhere in that document was

12  it specified that it only applies to tenured faculty.

13           THE COURT:  We have been there, Dr. Tse, I made my

14  ruling, so why aren't we moving on?

15           MS. TSE:  All right.

16           The other issue then is how much am I expected to come

17  up with percent REF.  And when Dr. Blaser was asked, he

18  basically said that 50 percent is not accurate, after which he

19  said it's common knowledge that it has to be a hundred percent.

20  That is when I asked him whether he has sent out any notices

21  stating such.

22           THE COURT:  I don't think that Dr. Blaser is the

23  person that you need to talk to about this.  I think that

24  perhaps Lucy Cribben will be somebody that you can question

25  about this, based on her affidavit in the --

G6D5tse3                          Blaser – direct

1              MS. TSE:  All right, I will.  I have just one more

2      question for Dr. Blaser.

3              THE COURT:  Okay.

4              MS. TSE:  That would be Exhibit 14 which was actually

5      submitted by NYU.

6              MR. CERASIA:  No objection, your Honor.

7              THE COURT:  Plaintiff's Exhibit 14 received in

8      evidence.

9              (Plaintiff's Exhibit 14 received in evidence)

10     BY MS. TSE:

11     Q.  This letter was --

12     A.  Yes, I have read it.

13     Q.  The letter was provided by Lucy Cribben to NYU counsel.  My

14     question to you is when you terminated Dr. Tse's appointment

15     three months earlier, given that both Dr. Ayyappa and Dr. Tse

16     were both associate research professors, did you recognize a

17     difference between those two employees?

18             MR. CERASIA:  Objection.

19             THE COURT:  What is the date of the letter where you

20     were terminated?

21             MS. TSE:  January 4th.

22             THE COURT:  And this is in March?

23             MS. TSE:  2011.  This one is in March.

24             THE COURT:  Okay.

25             MS. TSE:  I am addressing the issue of comparators.

1          THE COURT:  I don't think that this is -- well, it may

2     be a person who was in the same position but your question

3     is -- I assume that you are saying that Dr. Ayyappa was not

4     disabled?

5          MS. TSE:  I was asking Dr. Blaser whether he sees a

6     difference between terminating my employment and Dr. Ayyappa's.

7          MR. CERASIA:  Objection, your Honor.

8          THE COURT:  Sustained.

9     BY MS. TSE:

10    Q.  Neither one of those letters justify cause for termination?

11         MR. CERASIA:  Objection.

12         THE COURT:  But I don't know that there is an

13    obligation to do so based on the 2007 letter.

14         MS. TSE:  I interpreted the 2000 letter to mean that

15    if your appointment is not renewed it would run to the end of

16    the academic year.  All right?  So, my appointment did not run

17    to the end of the academic year.  Technically it ended August

18    31st, 2010.

19         THE COURT:  I'm referring to Plaintiff's Exhibit 13,

20    the 2007 letter.

21         MS. TSE:  Yes.  It said that if the appointment is not

22    renewed it would automatically terminate.

23         THE COURT:  I'm still not sure what your question is

24    in relation to Dr. Ayyappa.

25    BY MS. TSE:

G6D5tse3                         Blaser - direct

1  Q.  Just to simplify, my question is did Dr. Blaser, at the

2  time, see any difference between me and Dr. Ayyappa?  Both were

3  associate research professors in the department and both were

4  employees of NYU.

5               MR. CERASIA:  Objection.

6               THE COURT:  Yes, sustained.

7               Dr. Tse, I am not seeing where you are going with

8  this.  Dr. Ayyappa's letter is March 30th, 2011, yours was

9  January.  I don't know how many people --

10              MS. TSE:  I'm sorry, your Honor.

11              THE COURT:  I don't know how many people are dismissed

12  or not retired, but between Exhibit 13 and -- I don't know that

13  they had to give a reason when you were terminated.

14              MS. TSE:  All right.  I need to make my question more

15  specific.

16              You were aware by the time I was terminated that I

17  belonged to a protected class or I was a qualified individual

18  under the ADA or, minimally, that I have disabilities.

19              MR. CERASIA:  Objection.

20              THE COURT:  Would you break it down?

21              MS. TSE:  All right.  Let's put it in the simplest

22  form.

23              THE COURT:  That would be good.

24  BY MS. TSE:

25  Q.  So, first of all, I sent you a letter around May 2010

G6D5tse3                         Blaser - direct

1    informing you, among other things, that I have disabilities

2    which --

3              THE COURT:  What was the first sentence of that

4    letter, though?

5              MS. TSE:  The first sentence is that --

6              THE WITNESS:  I am hereby requesting long-term

7    disability.

8              MS. TSE:  Yes, but you cannot ask for long-term

9    disability leave unless you are disabled, so --

10             THE COURT:  But if you are asking for the leave as

11   opposed to asking for an accommodation --

12             MS. TSE:  We will hear from Mr. Odom, the sequence of

13   those events.

14             THE COURT:  Okay.

15   BY MS. TSE:

16   Q.  My question to Dr. Blaser is, May 2010 he became aware that

17   I have disabilities which preclude me from performing my duties

18   as an associate research professor.  I was terminated January

19   4th, 2011, and three months later he terminated someone,

20   Dr. Ayyappa, who has the same appointment level as myself, an

21   associate research professor.

22             Question:  Do you see any difference between Dr. Tse

23   and Dr. Ayyappa?

24             MR. CERASIA:  Objection.

25             THE COURT:  Sustained.

1          To your knowledge, did Dr. Ayyappa have any

2     disabilities?

3          THE WITNESS:  I was not aware of any disabilities.

4          THE COURT:  All right.

5          I don't know that you can get more out of Dr. Blaser.

6          MS. TSE:  I have no more questions for Dr. Blaser.

7          THE COURT:  Thank you, Dr. Tse.

8          Mr. Cerasia?

9          MR. CERASIA:  Sure.  May I proceed, your Honor?

10          THE COURT:  Yes.

11          MR. CERASIA:  Thanks.

12     CROSS EXAMINATION

13     BY MR. CERASIA:

14     Q.  Good afternoon, Dr. Blaser.

15          You testified that you spent 12 years as the Chair of

16     the Department of Medicine at NYU.  Can you just tell us what

17     your start date and end dates were?

18     A.  The start date was April 1st, 2000, and the end date, I

19     believe, was December 18th, 2012.

20     Q.  I am going to refer you to Plaintiff's Exhibit 2 which is

21     the March 4, 2010 letter from Dr. Valentine to Dr. Tse about

22     her removal as the core director.

23     A.  I don't think I still have that -- oh yes.  I have it, I

24     have it.

25     Q.  And the department kept Dr. Tse on from April 1, 2010,

G6D5tse3                        Blaser – cross

1    until April 4th of 2011?

2    A.  That's correct.

3    Q.  Why did you give her so much time to remain employed at NYU

4    after she was removed as the core director?

5    A.  We were trying to help her.  We were trying to give her

6    more time so that she could find alternative funding.

7    Q.  In your 12 years as Chair of the Department of Medicine,

8    were you aware of any other non-tenured research faculty member

9    who received one year and three days of salary support --

10   A.  I don't.

11   Q.  -- from the department?

12   A.  I don't believe so.

13   Q.  Between June 1st of 2010 and April 4 of 2011, did Dr. Tse

14   ever specifically come to you and ask you to identify any

15   principal investigators or tenured faculty members that she

16   could collaborate with to get funding?

17   A.  I don't believe so.

18   Q.  If she had done that, would you have helped her?

19          THE COURT:  No, no, she didn't.  He doesn't remember.

20   Let's move on.

21   BY MR. CERASIA:

22   Q.  At any point after Dr. Tse was removed as the director of

23   the core, did she ever come to you with any specific research

24   project that she wanted to pursue to get grant money?

25   A.  I don't believe so.

1              MS. TSE:  Objection.

2              THE COURT:  Basis?

3              MS. TSE:  Both Dr. Blaser and I are well aware of what

4    is needed to apply for extramural funding and --

5              THE COURT:  Well, I think I know where you are going

6    with this.  I will overrule the objection.

7              Continue, please, Mr. Cerasia.

8    BY MR. CERASIA:

9    Q.  Did Dr. Tse ever come and brainstorm, so to speak, with you

10   about research proposals or funding that she wanted to pursue?

11   A.  No.

12   Q.  Between June 1st of 2010 and April 4th of 2011, did Dr. Tse

13   ever ask you for any specific accommodation for her medical

14   condition?

15   A.  I don't believe so.

16   Q.  Between June 1st, 2010 and April 4th of 2011, did Dr. Tse

17   ever come to you or in any way ask you or the School of

18   Medicine for money to help pay the cost for use of equipment,

19   machines, or people within the laboratory?

20   A.  I don't believe so.

21   Q.  During the time that you were the Chair of the Department

22   of Medicine, were you aware of any part-time non-tenured

23   research faculty who worked within the department?

24   A.  I am not aware.  It is possible but I'm not aware of any.

25   Q.  At any point from the time Dr. Tse got removed as the core

G6D5tse3                          Blaser - cross

1   director until her termination in April of 2011, did she ever

2   identify for you any job that she felt was vacant at NYU?

3   A.  No.

4           MS. TSE:  Objection, your Honor.

5           THE COURT:  Basis?

6           MS. TSE:  I will not have access to that information.

7           THE COURT:  That may be, but the question was that she

8   felt was vacant at NYU, which is a more subjective measure so I

9   don't know that the answer would change.  So, I will overrule

10  the objection.

11  BY MR. CERASIA:

12  Q.  From the time Dr. Tse was removed as the core director

13  until April 4th of 2011, did you ever become aware of any

14  vacant job at NYU for which she was qualified?

15  A.  No.

16          MS. TSE:  Can we be specific --

17          THE COURT:  Just, just --

18          MS. TSE:  I'm sorry.

19  BY MR. CERASIA:

20  Q.  I am going to refer you to Plaintiff's Exhibit 12 which is

21  your January 4, 2011 letter to Dr. Tse.

22  A.  Yes, I have it.

23  Q.  Is that the standard type of letter that you issued to

24  non-tenured research faculty to let them know they would not be

25  renewed?

G6D5tse3                         Blaser - cross

1   A.   More or less, yes.

2   Q.   At any point after that letter was sent to Dr. Tse did she

3   ever come to speak to you about the letter?

4   A.   I don't believe so.

5   Q.   Why is it that the School of -- excuse me -- that the

6   Department of Medicine ended her employment at that time?

7   A.   At that point she only had 5 percent effort that was

8   covered by grants and by that time it had been about nine

9   months after she had been removed as core director.

10  Q.   Does that mean that either the school or the department was

11  supporting 95 percent of her salary by administrative funds?

12  A.   By that point, yes.

13  Q.   Why can't the Department of Medicine pay salary of

14  non-tenured faculty members who do not have grant funding?

15  A.   Well, the Department of Medicine could but --

16              MS. TSE:  Objection.

17              THE COURT:  No.  Dr. Tse, the time to object is after

18  the question has been asked and before --

19              MS. TSE:  I'm sorry, your Honor.

20              THE COURT:  All right.

21              You may answer, Dr. Blaser.

22              THE WITNESS:  The Department of Medicine could do that

23  but, in practice, there is just not enough money to do that and

24  our primary obligation is for our tenured faculty members.  And

25  that is true at NYU and just about every university I am aware

G6D5tse3                           Blaser - cross

1   of.

2   BY MR. CERASIA:

3   Q.  Is the NYU School of Medicine a not-for-profit?

4   A.  I believe so.

5   Q.  At any point after January 4, 2011, did Dr. Tse ever ask

6   you for any kind of accommodation to extend her employment?

7   A.  I don't believe so.

8   Q.  After -- strike that.

9           In your opinion, was there anything more that you or

10  the Department could have done after June 1st, 2010, to get

11  Dr. Tse any additional extramural funding?

12  A.  At one point there was a discussion in a meeting I think

13  with Mr. Odom and Ms. Cribben that were present where we had a

14  discussion where we urged her to look for further support.  I

15  think that the grant proposal that was submitted with

16  Dr. Reibman is one example of her seeking to get support.  I

17  think, ultimately, that grant was not funded.

18  Q.  If you could look at Plaintiff's Exhibit 11, which is a

19  July 2010 grant application submission with Dr. Reibman --

20  A.  Yes, I have it.

21  Q.  -- is that what you were just referring to?

22  A.  Yes.

23  Q.  Is it your understanding that that was an unsuccessful

24  grant application?

25  A.  That's my understanding.

1   Q.  If you look at page 1 under 11, Section 11 -- let me ask

2   you this.  What was Dr. Reibman or what is Dr. Reibman's area

3   of speciality?

4   A.  Dr. Reibman is a physician scientist who studies the --

5   primarily studies the lung and studies immune responses in the

6   lung.

7   Q.  Were you aware, at this time, of Dr. Reibman having any

8   specialization in HIV?

9   A.  She has worked on HIV.

10  Q.  Was that Dr. Tse's area of specialization?

11  A.  Yes.

12          MS. TSE:  May I?

13          THE COURT:  You will have an opportunity to ask

14  further questions when Mr. Cerasia is finished.

15          MS. TSE:  All right.  I will.

16  BY MR. CERASIA:

17  Q.  You referred to a meeting that you attended with Dr. Tse,

18  Mr. Odom, and Ms. Cribben.  Do you remember when that meeting

19  took place?

20  A.  I don't exactly remember it but I have seen documents.  I

21  think it was around August of 2010.

22  Q.  And I think you testified that you discussed generally with

23  Dr. Tse about some opportunities or where she could look for

24  funding sources, right?

25  A.  I believe so.  I think we also had a discussion about

G6D5tse3                    Blaser - cross

1    long-term disability.

2    Q.   And what was the discussion that you had about long-term

3    disability?  What you testified to on your direct examination?

4    A.   I think that Dr. Tse wanted to apply for long-term

5    disability for 65 percent of her effort but Mr. Odom said it is

6    all or none, you have to apply for a hundred percent.

7    Q.   And you say you were -- sorry.

8    A.   And the department and the school favored that option.

9    Q.   At any point after that August 2010 meeting do you have any

10   recollection of Dr. Tse ever coming to you to ask you for any

11   kind of accommodation for her medical condition?

12   A.   I have no such recollection.

13   Q.   Now, with respect to the May 13th, 2010 letter which is

14   Plaintiff's Exhibit 6 that Dr. Tse sent to you about her

15   long-term disability --

16   A.   Oh, yes -- yes, I have it.

17   Q.   At any point after receiving that letter, did Dr. Tse come

18   to you to tell you that she was applying for long term

19   disability?

20   A.   I don't believe so.

21   Q.   Did you ever direct her, at any point before May 13, 2010,

22   to apply for long term disability?

23   A.   I don't believe so.

24   Q.   Even after the August 2010 meeting, did you ever direct her

25   that she had to apply for long term disability?

G6D5tse3                         Blaser - redirect

 1   A.  No.

 2   Q.  After Dr. Tse was removed as the director of the core in

 3   April 2010, did you want her to exceed in obtaining funding to

 4   continue her employment at NYU?

 5   A.  Yes.

 6   Q.  Did you have any hostility or animosity towards her because

 7   of her medical condition?

 8   A.  I did not.

 9           MR. CERASIA:  May I have a minute, your Honor?  I may

10   be done.

11           THE COURT:  Okay.

12           (Counsel conferring)

13           MR. CERASIA:  I have no other questions at this time.

14           THE COURT:  Okay.

15           MR. CERASIA:  Thank you, Dr. Blaser.

16           MS. TSE:  Redirect, your Honor?

17           THE COURT:  Yes.

18   REDIRECT EXAMINATION

19   BY MS. TSE:

20   Q.  I think this will be a good time to bring up plaintiff's --

21           THE COURT:  Dr. Tse, please remain seated and use the

22   microphone.

23   Q.  -- requesting permission to bring up plaintiff's trial

24   Exhibit 9, it is Bates stamped NYU 003721.

25           May I approach, your Honor?

G6D5tse3                        Blaser - redirect

1              THE COURT:  You may.

2     Q.   This is a notice titled Process for Implementing Research

3     Faculty.

4              THE COURT:  Actually, you know the better way to do

5     this is to show it to Dr. Blaser and ask him what it is.

6              MS. TSE:  Sorry.

7              May I collect the ones that I gave to you because I

8     have to recycle them.

9              THE COURT:  Yes, but why don't we wait until you are

10    through and Mr. Cerasia is through, so he doesn't have to keep

11    getting documents.

12             Is there a particular part of Plaintiff Exhibit 9 that

13    you wish to direct Dr. Blaser's attention to?

14             MS. TSE:  Yes; that would be paragraph 9.

15             THE COURT:  I'm sorry, what number?

16             MS. TSE:  Paragraph 9 on page 2.

17             THE COURT:  Okay.

18             MS. TSE:  NYU 003722 under junior faculty.

19             THE WITNESS:  Yes, I am ready.

20             MR. CERASIA:  I have no objection to the exhibit, your

21    Honor.

22             THE COURT:  All right.  Plaintiff's Exhibit 9 received

23    in evidence.

24             (Plaintiff's Exhibit 9 received in evidence)

25             MS. TSE:  May I proceed?

G6D5tse3                          Blaser - redirect

 1          THE COURT:  Yes, please.

 2   BY MS. TSE:

 3   Q.  First of all, can you read that paragraph to the Court?

 4   A.  Paragraph 9.  Junior faculty.  In implementing the REF,

 5   special consideration shall be given to faculty who are within

 6   the first five years after initial appointment as assistant

 7   professor ("Junior faculty") whose percentages may be lower

 8   while they build their portfolio of research support and who

 9   are making progress toward achieving the REF without having

10   achieved it.

11   Q.  Do you know of any junior faculty in the research track who

12   were recruited to NYU as tenured members of the faculty?

13          THE COURT:  I'm sorry.  I don't understand the

14   question.

15   Q.  We are referring to junior faculty and this notice applies

16   to research faculty.  So, my question -- and there will be

17   subsequent questions, related to the topic.

18          Do you know of any members who are junior faculty that

19   were recruited as tenured members in the research track?

20   A.  I believe that this document refers to the tenured faculty

21   and presumably by junior faculty this would mean tenured track

22   faculty, although it is not so stated.

23   Q.  Once again, can you find in this document where it says

24   that it applies only to tenured faculty?

25   A.  I cannot.

1   Q.  I am referring to where it says:  Faculty who are within

2   the first five years after initial appointment -- can you

3   explain to the Court the significance of five years?

4   A.  Not specifically but, in general, faculty on the tenure

5   track have a certain number of years to achieve tenure after

6   they've been appointed.  If someone is appointed on the tenure

7   track they may have seven years.  It has recently gone up to

8   probably close to 10 years to achieve tenure.

9   Q.  Specifically, five years as it applies to achieving the

10  REF.

11  A.  I don't understand your question.

12  Q.  The paragraph says that special consideration will be given

13  to faculty who are within the first five years after initial

14  appointment?

15          THE COURT:  What is the question, though.

16  Q.  The question is, in your opinion, would it take five years

17  or as many as five years for someone who is starting out to

18  achieve the school's REF?

19          MR. CERASIA:  Objection --

20          MS. TSE:  Because.

21          THE COURT:  Wait.  Wait.  Let's hear the rest of this

22  question.

23          Please continue, Dr. Tse.

24  BY MS. TSE:

25  Q.  The paragraph is very specific about five years and about

G6D5tse3                          Blaser - redirect

1    building a portfolio of research so that progress can be made

2    toward achieving the REF.

3    A.  So, Dr. Tse, are you asking me about this paragraph?

4    Q.  I am asking you why five years.  Why not five months?

5              THE COURT:  This is argumentative.

6              MR. CERASIA:  Objection.

7    BY MS. TSE:

8    Q.  What is the significance of five years, in your opinion?

9              MR. CERASIA:  Objection.

10             THE COURT:  No, I will allow that.

11             THE WITNESS:  First let me say that this is a document

12   provided by the School of Medicine.  The Department of Medicine

13   is under the School, we try to understand and apply the

14   policies of the School.

15             My understanding is that this refers to faculty

16   members who are appointed on the tenure track to ultimately

17   achieve tenure and they are given a period of time where they

18   do not have the full obligations of the REF as they're building

19   up their research portfolio.  It applies -- my understanding,

20   as you asked me, is that this applies to people on the tenure

21   track.

22   BY MS. TSE:

23   Q.  To the best of your recollection, can you name any tenured

24   professors on the research track in the Department of Medicine?

25             MR. CERASIA:  Objection.

1           THE COURT:  I will sustain that as to relevance.

2           Let me ask you something, Dr. Blaser.  Does it take

3   time to build-up your REF whether you are tenured or not?

4           THE WITNESS:  The appointment of a non-tenured faculty

5   member is different than the appointment of -- tenure is a much

6   greater institutional commitment to an individual, that's why

7   tenure is so prized and so the appointment of people on the

8   tenure track is given to people of unusual promise and they are

9   given the opportunity to ultimately develop into a tenured

10  position.

11          The appointment on the non-tenure track is different.

12  It does not carry the opportunity to get tenure and it is

13  usually in support of someone else's program.  Generally what

14  has happened in the past is that a tenured faculty member or a

15  tenured track faculty member would say I would like to appoint

16  so and so -- I would like so and so to be considered for

17  appointment on the non-tenured track to assist me in my work.

18          Currently, in my own laboratory -- I am a researcher

19  as well -- currently, in my own laboratory, I have three

20  members of the faculty who are not on the tenure track.  One of

21  them has worked with me for more than 20 years and two others

22  have worked for me for about 10 years.  They, and I, understand

23  that the obligation is for our research efforts, collectively,

24  to pay 100 percent of their salary.

25          THE COURT:  All right.

G6D5tse3                           Blaser - redirect

1           THE WITNESS:  And that's the general standard.

2           THE COURT:  Now, you have described the individual on

3     tenure track as particularly promising which would mean they

4     are somewhat above the cut, if you will?

5           THE WITNESS:  Yes.

6           THE COURT:  All right.

7           THE WITNESS:  That they are capable of achieving

8     national recognition for a body of scholarly work.

9           THE COURT:  All right.  And I guess my question is for

10    the gifted tenure-track people, even they might not be able to

11    build-up their REF within the first year or two to

12    expectations, correct?

13          THE WITNESS:  Yes.

14          THE COURT:  And so, this five-year period is some sort

15    of guideline by which you would expect your particularly gifted

16    people to have made up their full REF?

17          THE WITNESS:  Yes.  And again, this concept of REF was

18    a concept that was introduced over the -- while I was

19    department chair.  There was no REF concept before that and as

20    it came about it was to help -- there were some tenured members

21    of the faculty who were no longer productive in research

22    anymore but they were getting full salaries, so this was an

23    attempt to set standards so that the university would not

24    indefinitely support people who were past their peak of

25    productivity.

G6D5tse3                            Blaser – redirect

1              THE COURT:  Okay.

2              THE WITNESS:  That was the intent.  And I think when

3     you discuss this with other witnesses you will find the same

4     position.

5              THE COURT:  All right.

6              Dr. Tse, any more questions for Dr. Blaser?

7              MS. TSE:  Yes, I do.

8     BY MS. TSE:

9     Q.  Plaintiff's Exhibit 39, that is my bio sketch as it was

10    submitted with the grant application with Dr. Reibman.

11             May I approach, your Honor?

12             THE COURT:  You may.

13    A.  Yes, I have reviewed it.

14    Q.  You just testified that my scientific expertise was limited

15    to the HIV field.  Can you point out --

16             THE COURT:  I don't believe that was his testimony.

17    The question was was that field also something that Dr. Tse was

18    involved in and he said yes.  He did not say it was your only

19    field.

20             MS. TSE:  All right.  I'm sorry.

21             So, in submitting this grant application together with

22    Dr. Reibman and looking over her bio sketch as it was submitted

23    to the NIH, would you agree that Dr. Tse was making serious

24    effort towards meeting her REF?

25             MR. CERASIA:  Objection.

G6D5tse3                          Blaser - redirect

1          THE COURT:  Sustained.  I do not see the connection

2    between Exhibit 39 and the level of effort.

3          MS. TSE:  I'm sorry, that's 40.  Did I make a serious

4    error?  No, that's Exhibit 39, I was right in that.

5          My question is actually to dispute NYU counsel's

6    request for Dr. Blaser to testify whether I had asked for help

7    in achieving the required REF.

8          THE COURT:  This document 39, does it go beyond 2010

9    when you were --

10          MS. TSE:  It was submitted with the grant application

11    with Dr. Blaser which was July 2010 and that would be after I

12    was removed as the CFAR core director.

13          THE COURT:  Right, but the question you are asking is

14    whether you made a serious effort to get funding.  I don't

15    believe that there has been a question that you were involved

16    with Dr. Reibman in applying for a grant.  So, I'm not sure

17    what your question to Dr. Blaser is now.

18          MS. TSE:  Dr. Blaser said that I should have sought

19    collaboration or assistance from investigators with funding and

20    basically I asked him, from my bio sketch which showed the

21    history of collaboration with Dr. Reibman, did I make my best

22    effort towards fulfilling my REF.

23          MR. CERASIA:  I don't know if that's a question or her

24    proffer.

25          THE COURT:  I'm not sure either but this document,

G6D5tse3                           Blaser - redirect

1    where does it talk about what you did after you were no longer

2    director of the CFAR flow cytometry core?

3              MS. TSE:  The list of publications is -- documents my

4    collaborative efforts or actually my productivity, my research

5    productivity with Dr. Reibman.  Mr. Cerasia here has

6    established that essentially I did not ask for assistance so

7    that I can fulfill my REF and I wanted to submit evidence to

8    show otherwise.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G6D3TSE4                          Blaser - recross

1         THE COURT:  But I'm not sure how Dr. Blaser can

2   testify about that particular thing based on this document.  So

3   I'll sustain the objection.  Any other questions?

4         MS. TSE:  No.

5         MR. CERASIA:  Just a few more, Judge.

6   RECROSS EXAMINATION

7   BY MR. CERASIA:

8   Q.  Other than Dr. Tse's work with Dr. Reibman in submitting

9   the grant proposal which was Plaintiff Exhibit 11, were you

10  aware of her collaborating with any other principal

11  investigators or tenured faculty after June 1st, 2010?

12  A.  I don't remember the specifics, but she had a collaboration

13  with faculty member in Ob/Gyn, I think Dr. Bruce Young.  And I

14  think that was for a 5 percent effort.

15  Q.  Is there any doubt in your mind, after the August 2010

16  meeting, that Dr. Tse knew that she had to have full funding to

17  keep her employment at NYU?

18  A.  No.

19        THE COURT:  Sustained as to form.

20  Q.  After the August 2010 meeting that you had with Dr. Tse,

21  Mr. Odom, and Ms. Cribben, did you have a belief that in your

22  mind that Dr. Tse understood that she needed to be fully funded

23  to continue her employment at NYU?

24        THE COURT:  How would he know what was in her mind?

25  Sustained.

G6D3TSE4

1    Q.  Was there anything that Dr. Tse said to you at the

2    August 2010 meeting or after that would lead you to believe

3    that she did not understand that she needed to be fully funded

4    to continue her employment at NYU?

5    A.  Not that I recollect.

6               MR. CERASIA:  No other questions.  Thank you.

7               MS. TSE:  One more question then.

8    REDIRECT EXAMINATION

9    BY MS. TSE:

10   Q.  Do you remember the exact date of the meeting?

11   A.  I know the month and the year.

12              THE COURT:  All right, Dr. Blaser, thank you very

13   much.  You may step down.

14              THE WITNESS:  Thank you.

15              (Witness excused)

16              THE COURT:  We are going to take our luncheon recess.

17   Let me caution you that the clock in the back of the courtroom

18   is wrong.  It is 1 o'clock.  We will resume at 2:15 at which

19   point who will be the witness?

20              MS. TSE:  That would be Ms. Sanchez.  She's the head

21   of human resources.

22              THE COURT:  Nancy Sanchez?

23              MS. TSE:  Yes.

24              THE COURT:  Enjoy your lunch.

25              MR. CERASIA:  Thank you, your Honor.  You too.

G6D3TSE4

1                MS. TSE:  Thank you, your Honor.

2                (Luncheon recess)

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:15 p.m.

3              THE COURT:  Good afternoon, please be seated.

4              MS. TSE:  Good afternoon, your Honor.

5              THE COURT:  Dr. Tse, are you ready to call your next

6    witness?

7              MS. TSE:  Yes.  Ms. Sanchez.

8              THE COURT:  Hi.  Would you remain standing and raise

9    your right hand.

10             (Witness sworn)

11             THE COURT:  Please be seated.  Pull your chair in.

12   Now would you state your full name, and spell both your first

13   and your last name.

14             THE WITNESS:  Sure.  It's Nancy, N-A-N-C-Y, Sanchez,

15   S-A-N-C-H-E-Z.

16             THE COURT:  You may proceed, Dr. Tse.

17    NANCY SANCHEZ,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. TSE:

22   Q.  Good afternoon, Ms. Sanchez.

23   A.  Hi.

24   Q.  I am Dr. Tse, as you probably know already, representing

25   myself.

1          THE COURT:  Dr. Tse, move the microphone closer.

2          MS. TSE:  Okay.

3          THE COURT:  Yes.

4          MS. TSE:  It's because I pulled my chair out.  Is the

5   this okay now?

6          THE COURT:  Yes, this is better.  Thank you.

7   Q.  Have you testified in court before?

8   A.  Yes.

9   Q.  Most of my questions hopefully will be yes or no.  You will

10  be presented with exhibits.  When you need more time to look

11  them over, please let me know.

12          Ms. Sanchez, what is your current position at the NYU

13  Langone Medical Center?

14  A.  I'm the senior vice president and vice dean of human

15  resources and organizational development and learning.

16  Q.  How many employees do human resources oversee at the

17  medical center?

18  A.  Meaning how many employees do we have responsibility for?

19  Q.  Yeah.

20  A.  27,000.

21  Q.  Of these, how many are faculty members in the school of

22  medicine?

23  A.  Compensated or non-compensated?

24  Q.  Can you explain to the Court --

25  A.  Those that receive salary from the school of medicine or

G6D3TSE4                        Sanchez - direct

1    those that only have a faculty appointment.

2    Q.  Like adjunct faculty appointments?

3    A.  Meaning they're not receiving salary from the institute.

4    About 2,400 currently.

5    Q.  How large is the Murray Hill campus for the school of

6    medicine?

7    A.  I'm not sure I understand.  What do you mean how large?

8    Q.  In terms of city blocks, how big is that campus?

9    A.  It is a difficult question to answer because we're so

10   spread out now.  If you're talking about the sort of what's

11   known as the superblock, it would be from 30th Street to 34th

12   Street on First Avenue.

13   Q.  Excluding Bellevue Hospital where most of the department of

14   medicine is located?

15   A.  I don't know if that's where most of the department of

16   medicine is located, but yes, it does exclude Bellevue.

17   Q.  Is payroll under the purview of human resources?

18   A.  No.

19   Q.  It's a separate department?

20   A.  Correct.

21   Q.  So, can you nonetheless give the Court a rough idea of the

22   annual outlay in faculty and staff salaries?

23   A.  No.  Not without looking it up.

24   Q.  Crain's New York reported an $89 million surplus for the

25   NYU Langone Health System in February of this year.  Does that

G6D3TSE4                          Sanchez - direct

 1    sound about right?

 2                MR. CERASIA:  Objection.

 3                THE COURT:  Objection sustained.  The witness said she

 4    can't tell without looking it up, so she isn't the one to get

 5    this information from.

 6    Q.  Of the 27,000 or so employees under your purview, do you

 7    know how many or roughly what percentage falls into the

 8    protected class?

 9                MR. CERASIA:  Objection.

10                THE COURT:  Yes.  How are you defining protected

11    class?

12                MS. TSE:  Those who have reported as being the targets

13    of discrimination for race, color, national origin, sex,

14    disability.

15                THE WITNESS:  I'm sorry --

16                MR. CERASIA:  Objection, your Honor.

17                THE WITNESS:  -- I still don't understand the

18    question.

19                THE COURT:  All right.  Objection sustained.  Break up

20    the categories, but the only one that would probably be

21    relevant here, Dr. Tse, is disability.

22                MS. TSE:  All right.  I will ask that question then.

23    Q.  How many of these employees, faculty and staff, are

24    qualified individuals under the Americans with Disabilities

25    Act?

G6D3TSE4                    Sanchez - direct

1    A.  I don't know.

2    Q.  How would you go about identifying them, and rather, how do

3    you go about identifying them?

4    A.  We send out an annual e-mail to the part -- to the

5    employees, and we ask them to self-identify.

6    Q.  As a covered entity, how does NYU inform these individuals

7    that they are entitled to reasonable accommodations for their

8    limitations?

9    A.  We post the information on the web, plus we send out

10   mailings to the employees.

11   Q.  By e-mail or printed mailings?

12   A.  We used to do it to the homes.  I don't recall off the top

13   of my head in terms in the last few years how we've done it,

14   whether it's been e-mail or we still send mailings to the

15   homes.

16   Q.  Are department chairs informed of NYU's obligations under

17   the ADA?

18   A.  All faculty and staff are sent the mailings.

19   Q.  Specifically, department chairs who are responsible for the

20   caretaking of employees within their department, do they get

21   the same notice or different?

22   A.  We send it out to all faculty and staff.  That means

23   everybody.

24   Q.  I understand that.  But, do you send a different one to

25   people or to employees who are in leadership positions who are

1   responsible for people under their management or supervision?

2   A.  No.

3   Q.  Thank you.  Are department administrators trained to

4   identify such individuals and offer them the protection to

5   which they are entitled under the law?

6   A.  Department administrators can avail themselves of

7   educational programs that we have that make people aware of how

8   to identify and engage in a conversation with individuals who

9   are in need of an accommodation.  Plus, we have an employee

10  relations staff that they are encouraged to reach out to.

11  Q.  Is the training mandatory or voluntary for the department

12  administrators?

13  A.  I don't remember off the top of my head.

14  Q.  Were you the head of human resources from April 2010

15  through 2011?

16  A.  Yes.

17  Q.  Operational protocols pretty much the same then as it is

18  now?

19          MR. CERASIA:  Objection.

20          THE COURT:  Sustained.

21  Q.  Did any changes take place since 2010 to what you described

22  today or just now?

23  A.  Yes.  I made reference to the fact that I don't recall if

24  the mailings go out to the homes or if they go out via e-mail

25  so things like that have changed, yes.

1              MS. TSE:  Exhibit 4, which has already been admitted

2     into evidence, may I approach the witness?

3              THE COURT:  You may.

4     Q.  Exhibit 4 is an employment history record at the school of

5     medicine, just to remind you, or if you're not --

6              THE COURT:  You can actually ask the witness what it

7     is.

8              MS. TSE:  Thank you, your Honor.

9     Q.  Do you recognize Exhibit 4 as a record from the human

10    resources department?

11    A.  So are you asking me if I recognize the document the way

12    it's printed, or are you asking me if I recognize the

13    information that's on it?

14    Q.  Both.

15    A.  Okay.

16    Q.  Either or both?

17    A.  Okay.  So the document, no.  The information on it, yes.

18    Q.  All right.  The document was actually provided by NYU

19    because it's Bate stamped as such.

20    A.  Okay.

21    Q.  Exhibit 15 contains Dr. Tse's time and effort reports.

22             THE COURT:  Just a second.  You want to show it to the

23    witness?  Are you going to ask the witness particular questions

24    about it?

25             MS. TSE:  Yes, I am going to ask the witness

1   particular questions about it.

2   Q.  Do you recognize those?

3   A.  No.

4   Q.  You've never seen them before?

5   A.  No.

6   Q.  All right.  Those are time and effort reports for faculty,

7   and they're posted by the NYU School of Medicine.

8            THE COURT:  Just a second, please.  What exhibit are

9   we talking about?

10            MR. CERASIA:  It's not in evidence.

11            MS. TSE:  That would be Exhibit 15.

12            THE COURT:  I don't believe I have it in my binder.

13            THE WITNESS:  Judge, do you want to see it?

14            MS. TSE:  It's Tse's time and effort to reports from

15   September 1st, 2007 through August 31, 2010.  And the JPTS

16   exhibit number for that is 15A.

17            THE COURT:  I do have Plaintiff's Exhibit 15 but the

18   tab was missing.  Now I have that.

19            MS. TSE:  May I continue?

20            THE COURT:  Yes.

21   Q.  These were posted and they were posted --

22            THE COURT:  Does the witness have a copy of what

23   you're talking about?

24            THE WITNESS:  Yes, your Honor.

25            MR. CERASIA:  She says she's never seen them.  They're

G6D3TSE4                          Sanchez - direct

 1    not in evidence.  I don't want Dr. Tse reading from them, your
 2    Honor.
 3              THE COURT:  Yes, this is correct.  This is not a
 4    document that you're familiar with?
 5              THE WITNESS:  No.
 6              THE COURT:  It's not --
 7              MS. TSE:  I'm sorry, your Honor.
 8              THE COURT:  It's not in evidence and this witness is
 9    not familiar with it, so it is not clear to me how you're going
10    to use this document with this witness.
11    Q.  Are you familiar then with the time and effort system for
12    faculty members of the school?
13    A.  I've heard of it, but I'm not familiar with it, no.
14    Q.  All right.  Would you be able to look at it and explain to
15    the Court at least what is on the papers?
16              THE COURT:  I don't think that that's a fair question
17    to ask this witness who has indicated she hasn't seen this
18    before.  And I can read, but it's not even in evidence.
19              MS. TSE:  All right.  We'll skip to the next question.
20              THE WITNESS:  Okay.
21    Q.  You are aware of what is known as the required extramural
22    funding for research faculty at the school?
23    A.  Yes.
24    Q.  Can you explain to the Court what that system is about.
25    A.  I can explain it from the perspective of being a member of

1    the institution, but not because I oversee it.  What it is, is

2    basically a productivity requirement that individuals who are

3    on the tenured track or are tenured are responsible for

4    covering either 50, 55, or 60 percent of their salary,

5    depending upon the timeframe that we're talking about, and

6    that's what it is.

7    Q.  Who is responsible for overseeing the enforcement of that

8    system?

9    A.  Steve Abramson.

10   Q.  What is his position in the school?

11   A.  He's the vice dean for faculty affairs.

12   Q.  Steven Abramson?

13   A.  Yes.

14           THE COURT:  Ms. Sanchez, let me ask you:  When you

15   defined the system, you referred to tenured faculty.  Does it

16   also apply to non-tenured faculty?

17           THE WITNESS:  No, not that I am aware of.

18   Q.  Do non-tenured faculty have required extramural funding?

19   A.  It varies depending upon the department.  But for some

20   departments, they're obligated to bring in their entire salary

21   on extramural funding.

22           MS. TSE:  All right.  In that case, may I approach

23   with Exhibit 8?

24           THE COURT:  I'm sorry, the number?

25           MS. TSE:  Exhibit 8.  It was admitted into evidence.

G6D3TSE4                            Sanchez - direct

1           THE COURT:  Yes, you may.

2    Q.  This is a letter that Dr. Tse received from her department

3    chair, Dr. Blaser, on September 18, 2009.  It pertains to the

4    academic year from 2008 to 2009.  The second page, the text

5    underlined in red essentially shows that Dr. Tse's REF was

6    100 percent.

7           Do you agree?

8           MR. CERASIA:  Objection.

9           THE COURT:  Sustained.

10   Q.  I will reword.  "Your current salary for the 2008 to 2009

11   academic year is $104,058.  Your current support on extramural

12   funding is $104,058 which meets the AEC performance standards."

13          That would be an REF at 100 percent, is that right?

14          MR. CERASIA:  Objection.

15          THE COURT:  Sustained.  I'm not sure that this witness

16   is familiar with this particular document.  But I do have a

17   question if you can answer it, Ms. Sanchez.  What is the year

18   for the school?  Is it June to June, is it September?  How does

19   it work?

20          THE WITNESS:  September 1st through August 31.

21          THE COURT:  So, a letter sent on September 18, 2009,

22   is talking about the past year's salary?

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  Proceed, Dr. Tse.

25   BY MS. TSE:

G6D3TSE4                        Sanchez – direct

1    Q.  If you can go to page one, third paragraph from the top.

2    And if you can read that paragraph to the Court, please.

3    A.  The third paragraph?

4    Q.  Yes.  Starting with "the dean's letter."

5    A.  "The dean's letter to the faculty dated March 17, 2008,

6    described performance expectations adopted for research

7    faculty.  Each full-time faculty member in the clinical

8    departments is expected to have achieved extramural funding

9    support for at least 50 percent of the portion of his or her

10   salary allocated to conduct research as of September of 2008

11   and continuing thereafter in accordance with increasing

12   percentages for subsequent years.  In the case where the

13   department standards exceed the performance standards in the

14   dean's letter, the department standards will be preserved.

15   Performance in terms of acquired extramural funding REF set for

16   an individual faculty member will be taken into account in

17   determining that faculty member's salary in subsequent years."

18   Q.  If you were the recipient of this letter, will you take

19   that to mean that her REF would be at least 50 percent?

20        MR. CERASIA:  Objection.

21        THE COURT:  Yes, sustained.

22        MS. TSE:  Can I rephrase?

23        THE COURT:  You can try.

24   Q.  Did this letter indicate to the addressee that each

25   full-time faculty member in the clinical departments, of which

1    department of medicine is such, is expected to have achieved

2    extramural funding support for at least 50 percent of the

3    portion of his or her salary allocated to conduct research?

4              MR. CERASIA:  Objection.

5              THE COURT:  Well, the letter speaks for itself.  Are

6    you asking the witness to interpret the letter?

7              MS. TSE:  I'm asking her as any rational and

8    reasonable individual whether she would take that to mean that

9    she is required to come up with 50 percent of her salary

10   support from extramural funding.

11             THE COURT:  Well, I sustained the objection.  This

12   witness has minimal, if any, information about this particular

13   letter.  So, I don't think it is appropriate to ask her to

14   opine or speculate about how someone else seeing it would

15   perceive it.

16             MS. TSE:  All right.  I understand.  May I move on

17   with Exhibit 6?

18             THE COURT:  You may.

19   Q.  Exhibit 6 is a letter that Dr. Tse sent to Dr. Blaser, her

20   department chair, on May 13, 2010, which was copied to

21   Mr. Odom.

22             Was Mr. Odom the vice president for employee and labor

23   relations at the time?

24   A.  Yes.

25   Q.  Please describe Mr. Odom's responsibilities to the Court.

G6D3TSE4                           Sanchez - direct

1    A.   He's the executive responsible for policy interpretation,

2    is responsible for grievances, arbitrations, union contracts,

3    things of that nature.

4    Q.   Please read the box section in Exhibit 6.

5    A.   "I am hereby requesting long-term disability leave

6    pertaining to 65 percent of my time and effort at NYU School of

7    Medicine starting June 1st of 2010.  Performing laboratory

8    experiments on biohazardous specimens (human fluids and tissue

9    isolettes) requires a level of manual dexterity and fine

10   control I no longer have, which precludes increasing my time

11   and effort on collaborative projects with Drs. W. Rom, J.

12   Reibman, and B. Young, or generating preliminary data that is

13   needed to apply for independent funding from extramural

14   sources."

15   Q.   Did Dr. Tse identify to Dr. Blaser that she is an employee

16   with disabilities?

17             MR. CERASIA:  Objection.

18             THE COURT:  I'll sustain to form.  The document speaks

19   for itself.  Again, I don't believe that Ms. Sanchez should be

20   asked to interpret this letter.

21   Q.   Maybe the next exhibit is something that Ms. Sanchez can

22   help us with.  Exhibit 16 is the employee statement from a

23   disability claim form from Unum.

24             MS. TSE:  May I approach, your Honor?

25             THE COURT:  You may.

1              MR. CERASIA:  I have no objection to the document.

2              THE COURT:  Plaintiff's Exhibit 16 received in

3     evidence.

4              (Plaintiff's Exhibit 16 received in evidence)

5     Q.  Does this look familiar to you?

6     A.  No.

7     Q.  Is benefits under the purview of human resources?

8     A.  Yes.

9     Q.  But you have never come across anything that looks like

10    this?

11    A.  I have staff who are responsible for this that manage it.

12    Q.  Who would that be?

13    A.  I don't know who processed this particular claim.

14    Q.  This is the employee statement, so --

15    A.  Yes.  It could be any one of 20 staff members who process

16    it.

17    Q.  All right.  Please read the box on page two, that's Bate

18    stamped NYU third party 000392.

19             THE COURT:  Would you say that again, please?

20             MS. TSE:  The second page of the claim form.

21             THE COURT:  You gave the Bate stamp number?

22             MS. TSE:  Yes.  Which is 0000392.

23    Q.  And that would be section four.  For all medical conditions

24    answer the following questions.  Can you please read.

25    A.  Sure.  "What specific duties of your occupation are you

G6D3TSE4                        Sanchez - direct

1   unable to perform due to your medical condition?"  Answer:

2   "Performing laboratory work as a research scientist."

3   Q.  Thank you.  The form was signed by Dr. Tse and dated

4   May 18, 2010.

5              MS. TSE:  May I approach with Exhibit 17, your Honor?

6              THE COURT:  You may.  Now, let me ask you, so far this

7   witness has not been able to help us on any of the documents

8   that you have showed to her.  Is there some document where she

9   can give some helpful and knowledgeable testimony that would

10  move this along?

11             MS. TSE:  She may be able to direct us to who can help

12  us with this because, apparently, the plaintiff's disability

13  claim is a major issue for dispute.

14             MR. CERASIA:  Your Honor, may I be heard a minute?

15             THE COURT:  Certainly.

16             MR. CERASIA:  Back at the May 12 final pretrial

17  conference, we lodged an objection to Ms. Sanchez as a witness.

18  She has no personal knowledge of Dr. Tse's employment

19  situation.  In fact, I think she will testify today this is the

20  first time she's ever met Dr. Tse.  She just has no connection

21  to this.  I think she's just being called because of her

22  capacity as someone who is the senior VP and vice chair of

23  human resources organizational behavior.  But, she doesn't have

24  the kind of personal knowledge of foundation needed to get

25  through documents like this, and I just respectfully submit

G6D3TSE4                          Sanchez - direct

1    that I think we're going to waste the Court's time.

2            THE COURT:  I'm not concerned about wasting my time as

3    much as I am concerned about wasting Ms. Sanchez's time.

4            MR. CERASIA:  Me too.

5            THE COURT:  So the question, Dr. Tse, is there a

6    particular document or some other evidence that Ms. Sanchez can

7    testify about based on personal knowledge?

8            MS. TSE:  My goal is to pretty much get some sense of

9    what Dr. Tse's employer's approach is in handling with

10   employees with disabilities.  And also how they handle their

11   disability insurance claims.  At the pretrial conference, we,

12   when Mr. Cerasia brought that up, I basically said that we need

13   some sense as to how the employer deals with these issues,

14   because so far, the department chair said he was not aware that

15   he needed to deal with it.

16           THE COURT:  I don't think that's what he said,

17   Dr. Tse.  You have to be very careful about mischaracterizing

18   what witnesses have said.

19           But my question to you is do you have any good-faith

20   basis for assuming that Ms. Sanchez will be able to explain or

21   add anything to your case?

22           MS. TSE:  She will most likely, and correct me if I'm

23   wrong, provide some sense, like she did earlier in her

24   testimony, as to how NYU handles such situations with their

25   employees in general.

G6D3TSE4                          Sanchez - direct

1          THE COURT:  Which situations?  You mean employees with

2     disabilities or your situation?

3          MS. TSE:  Employees with disabilities in particular.

4          THE COURT:  What was the last part?

5          MS. TSE:  In particular.  Employees with disabilities.

6          THE COURT:  Ms. Sanchez, in your capacity at NYU, do

7     you specifically deal with employees with disabilities?

8          THE WITNESS:  I have staff that deal directly with the

9     employees who have disabilities.

10         THE COURT:  All right.  Do they report directly back

11    to you?

12         THE WITNESS:  Sometimes, sometimes not.

13         THE COURT:  Did you have any knowledge or involvement

14    with Dr. Tse's claim?

15         THE WITNESS:  I was just aware of the fact that there

16    was a situation with Dr. Tse and insufficient funding to source

17    her salary.  But it was Reg Odom who handled the case itself in

18    terms of representing HR.

19         THE COURT:  Dr. Tse, under the circumstances, it is

20    not clear to me that Ms. Sanchez can provide any helpful

21    information to the Court.  Is there any particular question you

22    wish to ask of her that might indicate that she has some

23    knowledge of your issues?

24         MS. TSE:  Yes.

25    Q.  Was Margaret Meagher the benefits director during 2010 to

G6D3TSE4                      Sanchez – direct

1    2011?

2    A.  Yes.

3          MS. TSE:  With the Court's permission, perhaps we

4    would be better situated if we call Ms. Meagher to testify,

5    rather than -- Ms. Meagher was on NYU's witness list.

6          THE COURT:  Right.  But, this is your case right now.

7          MS. TSE:  I understand.  But, it appears that I may

8    have called a witness who is trying her best to help, but

9    because the jobs within HR were delegated to different staff

10   members, she could not really, you know, provide any more

11   information than what's on the piece of paper which we can all

12   read.

13         THE COURT:  Yes.  I hear that.  Mr. Cerasia, do you

14   wish to be heard?

15         MR. CERASIA:  No, your Honor.  I just repeat that she

16   is a witness who doesn't have personal knowledge of this

17   situation.

18         THE COURT:  Ms. Sanchez, so we don't take up any more

19   of your time, thank you for showing up.  You are dismissed as a

20   witness.

21         THE WITNESS:  Thank you, your Honor.

22         MS. TSE:  Your Honor, can I ask two more questions?

23   I'm sorry.  I should -- I didn't expect you to dismiss her.

24         THE COURT:  What else would I do when the last five

25   minutes we've been talking about she is not really able to help

G6D3TSE4

1    move this case forward?  Two more questions.  And that's it.

2    BY MS. TSE:

3    Q.  Was human resources or the employees department responsible

4    for compliance of employment laws?

5    A.  The institution is responsible for ensuring that laws are

6    complied with, and human resources is the department that is

7    most knowledgeable.

8    Q.  One more question is so human resources would not be

9    responsible for notifying individual faculty members of their

10   required extramural funding?

11   A.  Extramural funding is a separate responsibility, and that

12   falls under Steve Abramson.

13              MS. TSE:  All right.  That's the two questions.

14              THE COURT:  Thank you, Ms. Sanchez.

15              THE WITNESS:  Thank you.

16              (Witness excused)

17              THE COURT:  I'm looking at the trial schedule and I'm

18   looking forward tomorrow, we have two witnesses coming in.  By

19   the way, if you can take advantage of it, my matter which was

20   on for tomorrow morning has been resolved, so I am also

21   available tomorrow morning if that helps accommodate anybody

22   else's schedule on the witness list, so we can sit a full day

23   tomorrow.

24              Now, as I understand it, we're having tomorrow

25   Mr. Odom and Ms. Cribben.

G6D3TSE4

1              MS. TSE:  Yes.

2              THE COURT:  Based on information I've seen, I assume

3      that they will be able to give some information that's helpful

4      here.

5              MS. TSE:  Yes.

6              THE COURT:  Now, based on what Ms. Sanchez said, I

7      also believe that Mr. Abramson can be helpful.

8              MS. TSE:  Yes.

9              THE COURT:  You can be helpful.  And Ms. Meagher, she

10     will also perhaps be able to be of help.

11             What about Elsa Nuñez, who is she?

12             MS. TSE:  She was and still is the manager for the

13     department of medicine.

14             THE COURT:  Manager in what sense?

15             MS. TSE:  Pretty much with space assignment.

16             THE COURT:  What is the relevance to what's before me

17     now?

18             MS. TSE:  She was responsible for where my office and

19     my laboratories were placed.

20             THE COURT:  In what period of time?

21             MS. TSE:  The time in question.

22             THE COURT:  2010/2011?

23             MS. TSE:  Yes.  And I had requested her to be on the

24     witness list mainly because NYU considered the provision of

25     laboratory and space as reasonable accommodations.

G6D3TSE4

1          THE COURT:  I don't quite understand that.

2          MS. TSE:  In their JPTS statement, they said that we

3     provided Dr. Tse with a lab and an office after she was removed

4     as the director of the core cytometry core, and they considered

5     that to be reasonable accommodations.

6          THE COURT:  Is that an accurate statement?

7          MR. CERASIA:  I don't believe it is an accurate

8     statement.  I think it is in the context of after she was

9     removed as the core director, no one kicked her out.  She still

10    had an office and laboratory space, and they supported her to

11    try to find extramural funding.  I think it is as simple as

12    that.  It is not like she telecommuted, is my point.  I don't

13    know what relevance it would have because I don't know that --

14         THE COURT:  I'm not sure it has relevance either.

15    Dr. Tse, the question about lab and office space isn't the

16    issue here, is it?

17         MS. TSE:  If the space was not provided in

18    consideration of my limitations and needs that I had previously

19    made known to the department.

20         THE COURT:  Well, I don't understand.  I think that

21    what you were seeking as an accommodation had nothing to do

22    with the type of lab you got.  It was whether or not you could

23    get a lab assistant.  Right?

24         MS. TSE:  Yes.  But --

25         THE COURT:  What difference does it make which lab you

G6D3TSE4

1    were given?

2            MS. TSE:  Mr. Cerasia just pointed out that after I

3    was removed as the CFAR flow cytometry core director, the

4    school did not kick me out right there and then, but provided

5    me with space so I can go and apply for extramural funding.

6    But the space has to be suitable.  And it's not.

7            THE COURT:  Well, that's not an issue before me.  The

8    suitability of the space in terms of the accommodation which

9    you were seeking is not really relevant.  Are you saying it was

10   too small or it was too big or it didn't have the equipment you

11   needed?  Did you specifically ask for certain things that you

12   needed in order to try and get preliminary data?

13           MS. TSE:  But, well, what I was driving at is that the

14   space is such that it makes it extremely difficult for someone

15   with my medical issues to work.

16           THE COURT:  Why?

17           MS. TSE:  The laboratory was too far away from the

18   office, even after I had articulated to Dr. Blaser years ago

19   that proximity is very important, because of my condition.  And

20   an office for the better part of the summer had no air

21   conditioning.  And it would not have the mattered except for

22   the fact that NYU expected me to perform.

23           THE COURT:  I think we're getting too far afield here,

24   Dr. Tse.  As I understand your case, you were saying they did

25   not provide you with reasonable accommodation which you told

G6D3TSE4

1    them was a lab assistant.  So, branching out into un-air

2    conditioned offices, I don't think is really relevant unless

3    you're making some claim of putative assignments or something.

4              MS. TSE:  No, I understand, your Honor.  That's why

5    she is not on my list anymore.

6              THE COURT:  Okay.

7              MS. TSE:  That's why after the pretrial conference I

8    took her off my list, along with a whole bunch of other

9    witnesses that I was going to call.

10             THE COURT:  All right.

11             MS. TSE:  And besides that, Elsa Nuñez will not be

12   able to help with the disability benefit applications.

13             THE COURT:  All right.  So, why is she on this list

14   then?  You took her off of yours.  Mr. Cerasia?

15             MS. TSE:  She was also on NYU's list.

16             THE COURT:  Yes.  Do you need her?

17             MR. CERASIA:  No.

18             THE COURT:  All right.  Then I'm sure she will be very

19   happy to hear that.  So who do we have for tomorrow?

20             MR. CERASIA:  Your Honor, may I be heard first on

21   Ms. Meagher?  I'm not so certain I understand why she would

22   need to come in.  The issue is not what Unum did with the

23   disability application.  The real issue is the fact that

24   Dr. Tse applied in May of 2010, and then there was an issue

25   about a discussion, you heard Dr. Blaser testify today, about

G6D3TSE4

1    August of 2010.  It is really the forms.  The process by

2    which --

3              THE COURT:  Well, Dr. Tse, did you have any

4    conversations with Ms. Meagher?

5              MS. TSE:  Yes, I did.

6              THE COURT:  She's relevant.

7              MR. CERASIA:  I only ask, Judge, because she's in and

8    out of the office.  She has pretty debilitating medical issues

9    that makes mobility an extremely difficult for her.  I don't

10   know that we're going to call her here because of those

11   limitations.  So I want to understand if Dr. Tse's going to

12   call her as a witness, because frankly I don't think NYU will.

13   At this point we won't.

14             MS. TSE:  Depending on whether Mr. Odom can help us

15   with the information that we would or that I would like to get.

16   Ms. Meagher basically handled the applications, but we may be

17   able to get the information that we need just from the

18   exhibits.

19             THE COURT:  Did you have a conversation with

20   Ms. Meagher as you filled these out?

21             MS. TSE:  I met with her.  I got instructions from her

22   as to what to do.  She also told me what they would need as

23   supporting medical records, that I will need to meet with

24   Alison Graham who is a nurse, basically, examines employees

25   claiming disabilities.  And so, she was very involved in the

1    entire process of applying for disability benefits.

2            But, as I said, if we can get all the information and

3    all the clarification that we need from the exhibits, from

4    Mr. Odom, then we would not need to bring her in.

5            THE COURT:  All right, then.  It seems to me that if

6    we can avoid bringing her in, if she only had dealings with you

7    in terms of the formality and the mechanics of filling out the

8    disability form, and did not have any discussions with you

9    about accommodation, then it is not clear to me that she can

10   add anything.

11           MS. TSE:  She was aware that the reason why I had to

12   apply for long-term disability benefits was because I needed

13   laboratory assistants to do the work that I cannot do because

14   of my disability.  Mr. Odom was just as aware of that so.

15           THE COURT:  But I'm still not sure, just because she

16   was aware that you were applying for disability, are you saying

17   that the only reason you applied for disability is that NYU

18   would not provide you with the needed assistants?

19           MS. TSE:  Yes.  Because basically, by the end of May,

20   I would lose 65 percent of my salary, unless I can replace it

21   with extramural funding.  And without laboratory assistants, I

22   have no confidence whatsoever that I can accomplish that.

23           THE COURT:  I think we keep going around and around in

24   circles on this, but it's not clear to me that Ms. Meagher will

25   be able to add anything.  And if it is an extreme inconvenience

G6D3TSE4

1    for her physically to come in here, I would need a very

2    detailed offer of proof from you, Dr. Tse, as to why we should

3    bring her in here.

4         MS. TSE:  I understand.  I'm hoping Mr. Odom will be

5    able to answer all the questions that we have for him.

6         THE COURT:  All right.  If you wish, see if you can

7    call any of the remaining witnesses to see if they can come in

8    and testify tomorrow morning.  Otherwise we will keep with the

9    schedule of Mr. Odom and Ms. Cribben tomorrow afternoon.

10        MS. TSE:  Given that Dr. Abramson is very likely a

11   very busy man, since he is the vice dean of faculty, we may be

12   better off to stick to the schedule that we already have,

13   unless your Honor thinks that it would help for --

14        THE COURT:  No, the only thing that I was suggesting,

15   initially I told you I was not available tomorrow morning.  It

16   turns out that I am.  I understand that you set your schedule

17   accordingly.  All I am saying is that if it would accommodate

18   any of the witnesses who are scheduled to appear at other times

19   to appear tomorrow morning, then I am available.  Otherwise,

20   we'll just keep with the schedule that we have.

21        MS. TSE:  What do you think, Mr. Cerasia?

22        MR. CERASIA:  I don't know about Mr. Odom or

23   Ms. Cribben.  As soon as we leave here we'll call them, and

24   we'll let Dr. Tse know.  Because to be honest, I am very

25   concerned about finishing two witnesses in a three-hour block.

G6D3TSE4

1    And I know Ms. Cribben has an important doctors meeting on

2    Wednesday at 1 p.m. so she wouldn't be available to testify,

3    and Dr. Abramson's scheduled in the morning, and he has a

4    lecture to give at 12 or 1 o'clock.  So we've got --

5            THE COURT:  As I say, I'm giving you the opportunity

6    to see if we can move this along a little bit more.  If it

7    works out, fine.  If it doesn't, then it doesn't.  All right.

8    Anything else we can do today?  Dr. Tse?

9            MS. TSE:  No, I'm good for the day.

10           THE COURT:  Okay.  Mr. Cerasia?

11           MR. CERASIA:  Well, I have no witnesses, Judge, I

12   mean, if Dr. Tse can't start testifying.

13           THE COURT:  Anything else you need to raise with me?

14           MR. CERASIA:  No.  I'm sorry, your Honor.  No.

15           THE COURT:  That's fine.  We are adjourned.  I would

16   like you to contact by e-mail Ms. Ackerman-Brimberg and let her

17   know whether or not you can take advantage of my newfound

18   availability tomorrow morning.  If not, I will see you tomorrow

19   afternoon.

20           MR. CERASIA:  Thank you, Judge.  Are we allowed to

21   leave anything in the courtroom like the binders somewhere so I

22   don't have to bring them back?

23           THE COURT:  Yes, you can.  We lock the courtroom in

24   the evening and it is opened in the morning.  And I don't have

25   any other matters scheduled here today or, other than you,

G6D3TSE4

tomorrow.  So I think that you can leave them if you don't need
them.

           MR. CERASIA:  I'm going to put them in the corner.

           THE COURT:  You can put them wherever you want.

           MR. CERASIA:  Thanks.

           (Adjourned until June 14, 2016, at 2 p.m.)

<pre>
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    MARTIN BLASER

 4    Direct By Ms. Tse  . . . . . . . . . . . . . . 3

 5    Cross By Mr. Cerasia . . . . . . . . . . . . .58

 6    Redirect By Ms. Tse  . . . . . . . . . . . . .66

 7    Recross By Mr. Cerasia . . . . . . . . . . . .76

 8    Redirect By Ms. Tse  . . . . . . . . . . . . .77

 9    NANCY SANCHEZ

10    Direct By Ms. Tse  . . . . . . . . . . . . . .79

11                        PLAINTIFF EXHIBITS

12    Exhibit No.                               Received

13     2   . . . . . . . . . . . . . . . . . . . . 8

14     3   . . . . . . . . . . . . . . . . . . . . .10

15     4   . . . . . . . . . . . . . . . . . . . . .12

16     6   . . . . . . . . . . . . . . . . . . . . .14

17     8   . . . . . . . . . . . . . . . . . . . . .29

18    10 subject to connection   . . . . . . . . .31

19    11   . . . . . . . . . . . . . . . . . . . . .43

20    12   . . . . . . . . . . . . . . . . . . . . .45

21    13   . . . . . . . . . . . . . . . . . . . . .45

22    14   . . . . . . . . . . . . . . . . . . . . .54

23     9   . . . . . . . . . . . . . . . . . . . . .67

24    16   . . . . . . . . . . . . . . . . . . . . .93

25
</pre>