G6E3TSE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DORIS TSE,

4                    Plaintiff,

5              v.                           10 Civ. 7207 (DAB)

6    NEW YORK UNIVERSITY,

7                    Defendant.

8    ------------------------------x

9                                          June 14, 2016
                                           10:00 a.m.
10   Before:

11                    HON. DEBORAH A. BATTS,

12                                         District Judge

13                        APPEARANCES

14   DORIS TSE, Pro Se

15   CERASIA & DEL REY-CONE, LLP
          Attorneys for Defendant
16   BY:  EDWARD CERASIA, II
              – and –
17        DANIEL T. DREISEN, in-house counsel, New York University

18

19

20

21

22

23

24

25

G6E3TSE1

1                    (Trial resumed)

2                    THE COURT:  Good morning.  Please be seated.

3                    MS. TSE:  Good morning, your Honor.

4                    THE COURT:  Doris Tse v. New York University.  Is the

5       plaintiff ready?

6                    MS. TSE:  Yes, I am, your Honor.

7                    THE COURT:  I see we have an addition to your team.

8                    MS. SASJA TSE:  Good morning, your Honor.

9                    THE COURT:  Good morning.  Mr. Cerasia, good morning

10      to you.

11                   MR. CERASIA:  Good morning, your Honor.

12                   THE COURT:  Good morning, Mr. Dreisen.  Good morning

13      to you as well.

14                   I see a witness on the stand.  Sir, would you please

15      stand and raise your right hand.

16                   THE WITNESS:  Sure.

17                   (Witness sworn)

18                   THE COURT:  Please be seated.  Now state your full

19      name, and spell both your first and your last names.

20                   THE WITNESS:  Okay.  My name is Reginald Derrik Odom.

21      R-E-G-I-N-A-L-D O-D-O-M.

22                   THE COURT:  Thank you.  You may proceed.

23                   MS. TSE:  Can we make sure that I can be heard

24      properly because we had problems yesterday.  Is this good?

25                   THE COURT:  Oh.  Yes.  I think it's good.  If you want

G6E3TSE1                          Odom – direct

1    to move it a little bit closer, it never hurts.

2              MS. TSE:  Okay.  Better?

3              THE COURT:  Better.

4     REGINALD ODOM,

5          called as a witness by the Plaintiff,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. TSE:

9    Q.  Hello, Mr. Odom.

10   A.  How are you.

11   Q.  We know each other well.

12   A.  Yes, it's been a while.

13   Q.  And as you know, I am representing myself today.  Have you

14   testified in court before?

15   A.  I don't believe I've testified in court before, no.

16   Q.  Are you a lawyer?

17   A.  Yes, I am.

18   Q.  Mr. Odom, please describe to the Court your position at the

19   NYU Langone Medical Center from 2009 through 2011.

20   A.  During that period of time, I was the vice president of

21   employee and labor relations for NYU Medical Center.

22   Q.  What were your responsibilities then?

23   A.  So I was responsible for the employee and labor relations

24   functions throughout the medical center.  Whenever there were

25   employment issues or labor relations matters, I had

G6E3TSE1                          Odom - direct

1    responsibility to address them myself or with a team of other

2    individuals working for me.

3    Q.  When did you leave NYU?

4    A.  I left NYU in June or July of 2013.

5    Q.  Were you deposed on September 22, 2011 by Dr. Tse's counsel

6    in New York?

7    A.  I recall being deposed.  I don't recall the specific date.

8    I'll take your word for it.

9            MS. TSE:  May we approach, your Honor?

10           THE COURT:  You may.

11   Q.  Please confirm that Exhibit 22 was an e-mail that you sent

12   to Dr. Tse in December 2009?

13   A.  Yes.

14           MS. TSE:  Can we admit Exhibit 22 into evidence,

15   please?

16           MR. CERASIA:  No objection, your Honor.

17           THE COURT:  Plaintiff's Exhibit 22 received in

18   evidence.

19           (Plaintiff's Exhibit 22 received in evidence)

20   Q.  Did you meet with Dr. Tse around that time, and she

21   informed you that she has osteoarthritis which limited her

22   ability to work?

23   A.  Yes.

24   Q.  Please confirm that Exhibit 23 was an e-mail that Dr. Tse

25   sent to you in February 2010.

G6E3TSE1                          Odom - direct

1   A.  Yes, I recall this e-mail.

2          MS. TSE:  May we admit Exhibit 23 into evidence, your

3   Honor?

4          MR. CERASIA:  No objection.

5          THE COURT:  Plaintiff's Exhibit 23 received in

6   evidence.

7          (Plaintiff's Exhibit 23 received in evidence)

8   Q.  Please read the underlined text to the Court.

9   A.  It reads as follows: "I asked my rheumatologist, Bruce

10  Solitar, M.D., clinical associate professor, for a letter

11  documenting my need for ADA accommodation during a periodic

12  office visit last week.  The letter will be sent to you

13  directly.  Please let me know if you do not receive it within

14  the next two weeks."

15  Q.  Thank you.  Please confirm that Exhibit 24 was a letter

16  that Dr. Solitar sent to you around March 2010?

17  A.  Yes, I recognize this letter.

18          MS. TSE:  Please admit Exhibit 24 into evidence.

19          MR. CERASIA:  No objection.

20          THE COURT:  Plaintiff's Exhibit 24 received in

21  evidence.

22          (Plaintiff's Exhibit 24 received in evidence)

23  Q.  Please read the underlined text to the Court.

24  A.  It reads as follows:  "Doris Tse is a patient under my

25  care.  I have cared for Dr. Tse for over the past 10 years.

G6E3TSE1                      Odom - direct

```
 1   She suffers from systemic lupus, erythematosus" I don't know
 2   how to say that "as well as severe osteoarthritis of her hands.
 3   She has severe deformity of both hands, and has limited grip
 4   strength and manual dexterity.  She has required multiple hand
 5   surgeries including placement of pins and rods in various
 6   digits."
 7            What's also underlined is "while Dr. Tse remains able
 8   to work full-time as a scientist, she has great difficulty
 9   performing experiments on a day-to-day basis."
10   Q.  Thank you, Mr. Odom.  Did Dr. Solitar's letter corroborate
11   that Dr. Tse was a qualified individual under the ADA?
12   A.  Yes.
13   Q.  Thank you.  Did Dr. Tse convey to you that she could
14   provide the intellectual piece that's needed for her job as an
15   associate research professor?
16   A.  Yes.
17   Q.  You suggested to Dr. Tse that long-term disability benefits
18   would be, to put it in your words, an option if she couldn't
19   perform the functions of the role.
20   A.  I recall that coming up in the conversation.
21            MR. CERASIA:  Objection.
22   Q.  Thank you.
23            THE COURT:  What time period are we talking about?
24            MS. TSE:  We are getting into the period after I was
25   removed as the core director.  So we are looking at the period
```

G6E3TSE1                        Odom - direct

1     after March 2010, and before I put in my application for

2     long-term disability benefits.

3     Q.   Did you assist Dr. Tse with applying for long-term

4     insurance benefits, long-term disability insurance benefits?

5     A.   I think I informed Dr. Tse about how to go about the

6     process.  The paperwork goes to the benefits function, went to

7     the benefits function within human resources.

8     Q.   That would be Margaret Meagher, who was the director of

9     benefits?

10    A.   Yes, Margaret was the director of benefits.

11              THE COURT:  Before we get there, what was your

12    response to this letter asking for an accommodation?

13    Plaintiff's Exhibit 22?

14              THE WITNESS:  During the conversation that Dr. Tse and

15    I had, we talked about -- she explained what her disability was

16    and what her functions were, and as she stated, she indicated

17    that she could provide the intellectual piece that's needed to

18    do her job, but what she needed was somebody to help her with

19    the manual issues that she needed to deal with in terms of the

20    experiments.

21              What she was requesting was a post-doc fellow, I

22    believe, to help support the role.  What was being provided and

23    what we felt was adequate was a technician to provide those

24    services for her.  A post-doc is a different level from an

25    intellectual standpoint, and we felt that part was being

G6E3TSE1                         Odom - direct

 1   handled by Dr. Tse, so there was no additional accommodation

 2   needed, that the technician provided the necessary manual

 3   manipulation needed for her role.

 4              THE COURT:  Was a technician provided?

 5              THE WITNESS:  Yes, there was a technician already

 6   provided for her in the lab.

 7              MS. TSE:  That was while I was still the director of

 8   the flow cytometry core.  I believe your Honor was referring to

 9   the period after I was removed as the flow cytometry core

10   director?

11              THE COURT:  Yes, I'm referring to Exhibit 22, which is

12   2009.  You were still there at the core, correct?

13              MS. TSE:  Yes.

14              THE COURT:  Okay.

15              MS. TSE:  I submitted the exhibit to provide proof

16   that Mr. Odom was aware before I was removed as the flow

17   cytometry core director that I was in need of ADA

18   accommodations, and what those accommodations were.

19              THE COURT:  So what was the date that you were

20   actually removed and no longer had the full-time lab person?

21              MS. TSE:  April 1st, 2010.

22              THE COURT:  April 1st, 2010.  Were there subsequent

23   conversations --

24              MS. TSE:  Yes.

25              THE COURT:  Let me finish.

1          MS. TSE:  I'm sorry.

2          THE COURT:  Were there subsequent conversations with

3     Dr. Tse after she was removed from the position of director of

4     the lab regarding her need for accommodations?

5          THE WITNESS:  I don't recall a request for any kind of

6     accommodation after our initial discussion.  Our first

7     discussion, if I recall, was about, specifically about the

8     accommodation she needed.  She was in the lab at the time.

9     After she was removed, the discussions I recall were about me

10    trying to help prod the process for her to pursue long-term

11    disability, and then subsequently there was a later

12    conversation with myself and a couple of others where we were

13    checking in on how she was doing in her need to get additional

14    support for her funding her job.

15          And at no point in time do I recall any additional

16    requests for accommodation in the different role that she was

17    in.

18          THE COURT:  Thank you.  You may proceed, Dr. Tse.

19          MS. TSE:  Thank you, your Honor.

20    BY MS. TSE:

21    Q.  We're going back to the LTD disability benefits.  Would

22    Dr. Tse be able to apply for and receive LTD benefits if she

23    had not elected to have the monthly premiums deducted from her

24    paycheck?

25    A.  I don't recall the specifics of the plan.  But sometimes

G6E3TSE1                          Odom - direct

1    there is a base level of benefit that's provided without cost,

2    and then usually there is a higher level of benefit that's

3    provided once you contribute.  To get the higher level, which

4    is 60 or 65 percent, something to that effect, you had to

5    contribute.  So I believe you were eligible for that.

6    Q.  So, LTD insurance was provided by NYU at a base level, and

7    if the employee so chooses and paid the premium, it would be

8    elevated to a higher level of coverage?

9    A.  That's my recollection, yes.

10   Q.  Thank you.

11            MS. TSE:  May we approach with Exhibit 2?

12            THE COURT:  You may.

13            MS. TSE:  That has been already admitted.

14   Q.  I'm sorry, I didn't -- so are you familiar with that

15   letter?

16   A.  Yes, I recall the letter.

17   Q.  All right.  Just to remind the Court where we are at, can

18   you please read the text underlined in red.

19   A.  In red?  Funding for that position -- excuse me.  "Funding

20   for that portion of your salary from CFAR budgets is scheduled

21   to end on May 31."

22   Q.  Did you, between the time that you received Dr. Solitar's

23   letter, which is around the same time that Dr. Valentine sent

24   this letter to Dr. Tse, ask Dr. Tse what she would need in

25   order to continue her job without the CFAR core grant?

1          MR. CERASIA:  Objection.

2          THE COURT:  I'm not sure I understand the question.

3   Would you please rephrase it.

4   Q.  Dr. Solitar sent you a letter in March 2010.  Dr. Valentine

5   sent me a termination letter around the same time, which was

6   March 4, 2010.  Do you remember meeting with Dr. Tse after she

7   received Dr. Valentine's termination letter?

8          THE COURT:  You mean the March 4 letter?

9          MS. TSE:  Yes.

10  A.  I recall that we had a number of meetings.  I'm not sure of

11  the time frame.

12  Q.  Thank you.  Do you recall asking Dr. Tse whether she could

13  perform in her new role without the support from the NIH which

14  paid for her laboratory technicians?

15         MR. CERASIA:  Objection.

16         THE COURT:  Basis?

17         MR. CERASIA:  No foundation.

18         THE COURT:  Well, the question is do you recall.  He

19  can either say yes or no.

20  A.  I don't recall.

21  Q.  Did you, as a representative of Dr. Tse's employer, NYU,

22  counsel her that since you are aware that she's a disabled

23  individual, that she can request reasonable accommodations to

24  her physical impairment?

25  A.  In our first conversation, the reason we were meeting was

1   because you were requesting an accommodation.  I thought that

2   Dr. Tse was very well aware of her rights to request an

3   accommodation.

4   Q.  All right.  And you do not feel that after she was removed

5   as the core director that she would need the same

6   accommodations to continue in her new role.

7   A.  I'm not aware of exactly how the new role would work.  My

8   understanding is as a non-tenured faculty researcher, that you

9   were obligated to support your salary at a 100 percent level,

10  and you would need to get additional funding to do that.  I

11  can't say that I know the details what would be involved in

12  that process.

13  Q.  By "that process," you mean what it would take her to get

14  the extramural funding to make up for the 65 percent of her

15  salary support that she lost?

16  A.  That's correct.

17  Q.  Thank you.

18          MS. TSE:  May we approach with Exhibit 6, your Honor.

19          THE COURT:  You may.

20  Q.  You were copied on this letter?

21  A.  Yes, that's correct.

22  Q.  And referring back to Dr. Valentine's termination letter,

23  so Dr. Tse sent this letter to Dr. Blaser two weeks before her

24  salary or 65 percent of her salary was about to run out.  Is

25  that correct?

1    A.  Well, in actuality, my understanding is your salary was

2    never reduced.

3    Q.  But, Dr. Valentine's letter specifically said, and you read

4    it a couple of minutes ago, that funding for that portion of

5    your salary from CFAR budgets is scheduled to end on May 31.

6    Dr. Tse did not receive any notice or letters from NYU

7    informing her that 65 of her salary would not run out.  Do you

8    have any --

9              THE COURT:  I'm totally confused now.

10             MS. TSE:  All right.

11             THE COURT:  First of all, this exhibit, March 4, 2010,

12   Exhibit 2, Mr. Odom is not copied on.

13             MS. TSE:  Yes.

14             THE COURT:  So, that's one issue I have.  But what are

15   you asking him in relation to this letter?

16             MS. TSE:  What I am trying to establish that Dr. Tse

17   was pretty much pressured into applying for long-term

18   disability benefits because her salary was going to run out, or

19   65 percent of her salary was going to run out in two weeks.

20   The only --

21             THE COURT:  I'm sorry.  Which exhibit are we referring

22   to, 2?

23             MS. TSE:  We're referring to 2 where Dr. Valentine

24   stated funding for that portion of your salary from CFAR

25   budgets, which was 65 percent, is scheduled to end on May 31.

1              THE COURT:  Okay.  So?

2              MS. TSE:  And lacking any further information from

3      NYU, I assumed that that was going to happen.  That on

4      June 1st, my salary would fall to 35 percent of what I had been

5      receiving for the previous year or two years.  And that was why

6      I contacted Mr. Odom, and we had a few meetings and few

7      exchanges of e-mail, and I was exploring my option to

8      supplement my income by way of long-term disability benefits.

9      I did not choose long-term disability benefits over continued

10     employment.

11             THE COURT:  What indication in the exhibits do we have

12     of that?

13             MS. TSE:  We will get to that in the next 15 minutes

14     at the most.

15             THE COURT:  Why don't we get to it now.

16             MS. TSE:  Okay.

17             First of all, to address the issue that your Honor

18     brought up, Dr. Valentine's letter was not copied to Mr. Odom,

19     but Exhibit 26, which is a series of e-mails between

20     Dr. Blaser, Dr. Valentine, Lucy Cribben, and including

21     Mr. Dreisen, who is present, as far as his involvement in the

22     drafting of the letter, that would be Exhibit 26.

23     Q.  Mr. Odom, can you confirm that?  And it's Bate stamped NYU.

24     A.  I'm sorry.  Could you repeat the question?

25     Q.  Just confirm that, you know, the series of e-mails at that

G6E3TSE1                        Odom - direct

1    time involving my termination as the flow cytometry director

2    and that you were involved?

3    A.  Yes, I was involved.  I recall this.

4            MS. TSE:  Please admit Exhibit 26 into evidence.

5            MR. CERASIA:  No objection.

6            THE COURT:  Plaintiff's Exhibit 26 received in

7    evidence.

8            (Plaintiff's Exhibit 26 received in evidence)

9            MS. TSE:  May we go back to Exhibit 6 to establish the

10   timeline.  That would be Dr. Blaser's letter, I sent in that

11   letter, and it's dated May 13, 2010.

12           THE COURT:  Which exhibit is that?

13           MS. TSE:  Exhibit 6, your Honor.

14   Q.  Please read the text in the box to the Court so we may be

15   reminded under what circumstances Dr. Tse applied for long-term

16   disability.

17   A.  You're referring to Exhibit 6?  I just want to be clear.

18   Q.  Yes, Exhibit 6.

19   A.  It reads as follows:  "I am hereby requesting long-term

20   disability leave pertaining to 65 percent of my time and effort

21   at NYU School of Medicine starting June 1st, 2010.  Performing

22   laboratory experiments on biohazardous specimens (human fluids

23   and tissue isolettes) requires a level of manual dexterity and

24   fine control I no longer have, which precludes increasing my

25   time and effort on collaborative projects with Drs. Rom,

1    Reibman, and Young, or generating preliminary data that is

2    needed to apply for independent funding from extramural

3    sources."

4    Q.  Thank you.  So Dr. Tse requested long-term disability leave

5    starting June 1st because 65 percent of her salary would be

6    lost?

7            MR. CERASIA:  Objection.

8    Q.  Starting June 1st, 2010.

9            THE COURT:  Objection sustained.  The witness is not

10   able to say why you did something.

11   Q.  All right.  Did NYU offer Dr. Tse any accommodations to

12   Dr. Tse's physical impairments by May 13, 2010, that you know

13   of?

14   A.  My understanding is was that there was an accommodation

15   that was available while you were the director of the lab.

16   Beyond that point, there was no additional request for

17   accommodation, other than the fact that your salary was

18   continued.

19   Q.  Continued to May 31?

20   A.  Actually your salary was continued through the following

21   year, if I recall.

22   Q.  Do you remember drafting a letter to that effect?

23   A.  Excuse me?

24   Q.  Informing Dr. Tse that her salary will be continued?

25   A.  No, I did not.

G6E3TSE1                    Odom - direct

1   Q.  Beyond May 31, 2010?  Because Dr. Tse did not receive any

2   such notice by letter or e-mail.  So you do not remember

3   drafting a letter together with Dr. Blaser or anyone else

4   informing Dr. Tse that her -- that 65 percent of her salary

5   would not stop?

6   A.  Your question to me was about what accommodations you

7   received.  So I articulated that the technician was the

8   accommodation associated with you being the lab director, and

9   an additional significant accommodation was your salary was

10  never discontinued.  Despite the fact that you were only down

11  to I believe it was 35 percent funding or something to that

12  effect.

13  Q.  Yes.  But my question is that you were under the impression

14  that my salary was not discontinued.  My specific question is:

15  Was Dr. Tse aware that her salary or 65 percent of her salary

16  would not be discontinued?

17              MR. CERASIA:  Objection.

18              THE COURT:  Objection sustained.  Rephrase the

19  question.

20  Q.  All right.  I will repeat my previous question.  Did you

21  draft or send Dr. Tse, did you draft a letter with Dr. Blaser

22  or did you yourself send Dr. Tse a letter or notice by e-mail

23  that her salary, 65 percent of her salary would not be

24  terminated on May 31, 2010?

25  A.  No, I did not.

G6E3TSE1                          Odom - direct

1    Q.  All right.

2              MS. TSE:  As your Honor requested, this is an e-mail

3    that Dr. Tse sent to Mr. Odom reiterating again her

4    limitations.  May we approach?

5              THE COURT:  You mean what you're going to give is an

6    e-mail?

7              MS. TSE:  Yes.  Exhibit 25.

8              THE COURT:  All right.  That's what I needed.

9              MS. TSE:  Sorry if I did not make that clear.

10             THE COURT:  You may approach.

11   Q.  Please read the underlined text to the Court.

12   A.  It reads as follows:  "Post-doc slash --"

13             MR. CERASIA:  Your Honor, I have no objection.  Before

14   he starts reading from the document, it's not in evidence.

15             MS. TSE:  I'm sorry.  I was ahead of myself.  Please

16   admit Exhibit 26 into evidence, your Honor.

17             THE COURT:  Is it 25?

18             MS. TSE:  25 okay.  Yes, I am very sorry for my

19   blunders.

20             THE COURT:  You need not apologize.  You are a skilled

21   researcher, but you're not a lawyer.

22             On the other hand, may I suggest that the Court is

23   fully capable of reading these documents.  And what the purpose

24   of having the witness here is for the witness to expand on or

25   explain or testify about something about this document.  So,

1   you do not need to have the witness read what you have so

2   conveniently underlined.  I can get that in.

3          But what I would like, if it is something that you had

4   planned to do, is does the witness have anything that he can

5   add to this document in terms of explaining what was going on.

6          MS. TSE:  All right.

7   Q.  Please confirm then, Mr. Odom, that you were notified by

8   Dr. Tse that she was to request long-term disability for

9   65 percent of her salary specific to her NIH support ending on

10  May 31, 2010.

11         THE COURT:  Before you answer that, I didn't actually

12  say Plaintiff's Exhibit 25 is received in evidence.  But it is.

13         (Plaintiff's Exhibit 25 received in evidence)

14         MS. TSE:  Thank you.

15  A.  Yes, I recall this document because I was a little confused

16  about your request specifically for 65 percent of your effort.

17  It confused me a little bit, which is what prompted me to ask

18  if that was what you were intending to do.  And you clarified,

19  articulating that you were trying to capture the piece of your

20  salary that wasn't being supported by additional grant funding.

21  Q.  Are you aware, because in that paragraph, Dr. Tse

22  specifically said that that portion of her salary or her need

23  for long-term disability benefits to cover that portion of her

24  salary may increase or decrease as positions with

25  accommodations at NYU is opened or closed?

1          Were you aware at that time whether Dr. Tse was

2     offered any such accommodations?

3     A.  I guess I'm confused by your question.

4          MR. CERASIA:  Objection.

5          THE COURT:  All right.  What was the basis for your

6     objection?

7          MR. CERASIA:  She referred to such accommodations.  I

8     don't think she's identifying what these accommodations are.

9          THE COURT:  Yes.  Will you rephrase your question,

10    Dr. Tse.

11         MS. TSE:  As I understood it at the time, and I was

12    advised by counsel from Maya Murphy P.C., that under the EEOC

13    it is up to the employer to provide accommodations.  And

14    previous to being removed as the CFAR core director, I was

15    actually also advised by Mr. Odom that, yes, as a qualified

16    individual under the ADA, I have rights to expect reasonable

17    accommodations from my employer, but I do not get to specify

18    what those accommodations would be, as long as they are

19    accommodations provided towards my physical limitations, so

20    that I can perform my job.

21         THE COURT:  Wait, are you saying that's what Mr. Odom

22    said to you?

23         MS. TSE:  He advised me, not pertaining to the current

24    issue at trial, but to the issue that your Honor dismissed in

25    your ruling on NYU's motion for summary judgment.

G6E3TSE1                          Odom – direct

1        THE COURT:  Then it's not the subject of this trial

2   right now.

3        MS. TSE:  I am just trying to establish that it is the

4   employer's responsibility and option to provide the reasonable

5   accommodations, which is why the letter says "ADA

6   accommodations," without specifying what they should be.

7        THE COURT:  You know you will have an opportunity to

8   testify, Dr. Tse.  Right now we have Mr. Odom on the stand.

9   Why don't we find out from him what he recalls, what he said,

10  and what he believes the obligations were.

11       So let me take one of the things you said and ask

12  Mr. Odom, what did you understand NYU's responsibilities to be

13  toward an individual who qualifies for ADA accommodations?

14       THE WITNESS:  NYU would be obligated to engage in an

15  interactive process to talk to the individual, and that was

16  part of our role, and the role I played in this situation was

17  to find out what accommodation was needed to support that

18  individual performing the essential functions of the job.  If

19  we can provide the accommodation, if it was reasonable to

20  provide that.

21       In the situation where we initially talked, what we

22  talked about was providing accommodation when she was director

23  of the lab, and that was the accommodation of providing a

24  technician to provide the manual manipulations that were needed

25  in the role.

G6E3TSE1                          Odom - direct

1         Once she was removed from the lab, there weren't

2    additional discussions about specific positions or needs for

3    accommodation.

4         THE COURT:  But you were aware that she needed

5    accommodation.

6         THE WITNESS:  Yes.

7         THE COURT:  And let me ask, was NYU paying for the

8    technician that she had had when she was the director?

9         THE WITNESS:  Yes.

10        MS. TSE:  May I, your Honor?

11        THE COURT:  Please.

12   Q.  On what did you base that statement?

13        THE COURT:  What I'm asking is were the funds NYU

14   funds or were they coming from NIH?

15        THE WITNESS:  I'm not certain of the specific funding

16   sources.

17        THE COURT:  Okay.

18        MS. TSE:  May I submit evidence to show that those

19   funds came from the NIH?

20        THE COURT:  I am pretty sure there will be evidence of

21   that.  So we need not belabor this with Mr. Odom.

22        MS. TSE:  We'll go on with Mr. Odom.

23   Q.  So to reiterate my question in the current framework, were

24   you aware by May 13, 2010, of any accommodations that NYU had

25   offered Dr. Tse to her physical impairments?

G6E3TSE1                         Odom - direct

1    A.  So the accommodation that had been offered previously was

2    the technician.  I'm not sure --

3    Q.  Let's forget about --

4    A.  You're saying additional accommodations?

5    Q.  -- the 2009 issue.  It is not additional.  Because upon my

6    removal as the CFAR core director, I lost that accommodation

7    independent of whether it came from the NIH or NYU, right?

8              So we're talking about events beginning on April 1st,

9    2010, when I was removed as the core director, and I no longer

10   have access to those NIH funds, I am no longer authorized to

11   use them.

12             MR. CERASIA:  Your Honor, I'm going to object.  This

13   all seems to be testimony as opposed to questions.

14             MS. TSE:  I am trying --

15             THE COURT:  No, I think it is a very long question.

16   But, why don't we see if we can cut it down and ask discrete

17   pieces of information from Mr. Odom, rather than having a

18   speech turning into a question.

19             MS. TSE:  All right.

20   Q.  I'm just trying to clarify from Mr. Odom which period we

21   are referring to.  We are referring to the period specifically

22   at the time that I sent Dr. Blaser the letter that is dated

23   May 13, 2010, when I informed him that I am applying for

24   long-term disability leave, because I could not perform my job.

25   A.  I'm sorry, I don't recall what the question was.

G6E3TSE1                        Odom - direct

1    Q.  Yeah.  The question is:  In the context of that letter, are

2    you aware or were you aware when you were copied on this

3    letter, of any accommodations that NYU had offered Dr. Tse

4    before May 13, 2010, but after April 1st, 2010?

5         THE COURT:  Great question.

6    A.  Okay.  After April 1st when you were no longer responsible

7    for the lab, I am not aware of accommodation.

8    Q.  Yes, and I have no access to the money that was used to pay

9    for my lab technicians.

10   A.  Right.  I am not aware of an accommodation request or any

11   accommodation offered.

12   Q.  So you are not aware of any formal requests for

13   accommodation, but by May 13, you were reminded once again that

14   Dr. Tse had a physical impairment that would affect her ability

15   to perform her job.  Meaning, you were copied on the May 13

16   letter to Dr. Blaser.

17   A.  The May 13 letter, requesting long-term disability.

18   Q.  Yes.  But, along with that request what exactly did Dr. Tse

19   state in the letter?

20   A.  In the letter you articulated that you no longer had the

21   level of manual dexterity and fine control you needed which

22   would preclude you increasing your time and effort on

23   collaborating projects, and you were requesting long-term

24   disability.

25   Q.  It was now, let's continue with the long-term disability

1    issue.

2            THE COURT:  Let's not get there quite yet.  Mr. Odom,

3    after Dr. Tse was no longer the director, and therefore did not

4    have the technician or the funds to pay the technician, what

5    accommodation to permit her to do her work was discussed?

6            THE WITNESS:  There was no discussion of an

7    accommodation outside of the role as the director of the lab.

8            THE COURT:  So, once she was removed as director of

9    the lab, NYU did not offer her an accommodation because of her

10   known disability?

11           THE WITNESS:  I'm not aware that we offered nor do I

12   recall her asking about an accommodation.

13           THE COURT:  All right.  Thank you.  You may go on to

14   what you wish to go on to, Dr. Tse.

15           MS. TSE:  Thank you.

16   Q.  Let us reaffirm, you were aware that I had a disability?

17   A.  Yes.

18   Q.  All right.  So going on with the long-term disability

19   benefits application, did you ask Dr. Tse to see Allison Brehm

20   from employee health services, to corroborate her disability,

21   namely osteoarthritis of the hands?

22   A.  Yes, I believe so.  But I thought that was in relation to

23   our original discussion about disability, and not necessarily

24   related to long-term disability.  I mean, our original

25   discussion about accommodation, not long-term disability.

1   Q.  That's all right.  Do you customarily or did you

2   customarily send employees with disabilities who need to apply

3   for long-term disability benefits to Ms. Brehm to corroborate

4   their disabilities?  Is that a routine practice?

5   A.  So again, I don't believe my referral to Allison Brehm was

6   related to long-term disability.  It was related to an

7   accommodation.

8           Typically what happens if a person comes in and

9   indicates they have a medical condition or needs an

10  accommodation, we'll ask them to get supporting documentation

11  from their physician and/or potentially meet with -- meet with

12  Allison Brehm who was the director of our employee health

13  services.

14          Typically the process is designed to get the clinical

15  communication to stay within the clinicians.  And again, one of

16  the complicating factors when you work at NYU Medical Center is

17  you have clinicians all around you.  And I want to constantly

18  remind our supervisors to be supervisors and not clinicians.

19  To try to separate those functions, we'll often have a person

20  meet with the clinical person in employee health service.  So

21  if there needs to be a discussion between that person's

22  physician to clarify a need for an accommodation, or clarify

23  something related to the request for a disability, that all

24  stays within the employee health service ambit.  And they come

25  back to the human resources function and say a person needs to

1    take frequent breaks or the person needs whatever they need,

2    just kind of in layman's terms to us, to keep the clinical side

3    out of the work relationship.

4    Q.   Thank you.  Did you ask Dr. Tse to request long-term

5    disability leave because there is a 180-day salary continuation

6    period in Unum's insurance policy?

7    A.   I don't recall that.

8    Q.   Are you aware that as a full-time faculty member, Dr. Tse's

9    salary may be continued for up to six months as stipulated in

10   the NYU faculty handbook?

11   A.   I don't recall the specifics of the handbook.

12   Q.   And the continuation of salary and, sorry, let me explain

13   in further detail.  And that continuation for salary is

14   specifically for illness or injury.

15          THE COURT:  Is there a particular policy or manual

16   that you're referring to?

17          MS. TSE:  The NYU faculty handbook.

18          THE COURT:  Is that in evidence?

19          MS. TSE:  It's not in evidence for trial.  But it was

20   submitted with the pretrial JPTS.  It was in the plaintiff's

21   exhibit list.

22          THE COURT:  So it was before the Court at some point?

23          MS. TSE:  Before the Court when the pretrial documents

24   were submitted, and that would be May of 2014.

25          THE COURT:  So, what I'm trying to establish here is,

1    is there a policy or manual that you can show to Mr. Odom to

2    help him answer your question more precisely?

3              MS. TSE:  I do not have it printed.  But, I can

4    definitely submit that to the Court.

5              THE COURT:  I believe that Ms. Ackerman-Brimberg, who

6    has everything all the time, will be able to assist you.

7              MS. TSE:  It will take me a minute.

8              THE COURT:  Take your time.

9              (Pause)

10             MS. TSE:  That would be 22C.  May we approach the

11   bench with this?

12             THE COURT:  Yes.  Bear with me just one second.

13             MR. CERASIA:  Your Honor, we had an objection to this

14   document when it was originally identified.

15             MS. TSE:  Plaintiff responded to that objection.

16             THE COURT:  All right.  Then for purposes now, I am

17   receiving into evidence Plaintiff's Exhibit 22C, which was part

18   of the motion for summary judgment, and we're making copies so

19   that the witness can look at it as Dr. Tse questions.

20             MS. TSE:  Thank you, your Honor.

21             (Plaintiff's Exhibit 22C subject to connection

22   received in evidence)

23             THE COURT:  Looking at the document, I see it is not

24   the complete manual but it is composed of selected pages.

25             MS. TSE:  52, yeah, the papers were excerpted from a

G6E3TSE1                           Odom - direct

1    very, very large handbook, and it is Bate stamped NYU 0003818

2    is the page that contains the information in question.

3              THE COURT:  All right.  I'm sorry.  Now that we all

4    are on the same page, literally, would you repeat your question

5    for Mr. Odom.

6    Q.  Were you aware that a full-time faculty member, such as

7    Dr. Tse, is or could be allowed six months' disability leave

8    from illness or injury, in her case illness?

9              THE COURT:  First of all, the objection is sustained.

10   I think we need to lay a little foundation here in terms of

11   Mr. Odom's knowledge.

12             Are you familiar with the policy manual that this

13   comes from?

14             THE WITNESS:  I'm familiar with the faculty handbook,

15   yes.

16             THE COURT:  To whom does the faculty handbook apply?

17             THE WITNESS:  It applies to the faculty at NYU School

18   of Medicine.

19             THE COURT:  All of the faculty?

20             THE WITNESS:  Yes.  And what's confusing about it is

21   there's different levels of faculty.  There is tenured faculty,

22   there is non-tenured faculty, and there are different pieces

23   that apply to the different faculty.

24             THE COURT:  Would this part of the document apply to a

25   faculty member in Dr. Tse's position?

1          THE WITNESS:  I'm not clear, because it references

2     code 102 which I don't recall what that means.  It refers to

3     salary and full-time faculty member and it says code 102.  I

4     don't know what that is.

5          THE COURT:  All right, then, again what I will do, as

6     I did yesterday with another document, which was Plaintiff's

7     Exhibit 10, I will receive this Exhibit 22C subject to

8     connection.  The connection being some evidence to establish in

9     this record that the pages that we're going to ask Mr. Odom

10    about now actually apply to a faculty member in Dr. Tse's

11    position.

12    Q.  So without going into the category of full-time faculty,

13    were you aware that there is such a policy providing six months

14    of disability leave?

15          MR. CERASIA:  Objection.

16          THE COURT:  Basis for the objection?

17          MR. CERASIA:  Policy applying to which category of

18    employees?

19          THE COURT:  I believe that I just stated, Mr. Cerasia,

20    that we don't know whether this part applies to Dr. Tse or not.

21    So, assuming for purposes now that it does, since we don't want

22    to bring Mr. Odom back, this will be received subject to

23    connection, and the testimony on this is going to be received

24    subject to connection.

25          Should it turn out that there is definitive proof

G6E3TSE1                         Odom - direct

1    offered to the Court that these pages or this part in the

2    manual do not apply to Dr. Tse, then this testimony will not be

3    received for all purposes.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CERASIA:  Thank you, your Honor.

2          THE WITNESS:  I'm sorry.  Can you repeat your

3    question?

4          MS. TSE:  For the recorder or for you?  I am waiting

5    for permission to continue.

6          THE WITNESS:  Oh, gotcha.

7          THE COURT:  Please do, Dr. Tse.

8          MS. TSE:  Thank you, your Honor.

9    BY MS. TSE:

10   Q.  After you were copied on this letter, did you inform

11   Dr. Blaser that, as a qualified individual, NYU is obligated to

12   accommodate Dr. Tse's limitations so she could do her job?

13   A.  Which letter are you referring to?

14   Q.  The May 13th, 2010.

15   A.  I didn't respond to this letter at all.

16   Q.  I understand.

17         So, you did not confer with Dr. Blaser after you were

18   copied on this letter?

19   A.  No.  This letter was a request for long-term disability.

20   Q.  You do not recall having any discussions with Dr. Blaser

21   after you were copied on this letter?

22   A.  Not that I recall.  Not in response to the letter.  I

23   viewed this as a request for long-term disability.

24   Q.  And you did not feel the need to discuss Dr. Tse's

25   limitations with Dr. Blaser?

G6E5tse2                        Odom - direct

1   A.  I guess I didn't respond to the letter at all.

2   Q.  All right.

3       And, likewise, you did not have any discussions with

4   Lucy Cribben --

5   A.  No.

6   Q.  -- after you were copied on this letter?

7   A.  Not that I recall.

8   Q.  Then, let us go back to your e-mail which was admitted as

9   Exhibit 26.  Did you, at the time, when you were drafting the

10  letter terminating Dr. Tse's role as the CFAR core director,

11  inform either Dr. Blaser or Ms. Cribben that Dr. Tse is a

12  qualified individual under the ADA and required accommodations

13  to perform her job?

14  A.  So, initially I did not draft the letter terminating

15  Dr. Tse.  I believe I was asked to express my opinion on the

16  letter and edit it but I did not communicate with Dr. Blaser or

17  Lucy Cribben to indicate your disability status.

18  Q.  All right.

19      Now, once again, and if we covered this point

20  previously I apologize for the redundancy, but we are going

21  back to Exhibit 25 which has been admitted into evidence.

22      So, if Dr. Tse did not make it adequately clear by May

23  13th, 2010 to you or Dr. Blaser that she is in need of

24  reasonable accommodations, did she do so in her e-mail to you

25  on May 14th, 2010?  That was the day after she sent Dr. Blaser

G6E5tse2                        Odom - direct

1   her request for long-term disability relief letter.

2   A.  I took this communication as just a clarification of your

3   request for long-term disability.  I wasn't interpreting a need

4   for accommodation as part of this.

5   Q.  Very well.  Let us go on with the application process.

6           I was trying to get clarification from Ms. Sanchez

7   yesterday --

8           THE COURT:  No, no, no, no.  We won't talk about what

9   other witnesses said.

10          MS. TSE:  I'm sorry.

11          THE COURT:  We are only concerned with what Mr. Odom

12  can tell us today and what he knows.

13          MS. TSE:  I'm sorry, your Honor.

14  Q.  May we approach with Exhibit 16, which is the employee's

15  statement from the Unum disability claim application?

16          Did Ms. Meagher, who handled the application process

17  for Dr. Tse, confer with you during the application process?

18          MR. CERASIA:  Objection.

19          THE COURT:  Well, I will allow it.

20  A.  Margaret and I had a couple of conversations during the

21  process.

22  Q.  Were you copied on any one of these forms?

23  A.  No.

24  Q.  There is also an employer statement.

25  A.  No.  I didn't receive -- I'm not familiar with this form.

G6E5tse2                        Odom - direct

1   I didn't receive any of the forms related to disability.

2   Q.  Ms. Meagher is unable to be here because of hardship --

3           MR. CERASIA:  Objection, your Honor.

4           THE COURT:  Yes.  Again, please, let us not talk about

5   any other potential witnesses with this witness.  You may ask

6   him about his interaction with Ms. Meagher, but don't speak

7   about whether she will or will not be a witness.

8           MS. TSE:  Thank you, your Honor.

9   BY MS. TSE:

10  Q.  May I point your attention to the page that contains the

11  box on the --

12          THE COURT:  Are we talking about the box that you made

13  on the second page of the document?

14          MS. TSE:  Yes.  There are many boxes but I am

15  referring to the blue box on the second page.

16          THE COURT:  In response to question 4.

17  BY MS. TSE:

18  Q.  The question is for Mr. Odom to confirm that Dr. Tse's

19  statement in her employee application is no different than her

20  position throughout the time since he was aware of her

21  disability.

22          MR. CERASIA:  Objection.

23          THE COURT:  Okay.  I don't understand the question.

24  Please, rephrase it.

25  BY MS. TSE:

1    Q.  In the box under Section D, for all medical conditions

2    answer the following questions --

3              THE COURT:  Wait a minute.  I'm sorry.  Which exhibit

4    are we working with now?

5              MS. TSE:  Exhibit -- I'm sorry, your Honor.  This is

6    Exhibit 16 --

7              THE COURT:  Right.

8              MS. TSE:   -- which may or may not have been admitted

9    into evidence.

10             THE COURT:  It was.

11             MS. TSE:  Thank you; and that would be page 2 of the

12   employee's individual statement.

13             THE COURT:  Okay.

14             MS. TSE:  And the blue box is:  For all medical

15   conditions, answer the following questions.

16             THE COURT:  So it is numbered question 4.

17             MS. TSE:  Yes.

18             THE COURT:  Which then says:  For all medical

19   conditions, answer the following questions.  And then the blue

20   box says:  What specific duties of your occupation are you

21   unable to perform due to your medical condition.  The answer

22   is:  Performing laboratory work as a research scientist.

23             Okay.

24             MS. TSE:  Yes.

25   BY MS. TSE:

1    Q.  That is the question at issue, and my question simply for

2    Mr. Odom is for him to confirm to the Court that inability to

3    perform laboratory work was consistent with our many

4    interactions previous to my application for long-term

5    disability benefits.

6              Or, putting it in a simple format --

7              THE COURT:  That's always good.

8    Q.  You were aware, since you reached out to me in December

9    2009, that I could not and still cannot perform laboratory work

10   as a research scientist which is my position at NYU?

11   A.  Yes.

12   Q.  Okay.  That's --

13             THE COURT:  Good.

14             MS. TSE:  May we move on to Exhibit 17 admitted into

15   evidence, if it wasn't taken care of yesterday?

16             THE COURT:  Bear with me just one second.  Exhibit 17

17   was not admitted yesterday.

18             MS. TSE:  May I request the Court to admit it into

19   evidence?

20             THE COURT:  Mr. Cerasia, any objections?

21             MR. CERASIA:  I have no objection to the document in

22   evidence, just only I am going to refer to the fact that

23   Mr. Odom said he never saw any forms but I don't have an

24   objection, in general.

25             THE COURT:  I understand.  So, Plaintiff's Exhibit

G6E5tse2                          Odom - direct

```
 1   17 --
 2            MS. TSE:  I didn't mean to interrupt, your Honor.
 3            THE COURT:  Plaintiff's Exhibit 17 is received in
 4   evidence.
 5            (Plaintiff's Exhibit 17 received in evidence)
 6            MS. TSE:  Thank you, your Honor.  And before we go
 7   into Plaintiff's Exhibit 17, let me point out that the
 8   employee's form was signed and dated May 18, 2010.
 9            May we approach, your Honor?
10            THE COURT:  You may.
11   BY MS. TSE:
12   Q.  And the employer statement was signed by Janice Bailey, the
13   Director of Benefits, on May 28, 2010?
14            MR. CERASIA:  Your Honor, for clarification, the
15   document says assistant director on page 2.
16            THE COURT:  Yes.  Thank you, Mr. Cerasia.
17            MR. CERASIA:  Sure.
18   BY MS. TSE:
19   Q.  And may I direct your attention, Mr. Odom, to the third
20   page that is Bates stamped NYU third-party 000424?  The blue
21   box, Section H, information about your retire or return to work
22   program -- meaning NYU's -- rehire or return-to-work program.
23   To the best of your knowledge, did NYU have such a program?
24   A.  I'm not aware.
25   Q.  You are not aware of any such programs?
```

A.  Not a formal program.  I am not aware of a formal program.

Q.  And pertaining to the question within the box, if the

employee is released to return to work in restricted duty, are

you willing to discuss accommodations?  And the boxes "yes" or

"no" are left blank.  Did you have any discussions with either

Ms. Bailey, who is or was Ms. Meagher's assistant director,

about this issue meaning the accommodations issue?

A.  No.

Q.  Thank you.

          May we approach with Exhibit 18, your Honor?  That's a

series of e-mails.

          THE COURT:  Certainly.

Q.  The e-mails were --

          THE COURT:  Just bear with me.

          MS. TSE:  I'm sorry.  Correction.  Exhibit 18 does not

contain e-mails.  These are actually telephone transcripts of

Dr. Tse's interview with an Unum representative.

          THE COURT:  All right.  Do you wish to admit this into

evidence?

          MS. TSE:  Please.

          MR. CERASIA:  Objection.  It is hearsay.

          THE COURT:  Well, it is a telephone transcript?  How

was it obtained?  Was it verbatim?

          MS. TSE:  It's Bates stamped NYU third-party 00512

which I take it to mean that Unum disclosed it at the request

G6E5tse2                          Odom – direct

1      of NYU.

2                  THE COURT:  Well, they may have, but the objection is

3      to hearsay, but there is no jury so I'm going to receive it in

4      evidence.

5                  MS. TSE:  Thank you, your Honor.

6                  THE COURT:  Plaintiff's Exhibit 18 received in

7      evidence.

8                  (Plaintiff's Exhibit 18 received in evidence)

9      BY MS. TSE:

10     Q.  And I just have, again, one simple question for Mr. Odom.

11                 The text that is underlined, is that consistent with

12     what Dr. Tse had been articulating to you during the period

13     before, let's say, she applied for long-term disability

14     benefits?

15     A.  I do recall in our conversations that you had indicated

16     that the manual manipulation was a concern and it was gradually

17     worsening.  The details here about accommodation, however, we

18     didn't discuss that.

19     Q.  But in her application Dr. Tse did articulate, to the

20     insurance provider, that she did not need any accommodations

21     from NYU previous to her using the NIH support but found

22     herself in such need afterwards?

23     A.  I wasn't part of the application process for long-term

24     disability.

25     Q.  Fair enough.

G6E5tse2                          Odom - direct

1          And I'm sorry we have to continue to ask for your help

2     with the Unum application process.

3          THE COURT:  Dr. Tse, how many Unum documents are you

4     planning to show?

5          MS. TSE:  Two more.

6          THE COURT:  Two more?  Okay.

7          MS. TSE:  May we approach with Exhibit 19, which is

8     Bates stamped by NYU, and this is an e-mail from Margaret

9     Meagher to an Unum representative?

10         THE COURT:  Let me just ask you, is there something

11    about this document that you have reason to believe Mr. Odom

12    can shed some light on it?

13         MS. TSE:  No.  We can just admit it into evidence

14    without asking Mr. Odom any questions.

15         THE COURT:  Mr. Cerasia?

16         MR. CERASIA:  I have no objection to 19.

17         THE COURT:  All right.  Plaintiff's Exhibit 19

18    received in evidence.

19         (Plaintiff's Exhibit 19 received in evidence)

20         MS. TSE:  Thank you, your Honor.

21         And the last piece, which is Exhibit 20, Unum's letter

22    notifying Dr. Tse that her application was approved.  May we

23    approach, your Honor?

24         THE COURT:  Let me ask you, Mr. Cerasia, do you have

25    any objection?

G6E5tse2                    Odom – direct

1          MR. CERASIA:  I have no objection to 20.

2          THE COURT:  So, Plaintiff's Exhibit 20 received in

3    evidence.

4          (Plaintiff's Exhibit 20 received in evidence)

5          THE COURT:  Do you have any particular questions about

6    this document for Mr. Odom?

7          MS. TSE:  No, but may I point the Court's attention to

8    the page Bates stamped NYU third-party 00900?  And if your

9    Honor feels that Mr. Odom should confirm that then I will ask

10   him to do so.

11         THE COURT:  Well, first I think you need to establish

12   that he is able to confirm that.

13         MS. TSE:  All right.  I will do that right now.

14   BY MS. TSE:

15   Q.  Were you aware, Mr. Odom, of the conditions under which

16   NYU's arrangement with Unum to provide disability benefits for

17   their employees, that the benefits would kick in, so to speak,

18   if the employee has a 20 percent or more loss in their income?

19   A.  I wasn't aware of the details.

20         MS. TSE:  All right.  So, Mr. Odom can't help us out

21   and we will have to just go by the document itself.

22         THE COURT:  Okay.  Now, do you have any additional

23   questions for Mr. Odom?

24         MS. TSE:  Yes.

25   BY MS. TSE:

G6E5tse2                              Odom - direct

1    Q.  Let's, for one quick moment, go back to Exhibit 26 and that

2    would pretty much be my last question.  I am referring to the

3    portion of that e-mail that was from Mr. Odom to Fred

4    Valentine, Martin Blaser, Lucy Cribben, Daniel Driesen, and I

5    would like Mr. Odom to confirm that you are aware -- you were

6    aware at the time that Dr. Tse needed to obtain extramural

7    funding in order to make up for her loss in salary from being

8    removed as the CFAR Flow Cytometry Core director and to give

9    her as much time as possible to do so?

10   A.  Yes.  That was specifically my request that they provide

11   you as much time as possible to help you obtain -- to allow you

12   obtain the additional funding to support yourself.

13   Q.  Since you are not a research scientist and have not applied

14   for any grants to run research projects, do you actually know

15   how much time would be needed?

16   A.  No.  I couldn't articulate how much time would be

17   necessary.

18   Q.  Thank you.

19          And by the time you met with Dr. Tse, Dr. Blaser, and

20   Ms. Cribben around August 2010, were you aware by that point in

21   time that Dr. Tse would need more than just time in order to

22   apply for extramural funding?

23          MR. CERASIA:  Objection to form.

24          THE COURT:  Well, if you can answer it, Mr. Odom,

25   please do.  Otherwise, we will ask Dr. Tse to rephrase the

G6E5tse2                          Odom - direct

1    question.

2              THE WITNESS:  My understanding, and what I recall from

3    that meeting, is that the point of the meeting was to discuss

4    how you were doing in terms of looking for additional funding

5    sources.  That was the purpose of the meeting; it was

6    Dr. Blaser, Ms. Cribben, and myself to check in to see how you

7    were doing.

8    BY MS. TSE:

9    Q.  Yes.

10   A.  I believe I recall when you started you had about 35

11   percent funding and I don't know whether things had dropped or

12   not, but I know the purpose was just to check in and see how

13   you were doing and if there was things we could do to help

14   support you.  I was kind of primarily there to support the

15   department in terms of if there was any needs you had or if you

16   had any particular requests to try to provide that support to

17   help you get additional funding.

18   Q.  Do you recall that Dr. Blaser at the meeting suggested that

19   long-term disability benefits would be an option for Dr. Tse to

20   continue to have an income?

21   A.  Yes, I do recall we discussed that if you weren't able to

22   get additional funding then long-term disability would be an

23   option, because what Dr. Blaser also articulated was that the

24   department couldn't continue, ad infinitum, to support your

25   salary a hundred percent.

G6E5tse2                          Odom - direct

Q.   Do you recall if Dr. Odom offered Dr. Tse any reasonable

accommodation to her physical limitations?

A.   Thank you for the promotion to Dr. Odom.

Q.   I'm sorry.

A.   That's okay, but no, specifically, we did not offer you any

accommodation specifically, nor do I recall you asking for any

specific accommodation during that meeting.  In fact, I believe

I recall in that meeting that you articulated that you didn't

think you were going to be successful in finding additional

funding support and I think that's how the conversation turned

to long-term disability being a viable option.

Q.   But you did not recall whether Dr. Tse articulated any

reasons why she would not be successful?

A.   I don't recall particular reasons, no.

          MS. TSE:  Okay.  Thank you.  I'm sorry that was a lot

more than a couple of questions.

          THE COURT:  No problem.  No problem.  Now, I think

this would be --

          MS. TSE:  No more questions for Mr. Odom.

          THE COURT:  This would be a good time for us to take

our mid-morning recess.  Mr. Odom, you may step down.  We will

resume in approximately 10 minutes.

          THE WITNESS:  Okay.  Thank you.

          MS. TSE:  Mr. Odom would you please bring all the

exhibits?

G6E5tse2                         Odom - direct

1              MR. CERASIA:  Your Honor, can I ask that they stay

2      there because I will use the same ones.

3              MS. TSE:  I can't give them to you because that's the

4      only copy that I have and I gave you a courtesy copy.

5              MR. CERASIA:  There is not a witness copy of exhibits?

6              MS. TSE:  I did not realize that I need to share them

7      with you.

8              THE COURT:  No problem.  We will leave them up here

9      and then when it is through -- you are through -- we will give

10     them back to you, Dr. Tse.

11             MS. TSE:  All right.  Okay.  Thank you.

12             THE COURT:  All right.

13             (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Please be seated.  Mr. Cerasia, questions

3       for Mr. Odom?

4              MR. CERASIA:  Thank you, your Honor.

5       CROSS-EXAMINATION

6       BY MR. CERASIA:

7       Q.  Good afternoon, Mr. Odom.  Could you please tell us your

8       educational background, college and law school, please?

9       A.  Sure.  I went to college at Cornell University, and I got a

10      degree in industrial and labor relations.  And then I worked

11      for several years, and then I went back to law school.  I went

12      to Hofstra Law School, and proceeded to practice for a number

13      of years before I left the kind of legal world and moved into

14      the HR functions.

15      Q.  When you practiced law, what type of law did you practice?

16      A.  Employment and labor law.

17      Q.  How long were you a practicing employment lawyer?

18      A.  I worked with Proskauer for three years, then I proceeded

19      to go in-house at Mount Sinai Hospital for another couple of

20      years.  So maybe five or six years, roughly.

21      Q.  How long have you been an HR professional?

22      A.  I left legal -- I forgot -- when I went from Mount Sinai

23      then I went to NYU and was practicing in the legal -- at the

24      legal department there for a couple of years.  Then I switched

25      to HR, so, I switched to HR I'm guessing around 2003 or 4.  I

G6E3TSE3                          Odom - cross

```
 1    moved to HR around then.
 2    Q.   What is your current position?
 3    A.   I'm currently the chief human resources officer for a
 4    company called Physician Affiliate Group of New York.
 5    Q.   Based on your legal and HR training and employment, did you
 6    have an understanding as of 2010 as to the applicable
 7    employment laws on reasonable accommodation?
 8    A.   Yes.
 9    Q.   Are you familiar with the term "interactive process"?
10    A.   Yes.
11    Q.   What did you understand that term to mean?
12    A.   What I understood it to mean was that if an individual is
13    requesting some form of accommodation, that you need to engage
14    with them in that process, meaning sit down and meet with them,
15    understand what they believe the accommodations necessary to do
16    the essential functions of their job are.  Also kind of confirm
17    that from a medical perspective, because sometimes what people
18    articulate is a little different from what the medical
19    providers will communicate.  And then try to see if there is a
20    way that the organization can provide a reasonable
21    accommodation that will address the concerns of the individual,
22    to allow them to perform the functions of their job.
23    Q.   Before you dealt with Dr. Tse starting at the end of 2009,
24    had you, in your role at NYU, addressed other requests for
25    reasonable accommodation?
```

G6E3TSE3                          Odom - cross

1    A.  Yes.

2    Q.  At any point after Dr. Tse was removed as the core

3    director, April of 2010, did she ever request to you to have

4    someone in the lab help her with experiments as a form of

5    accommodation?

6    A.  No.

7    Q.  At any point after Dr. Tse was removed as the core director

8    in April of 2010, did she ever ask you as a form of

9    accommodation to provide her with any kind of help on research?

10   A.  No.

11   Q.  At any point after Dr. Tse was removed as the core

12   laboratory director in April of 2010, did she ever tell you

13   that anybody in the lab had declined to do work for her?

14   A.  No.

15   Q.  At any point after Dr. Tse was removed as the core director

16   in April of 2010, did she ever tell you that she was denied any

17   access to working with somebody in the laboratory?

18   A.  No.

19            THE COURT:  I'm not sure I understand the import of

20   that question.

21            MR. CERASIA:  Well, your Honor, one of the issues in

22   the case, Dr. Tse keeps saying she couldn't do work because she

23   didn't have a lab technician.  I think it is important to

24   stress that at no time did she present to Mr. Odom or to the

25   school of medicine that she didn't have access to the lab or

G6E3TSE3                          Odom - cross

1    she needed it for any specific research project.  So you're

2    almost putting the cart before the horse by saying I don't have

3    a technician.  Well, you've got to have a research scientific

4    idea before you go into the laboratory.  It's not like going

5    into the law library and just deciding --

6              THE COURT:  That's a different question from what you

7    asked Mr. Odom.  My point is, it is clear she did have an

8    accommodation in that she had a lab technician when she was

9    director.  The question is, knowing of her condition, when she

10   no longer was director of the lab, and had access to her own,

11   if you will, lab technician, was NYU aware of the fact that she

12   did need an accommodation?

13             You can answer that.

14             THE WITNESS:  Do you want me to answer that?

15             So, there was still access to technicians in the lab.

16   If Dr. Tse would have utilized the resources of the lab, there

17   were technicians available to support her in terms of anything

18   she needed to do.

19             THE COURT:  Well, were they aware of that?  In other

20   words, what I'm asking is, they were technicians assigned to

21   other people, correct?

22             THE WITNESS:  Well, there are also technicians that

23   worked in the lab.  So anybody who was coming in to utilize the

24   lab would be able to access those technicians to support with

25   their research.

G6E3TSE3                        Odom - cross

1        THE COURT:  There are unaffiliated lab technicians who

2   are assigned to the lab, and they don't work with any

3   particular doctor on a grant?

4        THE WITNESS:  I think they are typically working with

5   various people.  But the people in certain labs, there are labs

6   that are available for other people to, I believe they block

7   time to utilize for research.  So they would have access to

8   individuals during that blocked time for any technical support

9   that they need.

10        THE COURT:  So if Dr. Tse had blocked time for a lab

11   technician, she could have gotten one?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.

14   BY MR. CERASIA:

15   Q.  Are you aware of Dr. Tse ever informing you that she tried

16   to block time for a lab technician?

17   A.  Not that I am aware of, no.

18   Q.  Are you aware, after Dr. Tse was removed as the core

19   director, of her ever saying that she had a research proposal

20   for which she needed help in the laboratory?

21   A.  No, I am not aware.

22   Q.  How would you have described, starting in December of 2009,

23   your working relationship and interaction with Dr. Tse?

24   A.  It was very cordial, professional.

25   Q.  Is that true throughout the whole time that you interacted

G6E3TSE3                        Odom - cross

1   with her?

2   A.  Yes.

3   Q.  In your mind, did you ever demonstrate any kind of

4   hostility or animosity towards her?

5   A.  No, not at all.

6   Q.  I think you have in front of you Plaintiff Exhibit 24 which

7   would be the March 3, 2010, letter from one of Dr. Tse's

8   physicians to you.  From Dr. Solitar.

9   A.  Yes, I have it.

10  Q.  You had read the underlined parts into the record, I

11  believe, or were referred to them.  If you look at the second

12  paragraph, right after the underlined after the word "basis,"

13  it says "She requires an individual with proper scientific

14  training to perform the bench that she is unable to do.  I

15  recommend and fully support her request to reinstate a post-doc

16  position as an ADA accommodation."  Do you see that?

17  A.  Yes.

18  Q.  That's what you testified to on direct examination of the

19  issue of whether or not it was a lab technician versus a

20  post-doc?

21  A.  Yes.

22  Q.  At any point after March 3, 2010, did you ever receive any

23  kind of letter from Dr. Tse or one of her medical professionals

24  stating what type of accommodation she needed?

25  A.  No.

G6E3TSE3                        Odom - cross

Q.  After Dr. Tse was removed as the core director in April of

2010, did you ever tell her that she would not continue to

receive her full salary?

A.  No.

          THE COURT:  Did you ever tell her that she would

continue to receive her full salary for a certain period of

time?

          THE WITNESS:  No.

Q.  Did you assume at that point that she was going to receive

her full salary?

A.  It wasn't clear how long the department would be able to

support it.  My position was that they should try to give her

at much time as they could.

Q.  In that respect, if you can look at Plaintiff Exhibit 26,

please.

A.  Yes.

Q.  The second set of e-mails is the one that you sent on

February 23, 2010, that Dr. Tse referred you to on direct

examination.  When you recommended to the department

administration at that time to have flexibility and give her as

much time as possible to obtain extramural funding and other

funding sources.

          Did you consider giving her that time was a form of

reasonable accommodation?

A.  Yes.

G6E3TSE3                          Odom - cross

1          THE COURT:  Well, in a whole discussion that we had on

2     your direct with Dr. Tse, I don't recall that you said that she

3     was aware that that was what you considered to be an

4     accommodation.

5          THE WITNESS:  I'm not sure that I specifically -- I

6     did not say to Dr. Tse that her salary would be continued for a

7     certain period of time because I wasn't clear how long the

8     department could support it.  My position was that Dr. Tse was

9     in a position where she had been the director of a lab for a

10    long period of time, and that she would need time to transition

11    to kind of build up research again.  Again, not as a

12    researcher, I don't know how long that would take.  So my

13    position with the department is try to give her as much time

14    and support as we can in that process.  So, I was attempting to

15    try to accommodate additional time.

16         Typically with non-tenured faculty members, they're

17    not given a lot of time if they don't get funding.  So my plea,

18    so to speak, to the department was try to support her as much

19    as you can, and give her as much time and by continuing her

20    salary.

21         But I did not, no, I did not communicate that to

22    Dr. Tse that that was what was going to happen because I wasn't

23    sure how long the department could support it.

24         THE COURT:  Are you aware if anybody did?

25         THE WITNESS:  I don't believe anybody did that I am

1    aware of.

2           THE COURT:  Okay.

3    Q.  Are you aware that her employment ended in April of 2011?

4    A.  Yes.

5    Q.  So from the time she got removed as the core director,

6    until April of 2011, her salary was continued for a little bit

7    more than a year?

8    A.  Yes.

9    Q.  During the time that you were an HR professional at NYU

10   School of Medicine, were you aware of any non-tenured faculty

11   member who received 10 months of salary continuation?

12   A.  No.

13   Q.  Did you have an understanding at that time of what the

14   usual practice was?

15   A.  My understanding was it was a few months, two or three

16   months, tops.

17   Q.  In the summer of 2010, did you have any understanding as to

18   whether or not Dr. Tse was collaborating with other tenured

19   professors, such as Dr. Reibman?

20   A.  My understanding was she had reached out immediately to the

21   people she was collaborating with.  I believe she had a portion

22   of her salary coming from them, and she was trying to see if

23   there was a possibility for further collaboration or expanding

24   her role.  I don't know how successful she was in doing that.

25   Q.  Do you know whether or not on the project she worked with

G6E3TSE3                    Odom - cross

1   with those other doctors, such as Dr. Reibman, in the summer of

2   2010, whether or not she had access to lab technicians to

3   perform research?

4   A.  My understanding is those individuals had technicians

5   working with them, so she would have had access to them if she

6   worked with them.

7   Q.  I want to bring your attention now with respect to the

8   direct testimony you had as to the long-term disability

9   application that Dr. Tse filed.  You mentioned Margaret

10  Meagher's name or Dr. Tse did.

11          Was Ms. Meagher involved in any way with you in

12  determining whether or not Dr. Tse should be accommodated?

13  A.  No.

14  Q.  Did you ever force Dr. Tse to file an application for

15  long-term disability benefits?

16  A.  No.

17  Q.  Did you ever suggest to her in the spring of 2010 that her

18  only option was to apply for long-term disability benefits?

19  A.  No.

20  Q.  Do you know whether or not Dr. Tse was aware after

21  June 2010 that in fact her full salary was going to be paid?

22  A.  I assumed she was receiving, so she was aware.

23  Q.  Are you aware at any point after June 1st, 2010, that

24  Dr. Tse ever withdrew her application for long-term disability

25  benefits after she was continuing to receive her full salary?

G6E3TSE3                        Odom - cross

1   A.  Not that I am aware.

2           THE COURT:  Wait a second.  How was she to know how

3   long she would receive her full salary?

4           THE WITNESS:  The only way she would have known that

5   would have been engaging with Dr. Blaser or Lucy Cribben.  If

6   the department would have given a commitment, but I don't know

7   if they ever did.

8           THE COURT:  Well then, you don't know that a decision

9   was made to give her her salary through the period of time.

10          THE WITNESS:  No, I just requested they give her as

11  long as possible.  But I was not sure how long the department

12  could support it.

13          THE COURT:  And again, how was she to know how long

14  the department would support her, as you put it?

15          THE WITNESS:  Unless there was some direct

16  communication, I'm not clear how she would know.

17          THE COURT:  Okay.

18  Q.  Mr. Odom, did you understand that as of June 10 -- or

19  June 1st, 2010, that the commitment from the department was an

20  open-ended commitment to continue to pay Dr. Tse's salary?

21  A.  I knew they were continuing to pay it.  I just wasn't sure,

22  again, how long they could.  I knew that Dr. Blaser said he

23  couldn't continue to support it out infinitum, but they were

24  trying to provide her more time to build up her potential for

25  work.

G6E3TSE3                        Odom - cross

```
 1   Q.  As of June 1st, 2010, no one told you, for example, it will
 2   only be another eight to 10 months?
 3   A.  No.
 4   Q.  Did Dr. Tse ever come to you at any point after June 1st,
 5   2010, and say "Mr. Odom, how long is my salary going to
 6   continue at full support?"
 7   A.  No.
 8   Q.  You referenced a August 2010 meeting with yourself,
 9   Dr. Blaser, Lucy Cribben, and Dr. Tse.  Do you remember that?
10   A.  Yes.
11   Q.  What was the purpose for you attending that meeting?
12   A.  I was there primarily to determine if there was any support
13   that we needed to provide Dr. Tse.  If she had any additional
14   requests, accommodation, or support to help her.  The point of
15   the meeting was to check in and see how she was doing and
16   trying to find other sources of funding to support her salary.
17   Q.  In the time that you had been an HR professional providing
18   support to the school of medicine, had you ever been to a
19   meeting similar to that?
20   A.  No.
21             MS. TSE:  Relevance.
22             THE COURT:  Well, I'll permit it.
23   Q.  Did you consider whether or not that August 2010 meeting
24   was part of the interactive process that you described?
25             THE COURT:  Wait.  First of all, you are a real
```

1    lawyer.  I would like non-leading questions, I would like to

2    hear from Mr. Odom.  Okay?

3            MR. CERASIA:  Your Honor, he testified that it was

4    part of the exploring reasonable accommodations.

5    Q.  At any point during the August 2010 meeting, did you seek

6    to engage in an interactive process with Dr. Tse?

7    A.  That was part of the reason I was there.

8            THE COURT:  I don't understand that answer.  What do

9    you mean that was part of the reason you were there?

10   Everything is sort of, like, vague.

11           When you went to that meeting, was it for an

12   interactive process regarding her accommodation?

13           THE WITNESS:  It was about a couple of things.  So,

14   Dr. Blaser and Lucy Cribben wanted to check in with her about

15   how she was doing in terms of getting funding.

16           THE COURT:  Would that be something you would be

17   directly involved in?

18           THE WITNESS:  No, I would not have been involved in

19   that portion of the meeting.

20           THE COURT:  What part of the meeting would you be

21   expected to be involved in?

22           THE WITNESS:  I was there in case there was some kind

23   of request for accommodation or if there was something else

24   that Dr. Tse wanted that we could try to support.  They asked

25   me to attend the meeting in case any issues relating to ADA or

G6E3TSE3                          Odom - cross

1    anything like that came up.

2              THE COURT:  Okay.  And it was Dr. Tse's responsibility

3    to raise it?

4              THE WITNESS:  Yes.  If there was a request she needed,

5    we wanted to understand what she was doing.  If she had

6    projects that she needed support on, we wanted to hear from

7    her, what support do you need.  And at the time, I don't recall

8    her raising any particular projects that she was working on or

9    ideas for research that she was working on that she needed

10   support.

11             THE COURT:  Okay.

12   Q.  Was Dr. Tse engaged during that meeting and the discussion?

13   A.  Yes.

14   Q.  After August of 2010, do you recall having received any

15   communication from Dr. Tse about her employment or any requests

16   for an accommodation?

17             THE COURT:  Break it up.

18             MR. CERASIA:  Fair enough.

19   Q.  After the August --

20             THE COURT:  Actually, anything I ask you to do is

21   fair.

22             MR. CERASIA:  You're right, your Honor.

23             THE COURT:  I'm the judge.

24             MR. CERASIA:  I understand.  I didn't mean that in any

25   derogatory way.  More of a reference to myself.

1   Q.  Mr. Odom, at any point after August of 2010, do you ever

2   recall having communication with Dr. Tse?

3   A.  I don't recall communication after our August meeting.

4   Q.  Were you aware that in September of 2010, that she filed

5   this lawsuit?

6   A.  Yes, I was eventually made aware.

7   Q.  Are you aware that at some point she received a letter from

8   Dr. Blaser informing her that her employment was going to end?

9   A.  Yes, I recall that.

10  Q.  I don't believe you have Exhibit 12 in front of you.  Do

11  you?

12  A.  I don't think so.

13          MR. CERASIA:  May I approach, your Honor?

14          THE COURT:  Certainly.

15  Q.  I'm going to show you what's in evidence as Plaintiff's

16  Exhibit 12 which is a January 4, 2011, letter from Dr. Blaser

17  to Dr. Tse.

18  A.  Yes.

19  Q.  Were you aware that that letter had been sent to her?

20  A.  Yes, I think I might have gotten copied on it.

21  Q.  At any point after that -- or strike it.

22          Do you know whether or not that letter was transmitted

23  to Dr. Tse?

24  A.  To the best of my knowledge it was.

25  Q.  At any point after January 4, 2011, did Dr. Tse ever

1    contact you to ask about extending her employment past April 4,

2    2011, as any form of accommodation?

3    A.  No.

4    Q.  At any point after April 1st of 2010, did Dr. Tse ever ask

5    you whether or not there were any vacant positions for which

6    she was qualified at NYU?

7    A.  No, she did not.

8    Q.  Were you aware of any such vacant positions at that time?

9    A.  No, I wasn't.

10          MR. CERASIA:  Your Honor, may I please have a minute

11   because I think I might be done.

12          THE COURT:  Certainly.

13   Q.  From the 2010/2011 time period, do you know how many vacant

14   positions -- excuse me.  Do you know whether or not vacant

15   positions were posted at NYU?

16   A.  Yes, there are always vacant positions posted.

17   Q.  How or where were they posted?

18   A.  Typically they're posted in the departments.  They're also

19   electronically available.  You can go into a job posting board

20   and see any open positions.

21   Q.  At any point after the August 25, 2010, meeting where the

22   issue of long-term disability came up, did you ever have any

23   discussion with Dr. Tse about her application for long-term

24   disability benefits?

25   A.  After our August meeting, I don't believe I had any further

1   conversations with Dr. Tse.

2   Q.  If you could turn to Plaintiff's Exhibit 17, please.  I

3   want to refer you back to the third page.  Dr. Tse only gave

4   you a black and white copy.  Does yours have a blue box, H?

5   A.  It has a blue outline around that box.

6   Q.  Okay.  She referenced the fact that there was nothing

7   checked there.  Do you know whether or not at any point after

8   May 18, 2010, when she submitted her long-term disability

9   application in Unum, she was ever out of work?

10          THE COURT:  Bear with me just one second.  Are we

11  referring to Exhibit 17?

12          MR. CERASIA:  Correct.  I think it is the third page.

13  It is Bate stamped 424.

14          THE COURT:  Okay.

15          MR. CERASIA:  Box H.

16          THE COURT:  I got it.  Thank you.

17          MS. TSE:  Objection, your Honor.  It's unclear what

18  Mr. Cerasia is driving at.

19          THE COURT:  Well, if we let him finish his question,

20  we might know.  I've been interrupting him.

21          MS. TSE:  Sorry.

22  Q.  I'll reask the question.

23          THE COURT:  Thank you.

24  Q.  As Dr. Tse submitted her application for long-term

25  disability benefits on May 18, 2010.  My question is at any

G6E3TSE3                    Odom - redirect

1   point between May 18, 2010, and the date of Exhibit 17, May 28,

2   2010, were you aware of Dr. Tse being out of work?

3   A.  No.  Not that I am aware of.  She wasn't out of work.

4           MS. TSE:  Relevance.

5           THE COURT:  Well, I'll allow it.

6   Q.  Was there ever a situation in May of 2010 where you had any

7   understanding that Dr. Tse had to be, quote, released to return

8   to work?

9   A.  No.

10          MR. CERASIA:  I don't have any other questions, your

11  Honor.  If I can just approach to get back my exhibit.

12          THE COURT:  Certainly.  Wait just one second.  Do you

13  have any additional questions?

14          MS. TSE:  Yes, I would like to inquire.

15          THE COURT:  Do you need him to have the exhibits for

16  that?

17          MS. TSE:  I would.

18          MR. CERASIA:  I only have one copy I want back.

19          MS. TSE:  That's fine.  I can dig up whatever if I

20  need it.  As long as you don't take the witness copies, I'm

21  fine.

22  REDIRECT EXAMINATION

23  BY MS. TSE:

24  Q.  I will redirect in the order pretty much that Mr. Cerasia

25  posted his questions to you.  He mentioned or he asked whether

G6E3TSE3                          Odom - redirect

1   you handled other requests for accommodations pretty much

2   around the same period that we were interacting with each other

3   over Dr. Tse's needs.

4          Were any one of those similar to Dr. Tse's situation?

5   A.  I think every request for accommodation is unique.

6   Q.  Fair enough.  So, you do not recall anybody who was removed

7   from grant support after which he or she had to apply for new

8   funding to meet the school's REF?

9   A.  Not that I am aware of.

10  Q.  Thank you.  Now, in replying to Mr. Cerasia's question, you

11  said that the doctor could have accessed anyone in the lab.

12  There are labs and labs and labs.  Are you aware that you have

13  free access to technicians in a lab only if that is the

14  investigator's lab?

15  A.  I'm sorry, could you restate the question?

16  Q.  Sure.  Regarding access to help in lab.  Are you aware that

17  the only time a researcher has free access to technical support

18  in a lab is when that lab has technicians that are paid for by

19  funds from the investigator?

20  A.  My understanding was that, you know, obviously if you are

21  an investigator, you have access to technicians.  But also the

22  whole purpose of certain labs is they're shared, and people

23  have access to those labs to support their research, such as

24  the lab you had originally directed.

25  Q.  So, in that context, after Dr. Tse was removed as the flow

G6E3TSE3                    Odom - redirect

1   cytometry core director, you believed that she still had access

2   to that lab?

3   A.  Yes.

4   Q.  And Mr. Cerasia mentioned or you mentioned that Dr. Tse

5   could block time because the flow cytometry core was a user

6   friendly facility and provides services to NYU researchers.  My

7   question to you is, are you aware that in order to block time,

8   you need money to pay for the time that you are blocking?

9   A.  My understanding was that you also had research that you

10  were working on with three other individuals.  That was part of

11  the issue that we wanted you to kind of expand to continue your

12  research.

13  Q.  Are you aware then that my salary was paid for by those

14  individuals from grants that they got from whatever source?

15  A.  Yes, I was aware of that.

16  Q.  Okay.  And all grants are granted based on the application

17  that was submitted and subsequently approved.  So, those grants

18  were awarded based on preconceived research projects, and

19  during the funding period, the investigator is expected to

20  fulfill those expressed goals.

21         Now, my question is, yes, you did say that Dr. Tse has

22  access to those technicians.  Are you aware that Dr. Tse could

23  not use that technical help towards generating data for new

24  projects?

25  A.  I was not aware of that.

Q.  Mr. Cerasia asked you whether Dr. Tse articulated any ideas

for new research projects to you.  Would you, given that you

are not a researcher, have good comprehension of what that is

about or was about?

A.  Obviously not the details of the project.  What I was

stating was that while I wouldn't have known details of a

particular project that you might have articulated, if you had

articulated that you were working on a particular research

project or idea, that would have been something that we would

probably would have gone into more discussion about or I would

have asked the department about support for you in that regard.

And that was also part of what we were trying to do in the

August 2010 meeting, was to see what else was possible, what

research was available, what were you working on, how could we

expand the opportunities for you to increase your funding

support.

Q.  Thank you.  I think we have spent enough time, questions

and answers, on the issues pertaining to extending my salary

beyond May 31 so we will not revisit that.

            What I will ask you, however, is since you stated that

you actually had worked in the capacity of an employment

attorney at NYU, before you assumed your position as VP of

labor and employee relations, are you familiar by the time you

moved out of employment -- being an employment attorney for

NYU, are you familiar with EEOC requirements that pertain to

1   providing a reasonable accommodation?

2   A.  Generally, yes.

3   Q.  So, please tell the Court whether a legal requirement

4   exists within the EEOC guidelines that an employee has to

5   specifically request a reasonable accommodation in order for it

6   to be provided?

7   A.  I'm not aware of a specific requirement of that type.

8   Q.  All right.  But you were aware that in order for Dr. Tse to

9   continue as a research scientist, because you were so informed

10  on more than one occasion that Dr. Tse required accommodations

11  to perform laboratory work?

12  A.  That was, yes, I go back again, that was our original

13  conversation.

14  Q.  Sorry.  We have to revisit that because that was brought up

15  by Mr. Cerasia.

16  A.  Sure, that's okay.

17  Q.  My last question.  No, actually I have one more question

18  where reasonable accommodation is concerned.

19          So, you consider extending Dr. Tse's salary beyond

20  May 31, 2010, a form of reasonable accommodation for her

21  specific disability?

22  A.  Yes, because that provided you full funding to allow you to

23  continue time to work on additional projects to help supplement

24  your support.  Again, I think at the time you were removed from

25  the CFAR core lab, you had 35 percent funding.  So what

1    normally would have happened is after a month or two, a person

2    would have dropped down to actually receiving 35 percent of

3    their salary.  So, yes, I did perceive it as an accommodation

4    to continue at full salary.

5    Q.  Are you aware that Dr. Tse's medical impairments were

6    chronic, meaning that she would not recover from them?

7    A.  I believe that's what she communicated to me, that it was

8    difficult and it was going to get worse.

9    Q.  So, providing her with an extension in salary payment would

10   not have enabled her to regain the ability to do laboratory

11   work.

12   A.  Well --

13   Q.  Is that correct?

14   A.  I disagree a little bit there because what providing you

15   with the extension in salary did is gave you more time without

16   a hardship to you personally to come up with ideas for

17   additional research.

18        So what we felt that you could do was you had the

19   brain power -- and still do, you're a very sharp person -- to

20   come up with research ideas, and then the execution of those

21   ideas and the lab work that would be necessary was where we

22   would have come in to help support you.  But what we needed

23   first was ideas for you to pursue.

24   Q.  Did you make that known to Dr. Tse at any point in time?

25   A.  I think that's what part of the conversations we had, for

1    example, the conversation with Dr. Blaser and Ms. Cribben were

2    about, were what are you doing, who are you working with.  You

3    know, what are you proposing that we do.  What are your ideas.

4    That was the whole purpose of that August meeting.

5    Q.  At any time during that meeting, do you recall specifically

6    asking Dr. Tse if we provide you with the laboratory help that

7    you need, how long will it take you to get extramural funding,

8    or, would you then be able to get extramural funding?

9             MR. CERASIA:  Objection.

10   A.  I don't recall a question being asked in that fashion.

11   Q.  Thank you.  We move on to vacant positions that did not

12   require laboratory work.  At any point in time do you remember

13   suggesting to Dr. Tse to look for those vacant positions?

14   A.  I don't recall suggesting that.

15            MS. TSE:  Thank you.  That will be all, your Honor.

16            THE COURT:  Thank you.  Mr. Cerasia, any further

17   examination?

18            MR. CERASIA:  One question, your Honor.

19   RECROSS EXAMINATION

20   BY MR. CERASIA:

21   Q.  Did Dr. Tse ever tell you she could not use the laboratory

22   without funds to pay for laboratory services?

23   A.  No.

24            MR. CERASIA:  That's the only question.

25            THE COURT:  Any further questions?

G6E3TSE3

1          MS. TSE:  No.  Thank you, your Honor.

2          THE COURT:  Mr. Odom, thank you very much.

3          THE WITNESS:  Thank you.

4          THE COURT:  You may step down.

5          (Witness excused)

6          THE WITNESS:  Dr. Tse, do you need these documents?

7          MS. TSE:  Yes, please.  If you will be so kind to

8    bring them back to us.

9          THE WITNESS:  Sure.  No problem.

10         THE COURT:  I assume that the next witness is

11   available at 2 o'clock?

12         MR. CERASIA:  Ms. Cribben is going to be here at

13   2 o'clock, yes.

14         THE COURT:  All right.  Then you will have a very long

15   and enjoyable, hopefully, lunch.  And I'll see you back in here

16   at 2 o'clock.

17         MR. CERASIA:  Thank you, your Honor.

18         MS. TSE:  Thank you, your Honor.

19         (Luncheon recess)

20         (Continued on next page)

21

22

23

24

25

```
1              A F T E R N O O N   S E S S I O N

2                         2:05 p.m.

3              THE COURT:  Ms. Cribben, can you hear me?

4              THE WITNESS:  You know, I don't hear well.

5              THE COURT:  I know.

6              THE WITNESS:  And you would think the microphone would

7    be helpful, but in some ways it is not.

8              THE COURT:  Okay.

9              THE WITNESS:  I really need somebody sort of talking

10   to me right here.  I can hear you.

11             THE COURT:  Okay.

12             Would it be helpful, when the attorneys ask you

13   questions, if they come up and stand in front of you?

14             THE WITNESS:  That would be helpful.

15             THE COURT:  All right.  Anything else that we can do

16   to make it easier for you to hear the questions, don't hesitate

17   to tell us.

18             THE WITNESS:  I didn't understand what you just said.

19             THE COURT:  Anything that we can do to make it easier

20   for you to hear --

21             THE WITNESS:  Right.

22             THE COURT:  -- don't hesitate to tell us.

23             THE WITNESS:  Okay, I won't.

24             THE COURT:  Okay?  Now, would you please stand and

25   raise your right hand?
```

G6E3TSE3

1    LUCY FLINN CRIBBEN,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4              THE COURT:  Would you state your full name, spelling

5    both your first and your last name?

6              THE WITNESS:  Lucy Flinn Cribben.

7              THE COURT:  Would you spell Lucy?

8              THE WITNESS:  L-U-C-Y.

9              THE COURT:  And Cribben?

10             THE WITNESS:  C-R-I-B-B-E-N.

11             THE COURT:  Thank you.

12             MS. TSE:  Your Honor, if I may drag a chair in front

13   of Ms. Cribben I would not have any problems questioning her.

14   My computer is portable.

15             THE COURT:  That would be fine.  My question is

16   whether with you there I can hear you.  So, let's see if we can

17   work something out here.

18             MS. TSE:  Thank you.

19             THE COURT:  Bill, I think we have to be a little

20   closer.  I think we have to be pretty much where Pam is.

21             Hello.  Ms. Tse, you may also --

22             MS. TSE:  (Daughter)  Thank you very much.

23             MS. TSE:  Your Honor, can you hear me?

24             THE COURT:  I can, Dr. Tse.  Thank you.

25             MS. TSE:  How about you, Ms. Cribben?

1          THE WITNESS:  From what have you said so far I can

2     hear you.

3          MS. TSE:  Is it okay?  I can speak a little bit

4     louder.  Would that help?

5          THE WITNESS:  Pardon me?

6          MS. TSE:  If I speak a little bit louder, would that

7     help?

8          THE WITNESS:  Well, louder and clearer, slower.

9          MS. TSE:  All right.  Let's give it a try.

10    DIRECT EXAMINATION

11    BY MS. TSE:

12    Q.  So, good afternoon, Ms. Cribben.  Have you testified in

13    court before?

14    A.  Yes.

15    Q.  Most of my questions will be yes or no, you will be

16    presented with exhibits.  Take as long as you need to look them

17    over.

18    A.  I'm not understanding you at all.

19         THE COURT:  You will be presented with exhibits and

20    you should take as long as you need to look them over.  When

21    Dr. Tse hands you exhibits, you should take as long as you need

22    to look at them.

23         THE WITNESS:  I don't know whether the microphones are

24    helpful, to tell you the truth.

25         THE COURT:  Is this any better?

1              THE WITNESS:  Yes.

2              THE COURT:  All right.

3              THE WITNESS:  As long as you are close to me like

4     this.  The microphone bounces off the ceiling.

5              THE COURT:  Is Dr. Tse close enough to you?

6              THE WITNESS:  No.  She needs to be closer.

7              THE COURT:  Can we see if we can move this up?

8              MS. TSE:  That is totally fine with me because you may

9     also be able to hear better.

10             THE WITNESS:  Let's try it without the microphone, can

11    we?

12             MS. TSE:  I don't have a microphone any more but you

13    may want to use yours.

14             Your Honor, can you hear?

15             THE COURT:  I can hear.

16             MS. TSE:  Very good.  We are making progress.

17             Can you hear me now?

18             THE WITNESS:  Uh-huh.

19    BY MS. TSE:

20    Q.  Let me repeat the last statement.  Most of my questions

21    will be yes or no.  You will be presented with exhibits.  If

22    you need more time to look them over, please, let me know.

23             THE COURT:  You have to say yes or no.

24             Do you understand what the --

25             THE WITNESS:  Yes.  All right, fine.

G6e5tse4                        Cribben - direct

1          THE COURT:  Okay.

2    BY MS. TSE:

3    Q.  Ms. Cribben, what was your position at the NYU Langone

4    Medical Center from 2009 through 2011?

5    A.  I was the administrator of the Department of Medicine.

6    Q.  When did you leave NYU?

7    A.  October 2012.

8    Q.  Thank you.

9          Please describe to the Court what your

10   responsibilities were.

11   A.  Well, my role in the Department of Medicine was to be in

12   charge of all the administrator -- administrative and financial

13   activities at the Department of Medicine and to provide support

14   for the chairman and for the faculty.

15   Q.  So, Dr. Blaser was relying on you because you have

16   responsibility for the budgeting and balancing of the books; is

17   that correct?

18   A.  Right.  Yes.

19   Q.  Did you keep track of the grants awarded to faculty in the

20   department?

21   A.  Yes.  I mean, I had a financial manager, a business

22   manager -- I'm not an accountant, I'm an administrator -- who

23   kept exhaustive records of funding.

24   Q.  But the business manager and the accountants were under

25   your supervision?

G6e5tse4                     Cribben - direct

1    A.   Absolutely.  Yes.

2    Q.   And, in that regard, allocation of expenses such as

3    salaries and supplies to each grant was under your purview?

4    A.   Well, that's not quite true.

5           The principal investigator has primary responsibility

6    for the allocation of the expenses.  I'm not a scientist so it

7    is up to the principal investigator to say I need this much

8    salary, I need a technician, I need so much for supplies.  Then

9    the division director, in your case it was Dr. Valentine, CFAR,

10   reviews that and approves it.  I didn't really get involved in

11   disagreements with the division director or the principal

12   investigator about what they budgeted unless there was

13   something that was not in compliance.

14   Q.   So, for example, when I was the CFAR flow cytometry core

15   and I need to draw a certain percentage of my salary from the

16   grant that was awarded to me, at that point in the time, Helene

17   Zinszner, if you remember her, was the CFAR administrator.

18   That process would go from me to Helene and Helene would ask

19   Dr. Valentine to approve the request and then it would go to

20   Department of Medicine for execution.

21   A.   Well --

22           MR. CERASIA:  Objection.

23           THE WITNESS:  I want to make it clear that the Center

24   for AIDS Research was administratively independent of the

25   Department of Medicine and so the administrator of CFAR did not

1   report to me like the other divisional administrators in the

2   department and the reason for that is that CFAR was a center

3   grant.  The money actually didn't come into the Department of

4   Medicine, it came to the Dean's office.  And the whole concept

5   of the center grant is that it involves not just the Department

6   of Medicine but many departments.

7          So, that's why it was independent, in a sense -- not

8   in a sense, it was independent from the Department of Medicine.

9   We worked in a collaborative way with CFAR but I was not in

10  charge of the finances of CFAR.

11         MS. TSE:  All right.  May we approach, your Honor,

12  with Exhibit 2?

13         THE COURT:  Certainly.

14         MR. CERASIA:  Excuse me.  Was that 2?

15         THE COURT:  2.

16         MS. TSE:  2.

17         THE WITNESS:  I'm sorry.

18         THE COURT:  That's all right.

19         THE WITNESS:  I'm sorry about that.

20         THE COURT:  No problem.

21         THE WITNESS:  Okay.

22  BY MS. TSE:

23  Q.  Were you involved in the drafting of this letter?

24  A.  No.  I have never seen this letter before.

25         MS. TSE:  May I have a moment, your Honor --

G6e5tse4                        Cribben - direct

1                   THE COURT:  Certainly.

2                   MS. TSE:   -- to bring out an exhibit related to this

3        issue?

4                   May we approach with Exhibit 26?

5                   THE COURT:  You may.

6                   THE WITNESS:  Okay.

7        BY MS. TSE:

8        Q.  Please focus your attention on the e-mail --

9        A.  Doris?

10       Q.  Sorry.

11                  Please focus your attention on the e-mail towards the

12       bottom of the page.

13       A.  Yes, I see that.

14       Q.  That's from Dr. Valentine, addressed to you and a number of

15       other individuals.

16       A.  Go ahead.  What is the question?

17       Q.  I would just like to point out to you that this e-mail from

18       Dr. Valentine specifically said that he was attaching two

19       letters notifying Doris Tse that she is being removed from the

20       position of the Director of the CFAR Flow Cytometry Core

21       Laboratory and Dr. Valentine's e-mail was addressed to

22       Dr. Blaser, you, Mr. Driesen.

23       A.  Well, I don't remember ever seeing this letter.

24       Q.  Do you remember seeing the draft of the letter?

25       A.  No.

G6e5tse4                    Cribben - direct

1    Q.  Because Dr. Valentine's --

2    A.  No.

3              THE COURT:  Only one person can talk at a time.

4    A.  There would be no reason for me to look at the draft.  As I

5    explained to you, the administrative responsibilities for CFAR

6    were independent of the Department of Medicine.  I was not the

7    administrator of CFAR so there would be no reason for me to

8    comment on this.

9    Q.  But it was, nonetheless, addressed to you?

10   A.  Well, Dr. Valentine copied me, I'm sure, because once you

11   were removed from the core you would then become part of the

12   Department of Medicine administratively.  Once your funding

13   from CFAR ended then you would administratively be under the

14   Division of Infectious Diseases and the Department of Medicine.

15   But, up until that point, which I think was June, the funding

16   continued until June from CFAR, if I am not wrong.  You were

17   still under the administration of CFAR.

18   Q.  So, you could have received a copy of the draft in the

19   e-mail but you did not feel that you need to look it over?

20   A.  No.

21   Q.  Is that a fair statement?

22   A.  This is Dr. Valentine's.  I'm an administrator.

23   Dr. Valentine is the boss just like Dr. Blaser is.  I'm not the

24   boss of the Department of Medicine so I would not be telling

25   him -- Dr. Valentine -- what to do.  That's his responsibility.

```
 1   Q.  All right.  In that case can we look at a different -- a
 2   slightly different matter?  Please focus your attention --
 3            THE COURT:  Wait just one second, Dr. Tse.
 4            MS. TSE:  Oh.
 5            THE COURT:  Please continue, Dr. Tse.
 6            MS. TSE:  Thank you, your Honor.
 7   Q.  Please focus your attention on the text underlined in blue.
 8   I am referring to Dr. Valentine's letter.
 9            THE COURT:  That's Plaintiff's Exhibit 2.
10            MS. TSE:  That's not 2, that's 26.
11            THE COURT:  Are you referring to the moving of the
12   equipment?
13   Q.  No.  All the exhibits are numbered on the upper right
14   corner of the page.  So, Exhibit 2 is the letter from
15   Dr. Valentine terminating Dr. Tse's appointment and you already
16   testified that you were not involved in the drafting letter and
17   I am now asking you to please focus your attention on the text
18   that is underlined in blue.
19   A.  We certainly hope that you will remain a user?
20   Q.  Yes.  All right.
21            After Dr. Tse was removed as the CFAR core director
22   she, like you just said, became your -- quote unquote --
23   responsibility because she was no longer under CFAR.  Is that
24   correct?
25   A.  Became your responsibility?  Well, my responsibility -- I
```

1   mean, faculty don't report to administrators, they report to

2   their division director and the division director reports to

3   the chairman.  Faculty members don't report to administrators.

4   Q.  I am not referring to reporting to you.

5   A.  That's what responsibility is.

6   Q.  Okay, then let me rephrase.

7       After Dr. Tse was removed as the CFAR core director,

8   did you then become responsible for her finances such as her

9   salary, supplies and assorted?

10  A.  The overall finances of the Division of Infectious

11  Diseases, yes, of which you were a member.  Yes.

12  Q.  Were you aware of any letters notifying Dr. Tse that after

13  April 1st, 2010, that she was no longer a faculty member in

14  CFAR which would have been obvious to her from the letter but

15  did anybody send her a letter notifying --

16  A.  Yes, I am aware.

17      THE COURT:  Wait, Ms. Cribben.  Let the her finish the

18  question first and then answer, please.

19  Q.  Were you aware or did you recall sending a letter to

20  Dr. Tse informing her that after April 1st, 2010, that she

21  would return because that's where she once was, to being a

22  member of the Division of Infectious Disease and that she would

23  be reported from that point on to the division chief of that

24  division?

25      MR. CERASIA:  Objection.

G6e5tse4                         Cribben - direct

1          THE COURT:  Basis?

2     A.  I don't remember that letter --

3          THE COURT:  Wait one second, Ms. Cribben.  One second.

4          MR. CERASIA:  Compound and lack of foundation.

5          THE COURT:  Well, it may be compound.  Let's break it

6     down.  In terms of foundation, I think that's what Dr. Tse is

7     trying to establish.  Okay?

8          So, would you simplify that question, please, Dr. Tse?

9          MS. TSE:  Yes.

10    Q.  Did you or were you aware --

11         THE WITNESS:  Let me just make something clear first

12    before, that might clarify this.

13         MS. TSE:  Objection to --

14         THE COURT:  Well, let's hear it first.  If you don't

15    approve, you may ask to have it stricken from the record.

16         MS. TSE:  Of course, your Honor.

17         THE WITNESS:  Faculty members don't have faculty

18    appointments in centers because the center is not an academic

19    discipline.  It's not medicine or pediatrics or pathology or

20    biochemistry.  So, Dr. Tse's faculty appointment was always in

21    the Department of Medicine but the administration of her work,

22    her grant and everything, was in the Center for AIDS Research

23    where she was funded.

24         So, I don't know whether that clarifies for you --

25         MS. TSE:  No, because --

1          THE WITNESS:  Your academic appointment was always in

2     the Division of Infectious Diseases.

3          THE COURT:  If that doesn't help, Dr. Tse, you may put

4     follow-up questions so that it does help.

5     BY MS. TSE:

6     Q.  All right.  I think we will need some follow-up questions.

7     I will re-word.

8          Did you, or for that matter Dr. Blaser, send Dr. Tse a

9     notice informing her of her position in the Department of

10    Medicine, as you just mentioned?

11    A.  I don't know why we would send -- I mean, I don't know why

12    we would send such a letter.  You knew what your position was,

13    you were an associate -- you were a research associate

14    professor in the Department of Medicine.

15         THE COURT:  May I ask a question here?

16         Ms. Cribben, are you saying that Dr. Tse always had

17    her position in the Department of Medicine?

18         THE WITNESS:  Yes.  I know that it's complicated.

19         THE COURT:  Maybe you all have a head start on me but

20    it is very complicated to me so it is helpful that everyone is

21    on the same page.

22         So, what you are saying is that when she ended -- when

23    her position as director was ended, that didn't change anything

24    in terms of her status within the Department of Medicine?

25    A.  In terms of her salary?

1          THE COURT:  Yes.

2          THE WITNESS:  Absolutely it did, because her salary

3     she received from the grants in CFAR.

4          THE COURT:  So once --

5          THE WITNESS:  So, when she was removed as the core

6     director, that funding was removed.  Now, as I remember, she

7     still had some other funding from collaborating with other

8     investigators in the Department of Medicine and I guess OB/GYN,

9     I wasn't as familiar with that, but I know in the pulmonary

10    division she did work with them.  So, that funded a very small

11    portion of her salary.  The bulk of her salary came from the

12    CFAR grant.  So, that did change but her faculty appointment,

13    her position as research associate professor did not change.

14         THE COURT:  Okay.

15         Dr. Tse?

16    BY MS. TSE:

17    Q.  What I was driving at was specifically, after Dr. Tse was

18    no longer the director of the flow cytometry core, the

19    administration of her financial support became your

20    responsibility?

21    A.  Yes, you're right.  You're right about that.

22    Q.  All right.  That's all I want to establish.

23         Next question:  Since you assumed responsibility for

24    Dr. Tse's finances after April 1st, 2010, did you provide her

25    with an account with which she can pay technicians' salaries or

1    paid the cores, meaning the flow cytometry cores chargeback

2    fees?

3    A.   No, because there was no funding for that.  We did provide

4    support for your salary.

5    Q.   But no support --

6    A.   No support --

7    Q.   -- other than my salary?

8    A.   There was no funding.  You were --

9    Q.   I'm asking you whether --

10            THE COURT:  One at a time, please.  Let Dr. Tse finish

11   the question and then you may answer, Ms. Cribben.

12   Q.   Please address specifically the question that I am asking,

13   and if I want additional information I will ask you for it.

14   The question, specifically, is not whether there is money but

15   whether you provided her with funds with which she can use to

16   hire a technician or pay the core's chargeback fees.

17   A.   Me personally?  No.  And the Department of Medicine did

18   not.

19   Q.   Thank you.

20            Exhibit 28 is an e-mail from Dr. Unutmaz, first name

21   is Derya.  Do you know who Dr. Unutmaz is?

22   A.   You would have to refresh my memory.

23   Q.   He was appointed to be the co-director of the Center for

24   AIDS Research and he submitted an application, the renewal

25   application to the NIH in June 2010.

A.  You know, as I explained to you before, I was not involved

in the CFAR applications.  I was not involved administratively.

Q.  Yes.

A.  So, vaguely, now that you are reminding me I remember this

but I'm not familiar with him or his role.

          MS. TSE:  Your Honor, may we admit Exhibit 28 into

evidence?

          MR. CERASIA:  Objection.  It is irrelevant.

          MS. TSE:  Goes to motive.  It is Bates stamped NYU

004945.

          MR. CERASIA:  This document has nothing to do with

Dr. Tse.

          MS. TSE:  Yes, but this letter has something to do

with Dr. Valentine using an NIH award that I applied for and

obtained to pay his own salary.

          THE COURT:  I am going to overrule your objection and

admit Plaintiff's Exhibit 28 into evidence.

          (Plaintiff's Exhibit 28 received in evidence)

BY MS. TSE:

Q.  Once again, Ms. Cribben, this e-mail was copied to you.

Please take as long as you need to read the whole e-mail and we

will focus our attention on the text underlined in red.

A.  What is the question?

Q.  In the second or rather the third paragraph of the e-mail:

In this regard, you had mentioned that the Dean mentioned was

G6e5tse4                          Cribben - direct

1    going to support some of Fred's salary, freeing up the

2    operating account for CFAR, which I believe is currently being

3    used to support Fred's full salary and two of his technicians.

4            The letter was addressed to Vivian Lee.

5            My question is, these funds are controlled by the

6    medicine department?

7    A.  I don't know if I completely understand this.

8            The funds, the operating account is actually

9    controlled by the Dean's office.  All operating accounts are

10   controlled by the Dean's office.

11           I mean, this isn't something that I would have been

12   involved in.  I mean, if he is saying the Department of

13   Medicine should take over him, I just don't understand what he

14   is saying here, frankly.

15   Q.  All right.  Then perhaps the underlined text in the first

16   paragraph will help?

17           On a related note, we would like to use some of the

18   remaining operating budget -- there it doesn't say operating --

19   this year?

20   A.  What is your question?

21   Q.  I haven't asked a question yet.

22           THE COURT:  Well, I think actually, Dr. Tse, it would

23   help if you asked the question first so it puts, in context,

24   the text of the letter.

25           MS. TSE:  All right.

```
 1              THE COURT:  So, what is it that you want Ms. Cribben
 2     to answer?
 3              THE WITNESS:  What is the question, right?
 4              THE COURT:  Yes.
 5     BY MS. TSE:
 6     Q.  The question is, were you aware that Dr. Valentine was
 7     using the flow cytometry core's operating budget to pay himself
 8     and his technicians?  And in that --
 9              THE COURT:  Wait, wait, wait, wait.  That's enough of
10     a question.  Any objection?
11              MR. CERASIA:  Relevance, your Honor.
12              THE COURT:  Yes.  I think -- I'm not sure what the
13     relevance is but I will let this continue just a little bit,
14     Dr. Tse.
15     BY MS. TSE:
16     Q.  Once again, it goes to motive.
17     A.  Well --
18              THE COURT:  Motive terms of what, though?
19              THE WITNESS:  I don't understand --
20              THE COURT:  No, no, don't.  I'm having a little
21     discussion with Dr. Tse about I'm not sure when she says
22     motive, motive for the ADA?  That's what is before me.
23     BY MS. TSE:
24     Q.  All right.  In that case can we just stay with admitting
25     Exhibit 28 into evidence and that the exhibit shows that
```

1      Dr. Valentine was using the CFAR flow cytometry core budget

2      budgeted expenses to pay his own salary and his technicians

3      after June 1st or around June 1st, 2010?  The e-mail was dated

4      June 15.

5              THE COURT:  Again, I'm not sure, Dr. Tse, of the

6      relevance of the fact, if it indeed is a fact, that

7      Dr. Valentine was using some of the operating budget for his

8      salary and two of his technicians.  I'm not sure what the

9      relevance of that is.  Let's assume it is true, what is the

10     relevance?

11             MS. TSE:  The relevance is that puts me in the

12     vulnerable position of having to obtain required extramural

13     funding.

14             THE COURT:  I don't quite see that connection.  Are

15     you saying he misappropriated the money?

16             MS. TSE:  Yes, I am.

17             THE COURT:  Well, that's certainly not relevant for

18     what is before me.

19             MS. TSE:  All right.

20             THE COURT:  So, if that's the reason, it is stricken,

21     and 28, as an exhibit, is stricken from the record.

22             MS. TSE:  All right.

23             I will limit my questions to the time period between

24     April 1st, 2010 and April 4th, 2011.

25             Do I have your Honor's permission to look into

G6e5tse4                        Cribben - direct

1      Dr. Tse's time and effort reports?  Because that pertains to

2      the required extramural funding.

3            THE COURT:  What is the relevance of that toward the

4      question of whether or not NYU discriminated against you for

5      your disability during this time period?

6            MS. TSE:  Because they demanded that Dr. Tse fulfill

7      her job expectations to come up with the school's required

8      extramural funding and she was -- her employment at NYU was

9      terminated because she failed in that task.

10           THE COURT:  Are you saying that because they held

11     Dr. Tse to the requirements that she was not able to meet --

12           MS. TSE:  Yes.

13           THE COURT:   -- that they discriminated against her?

14           MS. TSE:  Yes, I am, your Honor.

15           THE COURT:  I think that's far afield from where we

16     are in terms of whether or not they discriminated against you

17     because of your disability.  So, it is not clear to me how

18     holding Dr. Tse to standards that were universally applied by

19     itself is relevant.  Now, if you are saying that it was clear

20     that you needed assistance in order to meet those standards,

21     that's another thing.

22           MS. TSE:  All right.  We will skip over the time and

23     effort issue and instead focus on what I needed or what Dr. Tse

24     would have needed in order to meet the school's expectations as

25     far as required extramural funding is concerned.

G6e5tse4                        Cribben - direct

1          THE COURT:  All right.

2          MS. TSE:  Give me a minute to reorganize, your Honor?

3          THE COURT:  Certainly.  Take your time.

4          (Pause)

5   BY MS. TSE:

6   Q.  Ms. Cribben, do you recall meeting with Dr. Tse and

7   Mr. Odom sometime around August 2010?

8   A.  Yes.

9   Q.  At that meeting, do you recall Dr. Blaser asking or

10  suggesting Dr. Tse to look into LTD benefits as a means for her

11  to have an income?

12  A.  Looked into what?

13  Q.  Long-term disability benefits.

14  A.  I do think that was brought up at the end of the meeting.

15  Q.  And do you recall whether Dr. Tse indicated or told

16  Dr. Blaser that she could not do laboratory work because she

17  was afflicted with osteoarthritis of the hands?

18  A.  Yes.

19  Q.  Now, your Honor, Exhibit 30 is a declaration --

20          THE COURT:  Before we get there, let me ask

21  Ms. Cribben what was your understanding of the purpose of that

22  meeting in August of 2010?

23  A.  Well, we were concerned about Dr. Tse because she had been

24  removed as the core director and she lost her funding, most of

25  it.  She had a small amount of funding.  In August it was down

1    to 5 percent.  So, given the policy of the medical school, you

2    have to obtain -- to be a research professor you have to obtain

3    55 -- at that time 55 to 60 percent of your salary from

4    extramural funding and we knew that that was not -- that

5    Dr. Tse did not have that funding.

6              Now, the purpose of the meeting was to try to

7    encourage her to collaborate with some of the other faculty --

8    and she was already doing that.  As a matter of fact, I think

9    she made a grant application about that time with Dr. Reibman,

10   if I am not wrong, and we were somewhat hopeful that that might

11   get funded.  But, the purpose of the meeting was to try to make

12   suggestions that Dr. Tse contact other faculty members.

13             I mean, Dr. Tse in some ways is in a unique position

14   of this center, and they worked with investigators throughout

15   the institution and she worked with investigators in almost all

16   the departments, am I right?  And so, she had access, you know,

17   to the research that other people were doing and, you know, we

18   suggested that she talk to them and possibly, you know, discuss

19   going on a common grant.

20             So, that was the purpose of the meeting, to try to

21   find out what are we going to do going forward.  And we do that

22   with all faculty members in this kind of situation.

23   Q.  Can you tell the Court how long it would take to get

24   something like that going?

25   A.  It depends on what it is.  It really does.  It depends

G6e5tse4                          Cribben - direct

on -- I mean, I can't -- I'm not a scientist so I can't tell

you that.  It takes some time but you were already -- I mean,

you most certainly have had a lot of data from all the years

that you were manager of that core laboratory.  I mean, I can't

tell you what kind of research or what your project would have

been, but in collaborating with other faculty members it would

not take years to get funded.

Q.  By years, how many years are you --

A.  I mean, we did support you for over a year, and you only

submitted one grant is my understanding, with Dr. Reibman.  If,

you know, three months later you said, look, I have this grant

that I have done with Dr. So-and-so and I am submitting it, but

you didn't do that.  You didn't come to us and say, oh, I have

another grant.  This one wasn't funded, I have another grant

now that I am putting in.  You didn't do that.

Q.  Do you remember when we received notice that the grant that

I put in, in collaboration with Dr. Reibman, was not funded?

A.  I can't.  I don't know when that was.

Q.  That would be November 2010.

A.  That would make sense.  Okay.  But you didn't apply for any

other grants after that.

Q.  Are you aware of such a thing known as grant submission

deadlines from the NIH?

A.  I am, but there are other -- excuse me.

          THE COURT:  That's all right.

1  A.  The NIH is not the only granting agency.  There are many,

2  many other foundations, pharmaceutical companies that supply

3  grants.  The NIH is not the only one.

4          So, if you couldn't meet an NIH deadline it is

5  possible that you could have sought funding from another

6  organization.  And, as a matter of fact, the funding that you

7  got, you did get some other funding from Dr. Reibman's

8  discretionary account.

9          Am I right about that?

10 Q.  No.

11 A.  I would have to go back and look at your funding sources

12 but some of the funding that you received was not -- it wasn't

13 all NIH funding.

14 Q.  Let's move on.

15         Let me then ask you, as far as foundation grants are

16 concerned, those have application deadlines as well?

17 A.  But they run at all different times and not all of them

18 are -- some of the foundations are pretty flexible in terms of

19 deadlines.

20 Q.  You mean you can submit a grant any time you want?

21 A.  Yes, some of them you can, actually.

22 Q.  So, at the August meeting in 2010 did you make any such

23 suggestions to Dr. Tse that she should look into grants other

24 than from the NIH?

25 A.  That's my -- that is really not in the purview of my

G6e5tse4                    Cribben - direct

1   position.

2   Q.  No, just answer the question.

3   A.  No.

4   Q.  It is a yes or no question.

5   A.  No.  No.  No.  No.

6   Q.  So you did not make any such recommendations?

7   A.  That's not my job.  And I don't have the knowledge to do

8   that.  I really don't.

9   Q.  But you just told the Court that there are all of these --

10  A.  Right, but that's up to the scientists.  The scientists are

11  the ones that request for proposals.  The institution publishes

12  all the request for proposals from all the foundations for

13  faculty and it is sent to faculty to see where funding is.

14              (Continued next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Why is that something that center faculty can do better
2   than other research faculty?
3   A.  I don't understand the question.
4           MR. CERASIA:  Objection.
5           THE COURT:  Sustained as to form.  Rephrase it, please
6   Dr. Tse.
7           MS. TSE:  Yes, your Honor.
8   Q.  You just said that center faculty should be able to do
9   that.
10  A.  To do what?
11  Q.  To apply freely for grants.
12          THE COURT:  I'm not sure I heard Ms. Cribben talk
13  about center faculty.
14          MR. CERASIA:  Central or center?
15          MS. TSE:  Center, as like Center for AIDS Research.
16  May I ask the court reporter to read back what Ms. Cribben said
17  regarding center faculty?
18          THE COURT:  Well, let me see.  Bear with me just
19  one second.
20  "Q. So you did not make any such recommendations?
21  "A. That's not my job, and I don't have the knowledge to do
22  that.  I really don't, will not"  -- I'm not sure what that is.
23  "Q.    But you just told the Court that there are all of
24  these --
25  "A. Right.  With you, that's up to the scientist, the

G6E3TSE5                         Cribben - direct

1   scientists are the ones that request for proposals.  The

2   institution publishes all the requests for proposals from all

3   the foundations for faculty.  And it is certainly, it is

4   circulated to faculty to see where the funding is."

5          I'm not sure where we got center.

6          MS. TSE:  All right.  I can rephrase that.

7          THE COURT:  Okay.

8   Q.  So, given that you are, you were aware that there are all

9   these funding opportunities, and at the meeting you were also

10  aware that Dr. Tse's extramural funding was at 5 percent, and

11  that she has a disability which precludes her from generating

12  preliminary data which is essential to applying for new grants.

13  Did you suggest to her that they're all these funding

14  opportunities that she could look into?

15  A.  Every faculty member who does research at NYU knows that.

16  Q.  But you specifically --

17  A.  That is part of their job description.  To be aware of

18  funding and to apply for funding.  That's the job of a faculty

19  member who is a research professor.

20  Q.  And notices were distributed to research professors

21  periodically to remind them that --

22  A.  That is done by the office of sponsored research.  There is

23  a dean for research who oversees all the research in the

24  institution.  I mean, a lot of the -- not just in medicine, all

25  the departments apply for grants.  That's why we encouraged you

1    to talk to some of the other faculty members that knew what

2    your skills were in running the core lab.  And you could be

3    helpful, possibly, in some of their grants.

4    Q.  Are you aware then that the data that I collected for other

5    research investigators at the school, when they were core users

6    of the flow cytometry core when it was under my direction, that

7    such data is not up to me to utilize, because it is their

8    intellectual property and not mine?

9    A.  I know, but that doesn't mean you can't collaborate with

10   them.  I mean, that's what --

11   Q.  Specifically what do you mean by "collaborate"?

12   A.  Talk to them and say, you know, I'd like to work on this

13   project with you.  They might say no.  I don't know.

14   Q.  And how did you know that I or Dr. Tse did not do that?

15   A.  Well, I don't know if you did.  I don't know that.  But you

16   didn't get -- what I do know is that you didn't get funded.

17   And my responsibility for the finances of the department of

18   medicine require that we could not any longer keep you on the

19   faculty.

20           This isn't just true at NYU.  I've worked at other

21   academic medical centers, public and private.  And this is --

22   this is the standard procedure.

23           You know, people think medical schools are very rich.

24   Medical schools operate right on the edge.  Right on the edge.

25   You know.  They are dependent on all sorts of variable funding

G6E3TSE5                      Cribben - direct

1    that changes every day.  Reimbursement for health care changes,

2    grants are constantly changing, and philanthropy.  Those are

3    the main sources of their revenue.  And it is like a juggling

4    act.  There are no hard dollars there.

5            So that's why we have to be very firm about this.

6    Otherwise, NYU will end up like Albert Einstein --

7            THE COURT:  Let's not start calling names.

8    A.  It went bankrupt, essentially.

9    Q.  Crain's New York reported that as of February 2016, the NYU

10   Langone Health System has an $89 million surplus.  Is that your

11   idea of working on the edge?

12           THE COURT:  Objection sustained.  Don't answer that.

13   A.  It's not.  You want to answer that?  A medical center --

14           THE COURT:  No, you don't have to answer, don't answer

15   that question.

16           THE WITNESS:  Okay.

17   Q.  You have just testified that Dr. Tse should have looked

18   into and applied for extramural funding.

19   A.  Yes.

20   Q.  Did you take your recommendations or your suggestions in

21   the context of the fact that she is a disabled individual?

22   A.  Yes.  I did take that into consideration.  Because there

23   are other things that you can do in research, but operate

24   equipment in a lab.  A lot of this is intellectual analysis of

25   data, collaborating with other faculty that have technical

1   support.  There are a lot of options there.

2   Q.  Then are you aware that the faculty who have research

3   awards, namely in my case, or in Dr. Tse's case, the

4   collaborators Dr. Rom, Dr. Reibman, and Dr. Young, 35 percent

5   of Dr. Tse's salary was supported by them?

6   A.  Hmm-hmm.

7   Q.  Are you aware that those grants were awarded to them for a

8   specific proposal, which they could not change just because

9   Dr. Tse needed additional salary?

10  A.  Well, I'm not talking about those specific grants.  I'm

11  talking about applying for new grants with them.  And, part of

12  your salary was reported from the discretionary account, which

13  is not restricted.  Not all grants --

14  Q.  That's irrelevant to my question, Ms. Cribben.

15          THE COURT:  Wait.  I think that let's hear the answer

16  and then we'll make a decision.

17  A.  Not all grants are restricted.  Now, I don't know what

18  grants you were on in pulmonary.  I know you were on

19  discretionary fund, which isn't restricted.  So I don't know

20  what the grants were.

21          But, what we were trying to say in that August meeting

22  was seek out your -- seek out people to collaborate with.  You

23  did that when you were core director.  You worked with faculty.

24  And see if you can develop a proposal with other faculty, or

25  yourself, with some data so you can apply for grants.

1    Q.  Did you realize then or do you realize now that the NIH

2    provided me with an award when I was the CFAR core director,

3    specifically to provide services to researchers at the

4    university?

5    A.  I don't know what you're talking about.  The equipment

6    grant?

7    Q.  No.  The CFAR flow cytometry core grant.

8    A.  Yes.  What about it?

9    Q.  What I just said.  That I was provided with a budget, with

10   an award?

11   A.  Right.

12   Q.  Because the NIH approved my budget?

13   A.  That's right.

14   Q.  To provide services, not to, quote unquote, collaborate as

15   you put it.  There's a difference.

16   A.  But we're talking about the period when you're no longer

17   core director.

18   Q.  So, when I am no longer core director, you assume as

19   someone who has probably never applied for a grant --

20           THE COURT:  That's gratuitous.  Don't have to go

21   there.

22           MS. TSE:  Sorry, your Honor.

23   Q.  Put it in your own words.

24   A.  Pardon me?

25   Q.  I'm rephrasing it in your own words.  That what you just

1    told the Court is that when I was removed as the CFAR flow

2    cytometry core director, you were assuming, but to use your own

3    words, from the position of somebody who is not a scientist,

4    that Dr. Tse can turn the services that she was providing into

5    collaborations.

6    A.  I don't understand what you're saying at all, frankly.

7          MR. CERASIA:  Objection.  I think she's misstating her

8    testimony.

9          THE COURT:  I'm not sure that she is.  But Dr. Tse,

10   would you try that again based on the last answer that

11   Ms. Cribben gave.

12   Q.  The flow cytometry core is a service facility.

13   A.  Yes.

14   Q.  And I was provided with funds by the NIH not only for my

15   own salary, but for lab technicians to provide those services.

16   Are you aware that there is a distinct difference between the

17   provision of services and a collaboration?

18   A.  Well, I'm using "collaboration" in a very general way.  I

19   am assuming that you talked to the investigators when you knew

20   something about their research, when you did the tests.

21   Because you're not just a technician.  You weren't just a

22   technician.  You were a research professor.

23   Q.  And?

24   A.  So, I would think that you would, you know, be interested

25   in the research they were doing.  I can't believe you didn't

G6E3TSE5                          Cribben - direct

1  talk to them about it.

2  Q.  Dr. Tse's mandated by the application that she submitted.

3  Would design experiments with the investigators who used her

4  core facility.  She was not mandated to go beyond that.

5  A.  Well --

6  Q.  That is the essence of a core.

7  A.  Not as core director, but as a research professor you are.

8           MR. CERASIA:  Objection, your Honor.

9           THE COURT:  You know something, I don't think you're

10  helping your case.  I think there is a lot of information going

11  back and forth, and you will have an opportunity to examine and

12  you can move to reconsider my overruling of your objections.

13           But the point is that it has been very difficult for

14  me to understand how this thing functions.  And the more

15  testimony that I get, that gives each witness's version of how

16  they thought it functioned, is helpful to me.

17           And I know that Dr. Tse has the burden of proving her

18  case, so she is getting a little bit more leeway.  But, this

19  question and answering or conversation between Dr. Tse and

20  Ms. Cribben is helpful for me.

21           So, I'm not overruling your objections because they're

22  wrong.  I'm overruling your objections because I need this.

23           MR. CERASIA:  I understand, Judge.  I'm not offended.

24  I understand.  I've done this before.  I just think they're

25  talking about two different things, and I think it's confusing.

1        THE COURT:  In that event, when you get your chance to

2   examine Ms. Cribben, you can help straighten out what you think

3   are the two different things.

4        MR. CERASIA:  Okay.

5        THE COURT:  Okay?  Could you put your last question,

6   Dr. Tse.

7        MS. TSE:  Yes.  I forgot what the exact words were.

8   But I will rephrase to the best of my ability.

9   Q.  You are saying that the function of the core director was

10   to look into the projects of her users.  Is that right?

11   A.  That's right.  But let me just --

12   Q.  How would you know that?

13        THE COURT:  Wait.  Let's have Ms. Cribben give more of

14   her answer and then you can put your next question.

15        MS. TSE:  Thank you, your Honor.

16   A.  I mean, I don't know what your exact job description was.

17   But, you were not just a technician.  You were not just the

18   core director as a technician doing tests.  You were a faculty

19   member.  And a faculty member, research faculty member,

20   collaborates with their colleagues, talks about research, goes

21   to research conferences, participates in the intellectual life

22   of the institution.  And in that process, you know, you can

23   gain collaborations with other faculty members.  That's what

24   faculty do.  It's an intellectual, not just a technical,

25   process.  If you are a researcher.  If you are a technician,

1    that's a different story.  But you weren't.  You were a

2    research professor.  You research, you publish, you talk about

3    science with your colleagues.  That's why people want to be at

4    academic medical centers.

5    Q.  And do you recall Dr. Blaser, who was Dr. Tse's supervisor,

6    intellectual and otherwise, making those recommendations to

7    Dr. Tse at the August 2010 meeting?

8    A.  Yes.  I think in general, we did talk about, we encouraged

9    you to seek out other faculty to collaborate with them and to

10   apply for grants.  That's my -- you know, it's been many years

11   now so I can't remember every word in that meeting.  But, in

12   the -- I'd say three-fourths of the meeting was devoted to

13   that.  We talked about people in pulmonary and the possibility

14   of maybe expanding your role there.

15   Q.  And I will repeat myself.  Are you aware then that once a

16   grant is awarded, that there is a certain goal that the

17   principal investigators to whom the grants were awarded had to

18   meet?

19   A.  Yes.

20   Q.  Furthermore, are you aware that any change in personnel in

21   particular from an NIH grant has to be resubmitted to the NIH

22   if it differs by more than 25 percent?

23   A.  I don't know where this is going, but yes, I do know all

24   that but --

25             THE COURT:  I'm not sure either.

1              MS. TSE:  Your Honor.

2              THE COURT:  Yes.

3              MS. TSE:  Ms. Cribben was insisting that Dr. Tse could

4    ask her collaborators to increase her salary support.  And I am

5    trying to counteract that statement because I was a principal

6    investigator with NIH awards, and I am keenly aware of the need

7    to meet your goals that were proposed in an application.  So

8    there is minimum if no leeway to just increase the salary

9    support of any person that was on your grant, as it was

10   proposed.

11             THE COURT:  Dr. Tse, I may be mistaken, but I thought

12   Ms. Cribben was saying that these were people that you could

13   approach for new proposals as opposed to having them change the

14   proposals that they already had been funded for.  I may be

15   wrong, but I thought that's what she was saying.

16             THE WITNESS:  Yes, that's exactly -- that's what we

17   discussed at that meeting.

18   Q.  Yes.  And I am trying to explain to the Court or asking you

19   whether you were aware that it is not as simple as asking the

20   people, namely, Dr. Rom, Dr. Reibman, and Dr. Young, to just

21   increase my level of participation in their grants?

22             THE COURT:  But Dr. Tse.

23   A.  That's not what I said.

24             THE COURT:  That's not what she said.  I think this

25   would be a good time for us to take our afternoon recess.  We

 1   will continue in about 10 minutes.

 2              MS. TSE:  Thank you, your Honor.

 3              (Recess)

 4              (In open court)

 5              THE COURT:  Please be seated.

 6              MS. TSE:  I was having great difficulty juggling my

 7   laptop and the exhibits that I need to refer to.  So can we

 8   confirm that Ms. Cribben can hear or is she having great

 9   trouble?

10              THE WITNESS:  I can't hear.

11              THE COURT:  She can't hear.  Let me see if we can

12   then, let's see if we can bring a chair in front of Dr. Tse's

13   table so that Dr. Tse can sit at the table and Ms. Cribben can

14   hear.  Let's give this a try.

15              MS. TSE:  Thank you, your Honor.

16              THE COURT:  Ms. Cribben, would you sit in that chair?

17              THE WITNESS:  Sure.

18              (Pause)

19              THE WITNESS:  I'll just use this.

20              THE COURT:  You use the screen until we can get a

21   better situation.  So you can read what Dr. Tse is asking you.

22   And then hopefully everybody will be in a good situation.

23              Dr. Tse.

24              MS. TSE:  I'm perfectly comfortable, your Honor.

25              THE COURT:  Good.  Are you ready to proceed?

 1              MS. TSE:  Yes.

 2              THE COURT:  Okay.

 3     BY MS. TSE:

 4     Q.  Let me try to paraphrase, so to speak, my question that we

 5     had so much difficulty with.  And I will use an example to see

 6     if that would help.

 7              Dr. Tse had worked with Dr. Blaser when she was the

 8     core director, specifically with a graduate student whose name

 9     was Mary Ann Pohl.  They were able to produce data that was

10     published in the Journal of Experimental Medicine.

11              Do you recall at the August 2010 meeting Dr. Blaser

12     extending an invitation to Dr. Tse asking her if she would

13     consider working for him?

14     A.  Are you saying did Dr. Blaser ask you to work for him?  Is

15     that the question?

16     Q.  Yes.  Work in his lab, work for him, doing what you just

17     described, the intellectual piece.

18     A.  No, I don't believe he did.

19     Q.  All right.  But you think that other core users could have

20     made such an invitation to Dr. Tse?

21     A.  Is that a question?

22     Q.  Yes.

23     A.  You know, I don't know.  I mean, this is your

24     responsibility as a faculty member.

25     Q.  Can you pull the microphone closer to you?

1          THE COURT:  Wait.  Wait.

2          MS. TSE:  I'm sorry.

3          THE COURT:  Again, only one person at a time.  You ask

4   a question, let the witness answer the question.  And then put

5   the next question.

6          MS. TSE:  I'm sorry, your Honor.  I couldn't hear her

7   answer.  That wasn't a question on my part.  I was just trying

8   to let the Court know that I could not hear what she was

9   saying.

10         THE COURT:  Okay.  Could you try and speak up.

11  A.  Yeah, I am talking -- I was talking about your role as a

12  faculty member.  Not core director.  Not as a technician.  But

13  as a faculty member.

14         And one of the, one of the ways you develop proposals

15  is to talk to other faculty members and find out what the

16  research is they're doing and how your research may relate to

17  theirs.  I mean, I couldn't tell you exactly who you should

18  approach or what you should do.  I'm not a scientist.  But I

19  know how research is done.  And that's how it's done.

20  Q.  You were not a scientist, I'm reiterating, but you know how

21  research is done.

22  A.  Yes.  I do.

23  Q.  All right.

24  A.  I was a research technician, as a matter of fact, for many

25  years.

1   Q.  Very good.  Did Dr. Tse told you at this meeting that she

2   was not interested in collaborating with other researchers?

3   A.  I'm reading this right?  That you were not interested in

4   collaborating with other researchers?

5   Q.  No.  My question specifically is do you recall?

6   A.  I don't recall that.

7   Q.  Dr. Tse saying at this meeting that she has no interest in

8   collaborating with other scientists at the medical school?

9   A.  You said that at the meeting?

10          THE COURT:  She's asking if you remember if she said

11  that at the meeting.

12          THE WITNESS:  I don't remember her saying that.  I

13  think I would be a little shocked if she said that.

14  Q.  Very well.  And so, your only recommendation that you

15  recall at the meeting was for Dr. Tse to provide the

16  intellectual piece, and seek out collaborators at the medical

17  center so she can meet her job expectations.

18  A.  I don't remember everything that was said at that meeting.

19  Dr. Blaser was there, I'm sure he made other recommendations.

20  I don't remember --

21  Q.  If you don't remember, just say no.

22  A.  No.

23  Q.  Very well.  And that is the best reasonable accommodations

24  that you could think of for Dr. Tse's physical impairments?

25          MR. CERASIA:  Objection.

1          THE COURT:  No.  Overruled.

2   A.  After that meeting, you never asked for any accommodations.

3   I -- that I am aware of.

4   Q.  All right.

5   A.  For your position as research professor.

6   Q.  All right.  And do you remember Dr. Tse expressing to

7   Dr. Blaser that she has difficulty meeting the expectations of

8   her position because she was unable to do laboratory work

9   because of her osteoarthritis?

10  A.  Yes, I do remember that you said that.

11  Q.  So you are aware that Dr. Tse has limitations because she

12  is a disabled individual?

13  A.  Yes.

14  Q.  And let me repeat myself.  Do you recall making the

15  suggestion to Dr. Tse that she could provide the intellectual

16  piece to somebody's research project as a form of reasonable

17  accommodation?

18  A.  I don't understand this question at all.

19          THE COURT:  Foundation for this?

20          MS. TSE:  Your Honor, let me backtrack.  May I?

21          THE COURT:  Please.

22          THE WITNESS:  I don't think that was discussed as an

23  accommodation.

24          THE COURT:  Let me see if I can help here.  What do

25  you recall, if anything, at that August meeting that was

1   discussed as an accommodation?

2           THE WITNESS:  I don't think there was anything

3   discussed.  Dr. Tse never requested an accommodation.

4           THE COURT:  All right.

5           MS. TSE:  Did we submit Exhibit 30 into evidence, your

6   Honor?

7           THE COURT:  Yes.

8   Q.  All right.  Do you have Exhibit 30?

9           MS. TSE:  May we approach?

10          THE COURT:  Yes.

11          MR. CERASIA:  I don't have any record of 30 in

12  evidence.

13          THE COURT:  I thought it was 3.

14          MS. SASJA TSE:  30.

15          MS. TSE:  30.

16          THE COURT:  I'm sorry.

17          MS. TSE:  That is actually --

18          THE COURT:  30 is not in.  3 is in.  I misheard.

19          MS. TSE:  Then let me have it back.  I'm sorry, your

20  Honor, for the confusion.

21          THE COURT:  No problem.

22          MS. TSE:  Exhibit 30 is a declaration by Lucy Cribben

23  that was made on April 9, 2012, and was actually submitted by

24  NYU counsel.

25          THE COURT:  First of all, are you moving Exhibit 30

1    into evidence?

2            MS. TSE:  Yes, I would like to have that admitted into

3    evidence if there is no objection.

4            THE COURT:  Mr. Cerasia?

5            MR. CERASIA:  I don't have any objection, your Honor.

6            THE COURT:  Plaintiff's Exhibit 30 admitted into

7    evidence.

8            (Plaintiff's Exhibit 30 received in evidence)

9    Q.  Did you have a chance, Ms. Cribben, to look over this

10   document?

11   A.  Yes.  I just looked over it now.

12   Q.  In paragraph two, you stated that you provide counsel to

13   faculty and staff concerning administrative matters.  Were you

14   trained by human resources to take on that task?

15   A.  Yes, I mean I didn't hear -- after staff concern -- what

16   else did it say?

17   Q.  I asked if you were trained by human resources --

18           THE COURT:  Wait.  Hold up.  The feed isn't working

19   yet so she can't hear.

20           MS. TSE:  Which question?

21           THE COURT:  Don't say anything until we're ready.

22           MS. TSE:  All right.

23           (Pause)

24           (The record was read)

25           THE COURT:  Are you trained by human resources to take

1    on that task?

2            THE WITNESS:  Well, yes.  But, I have a master's

3    degree in health care administration.  Before I came to NYU, I

4    have extensive experience.  As an administrator at Cornell, New

5    York Hospital, I was an associate dean at Downstate before

6    coming here.  So, by the time I got to NYU, I had the

7    education, I had the experience, and I participated in all the

8    professional development activities I could.

9    Q.  My question is specifically were you trained by the NYU

10   Langone Medical Center human resources to provide counsel to

11   faculty and staff, yes or no?

12   A.  Yes.

13           THE COURT:  Are you asking whether there was specific

14   training put on by Langone for her, in addition to all of her

15   experience?

16           MS. TSE:  Yes.  Whether she was trained by Langone's

17   human resources to counsel faculty and staff.

18           THE COURT:  And who do you mean by Langone's human

19   resources?  Do you have specific people?

20           MS. TSE:  The department directed by Sanchez.

21           THE COURT:  I'm not sure that this is something that

22   we need to pursue.  So let's move on.

23           MS. TSE:  May I ask one question?

24           THE COURT:  You can try.

25           MS. TSE:  All right.

1    Q.  So whether you were trained by human resources at Langone

2    or not, you had the knowledge to identify employees in the

3    protected class?

4            THE COURT:  And by that you mean?

5    Q.  For example, Dr. Tse.

6            MR. CERASIA:  Objection.

7    A.  I don't know what the question is.

8            THE COURT:  Sustained.

9    Q.  All right.  Let me rephrase it.

10           THE COURT:  This is your last chance.  Make it good.

11           MS. TSE:  All right, your Honor.

12   Q.  You are telling the Court that you were trained, whether at

13   NYU or before, and that you are familiar with the Americans

14   with Disabilities Act, as it would apply to Dr. Tse.  Yes or

15   no?

16   A.  I don't think I said that.

17           THE COURT:  No, she's asking you if you are familiar

18   with the Americans with Disability Act.

19           THE WITNESS:  I'm familiar with it, but I'm not an

20   expert on it, and I would in all cases like this, I would rely

21   on the expertise of human resources.

22           MS. TSE:  That's all my questions, your Honor.

23           THE COURT:  Thank you, Dr. Tse.

24           Mr. Cerasia?

25           MR. CERASIA:  One second, your Honor.

1          THE COURT:  Sure.  I'm wondering whether we should --

2          MR. CERASIA:  I can come up here in the chair if

3  that's easier.

4          THE COURT:  Yes, yes.

5          MR. CERASIA:  I'm fine to stand.

6          THE WITNESS:  The closer you are the better.

7          THE COURT:  The closer you are the better.

8          MR. CERASIA:  Fair enough.  Thank you.

9  CROSS-EXAMINATION

10 BY MR. CERASIA:

11 Q.  Ms. Cribben, did you ever tell Dr. Tse that she needed less

12 than 100 percent funding to continue her employment?

13 A.  That she needed what?

14 Q.  Less than 100 percent funding to continue her employment?

15         THE COURT:  In what period of time?

16 Q.  And my question is, just all my questions I'm going to ask

17 you are from June 1st, 2010, until the end of her employment in

18 April of 2011.

19 A.  I don't think I had a discussion with her about it, no.

20 That's a policy of NYU, and information on that is sent by the

21 dean's office.

22         (Continued on next page)

23

24

25

1    BY MR. CERASIA:

2    Q.  Between that same time period, do you have any recollection

3    of Dr. Tse ever asking the Department of Medicine for money to

4    pay for laboratory research?

5    A.  No.

6    Q.  Dr. Tse had asked you a question about whether or not you

7    ever set up an account for her.  Do you remember that question?

8    A.  Yes, and I don't believe we did.

9    Q.  Your answer, actually, was you said that you had no funding

10   for that account.

11   A.  Right.

12   Q.  My question is, what did you mean by that?

13   A.  If there is no money there is no money to put in an

14   account.  You can't open an account unless you have funds that

15   are going to go into that account.  NYU is actually very, very

16   strict about that.

17   Q.  Do you have any -- do you recall if anybody at the August

18   2010 meeting, or otherwise, ever told Dr. Tse that she,

19   herself, had to do lab work to get research funding?

20   A.  Did what?

21   Q.  Did anybody ever tell Dr. Tse that she had to do the lab

22   work herself in order to obtain funding?

23   A.  Absolutely not.

24          THE COURT:  Now, are you talking about the August 2010

25   meeting, Mr. Cerasia, or are you talking about ever?

G6E5tse6                        Cribben - cross

 1   BY MR. CERASIA:

 2   Q.  Ever, between June 2010 and April 2011.

 3   A.  I don't know that any -- I mean I don't know.  I certainly

 4   wouldn't.

 5   Q.  After the August 2010 meeting with you, Dr. Blaser, Dr. Tse

 6   and Reggie Odom, did you ever hear from Dr. Tse after that

 7   meeting?

 8   A.  No.  Well, it was before.  I mean there were some issues

 9   having to do with construction but that was, I think, in 2009.

10   Q.  After the August 2010 meeting, did you ever receive any

11   information from Dr. Tse that she in fact was collaborating

12   with other principal investigators on new research projects?

13   A.  No.

14   Q.  Do you know why Reggie Odom was at the August 2010 meeting?

15   A.  I actually -- let me think about it for a minute.  I assume

16   Dr. Blaser asked him to come to the meeting.

17              MR. CERASIA:  I have no other questions.

18              THE COURT:  All right.  Thank you, Mr. Cerasia.

19              MR. CERASIA:  Sure.

20              MS. TSE:  Redirect, your Honor.

21              THE COURT:  One minute.

22              MS. TSE:  Sorry.

23              THE COURT:  You may proceed.

24              MS. TSE:  Thank you, your Honor.

25   REDIRECT EXAMINATION

1   BY MS. TSE:

2   Q.  Did you or were you aware that Dr. Blaser or even Mr. Odom

3   informed Dr. Tse that she has to come up with 100 percent REF

4   to fulfill her job expectation?

5   A.  No.

6   Q.  Thank you.

7         We are, unfortunately, going to venture into the world

8   of lab research again.

9         THE COURT:  Well, actually, you are limited to asking

10  Ms. Cribben questions that are related to what Mr. Cerasia had

11  just asked her.  So, you can't re-open and start anew.

12        MS. TSE:  All right, but Mr. Cerasia did ask

13  Ms. Cribben issues about lab research and I will -- and please,

14  correct me if I misinterpreted or did not hear properly.

15  BY MS. TSE:

16  Q.  Were Dr. Tse instructed at the August 2010 meeting as to

17  how she can get funding without the need to do lab work?

18  A.  I think I have answered this.

19        THE COURT:  I know, but let's, if you would, please

20  answer it again.

21  Q.  Yes or no?

22  A.  You know --

23  Q.  No, no, no, let --

24        THE COURT:  No.

25        THE WITNESS:  What we talked about at that meeting is

1    what we talk about with all faculty.

2              THE COURT:  No, but the question is do you recall

3    specifically Dr. Tse being instructed at that August 2010

4    meeting how she could get funding without the need to do lab

5    work?

6              THE WITNESS:  Yes; by collaborating with other faculty

7    members.

8    BY MS. TSE:

9    Q.  And that's the only recommendation that you have for her at

10   the meeting?

11   A.  I don't remember everything that was said at that meeting.

12   I remember that that was one of the things that was emphasized.

13   Q.  Regarding her inability to do lab work?

14   A.  What is the question?

15   Q.  That the only recommendation that was presented to Dr. Tse,

16   because she articulated the fact that she could not or would

17   have a very low chance to successfully apply for funding

18   because she could not do lab work herself and did not have the

19   lab technicians that she would need to do the lab work for her,

20   that your only suggestion is for her to collaborate with other

21   investigators?

22             MR. CERASIA:  Objection, your Honor.  I think it is

23   compound.  I heard a lot of "ands" in there.  I don't have the

24   transcript in front of me.

25             THE WITNESS:  You know, most funded investigators

G6E5tse6                          Cribben - redirect

1    don't actually do the technical --

2                MS. TSE:  That is not my question, Ms. Cribben.

3                THE WITNESS:    -- lab work.

4                THE COURT:  I understand, but, look.  It has been a

5    long day.  Let's see if we can keep it short and simple.  Would

6    you rephrase your question?

7                MS. TSE:  Yes.  Definitely.  I will do it stepwise.

8                THE COURT:  That's good.

9    BY MS. TSE:

10   Q.  Dr. Tse articulated at the meeting that she has a

11   disability; is that right?

12   A.  Yes.

13   Q.  Dr. Tse also articulated at the meeting that that

14   disability would not allow her to do lab work; is that right?

15   A.  Yes.

16   Q.  And Dr. Tse also articulated at the meeting that she would

17   need preliminary data in order to propose new projects to get

18   funding; is that right?

19   A.  I don't remember her saying that at the meeting.

20   Q.  That's fine.

21          But you do remember that you recommended or suggested

22   that because of her impairment that she should look into

23   providing the intellectual piece in collaborations with other

24   investigators at the school; is that right?

25                THE COURT:  Wait.  Are you asking whether Ms. Cribben

1  herself made that recommendation or whether or not that

2  recommendation was made by somebody else at that meeting?

3          MS. TSE:  I was asking whether she or other people.

4          THE COURT:  Let's do one at a time.

5          MS. TSE:  All right.

6  BY MS. TSE:

7  Q.  Did you, yourself --

8  A.  Actually, I think the recommendation was made by

9  Dr. Blaser.  He would be the appropriate person to make that.

10 Q.  All right.  I can move on to the next question.

11 A.  I don't know how much I had to say about that but I would

12 think that it was Dr. Blaser who -- you know, we had a

13 discussion and we mentioned pulmonary and I think your lab was

14 near the pulmonary people, that that was a possibility.

15 Q.  Do you recall whether any specific researchers at the

16 school were mentioned as possibilities for Dr. Tse to look

17 into?

18 A.  I don't remember outside of, you know, having worked -- had

19 worked with other investigators.  I think we suggested that you

20 pursue that.

21 Q.  Very well.

22          And, at the meeting, did you or Dr. Blaser inform

23 Dr. Tse that you expect her to follow up with you regarding

24 remember collaborations with other investigators to get

25 extramural funding?

G6E5tse6                           Cribben - redirect

1   A.  I don't think that we asked you to come back and report to

2   us but it is assumed that, you know, if you did collaborate and

3   went in with them and applied for grants, that you would want

4   to tell us about that.

5   Q.  We are going back for the last question on page 2 of your

6   declaration which was something also that Mr. Cerasia raised

7   and it pertains to the collaborations.

8           Dr. Tse had an ongoing collaboration with Dr. Reibman,

9   Dr. Rom and Dr. Young which, together, provided for 35 percent

10  of her salary.  In your declaration you said that by August

11  31st, 2010 she had approximately 5 percent of her salary paid

12  through extramural grants.

13          THE COURT:  After August 31st.

14  Q.  After August 31st.

15          Can you tell the Court whether you know of the

16  circumstances under which her salary support dropped from 35

17  percent to 5 percent?

18  A.  Well, I'm assuming that those grants were all --

19          THE COURT:  No, no.  Don't assume.  Do you know or do

20  you not know?

21          THE WITNESS:  I have to say I don't know.  I could

22  guess, but I don't know.

23          THE COURT:  That's fair.

24          THE WITNESS:  I don't know.

25  BY MS. TSE:

Q.  Now, Dr. Young is from the department of OB/GYN?

          THE COURT:  This is beyond the scope of what

Mr. Cerasia went into so I think that this part of the

examination is at an end.

          MS. TSE:  Thank you, your Honor.

          THE COURT:  Mr. Cerasia, anything else?

          MR. CERASIA:  Two questions, your Honor.

RECROSS EXAMINATION

BY MR. CERASIA:

Q.  At the August 2010 meeting, did Dr. Tse ever tell you or

the others who were in attendance that she had a specific

research proposal that she wanted to pursue?

A.  No.

Q.  With respect to paragraph 2 of your declaration and the

reference to the fact that after August 31st, 2010 she had 5

percent funding support for her salary -- right?

A.  Yes, I see that.

          THE COURT:  That's in paragraph 4.

Q.  Oh, I'm sorry.  It is on page 2, paragraph 4.  Thank you,

your Honor.

          Did you verify that information at the time you signed

your declaration in April of 2012?

A.  I believe so, yes.

          MR. CERASIA:  Thank you.  Nothing else.

          THE COURT:  All right.  Ms. Cribben, thank you very

 1    much.  You may step down.

 2              (Witness steps down)

 3              THE COURT:  I see that for tomorrow we have scheduled

 4    Steven Abramson, Dr. Tse, Margaret Meagher -- we don't know

 5    what is happening there -- and Elza Nunez.

 6              Has Margaret Meagher been notified or subpoenaed?

 7              MS. TSE:  From yesterday's session I remember

 8    Mr. Cerasia mentioning that Ms. Meagher has difficulty

 9    mobilizing, and if your Honor would allow to admit into

10    evidence, which I don't recall whether it was done -- I'm sorry

11    for that lapse in memory -- the e-mail that she had exchanged

12    with the Unum representative into evidence.

13              THE COURT:  Do you happen to remember what exhibit

14    number that is?

15              MR. CERASIA:  19, your Honor; and it is in evidence.

16              THE COURT:  It is in evidence.

17              MS. TSE:  All right.  So, beyond that, at least on my

18    part, I do not think that we will need to bring Ms. Meagher in

19    for testimony.

20              THE COURT:  All right.

21              Mr. Cerasia?

22              MR. CERASIA:  We would not call her as a witness,

23    Judge.

24              THE COURT:  All right.  So, then Elza Nunez, I believe

25    you told me before but I don't remember, so what is the

1      significance of her testimony?

2                 MS. TSE:  Elza Nunez was and still is the manager for

3      the Department of Medicine and the only contributions, as far

4      as fact-finding is concerned, would be specific to laboratory

5      and office space allocation.  So, I do not think that she would

6      provide any information that would be useful.

7                 THE COURT:  All right.  So that we are now down to two

8      witnesses for tomorrow.  Aside from these witnesses, are there

9      any other witnesses that we would be expecting to put on?

10                MS. TSE:  Not from my part.

11                MR. CERASIA:  Not from ours either, your Honor.

12                THE COURT:  So, the testimony may conclude tomorrow.

13                MR. CERASIA:  Your Honor, just as a reminder,

14     Dr. Abramson is available, I think, only until around noon or

15     1:00 because he has to give a lecture so he has a short window.

16                THE COURT:  Your point?

17                MR. CERASIA:  I just wanted to let your Honor know.

18                THE COURT:  I will give him a late note, if necessary.

19                There are two outstanding issues.  I have received two

20     documents, Plaintiff's Exhibit 10 and Plaintiff's Exhibit 22C

21     into evidence, subject to connection.  The connection being

22     whether or not these manuals or documents did or did not apply

23     to Dr. Tse.  How are we going to deal with that?

24                MS. TSE:  Document 10 was issued by the Office of

25     Education, Faculty and Academic Affairs and Dr. Abramson is the

G6E5tse6

1   Vice Dean for education, faculty and academic affairs.

2          THE COURT:  So, Dr. Abramson can testify to that?

3          MS. TSE:  Can testify to -- can confirm whether that

4   policy was issued by his office, can confirm that the word

5   "tenured faculty" is not --

6          THE COURT:  No, no.  I can see that from the document.

7          MS. TSE:  I'm sorry.

8          THE COURT:  What I am asking is it was raised that

9   Dr. Tse feels that these documents related to her and therefore

10  the conditions or the requirements in there related to her.

11  Mr. Odom testified that it was for tenured faculty and some of

12  it was not, and having seen just a few pages he couldn't tell

13  what was for what.

14         So, it is really important that in terms of some of

15  the argument that Dr. Tse plans on making that these terms

16  applied to her, that I know from someone who has knowledge

17  whether or not these documents did apply to Dr. Tse and, if

18  not, why, since on their face it isn't clear that they deal

19  with tenured faculty.

20         How are you going to deal with that, Mr. Cerasia?

21         MS. TSE:  The answer would have to come from --

22         THE COURT:  Mr. Cerasia.

23         MS. TSE:  Oh.  I'm so sorry.

24         MR. CERASIA:  I didn't offer them into evidence, your

25  Honor.

G6E5tse6

```
 1         THE COURT:  No, but the reason given why they should
 2   be discounted was because it didn't apply to her.
 3         MR. CERASIA:  And I believe that Dr. Abramson
 4   certainly can testify as to Exhibit 10.
 5         THE COURT:  What about Exhibit 22C?
 6         MR. CERASIA:  It is possible.  I don't know the
 7   answer, Judge.
 8         THE COURT:  You know --
 9         MR. CERASIA:  But it also wasn't an exhibit that she
10   was using.  22C was from her prior --
11         THE COURT:  I understand, but first of all, everything
12   here is something that is available.  We are dealing with a
13   plaintiff who is representing herself, we are dealing with a
14   set of very convoluted facts and assumptions made about what
15   does or doesn't apply, what is or is not significant, what is
16   or is not expected.  Some of the documents that have been
17   offered in evidence are self-contradicting.  So, what I am
18   telling you is that if you wish to present as complete a record
19   to this Court as possible, some of these things need to be
20   cleaned up.  And I do believe that Dr. Tse is really not in a
21   position to do that unless, of course, Dr. Tse, you can bring
22   in your version of the complete faculty handbook that was given
23   to you showing that it was sent to you and whatever the other
24   document is, the policy on performance expectations for
25   research faculty.  If you can present to the Court that these
```

G6E5tse6

1    documents were given to you by NYU as relevant to you in your

2    position as a non-tenure track full-time research assistant

3    professor, then I think that you have done all you can in terms

4    of letting the Court know the significance of these documents

5    and what weight to give them.  And it would seem to me that

6    NYU, if you can clear this up for the Court, it would be

7    appreciated.

8              MR. CERASIA:  I understand, Judge.  And what I can

9    tell you from having discussion with Dr. Abramson, he can

10   testify to Exhibit 10, which is the policy that Dr. Blaser

11   looked at yesterday.

12             THE COURT:  Right.

13             MR. CERASIA:  As to the faculty handbook, I guess I

14   have some questions and maybe it would be helpful so we could

15   find somebody who could testify to it.  This deals with a leave

16   of absence.  I'm not aware of any request for leave of absence

17   made.

18             So, is the question that is being asked whether or not

19   this provision on page 52 of the faculty handbook that deals

20   with leave of absence would apply to Dr. Tse?  Because I guess

21   the first question I have is what is the relevance?  She never

22   applied for a leave of absence.

23             THE COURT:  Dr. Tse, would you address what

24   Mr. Cerasia just asked, what is the significance?

25             MS. TSE:  Yes, your Honor.

G6E5tse6

1          Mr. Cerasia just pointed out that I never requested

2     long-term disability leave.  I would like to direct his

3     attention to Exhibit 6, my letter to Dr. Blaser Bates stamped

4     NYU 003909, first paragraph.

5          THE COURT:  You were requesting long-term disability

6     leave.

7          MR. CERASIA:  If I may clarify, the testimony has been

8     that the long-term disability relief that she requested was

9     under the Unum policy.  She didn't request a leave of absence

10    under the faculty handbook.

11         MS. TSE:  May I speak, your Honor?

12         THE COURT:  Sure.

13         MS. TSE:  I do not believe that my letter to

14    Dr. Blaser specifically said under what circumstances that

15    Dr. Tse was requesting long-term disability leave.

16         THE COURT:  The document itself doesn't say under the

17    Unum policy.

18         MR. CERASIA:  But four days later she submitted her

19    Unum application.

20         THE COURT:  Where would she get that?

21         MR. CERASIA:  She would have gotten it from the

22    benefits department.

23         THE COURT:  You see, this is part of the problem that

24    I am having.

25         MR. CERASIA:  I am trying to understand, I am trying

1   to find a witness, Judge, and it is hard to find a witness if I

2   don't understand what it is she is asking for.

3           THE COURT:  The point is she is saying she didn't ask

4   for it under Unum.  She put in long-term disability as she

5   understood it under this policy, page 52.

6           Now, I have not heard anyone testify as to what NYU

7   told Dr. Tse at any particular point in terms of whether or not

8   what were the ramifications of applying for disability, of

9   whether there was more than one way of doing it.  Did Dr. Tse

10  understand that the only disability available to her was under

11  Unum and therefore this other thing doesn't apply?

12          There are just too many spaces in here and it seems to

13  me that it would behoove both parties to try and fill in some

14  of these blanks.

15          MS. TSE:  Your Honor, for my part I can say that I was

16  provided with a copy of the faculty handbook when I joined the

17  faculty in 1994 at the orientation session.  It's a mass

18  orientation session, not a one-on-one.  And the new members of

19  the faculty were provided with the faculty handbook and I don't

20  recall exactly but newer versions of the handbook were also

21  delivered and, once again, I don't recall whether it is to my

22  house or to my office.  But I do have a complete version of the

23  handbook in PDF from which the pages were excerpted.

24          Does that help?

25          THE COURT:  And where did you get that?

G6E5tse6

1              MS. TSE:  The PDF version?

2              THE COURT:  Yes.

3              MS. TSE:  It is posted online.

4              THE COURT:  See, the difficulty that I have is that if

5    I understand the disagreement between you and NYU is that you

6    feel that there were certain conditions that did apply to you

7    that were appropriate for your rank and Dr. Blaser and Mr. Odom

8    have said, oh, that did not apply to you, it only applied to

9    tenured faculty.

10              The question, of course, is whether or not this is

11   significant may relate to damages should we get that far.  In

12   the meantime, one of the things that is important to have

13   evidence of is what would be the circumstances under which

14   Dr. Tse learned about long-term disability, learned about Unum,

15   what she was told, how it was explained to her.  I heard at

16   some point that -- not today, but Mr. Odom supposedly told her

17   that it was either zero or a hundred percent.  That was not

18   asked of Mr. Odom today but what was the significance of that

19   in terms of her decision to apply?  What was she told that

20   prompted her to apply?

21              Somebody must have talked to her at some point about

22   this and it would be very helpful because Dr. Tse is going to

23   testify as to what she recollects and if I don't have anybody

24   else testifying about what they did or what actually happened,

25   it's, to me, almost an incomplete record.

G6E5tse6

1      So, we will talk at the close of tomorrow about where

2  we go from here but, to be quite honest with you, it is not

3  clear to me that many of the questions raised have been

4  resolved by the evidence or the testimony.

5      So, I am telling you that this evening so you can have

6  time to think it over.  It is not like next week -- or this

7  week is the only time that you have to produce exhibits or

8  testimony that have been exchanged in discovery but I have to

9  tell you, I'm sort of surprised that I have had two days of

10  testimony and a lot of the questions raised have not been

11  answered.

12      So, I am letting you know that I don't think that I

13  have enough information.  You can do what you will with that

14  information for me but I will see you -- what time is

15  Dr. Abramson showing up tomorrow morning?

16      MR. CERASIA:  He is showing up for 10:00 a.m.

17  testimony.

18      THE COURT:  Okay.  We will start at 10:00 a.m.

19      MS. TSE:  Your Honor, do I have your permission, if I

20  succeed to find them in the discovery materials, to provide

21  further information on the issues that you just mentioned?

22      THE COURT:  Absolutely.

23      MS. TSE:  To bring them in and submit them into

24  evidence?

25      THE COURT:  Absolutely.

G6E5tse6

1              MS. TSE:  Thank you, your Honor.

2              THE COURT:  All right.  I will see you all tomorrow.

3              (Adjourned to 10:00 a.m., June 15, 2016.)

INDEX OF EXAMINATION

Examination of:                                  Page

REGINALD ODOM

Direct By Ms. Tse  . . . . . . . . . . . . . 111

Cross By Mr. Cerasia . . . . . . . . . . . . 155

Redirect By Ms. Tse  . . . . . . . . . . . . 172

Recross By Mr. Cerasia . . . . . . . . . . . 178

LUCY FLINN CRIBBEN

Direct By Ms. Tse  . . . . . . . . . . . . . 182

Cross By Mr. Cerasia . . . . . . . . . . . . 225

Redirect By Ms. Tse  . . . . . . . . . . . . 228

Recross By Mr. Cerasia . . . . . . . . . . . 233

1                         PLAINTIFF EXHIBITS

2    Exhibit No.                                          Received

3    22    . . . . . . . . . . . . . . . . . . 112

4    23    . . . . . . . . . . . . . . . . . . 113

5    24    . . . . . . . . . . . . . . . . . . 113

6    26    . . . . . . . . . . . . . . . . . . 123

7    25    . . . . . . . . . . . . . . . . . . 127

8    22C subject to connection   . . . . . . . . 136

9    17    . . . . . . . . . . . . . . . . . . 146

10   18    . . . . . . . . . . . . . . . . . . 148

11   19    . . . . . . . . . . . . . . . . . . 149

12   20    . . . . . . . . . . . . . . . . . . 150

13   28    . . . . . . . . . . . . . . . . . . 195

14   30    . . . . . . . . . . . . . . . . . . 222

15

16

17

18

19

20

21

22

23

24

25