G6F5tse1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DORIS TSE,

4                 Plaintiff,

5            v.                          10 Civ. 7207 (DAB)

6    NEW YORK UNIVERSITY,

7                 Defendant.

8    ------------------------------x

9                                       June 15, 2016
                                        11:11 a.m.
10   Before:

11                   HON. DEBORAH A. BATTS,

12                                       District Judge

13                       APPEARANCES

14   DORIS TSE, Pro Se

15   CERASIA & DEL REY-CONE, LLP
          Attorneys for Defendant
16   BY:  EDWARD CERASIA, II
               – and –
17        DANIEL T. DREISEN, in-house counsel, New York University

18

19

20

21

22

23

24

25

G6F5tse1

1          (Trial resumed)

2          THE COURT:  Dr. Tse?

3          MS. TSE:  May we approach?  I can speak from here, of

4     course.

5          I had success finding the documents that you asked for

6     yesterday and I would like to bring them to the bench.  They're

7     labeled Exhibit 43 and 44 and I would be using them to question

8     the witness, Dr. Abramson, but I would like to know if we can

9     admit them into evidence.

10         THE COURT:  Okay.

11         Have you shown it to Mr. Cerasia?

12         MS. TSE:  Yes.  I provided him with a copy.

13         THE COURT:  Mr. Cerasia, do you have objections to

14    admissions of documents 43 and 44 -- Plaintiff's Exhibit 43 and

15    44.

16         MR. CERASIA:  I do not with respect to Exhibit 43.  44

17    I just haven't seen before so I guess it is subject to

18    authentication.  It was not involved in discovery in the case.

19         MS. TSE:  No.

20         MR. CERASIA:  But, your Honor, these revolve around

21    the faculty handbook and, as I told Dr. Tse when she came in,

22    that leave of absence policy applies to all faculty so it is

23    not an issue in dispute.  So, maybe it can speed things along.

24    That was 22C that your Honor had received, subject to

25    connection.  So, I wanted to let you know that.

G6F5tse1

|   |   |
|---|---|
| 1 | THE COURT:  Is that also true of 10, which I received |
| 2 | subject to connection? |
| 3 | MS. TSE:  Yes, most definitely. |
| 4 | MR. CERASIA:  Well, Dr. Abramson will testify about |
| 5 | Exhibit 10. |
| 6 | THE COURT:  So, we will say that at this point |
| 7 | Plaintiff's Exhibit 22C is received in evidence full, no longer |
| 8 | subject to connection. |
| 9 | MS. TSE:  And if I may provide some information on |
| 10 | Exhibit 44, I found this in the archives of my computer, it |
| 11 | dates back to 2008 and it was not disclosed during discovery |
| 12 | but it does have some very revealing information on what is |
| 13 | considered a non-tenure track full-time faculty, of which I was |
| 14 | a member. |
| 15 | THE COURT:  All right.  So, let's -- I guess we are |
| 16 | ready to proceed then.  Is it Mr. Abramson or Dr. Abramson? |
| 17 | MR. CERASIA:  Dr. Abramson.  May I go get him, your |
| 18 | Honor? |
| 19 | MS. TSE:  May we bring these to the bench when |
| 20 | Mr. Cerasia -- |
| 21 | THE COURT:  Why don't we hold off until you are going |
| 22 | to use them.  Are you going to use them with Dr. Abramson? |
| 23 | MS. TSE:  No, I'm not going to use that. |
| 24 | THE COURT:  Let's hold off because I want to get |
| 25 | Dr. Abramson in and out because of his schedule.  They have |

G6F5tse1                          Abramson – direct

1    been received in evidence.  43 is in and we are still waiting

2    for Mr. Cerasia to have a chance to look at 44; is that

3    correct?

4              MR. CERASIA:  Yes.  Did you say you will show 44 to

5    Dr. Abramson?

6              MS. TSE:  No, I won't be showing either 43 or 44.

7              THE COURT:  43 is in, 44 is not.

8              (Plaintiff's Exhibit 43 received in evidence)

9     STEVEN ABRAMSON,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12             THE COURT:  Would you state your full name and spell

13    both your names for the record.

14             THE WITNESS:  S-T-E-V-E-N  A-B-R-A-M-S-O-N.

15             THE COURT:  Thank you.

16             You may proceed, Dr. Tse.

17    DIRECT EXAMINATION

18    BY MS. TSE:

19    Q.  Good morning, Dr. Abramson.  Before I start, I would just

20    like to apologize to your Honor and everyone for the delay.

21             Dr. Abramson, you may already know, Doris Tse, a

22    former associate research professor in the Department of

23    Medicine is the plaintiff in this suit.  Since you were not

24    involved with Dr. Tse's termination we are hoping that you can

25    provide the Court with impartial statements on the issues under

G6F5tse1                    Abramson - direct

1   consideration today.

2              Have you testified in court before?

3   A.  Yes, I have.

4   Q.  Now, most of my questions will be yes or no.  You will be

5   presented with exhibits.  When you need more time to look them

6   over, please, let me know.

7   A.  Okay.

8   Q.  Dr. Abramson, what is your position at the NYU Langone

9   Medical Center?

10  A.  I have two positions:  One, I am the Vice Dean for

11  Education, Faculty and Academic Affairs, and for the last three

12  years I have been Chairman of Medicine.

13  Q.  Please describe for the Court your responsibilities as the

14  Vice Dean for Education, Faculty and Academic Affairs?

15  A.  So, for the education piece it is oversight for medical

16  student residency and graduate medical education.  For faculty

17  affairs it is promotions, appointments, issues relating to

18  faculty grievances.

19  Q.  Thank you.

20             After you replaced Dr. Blaser as the chair for the

21  Department of Medicine, are they any different or pretty much

22  the same?

23  A.  Differences in the department?

24  Q.  Yes; as the chair of the Department of Medicine.

25  A.  We have built upon what Marty had started so its

G6F5tse1                          Abramson - direct

1    continuation and growth.

2                  MS. TSE:  May we approach, your Honor?

3                  THE COURT:  You may.

4    Q.  Exhibit 13 has been admitted into evidence.  Please

5    confirm, as Exhibit 13 shows, that your office is aware that

6    certain members of the NYU faculty may fall into the protected

7    class, meaning that they could be targets of discrimination.

8                  MR. CERASIA:  Objection.

9                  THE COURT:  Yes.  Sustained as to form.

10                 Are you going to ask him a specific question about

11   this document?

12                 MS. TSE:  All right, I will rephrase.

13   Q.  Can you explain to the Court what you mean, since it is a

14   notice that you sent to department chairs, that

15   non-appointment, however, cannot be based on unlawfully

16   discriminatory factors?

17   A.  So, we send this every year because people who are

18   non-tenured serve at-will and can be not reappointed.  We are

19   very careful to make sure that the chairs are making the

20   decisions to not reappoint based on the merit, the performance,

21   the funding of the individual faculty member.  We always want

22   to be sure that there is no reason that a person is being let

23   go except for underperformance, meaning discrimination of any

24   kind.

25   Q.  Thank you.

1            May we approach, your Honor?

2            THE COURT:  You may.

3  Q.  Exhibit 24 is a letter from Dr. Bruce Solitar who is -- who

4  was and still is Dr. Tse's rheumatologist.  He is a clinical

5  associate professor in the Department of Medicine; is that

6  right?

7  A.  Yes.  As chair of rheumatology in the past I trained

8  Dr. Solitar as a young rheumatologist.

9  Q.  Thank you.

10           Now, Exhibit 24 is a letter that Dr. Solitar sent to

11  Dr. Odom who, at the time, was VP of Employment and Labor

12  Relations.

13           Please, if you can comment on the underlined text?

14  A.  Sure.

15           So, Dr. Solitar has made a diagnosis of systemic lupus

16  erythematosus, E-R-Y-T-H-E-M-A-T-O-S-U-S, and a diagnosis as

17  well of osteoarthritis involving the hands.

18           Anything -- what else would you like?

19  Q.  I'm sorry.  Do you agree that NYU was duly informed in that

20  Dr. Tse was a qualified individual under the Americans with

21  Disabilities Act?

22           MR. CERASIA:  Objection.

23           THE COURT:  That's calling for a legal conclusion so I

24  will sustain the objection as to form.  You may ask what his

25  understanding of this letter is.

G6F5tse1                        Abramson - direct

1    Q.  All right.  I will rephrase.

2             Looking at this letter, would you agree that Dr. Tse

3    would fall into your description on non-reappointment based on

4    unlawfully discriminatory factors or she has the potential to

5    be -- to not have her appointment --

6             THE COURT:  This is getting too confusing and it is

7    not going where I think it will be unobjectionable.  So, what

8    is it that you really want to ask Dr. Abramson about this

9    letter?

10             MS. TSE:  Whether Dr. Tse would be viewed by his

11   office, in particular, and NYU, in general, as a disabled

12   individual.

13             THE COURT:  Great question.

14             THE WITNESS:  I wouldn't read it that way.  It says

15   that Dr. Tse is able to work, may have some difficulty doing

16   specific work.

17   Q.  Very well.

18             And given that Dr. Tse had difficulty doing particular

19   work, would you agree that if she was provided reasonable

20   accommodations to offset her medical impairments, she would be

21   able to meet her job expectations as an associate research

22   professor?

23             MR. CERASIA:  Objection.

24             THE COURT:  Sustained as to form.

25   Q.  All right.  Let me try harder not to make things

G6F5tse1                        Abramson - direct

1      complicated.

2                  THE COURT:  Let me ask a question, Dr. Abramson.

3                  Dr. Abramson, in your opinion, based on this diagnosis

4      by Dr. Solitar, would Dr. Tse qualify for an accommodation?

5                  THE WITNESS:  I think based on this what the

6      supervising investigator would do would be to meet with

7      Dr. Tse, look at the things that can be done and which can't be

8      done.  That's what I would do.  I don't know that it frankly

9      means that additional help must be provided by the person who

10     you are working with but it certainly would involve a

11     discussion.  I would sit down with Dr. Tse and say, okay, what

12     can you do, what can't you do.  Let's see if we can map out

13     some experimentations or collaborations to allow you to

14     continue to work.  But I don't think it would trigger, well, I

15     must hire somebody else to assist Dr. Tse which is a different

16     discussion.

17                 THE COURT:  Well, let's continue on in that.  What

18     would -- why do you say that's a different discussion?

19                 THE WITNESS:  Well, I would look to see how Dr. Tse

20     could do work in the laboratory but I wouldn't feel that it

21     would be then my obligation to say that piece that you don't,

22     you are not able to do, I must hire a third person or a second

23     person to assist you.  My advice might be let's find some other

24     scientist to work with you, let's do collaborations, especially

25     if a person doesn't have their own grants.  What we really try

G6F5tse1                        Abramson - direct

1    and do is find discussions with other doctors, other scientists

2    who could allow that other person to work as part of a team,

3    collaborative team.

4            So, I would try and find a solution but I wouldn't

5    necessarily say that I had the obligation to hire another

6    person to assist at the bench.

7            THE COURT:  Would you consider hiring another person

8    to assist in the lab?

9            THE WITNESS:  Only if I, as the leader of the lab,

10   felt that there was a collaborative project that either I was

11   interested in proceeding with or with someone else in the

12   laboratory was.

13           So, what happens if someone has no funding, the chair

14   really is in a position to decide is the value of what they're

15   doing worth an additional investment for the project that you

16   can do together, either for me if I am your direct

17   supervisor -- the person's direct supervisor -- or in the

18   department if there are other people.  But, at the end of the

19   day, it has to be in the setting of how valuable I view that

20   work is to invest more dollars into it to see the science go

21   forward.

22           THE COURT:  Thank you.

23           MS. TSE:  May I proceed, your Honor?

24           THE COURT:  You may, Dr. Tse.

25   BY MS. TSE:

G6F5tse1                         Abramson - direct

1    Q.  We will be presenting you with exhibits to further explore

2    the points that you have just made.

3    A.  Okay.

4    Q.  Now, before we go into that, I would like --

5             THE COURT:  Let's just wait one second.

6             THE WITNESS:  Yes.

7             THE COURT:  Please, take your time.

8             THE WITNESS:  Okay.  Thank you.

9    BY MS. TSE:

10   Q.  Before I go into that, let me present to the Court that

11   Dr. Abramson is an internationally recognized rheumatologist

12   and he has extensive expertise in basic science and clinical

13   research and he, I am sure, without a shadow of a doubt, that

14   he is totally familiar with the grant application process.

15   A.  Yes.

16   Q.  Am I right about that?

17   A.  That's correct.

18   Q.  Thank you.

19             May we approach, your Honor?

20             THE COURT:  You may.

21   Q.  Exhibit 10 is NYU's policy on Performance Expectation for

22   Research Faculty.  Please confirm that that was issued by your

23   office?

24   A.  That's correct.

25   Q.  Now, as a member of the research faculty, Dr. Tse was

1    expected to acquire enough extramural funding to support 60

2    percent of her salary in 2010; is that right?

3    A.   That is --

4              MR. CERASIA:   Objection.

5    A.   -- I'm not sure correct because I don't -- I have to look

6    back at when 60 percent became the benchmark.  I would point

7    out that the benchmark is a floor and not a ceiling and that

8    whether it was 55 in 2010 or 60.  I would have to look back.

9              I should say that I led the committee that drafted

10   these recommendations and got it approved by the faculty

11   council so I am very, very much familiar with the development

12   of the document and its intentions.

13   Q.   Please take your time to read through the policy because I

14   believe that there is a section there that stipulated 60

15   percent and as soon as I find out where that is --

16             THE COURT:   It is NYU 03084.

17   A.   I see it on the third page.

18   Q.   Thank you.

19             So, just to reiterate, it would be 60 percent of total

20   compensation for that year?

21   A.   Yes, but I think the rest of that paragraph is extremely

22   important.  When I said that 60 percent was a floor, it then

23   goes on to say, and the intent was, that it may be higher

24   depending on the individual department.  So, it says:

25   Promulgated departmental policies.  So, in fact, within an

G6F5tse1                    Abramson - direct

1    individual department the chair has the ability to set the bar

2    higher.  When we implemented this it was an attempt to create a

3    floor for faculty but not a ceiling and that was left to

4    departmental chair discretion to make that value higher.

5    Q.  And I am now referring to Section D, letters to faculty

6    that the members of the research faculty --

7              THE COURT:  Wait.  What Bates stamp page is that?

8              MS. TSE:  That's NYU 003087.

9              THE COURT:  Thank you.

10             MS. TSE:  Towards the top, Section D.

11   Q.  And the instructions there were for the department chairs

12   stating that chairs will send a letter of responsibilities to

13   each faculty member annually informing each faculty member of

14   his or her performance over the past academic year as well as

15   expectations for the coming year.

16             Is that how it is supposed to go?

17   A.  That's correct.

18             MS. TSE:  Give me a second?

19             THE COURT:  Certainly.

20             MS. TSE:  May we approach, your Honor?

21             THE COURT:  You may.

22             MS. TSE:  Do you have Exhibit 13?

23             THE WITNESS:  Which one?

24             MS. TSE:  Do you have Exhibit 13?

25             THE WITNESS:  I do.  This is the letter.

1          MS. TSE:  I'm sorry, I am really -- that's why he

2     doesn't have it.  Okay.  I should be able to find it.  That

3     would be Exhibit 9.  I apologize to everybody for the fumbling.

4          THE COURT:  While we are waiting, Dr. Abramson, in

5     terms of exhibits Plaintiff's Exhibit 10, am I correct that

6     this applied to all faculty, tenured and nontenured?

7          THE WITNESS:  With caveats.  This document was written

8     primarily for tenured faculty.

9          THE COURT:  It may have been written for tenured

10    faculty.  What I am trying to get out of you is is there

11    anything within that document that suggests that parts of it do

12    not apply to someone in Dr. Tse' position?

13         THE WITNESS:  In this case it is on B1, which I

14    alluded to, wherein we say that a chair may set a bar higher

15    than the 60 percent.

16         THE COURT:  Are you talking about --

17         MS. TSE:  Exhibit 10, it is B, Required Extramural

18    Funding -- REF.

19         THE COURT:  Bear with me.  What page is this?

20         THE WITNESS:  3084.

21         THE COURT:  All right.  The chair --

22         THE WITNESS:  Again, the issue is that the 60 percent

23    is a floor requirement but a chair may set it higher.  And we

24    put that in place particularly for non-tenured faculty because

25    the non-tenured faculty are faculty at-will and the chair has

1    to make a decision, depending on their ability to get

2    extramural funding or be collaborative scientists with other

3    funded scientists, how much that person needs to bring in on

4    their own with regard to the extramural funding requirement.

5    BY MS. TSE:

6    Q.  But -- or and, pertaining to that, the chair is expected to

7    send letters notifying the individual research faculty member

8    where he or she stands as far as REF expectations are

9    concerned; is that right?

10   A.  That's generally true, unless there are other circumstances

11   that would lead the chair to take a different approach.

12   Q.  All right.  Let's then get to Exhibit 8.

13   A.  8?  I have 9, that is the last one.

14   Q.  That would be -- oh, did you get 9?  I'm sorry.

15          May we approach the bench again, your Honor?

16          THE COURT:  You certainly may, Dr. Tse.

17   Q.  While we are waiting, Exhibit 8 is a letter that Dr. Blaser

18   sent Dr. Tse on 2009 specifically addressing the issue that we

19   just discussed, by that I mean covered under Section D of

20   Exhibit 10, letters to faculty.

21   A.  Yes.

22   Q.  And if you can focus on the two underlined areas on page 2,

23   does that show that Dr. Tse achieved 100 percent of her REF for

24   that particular year which ended with academic year August

25   31st, 2009?

G6F5tse1                    Abramson - direct

1   A.  Yes, it does.

2   Q.  And may I direct your attention to the first page, third

3   paragraph?  I am referring to the second sentence and, with the

4   Court's permission, I would like to read it so we are all going

5   to be on the same line:  Each full-time faculty member in the

6   clinical departments is expected to have achieved extramural

7   funding support for at least 50 percent of the portion of his

8   or her salary allocated to conduct research as of September

9   2008 and continuing thereafter in accordance with increasing

10  percentages for subsequent years.

11          So, Dr. Tse, upon receiving this letter, was

12  instructed that she needed to achieve a minimum of 50 percent

13  for previous academic year and subsequent increases afterwards;

14  is that correct?

15  A.  Yes.

16  Q.  And according then to Exhibit 10, the expectation for her

17  for the subsequent year would be 60 percent?

18  A.  Or more.  60 is the floor.

19  Q.  Can you please point out to the Court where that is so

20  stipulated?

21  A.  Well, it is the continued use of the word "minimum."  That

22  you must cover at least 60 percent.  And again, that language

23  is intentional because we have many faculty who cover 80

24  percent, 90 percent, or 100 percent, and those people are

25  continued to cover that much of their salary.  If a person

G6F5tse1                        Abramson - direct

1    begins to decline in their productivity and they fall below

2    what they're currently funding, 80, 90 -- you were covering 100

3    percent -- if it falls below 60 percent people become subject

4    to some negative outcome and negative outcomes can include

5    salary reductions, or in the case of non-tenured faculty,

6    non-reappointment.

7    Q.  Thank you.

8            You are or have been a member of study sections at the

9    NIH?

10   A.  Yes.

11   Q.  Please explain to the Court how this system works.

12   A.  Well, the study section is the model by which grant

13   applications to the NIH are reviewed and it is a peer-review

14   model.  People with expertise in the field, usually 20, 25

15   people, may read 80 grants twice a year.  Those grants are

16   divided among the several -- the 20 or 25 scientists and then

17   are presented over a two to three-day period and ranked.  And,

18   depending on the rank, grants will be funded or not funded.

19           MS. TSE:  Your Honor, is that pretty clear to you in

20   particular, how --

21           THE COURT:  Let me reabsorb this.

22           And this is reviewed by NIH?

23           THE WITNESS:  So, the NIH selects scientists that they

24   bring to Bethesda and the scientist spends two days -- the NIH

25   runs two programs so they're staffing it and they assure the

G6F5tse1                    Abramson - direct

1    quality control and what not, but it is the scientists from

2    around the country, each of whom they have been assigned 10

3    applications, and two or three people present those

4    applications to the group of 25 for discussion and then they

5    are rated for quality.

6              THE COURT:  But this is for NIH's selection.

7              THE WITNESS:  So, that's how NIH does it but most

8    large funding agencies, typically foundations, Heart

9    Association, have a similar model, it is called -- it is a

10   peer-review model.

11             THE COURT:  So this is what an individual applying for

12   a grant has to go through?

13             THE WITNESS:  That's right.

14             THE COURT:  Thank you.

15   BY MS. TSE:

16   Q.  And please confirm for the Court that if there is any

17   conflict of interest, the reviewer is expected to recuse

18   himself or herself?

19   A.  That's correct.  And the NIH is very, very attentive to

20   that and will recuse scientists who have any relationship at

21   all with the applicant.

22   Q.  So that's a guarantee that the reviews are impartial?

23   A.  That is the goal, that they're impartial.

24   Q.  Thank you.

25             Your Honor, Exhibit 31 is what is known as a summary

statement which is a review by such an NIH panel pertaining to

Dr. Tse's application.  I know you do not want to get into the

CFAR flow cytometry core grant application but this is the

closest thing that plaintiff can provide as far as an impartial

assessment of her capabilities to apply for grants and meet the

school's REF.

THE COURT:  Mr. Cerasia, do you have anything to say?

MR. CERASIA:  I do.  I object, your Honor.  The date

of the release of this is December 14, 2009 and this is an

application or funding proposal by Dr. Valentine and this would

relate to the time that Dr. Tse was part of the core as the

core director, and your Honor has already excluded from this

trial -- funding relating to her as a core director.  So, I

don't see the relevance.

THE COURT:  Well, you do understand that the time

period that I am interested in does not mean that any documents

before or after are not relevant to understand.

MR. CERASIA:  I do understand that but this relates to

funding for the core.  It is not just purely the date, it deals

with the core funding which she lost had she was no longer the

director of the core.

THE COURT:  All right.

Dr. Tse, why are you presenting this exhibit?

MS. TSE:  Because this is the most or not the most but

the only impartial assessment of the plaintiff's capability to

G6F5tse1                        Abramson - direct

1   apply for grants and meet NYU's REF.  This is how she

2   performed.  On an application that was reviewed months before

3   she was removed as the flow cytometry core director and we will

4   not refer to that event.  What I want to do is establish that

5   Dr. Tse is a capable, principal investigator.

6            THE COURT:  Are you referring to page 5 of Exhibit 31?

7            MS. TSE:  There is NYU 004046, yes, that would be page

8   5, and the review consists of one summary critique and three

9   individual critiques by the reviewers that Dr. Abramson just

10  mentioned and their reviews that specifically pertains to

11  Dr. Tse, the text underlined in red.

12           THE COURT:  Under what?

13           MS. TSE:  Underlined in red.

14           THE COURT:  I am confused, Dr. Tse.  Are you saying

15  that your offering is to show that you were considered to be

16  performing very well in December of 2009?

17           (Continued on next page)

18

19

20

21

22

23

24

25

G6F3TSE2                          Abramson - direct

1              MS. TSE:  No.  The purpose is to show that, yes, I was

2      performing well in 2009.  But, along with every, at least NIH,

3      but also other foundation applications, it is very important to

4      show that you were previously funded.  And, so, I would, when I

5      applied for a new grant, have to run through the same gauntlet

6      of reviewers, and by showing that they consider me competent,

7      all right, that would pretty much indicate my chances of

8      success.  Not that the new set of reviewers would have access

9      to this set of reviews.

10             So what I'm trying to accomplish here is to show your

11     Honor that the plaintiff was a competent investigator, and

12     there is no reason why she should not continue as a competent

13     investigator, if provided with what she needs to maintain that

14     status.

15             THE COURT:  I sustain your objection, Mr. Cerasia.  It

16     seems to me that the question of competence is not what we are

17     looking at.  There are other documents talking about how well

18     you have performed, and actually I think there are letters from

19     either Valentine or Blaser which are quite complimentary.  So I

20     don't know that it is necessary to submit Plaintiff's Exhibit

21     31 to accomplish the same purpose.  It is cumulative.  So I'll

22     sustain the objection.

23             MS. TSE:  May I, your Honor, just make this statement

24     that those recommendations were even older than this.  That was

25     the basis for Mr. Cerasia's objection that document dates back

G6F3TSE2                      Abramson - direct

1      to 2009.  The recommendation that I got from Dr. Blaser for my

2      promotion was dated 2005.  And a lot could have happened or NYU

3      can potentially argue that between 2005 and 2010, my mental

4      condition had degenerated along with my physical condition.

5      And this would pretty much establish that that was not the

6      case.

7                MR. CERASIA:  Your Honor, maybe I can sum it up.  I'll

8      stand corrected, because the record will reflect I'm

9      100 percent certain that Dr. Blaser said, Dr. Tse, I never

10     questioned your competency technically.  So, we've never made

11     an argument that she was mentally incompetent or not mentally

12     competent during the time in question.

13               I think the issue has just been she didn't have the

14     funding.  And no one said it was because of mental

15     incompetence.

16               MS. TSE:  I'm sorry.  The issue came up yesterday

17     about my intellectual piece, if I remembered correctly, and my

18     capability.

19               THE COURT:  How did it come up?  Who was the witness

20     or what was the document?

21               MS. TSE:  I was referring to Mr. Odom's testimony.

22               THE COURT:  That what?

23               MS. TSE:  I asked him whether he recalled that there

24     is a mental piece to my performance as an associate research

25     professor.

1        THE COURT:  Right.

2            MS. TSE:  And he agreed.

3        THE COURT:  He agreed that there was a mental

4    component?

5            MS. TSE:  No, an intellectual component.

6        THE COURT:  He agreed there was an intellectual

7    component.  I am still lost as to why you feel that you need to

8    offer Plaintiff's Exhibit 31.

9            MS. TSE:  This is an assessment outside of NYU, has

10   nothing to do with the circumstance under which I was removed

11   as core director, but it does establish that I have what it

12   takes to apply for extramural funding, if I was provided with

13   accommodations for my physical impairment.

14        It is a lot closer -- this assessment, first of all,

15   is impartial, and it is a lot closer to the event on April 1st,

16   2010, upon which it became necessary for me to replace the

17   65 percent funding that I had obtained and lost.

18        THE COURT:  You're focusing on something that I'm not

19   focusing on.  I'm focusing on whether or not you were provided

20   with a reasonable accommodation.  And so, your competence at

21   this point I don't believe is in issue.  All right.  Next?

22            MS. TSE:  I will go on.  For that reason, we can skip

23   through Exhibit 32 as well.  May we continue with Exhibit 7

24   which, if I remember correctly, was admitted into evidence?

25        THE COURT:  Exhibit 7?

1          MS. TSE:  Yes.

2          THE COURT:  I don't believe that it was.  Bear with me

3     just one second.  It has not been received in evidence.

4          MS. TSE:  May I ask to have it admitted?

5          THE COURT:  Mr. Cerasia?

6          MR. CERASIA:  I'm going to object on the ground I

7     believe it is irrelevant and deals with the lost budget for

8     when she was the core director, from my understanding.

9          MS. TSE:  Yes, but it also shows that I had what it

10    took to be an NIH principal investigator.  Dr. Abramson can

11    confirm for us that that's what a typical NIH grant budget

12    looks like.  And the salaries in the red box were laboratory

13    assistants that were budgeted by the principal investigator,

14    which at that time was Dr. Tse.

15         THE COURT:  And again, the relevance of this?

16         MS. TSE:  That I had what it took to do my job for the

17    previous 10 years, because as the principal investigator for

18    the CFAR flow cytometry core, I obtained NIH funding from 2000

19    through 2010.

20         THE COURT:  But I don't think that's in issue.

21         MS. TSE:  All right.

22         THE COURT:  But look, Dr. Tse, explain to me why you

23    think it is.

24         MS. TSE:  Because it came up that why was Dr. Tse so

25    insistent on the need for laboratory assistants.  For the 10

G6F3TSE2                    Abramson - direct

1   years up to April 1st, 2010, she had laboratory assistants,

2   which she needed to do her job ever since she came down with

3   osteoarthritis, which was the past 10 years according to

4   Dr. Solitar.

5          THE COURT:  But, I'm sorry to interrupt, but I don't

6   think the issue is whether or not you had laboratory assistants

7   when you were core director.  I think the issue is, you

8   represented that you needed laboratory assistants.

9          MS. TSE:  Yes.

10          THE COURT:  Once you were no longer there as core

11   director.

12          MS. TSE:  Yes, I did.

13          THE COURT:  That was the accommodation you were

14   seeking.

15          MS. TSE:  Yes.  And I was also very specific about

16   indicating that the laboratory assistants that I asked for was

17   needed for me to generate preliminary data so I can apply for

18   grants.

19          THE COURT:  No, that is understood, even by me.

20          MS. TSE:  I'm sorry.

21          THE COURT:  What I'm saying is I'm not sure that, I

22   don't think it is in issue whether or not you had a staff as

23   core director or what their qualifications were, what their

24   titles were.

25          But you know something, it may be relevant for damages

1   if applicable, so rather than go back and forth on this, I am

2   going to receive Plaintiff's Exhibit 7 in evidence.

3            (Plaintiff's Exhibit 7 received in evidence)

4            MS. TSE:  Thank you, your Honor.  May we approach

5   Dr. Abramson?

6            THE COURT:  Yes.

7   Q.  Dr. Abramson, please confirm for the Court and let us just

8   stay with the first page that this is a pretty typical NIH

9   grant application budget, listing the principal investigator

10  and personnel that he or she needed to accomplish the proposed

11  project?

12  A.  Yes, but I have a question.  Was this part of a program

13  project grant on which this is a -- the core component of a

14  program project grant?

15  Q.  Each core was required to submit individual budgets.

16  A.  Understood.  But this is for the core component of a larger

17  grant.

18  Q.  Yes, it was.

19  A.  That's going to be an important point to discuss at some

20  point.

21            THE COURT:  Leave it up to your attorney.

22  A.  Should I comment?  May I comment on that?

23  Q.  Yes, please, of course.

24            THE WITNESS:  Your Honor, it needs -- it requires an

25  understanding of the submission of grants and the components of

1   grants.  And to the extent that this is a reflection of a

2   person to be able to become a principal investigator on a new

3   grant, it's not clear that this represents that.  Because when

4   you are running a core facility, you're providing a very

5   important, frankly, service to a larger grant.

6        What grants are judged on are the innovation, the

7   creativity, the ideas that are being presented to the NIH.  Not

8   the capacity of the lab to have a core facility provide the

9   tests that you think are important to answer your hypothesis.

10       So running a core facility is an important skill and

11  very important to a larger enterprise.  But the skills drawn

12  from a core facility are not necessarily related to the skills

13  to write a successful principal investigator grant.  It is a

14  service contract basically with the NIH.

15       So Dr. Valentine, who I am asking, was the PI on this

16  grant?

17       MS. TSE:  As the director.  I'm sorry.  But as the

18  director of the CFAR.

19       THE WITNESS:  Right.  Is asking the questions,

20  providing the approach, what tests you want to do for your

21  hypothesis.  What is your program.

22       So a grant is judged by innovation, approach,

23  creativity, as well as the ability to execute the grant.  And

24  the core facility is the ability to execute a grant.  But isn't

25  funded without the other pieces.

1           THE COURT:  All right.

2           THE WITNESS:  Okay.

3           THE COURT:  Thank you.

4           MS. TSE:  Your Honor, may I mention that it came up

5      yesterday that Dr. Tse, absent laboratory assistants, could use

6      data that she generated while she was the core director to

7      establish collaborations with NYU?

8           THE COURT:  This is an argument you may make in

9      summation, Dr. Tse.  But what I'm concerned about now is you

10     had an opportunity to pursue that with whichever witness it was

11     yesterday.  This is a new witness.  Would you please ask the

12     questions of Dr. Abramson that are necessary to present your

13     case, and you'll have an opportunity to ask additional

14     questions, but he wasn't here yesterday.  He does not know what

15     was said yesterday.

16          So if you're planning on making an argument after all

17     of this is over, then you may do so by comparing various

18     testimonies.  But, this I don't think is taking appropriate

19     advantage of the knowledge that Dr. Abramson has.  So let's

20     stick with that.

21          MS. TSE:  No.  Then that's what I will do.

22          So, I would like to proceed to Exhibit 34.  This is

23     known as a notice of grant award which I am sure Dr. Abramson

24     is familiar with.  May we admit that into evidence?

25          THE COURT:  Mr. Cerasia.

 1             MR. CERASIA:  If I understand this document correctly,

 2       it refers to an equipment grant?  For the F-A-C-S all caps, new

 3       cap A-R-I-A.  Am I correct, Dr. Tse?

 4             MS. TSE:  Yes.

 5             MR. CERASIA:  And your Honor at the final pretrial

 6       conference said funding for this equipment grant is not part of

 7       this case.  So I don't think it is relevant.  But I don't know

 8       why she's introducing it at this point.

 9             THE COURT:  Yes, would you please explain to me,

10       Dr. Tse, why you want this exhibit in?

11             MS. TSE:  First, in response to Dr. Abramson's

12       testimony as to the difference between being a principal

13       investigator on a core grant award, and a principal

14       investigator who was standalone, and also, in response to NYU's

15       testimony that I could have made use of this instrument to

16       establish new collaborations towards my required REF.

17             THE COURT:  Bear with me just one second.

18             As I understand it, Dr. Tse, you're offering this

19       exhibit to counter Dr. Abramson's testimony about the

20       difference between a principal investigator on a core grant and

21       a principal standalone investigator.  Is that correct?

22             MS. TSE:  That's actually not the ultimate goal.

23             THE COURT:  What is the ultimate goal?

24             MS. TSE:  NYU claimed yesterday or provided evidence

25       yesterday that I could, given that I could not do laboratory

1    work, use my expertise that I developed as the core flow

2    cytometry director to build new collaborations with

3    investigators at the school.  And the events that I would be

4    providing evidence towards took place around May 22, and if I

5    may present Dr. Tse's position at that time, she was --

6              THE COURT:  I'm totally confused.

7              MS. TSE:  All right.

8              THE COURT:  I'm totally confused.

9              MS. TSE:  I'm so sorry, your Honor.

10             THE COURT:  That's not your problem, that's my

11   problem.  But, it would help if I did understand.

12             MS. TSE:  Can I put it simpler, and if I would refer

13   to things I should not, just let me know because I don't know,

14   you know, whether I am making a serious blunder.

15             THE COURT:  You know what, don't worry about that.

16   But what my concern is, this is, as Mr. Cerasia said, an

17   application for a machine, correct?

18             MS. TSE:  Yes.

19             THE COURT:  So how is that different from being CFAR

20   director?

21             MS. TSE:  The machine was independent of CFAR, totally

22   independent of CFAR.

23             THE COURT:  Was it a research grant application?

24             MS. TSE:  Yes, it was.

25             THE COURT:  In that, let me rephrase that.  Was it a

G6F3TSE2                         Abramson - direct

1    pure research grant application that would require use of

2    machines to come up with or to prove the theory or was it an

3    attempt to obtain another machine?

4          MS. TSE:  No.  A shared instrument grant is when you

5    apply to an NIH for an award that would allow you to purchase,

6    usually, a very expensive state-of-the-art instrument.  On that

7    grant, you have to list the number of collaborators, not a

8    single one.  That's why it's known as shared instrument.  It's

9    not going to be my instrument.  It's an instrument that's going

10   to be shared with a large number of investigators.  And each

11   one of those investigators, together with myself, will have to

12   propose what this machine is going to be used for.

13          And let's say an example, this machine will be used to

14   detect and isolate very rare cancer cells so that we can find

15   out why these patients develop cancer.  And if I remember

16   correctly, and there was at least half a dozen different

17   investigators on this grant.  And approval for the grant

18   depends, first of all, on my capacity as the principal

19   investigator, knowing the instrument, knowing what it can do,

20   be able to oversee its operation and maintenance, because this

21   was an instrument that cost about $500,000.  So the NIH is not

22   going to give out money freely to anybody who just simply asks

23   for it.

24          But that is not the only component in this grant.

25   There is also a very scientific component, meaning that the

1    investigators who were listed as what is known as key personnel

2    on this grant will be working with me, using this instrument,

3    to arrive at a certain goal in their proposed research

4    projects.  Now, let me --

5            THE COURT:  Let me just ask you.  As part of this

6    application, did you also submit a proposed project that you

7    would be using the machine for?

8            MS. TSE:  Yes.  I did.  But, if that's the only piece,

9    it would not qualify for a shared instrument grant.

10           THE COURT:  So, can you point me to where your

11   research aspect as opposed to obtaining a machine aspect is in

12   this grant?

13           MS. TSE:  I will have to pull up the grant application

14   itself, which I can do, but it will take me a while.  It is in

15   my computer.  And I believe it was actually or excerpts of it

16   were submitted during the response to summary judgment.

17           THE COURT:  I am going to not receive this document in

18   evidence at this time.

19           MS. TSE:  May I add one more thing?  If you recall,

20   I'm sorry, your Honor, but if you recall, NYU provided

21   testimony that rather than accommodate my need for laboratory

22   assistants, I could have used the instrument or the data that I

23   collected using this instrument to set up collaborations so

24   that I can have my salary supported.  And I would like to

25   present evidence to the Court why I was not able to do that.

THE COURT: This will do this, this particular Plaintiff's Exhibit 34 will do that?

MS. TSE: Exhibit 34, if we go to the second page, which would be plaintiff 0851, underlined in red, that there is a proposal involved and the award was based on the proposal. And if the Court would like me to pull up that proposal, I would need --

THE COURT: I think we're getting far afield here. Are you pointing to this page plaintiff's 0851 to show that there are limitations on how the machine could be used? I'm not exactly sure what this says.

MS. TSE: What it said is in the view of the NIH, I was a principal investigator. And nowhere in this notice of award was the Center for AIDS Research mentioned. So this is a standalone, independent, grant application on my part.

THE COURT: Right. For a machine.

MS. TSE: Yes, but in order to --

THE COURT: No. We've spent enough time on this. We have a witness on the stand and who is sitting here not being asked questions. Please take advantage of the live presence of Dr. Abramson. I am not going to receive this document in evidence at this time. If you lay a foundation for it at some other point, you may seek to reoffer it. But at this point I'm not receiving it in evidence.

MS. TSE: All right. Can we establish at this point,

1    may I reiterate that NYU provided testimony --

2              THE COURT:  No.  I don't want to hear about -- this is

3    argument, Dr. Tse.  We have a witness here who has been sitting

4    here silent for at least half an hour.

5              MS. TSE:  I'm sorry, your Honor.  I will move on in

6    the best of my ability.

7    BY MS. TSE:

8    Q.  Dr. Abramson, can you confirm that when you have an

9    instrument that is shared, the users have to pay what is known

10   as charge back fees?

11   A.  That's correct.  Well, it's not -- it will vary with the

12   laboratory, but that is not an uncommon model.

13   Q.  All right.  Without going back into grant applications and

14   so on and so forth, suffice it to say that after I was awarded

15   this grant, I purchased the machine, saw to it that it was

16   functional, including designing a proper laboratory to house

17   the instrument, and put it into operation, and saw to it that

18   it was properly maintained.  And --

19             THE COURT:  Wait.  Please, is that a question or is

20   that a statement?

21             MS. TSE:  No, I'm just running by Dr. Abramson and I

22   would ask him --

23             THE COURT:  Just ask the question.  Because what is

24   happening here is I'm not sure whether you are summing up,

25   whether you're giving testimony, or whatever.  Are you asking

1    the witness to assume certain facts and then asking him a

2    question?  Or are you asking him to confirm certain facts?

3              MS. TSE:  I would rephrase it so it would be a

4    confirmation.

5    Q.  All right.  Dr. Abramson, upon receiving such an award,

6    would the principal investigator have to first purchase the

7    instrument?

8    A.  Yes, of course.  Well, the university purchases the

9    instrument based on the dollars that come in, yeah.

10   Q.  And the selection of the instrument would be based on the

11   grant application as specified --

12   A.  That's correct.

13   Q.  -- in the grant application.

14             Subsequent to that, it would be the responsibility of

15   the principal investigator to design, if necessary, a proper

16   laboratory where the instrument would be placed.  Is that

17   right?

18   A.  Well, again, Dr. Tse, it depends.  It depends.  So let me

19   just comment.  An instrument grant of that size from the NIH is

20   granted based on multiple, as you said, sharers, shared users.

21   And they judge the merit of the application on the independent

22   NIH funding of the collaborative group of principal

23   investigators.

24             So, the award is not to the person who is going to

25   oversee the machine per se, the instrument -- although that

G6F3TSE2                        Abramson - direct

1    person will be a user and whatnot.  But if there are, I don't

2    know how many there are on this, usually there's five, six,

3    seven.

4    Q.  About six.

5    A.  Six PIs.  And the merit of the application is based on how

6    the grants of those PIs, which must be NIH funded as PIs, will

7    take advantage of this machine to study cancer cells or

8    proteins or whatever it measures.

9            So, the awarding for an instrument grant depends upon

10   the intellectual capital of the six PIs.

11           Then, all of these instruments are not owned by the

12   person who makes the application, the PI for the core of the

13   instrument.  They're owned by the department, initially the

14   medical school, because they're $500,000 instruments.  And then

15   the decision of where that instrument lives, the way people

16   utilize it, whether there are charge backs, that's frankly

17   usually a departmental chair or the scientist that oversees it.

18           So it's not a simple I am going to apply for an

19   instrument, it's my instrument.  It is by definition a

20   collaborative resource for multiple investigators, and

21   therefore, when it's collaborative of multiple investigators,

22   no single person makes the decision.  It is usually the

23   chairperson or something like that.  It is more complicated

24   than a simple "I'm making an application for a grant and I am a

25   PI of the instrument grant."

1  Q.  In addition, the responsibility of the principal

2  investigator would be to see to the operation and maintenance

3  of this instrument, which is also described and included in the

4  application?

5  A.  That's right.  So it's a part of a core facility.  Because

6  by definition, it is a core utilized by multiple other people.

7  Q.  I don't believe that it's considered a core.  But, you

8  know --

9          THE COURT:  You're not going to argue with the

10  witness.

11          MS. TSE:  I'm sorry.

12          THE COURT:  He has given his testimony.  If you have

13  something to refute it.

14          MS. TSE:  Yes, I do.  Since Dr. Abramson stipulated

15  that the instrument belongs to the university, may I bring up,

16  admit into evidence Exhibit 37 which are excerpts from the NIH

17  grants policy statement that says otherwise?

18          THE COURT:  What?  Are you saying that this

19  contradicts Dr. Abramson's testimony?

20          MS. TSE:  In some ways, or in major ways.

21          THE COURT:  Well, under those circumstances, you don't

22  even have to put it into evidence.  You can just use it to

23  question Dr. Abramson in terms of "is it true that" and then

24  you can read from this.

25          MS. TSE:  All right.

1          THE COURT:  Before you do that, let's take our morning

2   break.

3          (Recess)

4          (In open court)

5          THE COURT:  Dr. Tse.

6          MS. TSE:  Your Honor, may we approach Dr. Abramson

7   with a copy of what I will be discussing with him and --

8          THE COURT:  Are you talking about the Exhibit 37?

9          MS. TSE:  Yes, so he can see what I'm referring to.

10         THE COURT:  No, no, I did not receive it in evidence.

11  So I said that you can use it as a good faith basis for asking

12  him particular questions.

13         MS. TSE:  All right.

14         THE COURT:  Okay?

15  BY MS. TSE:

16  Q.  The document I'm referring to, which I'm sure you're quite

17  familiar, is the NIH grants policy statement.

18  A.  Okay.

19  Q.  And the sections that I'm referring to --

20         THE COURT:  No.  Just ask him a question based on

21  something in that document.

22         MS. TSE:  Very well.

23  Q.  Once the award is accepted by the grantee, which is NYU,

24  the contents of the notice of grant award or NGA are binding on

25  the grantee.  Does that sound familiar?

1    A.  I believe so.  I have not read the document.

2    Q.  All right.  So, once the award is made by the NIH, and the

3    money from the award was used towards the goals in the

4    proposal, then the award or the terms of the award becomes

5    binding.

6    A.  Hmm-hmm.

7              THE COURT:  Are you saying yes?

8              THE WITNESS:  Yes, I am, sorry.

9    Q.  Next issue.  A grant to an individual --

10             THE COURT:  Let me just ask you, what do you mean by

11   terms of the award?

12             MS. TSE:  Oh, referring back to that notice of grant

13   award, which is Exhibit 34.

14             THE COURT:  Okay.  That also is not in evidence as far

15   as I know.  Let me ask you, Dr. Tse, are there specific terms

16   that you want to ask Dr. Abramson about in terms of how are

17   they enforced or what does it mean?

18             MS. TSE:  Basically, how should it have been enforced.

19   Because this instrument was appropriated and given to another

20   individual.

21             THE COURT:  That's where we're going with this?

22             MS. TSE:  Yes.

23             THE COURT:  Okay.  That's off base.  Move on.  Do you

24   have anything that deals with whether or not you were provided

25   with an accommodation for the period of time that we're talking

1   about?  Don't go back to "I don't like the fact that I was

2   removed."

3           MS. TSE:  No, no, no, this has nothing to do with my

4   being removed.  I am referring to events that took place around

5   May 22, 2010.

6           THE COURT:  Ask him about events that took place

7   around May 22, 2010.

8           MS. TSE:  I will ask him that first, and then refer

9   back to the NGA and the NIH grants policy, if your Honor thinks

10  that that would be necessary.

11          THE COURT:  All right.

12          MS. TSE:  Am I more on point?

13          THE COURT:  I don't know.  Let's see where it goes.

14          MS. TSE:  All right.  But I would like to reiterate

15  what Dr. Abramson said just before the recess.  That one has to

16  pay generally charge back fees to use what is known as a shared

17  instrument.

18  Q.  And the principal investigator, Dr. Abramson, of that

19  instrument, would be the individual who collects those fees, is

20  that right?

21  A.  Not necessarily.  No.  It may be that the department

22  collects the fees.  Remember that these instruments are shared

23  among six, in this case, PIs.  There is no firm -- it never

24  goes to the individual per se who oversees an instrument as a

25  standard way.

1          The, again, the instrument belongs to the department,

2     to the medical school.  There is an operator of that

3     instrument.  That operator of that instrument may leave or

4     stay.  That instrument is a resource for the community of

5     investigators, whoever is overseeing it, and however, frankly,

6     it was obtained.

7          THE COURT:  Let me ask you, Dr. Abramson.  Let's say

8     there were seven investigators who supported the application

9     for the machine.  Once the grant is given, does that mean that

10    only those six or seven people can use the machine?  No one

11    else can?

12         THE WITNESS:  That's a very important point in this

13    context.  The machine is primarily to service those grants so

14    they have first access to it and ordinarily do not pay a fee to

15    utilize it, because the grant is paying the fee.  You write a

16    grant that says "I am going to do X number of tests" and that

17    goes to pay for the operations.

18         Sometimes, but not always, the department will say,

19    you know, I have this machine, others may want to use it, but

20    for them I'm going to charge the users fee.  So it really

21    varies.

22         In, frankly, many of these shared instrumentation

23    there is no fee applied to it because it used to the community

24    of people who are -- who applied for it.  But it really varies.

25    A lot depends on how much time during the day the instrument is

G6F3TSE2                        Abramson - direct

 1   used.  So if seven people get the instrument, but find they're

 2   only using it one day a week to service their grants, then the

 3   smart approach will be are there other people who want to come

 4   and pay for it.

 5          But there is no absolute standard approach to this.

 6          THE COURT:  So if you are not on a grant, and you want

 7   to use machines that came with a grant, you could be asked to

 8   pay for it.

 9          THE WITNESS:  That's correct.

10          THE COURT:  What about people?  If you ask to use, for

11   instance, lab assistants who came with someone else's grant,

12   would that also require you to pay for their time or would they

13   be just thrown in with the lab?

14          THE WITNESS:  Usually, lab assistants work

15   specifically on projects for which they were funded by their

16   principal investigator.  Sometimes two investigators will share

17   an assistant.  But usually it's -- they're not to be utilized

18   by people who come in, unlike the instrument, by people who

19   come in to get their services.

20          THE COURT:  Thank you.  Dr. Tse.

21   BY MS. TSE:

22   Q.  The history of the FACSAria, the grant was awarded in 2007,

23   and since then, there, like you explained to Judge Batts, there

24   were charge back fees on the order of about $75 an hour.  And

25   given that at that time it was state-of-the-art instrument,

G6F3TSE2                         Abramson - direct

1   requires experts not only to design the experiment but also to

2   operate the instrument, the $75 an hour is actually very

3   reasonable and was placed in, I think, the correct term or the

4   NYU term for it is an operating account, from which Dr. Tse was

5   drawing her salary and salary for the laboratory staff.

6          Is that about right?

7   A.  How dollars are used, accrued to the department for access

8   to a machine, will vary according to the needs of the

9   department.  If, for example, the core director or the person

10  operating the machine has another salary source from the school

11  or the department, and dollars committed for use, the

12  chairperson may decide to use those dollars for something else.

13  There is no strict rule that a fee that comes in for a machine

14  goes to pay for the director of the machine.  It's at the --

15  all of this is how one manages a laboratory.

16  Q.  Can you then explain to the Court how those determinations

17  and decisions were made?

18  A.  In this case, I don't know.  You're asking me a generic

19  question?

20  Q.  Yes.  Let's say not in particular the FACSAria, but a

21  different machine.  A different cell sorter.

22  A.  A person who is running a core facility or an instrument,

23  regardless of whether they're tenured or not tenured, is

24  serving at the will of the person who is responsible for that

25  laboratory.  There is another obligation, and if the person is

1   doing the job, they stay on the job.  If for whatever reason

2   the chairperson or the PI says I need to make a change, then a

3   change gets made.

4           A core director is an employee providing a service to

5   other investigators.  And as any employee, judgments are made

6   as to whether they're doing what needs to get done or not.

7           So, there's no rules in any individual case except

8   what I'm saying.

9   Q.  Then let's get back to the case of the FACSAria.  Dr. Tse

10  was the named principal investigator, so would it be up to her

11  or somebody else, like, for example, a department chair who was

12  not the principal investigator?

13  A.  Yes.  So this was a program grant with a instrument.  Let

14  me just make sure I'm following -- is this the instrument grant

15  or --

16  Q.  This is an independent standalone shared instrument grant.

17  A.  Right.  The person who is the PI in the grant, because it

18  is an instrument grant owned by the school, has no ownership

19  over that instrument.  So if the decision has to be made that

20  the instrument is servicing multiple investigators in the

21  department, the chairperson or the PI can make a change over

22  who is operating the instrument.  These --

23  Q.  But may I --

24          THE COURT:  Let him finish his answer.  Then you can

25  put another question.

1          MS. TSE:  Sorry.

2     A.   You know, an instrument is not -- the PI of the instrument

3     grant really is not the decider, as it were, of who is going to

4     oversee the operations of the instrument, if there are issues

5     coming up with regard to the competency or ability to oversee

6     that instrument.

7     Q.   Now, in the case in front of us, the shared instrument

8     grant was awarded to Dr. Tse.  But what you are telling the

9     Court now is somebody else can take over the operation of the

10    instrument and redirect its proposed goals?

11    A.   That's absolutely correct.  This is different from a grant

12    that is -- the traditional research grant.  I would ask the

13    question or frame it this way.  Would the person who is the PI

14    of the instrument grant, in the absence of the other six

15    investigators who NIH funds, have ever successfully had the NIH

16    give them a half a million dollar grant?  And the answer in

17    that hypothetical is no.  The NIH doesn't give half a million

18    dollar grants to a person who runs a core facility because they

19    write a grant.

20         The only reason an instrument grant at that level is

21    given is because the level of the science of the six NIH funded

22    investigators, and they're usually leaders in their field with

23    multiple R01 grants to invest that kind of money.  It's because

24    of them that the grant is being given to the institution.  The

25    NIH is investing in the science, not in the engine that's doing

 1    the tests.

 2              So this is a very different kind of circumstance when

 3    an instrument comes into the laboratory.

 4    Q.  You are familiar then with what is known as a progress

 5    report.  Can you explain to the Court what that is?

 6    A.  Ever hear of the NIH ask for a progress report as to what

 7    was done under the grant that was funded.  Were you executing

 8    the grant as you had promised.  So it is a three-page report

 9    each year, typically.

10    Q.  Who gets to write that progress report?

11    A.  It's usually the PI of a particular grant.

12    Q.  So, you expect that in this case, Dr. Tse would be the

13    person?

14    A.  So long as Dr. Tse was the director of this particular

15    instrument.  That's correct.  If a change had to be made, that

16    other person would do it.

17    Q.  All right.  In that event, let us see if what Dr. Abramson

18    had just testified to agrees with what is in the NIH grants

19    policy.

20              MS. TSE:  May I?

21              THE COURT:  What's the question, Dr. Tse?  I can't

22    tell until I hear what the question is.

23              MS. TSE:  I'm waiting to see if everybody is ready to

24    move on to validating by the NIH grants policy statement what

25    Dr. Abramson just testified to.

G6F3TSE2                              Abramson - direct

```
 1              THE COURT:  All right.  What is it in that policy that
 2      you wish to --
 3              MS. TSE:  I will go through it --
 4              THE COURT:  No just --
 5              MS. TSE:  Very well.
 6      Q.  On page 108 of the policy, a grant to an individual may not
 7      be transferred.  Page --
 8              THE COURT:  Wait.  Let him respond to that.
 9              THE WITNESS:  I have to see the policy.
10              THE COURT:  For these purposes, I'm going to
11      provisionally admit into evidence -- what is the number?
12              MS. TSE:  37.
13              THE COURT:  All right.  Plaintiff's Exhibit 37.  If it
14      turns out that this is not relevant, this and the testimony
15      will be stricken.
16              MS. TSE:  I understand.
17              (Plaintiff's Exhibit 37 received in evidence)
18              MS. TSE:  May we approach?
19              THE COURT:  Yes.
20              (Continued on next page)
21
22
23
24
25
```

G6F5tse3                       Abramson - direct

1          THE WITNESS:  So your question is on page 108?

2     BY MS. TSE:

3     Q.  Yes.

4     A.  A grant to an individual may not be transferred.  Is that

5     correct?

6     Q.  Yes.

7     A.  My first question is, is this applying to an

8     instrumentation agreement or just grants in general?

9     Q.  This is grants in general.

10    A.  In general.

11          And so, it is not clear -- I would have to look into

12    it, whether an instrumentation grant would be considered the

13    same, number one.

14          Number two, I'm not sure what it means, and I would

15    ask what transfer to this grant means.  Does it mean the person

16    overseeing the instrument was changed?

17          THE COURT:  Or does it mean it was sent to another

18    institution?

19          THE WITNESS:  Right.  Because if there is a question

20    of -- and again, this is not at all related to anything about

21    this case, if it comes to pass that the person operating the

22    machine is felt not to be able to service the needs of the

23    other investigators, then a change would need to be made

24    because an instrument is different from a traditional grant.

25    BY MS. TSE:

G6F5tse3                          Abramson - direct

1   Q.  Then let us go to page 112.  Requests for prior approval.

2   A.  What is the question?

3            THE COURT:  What page are we on?

4            MS. TSE:  112, your Honor, of Exhibit 37, and that

5   would be the policy statements page.

6            THE COURT:  Bear with me one second.  All right.

7   Q.  Now, under that paragraph the policy states:  All requests

8   for NIH awarding office, prior approval must be made in writing

9   which includes submission by e-mail to the GMO -- which is

10  grants management office, that would be at the NIH -- no later

11  than 30 days before the proposed change.  The request must be

12  signed by both the PI -- principal investigator -- and the AOO,

13  which is an organization at the institution -- or the NYU in

14  this case.

15           Do you have any comments on that, Dr. Abramson?

16  A.  I'm not sure what the question is.

17  Q.  My question is, for this case in particular and NYU in

18  general, you would abide by this stipulation?

19  A.  I would have to -- you would have to be more specific as to

20  what I am abiding by.

21  Q.  All right.  It says --

22           THE COURT:  Just a second, Mr. Cerasia, please.  You

23  have been very patient.

24           MR. CERASIA:  Your Honor, I would just like to make

25  one clarification.  If you look at the top of page 108, this

1   talks about a change of grantee organization and this is a

2   policy that deals with the transfer of the legal and

3   administrative responsibility for grant-supported project or

4   activity from one legal entity to another.  That's the whole

5   context here.  It is not clear to me that that's the question

6   that is being asked, that we are talking about a transfer from

7   one legal entity to another which is not relevant to this case.

8            THE COURT:  Dr. Tse?

9            MS. TSE:  I didn't -- when I read over the entire

10  policy statement I did not interpret it as such.  So, I am open

11  to input from Dr. Abramson.

12           THE WITNESS:  Well, again --

13           THE COURT:  Wait a second, sir.

14           THE WITNESS:  I'm sorry.

15           THE COURT:  I think Mr. Cerasia raised a very valid

16  point.  Just looking at the face of the document it is not

17  clear to me that the section that you read is not affected by

18  "or inclusive in change of grantee organization."

19           MS. TSE:  That is immaterial and may I just explain --

20           THE COURT:  I think it is quite material.

21           MS. TSE:  -- from my perspective why that is?

22           A grant to an individual may not be transferred and

23  that would mean that even if, let's say, Dr. Tse were to

24  relocate from NYU to Columbia University, she could not take

25  this instrument with her but as long as she stays within the

1    same institution, since the grant was awarded to Dr. Tse as the

2    principal investigator, it may not be transferred.  And, if the

3    transfer was to be made there are certain guidelines.

4        THE COURT:  What does this have to do with an

5    accommodation?

6        MS. TSE:  This instrument generates revenue from

7    chargeback fees.  When I was operating and overseeing the

8    operation of this instrument in fulfillment of the proposed

9    projects, the chargeback fees were deposited or paid to what is

10   known as an operating account which pays for my salary as well

11   as the salary of laboratory personnel.  All right?

12       On about or around May 22nd, 2010, this instrument was

13   taken from me and given to another individual and the NIH

14   stipulated guidelines was not followed.

15       THE COURT:  Again, what does this have to do with an

16   accommodation?

17       MS. TSE:  Not only was Dr. Tse not accommodated.

18       THE COURT:  Well, that's the only thing that is at

19   issue before me here and now.  Your position is that you were

20   not accommodated.  What they did with this machine is not

21   before me right now.  So, I do not see the connection between

22   what is at issue before me and whether or not the terms of this

23   grant were abided by by NYU.

24       MS. TSE:  All right.  Then using this instrument

25   further incapacitates Dr. Tse's ability to meet her REF which

1   was NYU's basis for terminating her appointment.

2               THE COURT:  Mr. Cerasia.

3               MR. CERASIA:  Yes, your Honor.

4               We dealt with this at the final pretrial conference

5   dealing with the loss of funding for the machine and your Honor

6   ruled that, *It is not before me and we are not going to get*

7   *into it now in the trial.*

8               It was funding that she had as a core director.  She

9   lost that funding when she was no longer the core director.

10  The only issue that is, as your Honor noted, is whether or not

11  the University failed to reasonably accommodate her from June

12  2010 to April 2011.  One of her arguments is I needed somebody

13  to do work on the machines and our argument is you first have

14  to come up with the scientific idea before you get entry to the

15  machine.  If you needed money to pay for the machine because

16  you had a scientific idea you should have asked us.  It had

17  nothing to do with the grant.  This grant money is gone, it is

18  out of the case because it relates to her time as a core

19  director.

20              THE COURT:  All right.  I agree that we are not going

21  to deal with Exhibit 37, we are not going to deal with the

22  grant money having been lost.  That is not relevant to the

23  issue before me.

24              MS. TSE:  Your Honor, may I point out that on May

25  22nd, 2010, when this instrument was removed from Dr. Tse there

```
 1    was no grant at issue here.  The grant was awarded in 2007.  It
 2    was spent and the instrument, as proposed, was up and running
 3    by 2008.  So, Mr. Cerasia's statements were not accurate.
 4              THE COURT:  I think that they were --
 5              MS. TSE:  Second --
 6              THE COURT:  Dr. Tse.
 7              MS. TSE:  I'm sorry.  I didn't mean to interrupt.
 8              THE COURT:  I made a ruling.  This is out.  That
 9    exhibit is out.  Let's not have any more questions dealing with
10    your removal from that position.  Let us focus on what you
11    needed as an accommodation once you were removed.
12              MS. TSE:  What I needed --
13              THE COURT:  No, no.  I'm not asking you to tell me.  I
14    am asking you to take advantage of the --
15              MS. TSE:  I will do that.
16              THE COURT:  Don't interrupt me.  I am telling you what
17    you need to do.
18              MS. TSE:  I am very sorry, your Honor.
19              THE COURT:  Dr. Abramson is here for a limited period
20    of time.  Ask him questions that relate to his knowledge or
21    role in terms of your accommodation or lack thereof.
22    BY MS. TSE:
23    Q.  Given that Dr. Tse had proposed, like you said, towards the
24    shared instrument grant award, she had made contact with
25    numerous investigators, explored the possibilities for
```

G6F5tse3                          Abramson - direct

1    research --

2              THE COURT:  Is this going to end up in a question?

3              MS. TSE:  Yes, it would, because I first want to let

4    Dr. Abramson know that there were, including myself, actually

5    about 10 different investigators and it is NYU's position that

6    I do not really need laboratory assistance, I could use my

7    history of flow cytometry, expertise in flow cytometry to reach

8    out to 10 other, for example, investigators that I have worked

9    with to see if we can develop -- turn those collaborations into

10   grant applications.  So, there is really no need for NYU to

11   provide me with those laboratory assistants.

12             Would you agree that while I had this machine --

13   Dr. Tse had this machine under her authority, it would make

14   those collaborations possible or facilitate, at the very

15   minimum, those collaborations?

16             THE COURT:  I don't understand the question.

17   BY MS. TSE:

18   Q.  Without the instrument, would Dr. Tse be in a position to

19   offer those collaborations to people she had once worked with?

20             THE COURT:  Okay.

21             Are you in position to answer that?

22             THE WITNESS:  I can speculate maybe.

23             THE COURT:  No, we don't like speculation.

24             In your professional opinion --

25             THE WITNESS:  In my professional opinion -- so, what

1     you are kind of asking again, you needed to have the machine.

2     It seems to me that decision was already made independent from

3     this issue of collaboration.  So, let me just say that.

4          To get other people involved in a collaboration they

5     have to be excited about your idea because they often have to

6     invest money in it, or time.  So, the first step is I can't

7     answer whether your machine would have made a difference or not

8     but I can answer the fact that collaborations are born from

9     common, mutual interest in an idea.  And so, the responsibility

10    first of the person seeking a collaboration is to excite

11    another person in the idea, and then that person will bring

12    something else to that collaboration that might be finances,

13    resources, maybe a technician, but it begins with the idea and

14    once the idea is captured, people then figure out how to get

15    the work done.

16         So, in answer I guess specifically to your question,

17    the use of the machine would not necessarily have made a person

18    more excited about the idea and if they were excited about the

19    idea because it is a user fee, they would have been able to get

20    preliminary data regardless of who was operating the machine.

21    BY MS. TSE:

22    Q.  So Dr. Tse must have got 10 different investigators

23    throughout different departments of the school excited about

24    utilizing flow cytometry towards their investigative goals

25    because those 10 investigators not only had to come up with a

1   proposed research project together with her because none of

2   those really have any expertise in flow cytometry or

3   established expertise in flow cytometry --

4            THE COURT:  Are we going to get to a question soon?

5            MS. TSE:  Yes, I will.

6            THE COURT:  Actually, I'm not sure that this question

7   follows from Dr. Abramson's testimony.  I don't believe that he

8   limited it to getting them excited about utilizing flow

9   cytometry.

10           MS. TSE:  No.  It's not restricted to flow cytometry

11  but one has to take into consideration that that is my field of

12  expertise.  So, when you have a collaboration, different

13  investigators will bring to the table their expertise.  For

14  instance, there was an investigator on the shared instrument

15  grant application.  Dr. Canary.  He was actually not at the

16  medical center but he was from the chemistry department at

17  Washington Square.  He wanted to use flow cytometry to study

18  Manganese levels in living cells and the NIH approved the grant

19  because, normally, that is something that the reviewers

20  considered innovative, exciting, and will contribute to new

21  knowledge.  All right?

22           That's generally how, like Dr. Abramson stated

23  earlier, grants were approved.

24           So, I had made contact with, according to his

25  statement, and pretty much --

 1          THE COURT:  Is this your testimony now?

 2          MS. TSE:  No, no, no.  There is a question there.

 3          THE COURT:  Well, I don't know where it is.

 4   BY MS. TSE:

 5   Q.  The question is, would removing Dr. Tse as the authority

 6   and the principal investigator of this instrument promote her

 7   ability to collaborate with these individuals?

 8   A.  No.  And let me tell you from my own experience because I

 9   have run a laboratory for 30 years, I have two NIH grants right

10   now.

11          Flow cytometry, for example, is now a core facility at

12   the School of Medicine, it is not the machine that Dr. Tse ran.

13   If I have a neat idea and I want to talk about it, we do it

14   with the core facility at the school and we find the resources

15   to do it, and it is not that expensive, frankly, because what

16   you are doing with a grant application is getting preliminary

17   data so you need several experiments that work, reasonably not

18   very costly -- it is not very costly to get preliminary data in

19   many instances and it may vary on what you are studying.  But,

20   if I want to collaborate with somebody because I am intrigued

21   with the idea and we find resources to do preliminary

22   experiments and I think we are perseverating on this one

23   critical machine being critical to people's success, even

24   Dr. Tse's success.

25          So, as a non-director of that machine, if there is a

1    great idea that other people were interested in and you would

2    find other people who had resource because they have other

3    grants, projects would go forward whether or not you were the

4    director, in my view.

5                So, I think one has to separate the engagement of

6    other scientist or he idea whether one person has easy access

7    to an instrument.  That's not the way science is done anymore.

8    It may have been many years ago where one person had the

9    machine and if that person had a monopoly on that machine I

10   could do a test, right, nobody else.  Flow cytometry is

11   standard and everybody in the school does it and you can go on

12   the website and you can go on the website and see how do I get

13   it done and how much does it cost.

14               So, the particular expertise in modern day science and

15   a particular machine is no longer critical to success.  That's

16   why the school has what we call core facilities for all

17   investigators in the school.

18   Q.  And you don't then agree with the NIH that the awardee of

19   the instrument needs to have expertise when --

20               THE COURT:  Objection sustained.

21   Q.  All right, let's reword this.

22               THE COURT:  No, let's move on.

23   Q.  So, Mr. Abramson, how -- can you tell the Court, after what

24   you have learned this morning, in what manner did NYU

25   accommodate Dr. Tse's disability so she could meet her job

1    expectations, the 60 percent REF --

2    A.  I can say --

3    Q.  -- and more, the minimum 60 percent REF?

4    A.  You asked me a few questions about what one would do.  From

5    what I understand --

6    Q.  No, specifically --

7              THE COURT:  No, no, no.  Do not argue with the

8    witness.

9              MS. TSE:  I'm sorry.

10             THE COURT:  You put a question.  He is trying to

11   answer it.

12             THE WITNESS:  All right, because it is a complicated

13   question with multiple dimensions.

14             What I said in that is that someone who is removed as

15   a core director for whatever justification now is not being

16   funded because a big part of their salary is not funded, the

17   department chair and the investigator can work together to try

18   and find alternatives.  With a non-tenured faculty member there

19   is, in my view, no obligation to do so.  You tried -- you were

20   with Marty Blaser, one of the nicest men at the medical school;

21   Dr. Reibman, a very lovely person.  I'm sure they tried to be

22   helpful.  On the other hand, if there was no money -- and this

23   is, by the way, a time when the NYU School of Medicine was

24   losing over a hundred million dollars a year and a lot of it

25   from research -- and so there was not a lot of extra money in

G6F5tse3                     Abramson - direct

the system.  And so, one can't simply say an investigator has

lost their grants, I have a pile of money over here and I am

going to give it to them.

          The obligation is to run an efficient lab and to get

people funded and to be as helpful as they can.  I understand

they did -- a year went by and then you were in the laboratory

and tried to do some work.  Beyond that, as a non-tenured

faculty who serves at-will, the department had no further

obligation, from what I know about the situation, to provide

assistance, help, technicians, or more money after it became

clear that you were not able to gain funding.  Then it becomes

the discretion of the chair who is trying to manage a budget

under very strict circumstances.

          I must -- the other context, the NIH in this period

even today only funds 10 percent of the grants that are applied

for and so it is a real crisis in science.  People who were

funded are no longer getting funded so what you are

experiencing was not unique but it made it very hard to find

extra money from research to move around to other people.

          Unfortunately, as a consequence, some people have

lost -- lost their positions.  And this is happening around the

country, where people in science are losing their positions

because there is very inadequate amount of money to fund

research in the country.

          So, my view is that that kind of work with the chair

1    was done for a while and that if they couldn't do more, that's

2    just unfortunate.

3    BY MS. TSE:

4    Q.  Are you explaining to the Court that Dr. Tse contributed to

5    the $100 million default that you said just came from research?

6    A.  No.  Not at all.  But I am saying there was not extra money

7    in the school in the departments to subsidize people who were

8    unable to get their own grants.  That's all I'm saying.  It is

9    not a particular person.  It was not a period -- years ago

10   there was a lot of money in the system and people could be

11   supported for longer periods.  In fact, the reason we even put

12   in that 60 percent floor was that we were trying to stop a

13   hemorrhaging, frankly, of scientists who -- researchers who

14   were poorly funded.  We had no benchmark, like many schools

15   have around the country, to say you really have to try and do

16   better.  People were just collecting -- we had $20 million of

17   salaries going to faculty with no grants so we put in place

18   these parameters.  We guided them in over about a four-year

19   period and then we have standards at NYU that everyone

20   understands is the 60 percent but it was in the context of we

21   just can't continue to give dollars for research when there is

22   no dollars coming in for research.

23   Q.  Can you please then explain to the Court that if NYU feels

24   empowered to regularly remove awards that Dr. Tse has succeeded

25   to obtain from the NIH, how would she ever meet the 60 percent

1    REF?

2              MR. CERASIA:  Objection.

3              THE COURT:  Sustained.

4    BY MS. TSE:

5    Q.  You just mentioned that around April 2010 or between April

6    2010 to April 2011, is it your position that for lack of money

7    NYU would not be obligated to provide reasonable accommodations

8    to Dr. Tse's impairment?

9    A.  That's correct.  That's correct.

10             That -- that the organization has to be

11   self-sustaining and it is unfortunate that decisions have to be

12   made that sometimes employment can no longer continue if a

13   person failing -- failing to meet the expectations of getting

14   extramural funding.  If a person is hired as a scientist and a

15   scientist is not getting extramural funding, then that's a

16   failing scientist, period.  And you can't maintain people who

17   are not getting grants.

18   Q.  Without going into the details, can you then at least

19   explain to the Court what time and effort reports are about,

20   that is, how you determined a faculty member's percent REF?  Is

21   that right?

22   A.  Well, we don't call it time and effort.  It is in the

23   document that you showed on calculating REF.

24   Q.  Yes.

25   A.  We basically say if you have a hundred percent work effort

1    you are a hundred percent researcher, 50 percent researcher and

2    get another 50 percent of your salary from a non-research

3    source such as core facility or seeing patients if you are an

4    M.D. and scientist.

5    Q.  Dr. Tse's time and effort reports that she filed with the

6    school, her percent REF for the three years preceding August

7    31st, 2010 was 100 percent, 95 percent, and better than 80

8    percent.  Do you consider that the track record of a failing

9    scientist?

10   A.  It depends on what happens subsequent to that period.  So,

11   that's a point in time but, unfortunately, if no grants come in

12   subsequently, that person has begun to fail, frankly.

13   Q.  Going back to Exhibit 10, which is the policy, can you

14   please explain to the Court what you mean by the additional 10

15   percent REF in recognition of outstanding academic

16   achievements?

17          THE COURT:  Would you refer us to the particular place

18   in this exhibit where there is?

19          MS. TSE:  Yes, I will as soon as I -- Dr. Abramson may

20   be better --

21          THE WITNESS:  3083(d) Acceptable Academic

22   Contributions.

23   BY MS. TSE:

24   Q.  Yes.  There is a list of them, and for the benefit of the

25   Court, can you please explain to them, specifically (d)(2), why

1    a faculty member will get additional REF?

2    A.  So, this was an attempt to give credit to faculty members

3    who might be falling short on the 60 percent floor based on

4    what they were doing academically, particularly with national

5    recognition.  So, I am writing major textbooks or, number two

6    particularly is serving on NIH study sections.

7           Now, in aggregate, these eight criteria each have a

8    contribution of only up to 10 percent and each one has about a

9    potential for 1 to 2 percent credit.  So, if someone, for

10   example, is at 58 percent instead of 60 but they're on a

11   national study section, they get two points.  But the most that

12   you will ever get from these national reputation contributions

13   is 10 percent.

14          THE COURT:  10 percent for each of --

15          THE WITNESS:  No, no, I apologize.  In total no more

16   than 10 percent and maybe 1 to 2 percent.  So each one of these

17   only carries a weight of 1 to 2 percent and so, therefore, if

18   you have only 1, you get 2, 1 to 2 points towards 60 and then

19   you can do the addition but maximizing at 10 percent.

20          MS. TSE:  Your Honor, Exhibit 39 is a biographical

21   sketch which is a short form of an individual's CV and it is a

22   form that is provided by the NIH for grant application use.

23   Exhibit 39 is Dr. Tse's bio sketch as it was submitted with the

24   Reibman grant application.  May we approach and show this to

25   Dr. Abramson?

1          MR. CERASIA:  It was admitted through Dr. Blaser on

2     Monday.

3          MS. TSE:  Oh, I'm sorry.

4          MR. CERASIA:  At least that's what my records show.

5          THE COURT:  I don't believe that my records show that

6     39 was admitted into evidence on Monday.  Let me check

7     yesterday.  (pause)

8          No.  So, Exhibit 39 has not yet been admitted into

9     evidence.

10         Mr. Cerasia, do you have an objection?

11         MR. CERASIA:  I don't have an objection at this point.

12         THE COURT:  I'm sorry?

13         MR. CERASIA:  I'm sorry.  I don't have an objection.

14         THE COURT:  So, Plaintiff's Exhibit 39 is received in

15    evidence.

16         (Plaintiff's Exhibit 39 received in evidence)

17         MS. TSE:  May we approach, your Honor?

18         THE COURT:  You may.

19    BY MS. TSE:

20    Q.  Dr. Abramson, Exhibit 39 is a bio sketch that was submitted

21    in response to an RFA together with Dr. Reibman.  Dr. Tse was a

22    co-investigator and listed under PDPI -- program director

23    principal investigator -- on the application.  If you want to

24    review the application, the Bates pages were submitted into

25    evidence as Exhibit 11.  Just let me know whether you want to

G6F5tse3                          Abramson - direct

1    look at that.

2    A.  All I can say from this is that you were an investigator.

3    Whether you were co-PD and true PI with Dr. Reibman, I can't

4    tell from this document.

5    Q.  All right, then we will -- may we have a moment to bring up

6    Exhibit 11 for Dr. Abramson?

7             THE COURT:  Yes, certainly.

8             Dr. Tse, do you wish to refer Dr. Abramson to a

9    particular part of 11?

10            MS. TSE:  No.  There is only two pages and the

11   pertinent information is boxed in blue.

12            THE COURT:  On page 2?

13            MS. TSE:  Both pages.

14            THE WITNESS:  Okay.  I see the information.

15   BY MS. TSE:

16   Q.  The date of submission and the funding opportunity, and on

17   page 2, Dr. Tse, and below that project role PDPI which is

18   program director, program investigator.

19   A.  Yes, I see that.

20   Q.  All right.  We will come back to that.

21            Going back to Dr. Tse's bio sketch, I would like to

22   bring your attention to the second page which is page 16 of the

23   grant application as indicated in the lower right, the boxed

24   part.

25   A.  Uh-huh.

G6F5tse3                    Abramson - direct

Q.   Does it show that Dr. Tse sat on as many as three review

panels?

A.   It does, but the reference in the extra -- in the

extraordinary academic contributions is interpreted as standing

members of a study section.  I am looking at this, these are ad

hoc study section committee, correct?  So study section meets

three times a year and you are appointed for a five-year

period.  That is different from what is shown here.

Q.   But the fact that Dr. Tse was invited to sit on three

review panels, is that the track record of a failing scientist?

          THE COURT:  It is now 1:45.  Dr. Tse, how much more do

you have for Dr. Abramson?

          MS. TSE:  No more than 15, 20 minutes?  Or I will try

to limit it.

          THE COURT:  Yes.  I will give you 10.

          MS. TSE:  Can Dr. Abramson answer my question?

          THE COURT:  No.  The objection is sustained.

          MS. TSE:  May I know on what ground so I won't venture

there again?

          THE COURT:  It is argumentative.

BY MS. TSE:

Q.   Dr. Abramson, as the Vice Dean of the school, after he

stated --

          THE COURT:  Listen.  I do not want a speech.  I have

ruled.  Move on or you don't get 10 more minutes.

G6F5tse3                          Abramson - direct

1           MS. TSE:  Very well.

2    BY MS. TSE:

3    Q.  So, can you confirm for the Court that Dr. Tse had either

4    independently or in collaboration with other investigators

5    obtained extramural funding from the bio sketch?

6    A.  I see the --

7           THE COURT:  What part of the bio sketch, Dr. Tse?

8    Q.  That would be under which is a mandate of supporting

9    grants, Section C, research support.

10   A.  So, I see, once again, as part of P 30, I see grant support

11   which appears to me to be not part of a PI, correct me if I am

12   wrong, a project within a larger grant.

13          MS. TSE:  May I, your Honor, approach with the bio

14   sketch of the individual to which the box area was reassigned?

15          THE COURT:  No.  I'm not going to have a comparison of

16   who replaced you and have the witness made a choice as to who

17   is better.  That is not where you are going and now you are

18   down to seven minutes.

19          MS. TSE:  In that case I will need the seven minutes.

20   Exhibit 42, may we approach with that?  It is a history of

21   Dr. Tse's NIH funding.

22          THE COURT:  You may.

23   Q.  Dr. Abramson, I believe Exhibit 42 shows that prior to her

24   assuming the responsibility --

25          THE COURT:  Do you have any objection to this?

1           MR. CERASIA:  You know, I would like her to lay a

2      foundation by this, Judge, but I am not certain it was produced

3      in discovery.  I don't know that the witness is familiar with

4      it but I am not.

5           THE COURT:  Yes.

6           MS. TSE:  The document was produced from a publicly

7      accessible website known as E-reports that the NIH has made

8      available.  It was not produced or was produced in discovery.

9      I cannot, off the top of my head confirm that, but it was

10     definitely included in the list of exhibits in the JPTS.

11          THE COURT:  Mr. Cerasia, do you have any reason to

12     object?

13          MR. CERASIA:  No, and that was the stated basis of our

14     objection.  I'm not trying to delay this, your Honor.  I want

15     to make sure the witness knows what this is because I don't.

16          THE WITNESS:  I am familiar with this website.

17          THE COURT:  All right, then.  42 received in evidence.

18          MS. TSE:  Thank you, your Honor.

19          (Plaintiff's Exhibit 42 received in evidence)

20     BY MS. TSE:

21     Q.  Dr. Abramson, does Exhibit 42 show that prior to assuming

22     the responsibilities as the PI for the CFAR flow cytometry core

23     during her early years at NYU, Dr. Tse was able to apply for

24     and receive NIH funding?

25          MR. CERASIA:  I'm going to object on the grounds that

 1   I think it is irrelevant.  This deals with funding from 1997

 2   through 2009.  It is all prior funding from the time in the

 3   core.  And to the extent that she is trying to bring it up

 4   again to show this argument about her competence, I think based

 5   on your Honor's prior rulings, it should be excluded.

 6           MS. TSE:  The witness has raised the issue in his

 7   testimony that Dr. Tse was purportedly removed because she was

 8   underperforming --

 9           THE COURT:  First of all, that is not what this

10   witness said, so if that's where this is going I am going to

11   strike Plaintiff's Exhibit 42 from being admitted.  It is no

12   longer admitted.

13           Now, you have three minutes.  Is there anything that

14   you would like to use that would be helpful to your position

15   that has not been excluded by the Court?

16           MS. TSE:  Yes.  I have one last question or two last

17   questions and this pertains to Dr. Abramson's expert as a

18   position and my question is, would Dr. Tse's osteoarthritis

19   have improved between March 2010 -- referring to the letter

20   submitted by Dr. Solitar -- on April 2011?

21           MR. CERASIA:  Objection.

22           THE WITNESS:  Where -- I'm sorry.  Go ahead.

23           THE COURT:  I will allow this.

24           THE WITNESS:  Would it have improved it?  Is that the

25   question?

1    BY MS. TSE:

2    Q.  Yes.

3    A.  So, the answer is everyone is different, frankly, and

4    osteoarthritis, interestingly, and I can show you my own

5    example with my hand, can be bad and then it can get very --

6    without symptoms for a protracted period of time.  So, it's

7    each individual is different and there is no way, without my

8    seeing a person during that time frame, whether they would stay

9    the same and get better or get worse.  There is no way of

10   knowing.

11   Q.  Dr. Tse articulated to Dr. Blaser in May 2010, and if we

12   need to we can approach and --

13            THE COURT:  What is the question, Dr. Tse?

14   Q.  Okay.  The question is, Dr. Tse articulated to Dr. Blaser

15   that because of the osteoarthritis she was incapable of doing

16   lab work herself and generate preliminary data towards new

17   grant applications.  She did not have a lab with staff.  Now,

18   my questions is, you have just said that it varies with the

19   individual whether the osteoarthritis would have progressed

20   between March 2010 and April 2011 and my second question --

21            THE COURT:  No, no.  Let's get an answer -- what was

22   the first question?

23            MS. TSE:  No, he did, he answered the first question

24   already, whether --

25            THE COURT:  What is the second -- don't link these

G6F5tse3                        Abramson - direct

1   things together.  This is making it much more difficult.  What

2   is your last question?

3   BY MS. TSE:

4   Q.  The last question, if I am not going to compound it would

5   be actually two --

6           THE COURT:  Well, choose the better one.

7   Q.  As I have introduced myself, I am Doris Tse and I am asking

8   you to give an opinion, as an expert witness given that you're

9   internationally recognized as a rheumatologist, can you

10  honestly say --

11          THE COURT:  No, no.  Strike the honestly.  Can you

12  say, as an expert.

13  Q.  Can you say, as an expert, that I appear totally disabled

14  today?

15  A.  Well, I can only see you from where I sit.  I see nothing

16  that is disabled.

17  Q.  Okay.  There?

18  A.  Perfect.

19  Q.  And finger splint for the hand, osteoarthritis.

20          I have no more questions, your Honor?

21          THE COURT:  All right, Dr. Tse.  Thank you.

22          Now, it is well past lunchtime.  Would people like to

23  take a break for lunch or -- I understand we have really

24  imposed on Dr. Abramson's time.

25          Mr. Cerasia, I don't want to put you at a disadvantage

G6F5tse3                          Abramson - direct

1    but are you willing to take a small lunch break and come back

2    and ask your questions or do you wish to just proceed through?

3              MR. CERASIA:  Your Honor, at this point I would like

4    to defer to Dr. Abramson because it is his schedule.  I will

5    need to take a snack break because I have medical issues that

6    require me to eat, but I think for 15, 20 minutes I'm okay but

7    I am really pushing it.  I have a snack here.

8              THE COURT:  You know what?  I am sorry, Dr. Abramson,

9    may we -- does your schedule permit us, having abused it so

10   far, does it permit us to take a half hour lunch break and then

11   come back?

12             THE WITNESS:  I have a patient at 3:00.

13             THE COURT:  So let me just ask you, I don't want

14   you --

15             MR. CERASIA:  Judge, I can go forward.

16             THE COURT:  No.  You see --

17             THE WITNESS:  Take a 15 minute break?

18             THE COURT:  I am not taking responsibility.

19             MR. CERASIA:  No, no.

20             THE COURT:  Mr. Cerasia, so many issues have come up

21   during the course of this trial.  It deals with someone's

22   health, we have accommodated people.  I don't want to endanger

23   anybody.  15 minutes would do for you?

24             MR. CERASIA:  It won't endanger me, your Honor.

25             THE COURT:  No, a 15-minute break.

G6F5tse3                        Abramson - direct

1              MR. CERASIA:  A five-minute break would be more than

2      enough for me right now.

3              THE WITNESS:  That's fine.

4              THE COURT:  All right.  Five minutes.

5              MR. CERASIA:  Thank you.

6              THE WITNESS:  Thank you.

7              (Luncheon recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Please be seated.  Mr. Cerasia, are we

3   ready to proceed?

4          MR. CERASIA:  I am, thank you, your Honor.

5          THE COURT:  Please do.

6   CROSS-EXAMINATION

7   BY MR. CERASIA:

8   Q.  Dr. Abramson, when Dr. Blaser was the chair of the

9   department of medicine, let's say between 2010 and 2011, do you

10  know what his policy was in that department as to the

11  percentage of funding that was needed for a non-tenure research

12  faculty member to maintain employment?

13  A.  I can't speak to what Marty's policy was specifically,

14  except I knew that he, like other chairs, expected non-tenured

15  faculty members to cover 100 percent of their salary.  And the

16  only exceptions would be if other scientists agreed to cover

17  them because they were collaborating or if he as chairperson

18  was working with a non-tenured faculty member who was important

19  to Marty's lab work, then the funding would come out of Marty's

20  funds, and that's not uncommon.

21          All of those, that whole spectrum of the person has to

22  cover all of his salary or they have a half-time job doing

23  administrative role, or the chair covers them, the whole

24  spectrum exists, depending on the role of the non-tenured

25  faculty in the department.

G6F3TSE4                          Abramson - cross

Q.   Do principal investigators, primarily tenured faculty

members, do they get to pick and choose who they want to

collaborate with on the non-tenured track?

A.   Yes.  By definition, sure.

THE COURT:  I don't understand that question,

Mr. Cerasia.

Q.   You as a principal investigator of a research program, do

you get to pick your team that you want to have on a grant

proposal?

A.   Yes, you choose the people that you want to work with.

It's -- oftentimes those are your collaborators for an extended

period of time.

Q.   In general, as a principal investigator, how do you pick

the people who are on your team?  Is it based on experience --

THE COURT:  Please, you are an attorney.  Let's not

try and cut corners by you testifying.  Just ask the open ended

question, please.

Q.   How is it that you go about picking the people on your

team?

A.   You look for people with expertise in the area that you're

interested in.  And then you get, like any other position, you

work to see what their backgrounds are.

Q.   On direct examination, you had testified about the process

in general that a researcher would go through in order to

submit a grant proposal, and you talked about an idea.  So can

1   you tell us just in a very general sense what that process is

2   starting with the idea until like the day you submit the grant

3   proposal?

4   A.  Well, you have a question.  You start with an idea which is

5   fundamentally a question.  And the question is if I -- is there

6   a particular gene that's causing a person with an arthritis to

7   get worse.  And so then you frame -- you frame a grant, which

8   says what several things would I have to test and do in order

9   to answer that question.  So you set a hypothesis.  You say, in

10  order to answer that question, I'm going to look at this gene

11  is going to cause that.

12          Then you write a 25 or now a 12-page document that

13  takes you several months.  It is a very arduous process.  And

14  you write a grant, you involve other people with expertise that

15  add value to your grant, and then you submit it.  And you write

16  your approach, how you're going to do it, what tests are you

17  going to do, how are you going to analyze it, what are the

18  statistics, and you submit it.

19          The process is arduous.  So as we speak, I have a

20  grant that study section I submitted in December or February.

21  And that grant took me six months to write.  So these are not

22  easily done.  And then the data, right now it is only a

23  10 percent chance that that grant will get funded, in which

24  case you have to go back and get more data and resubmit it.

25          So it's not, it is a -- it takes a lot of -- robust

G6F3TSE4                        Abramson - cross

 1   data.  You can't just say I have a great idea and I am going to

 2   write it up and get a grant.  There is a lot that goes into it.

 3   Q.  After you have the idea but before the grant, do you use

 4   the laboratory to conduct some kind of experiments?

 5   A.  You always need preliminary data.  And your data has to

 6   show that the idea that you have, there's some semblance of an

 7   indication that that's the right direction to go or that you

 8   can answer your question.

 9   Q.  Is there ever an occasion where a research faculty member

10   would go into the laboratory without a specific idea or

11   hypothesis?

12   A.  In anticipation of writing a grant?

13   Q.  Right.

14   A.  Can't do it.  I mean, the grant, you have to write an

15   introduction of why this is an important area and what adds --

16   what question are you going to answer and what approach are you

17   going to take and what preliminary data that you have to

18   justify that you can do it.  And then you have enough expertise

19   on your end to answer your question.

20   Q.  Does a researcher always need new preliminary data or are

21   there times that they use past preliminary data that they might

22   have used in the past six months, year, whatever the time

23   period may be?

24   A.  Usually the preliminary data can be anywhere up to a year

25   in the past, typically.  Because, remember, it takes months to

1    write these grants.

2    Q.  Can you please look at, it is in front of you, Plaintiff's

3    Exhibit 10.  I'm going to ask you to turn to the page which has

4    the Bates number in the bottom corner of 3086.  Specifically,

5    it would be policy BC number five entitled "safe harbor."  Do

6    you see that?

7    A.  I do.

8    Q.  As someone who participated in the drafting of that

9    document, what is a safe harbor provision?

10   A.  So this was an attempt to address the difficulty, the

11   cycling the people have in the course of their grants.  You

12   might go without a grant for a year.  And we didn't want to

13   have salaries lowered or have consequences for someone who is

14   in a sustained period of funding.  So therefore you would not

15   have the initiation of salary reduction.

16           Again, as we spoke before, this applies not -- on this

17   point, that this applies, predominantly this applies to tenured

18   faculty members.  What trumps this paragraph in a non-tenured

19   situation, if there are no moneys to support somebody, even if

20   they've had several years of funding up to the safe harbor

21   baseline, if there is no moneys available to the division, to

22   the director, that director, because the non-tenured faculty is

23   at will, will give three months' notice, if necessary.  We try

24   to maintain people though.

25   Q.  So, does this provision relate, as it says, only to a

1    protection from salary or does it relate to a protection for

2    continued employment?

3    A.   This only has to do with salary.  And remember, again, this

4    was conceived of for tenure.  So these people are by definition

5    continually employed.  The question is can you lower their

6    salaries with a tenured situation.

7              THE COURT:  Dr. Abramson, is there anywhere in this

8    document that indicates that this applies only to tenured

9    faculty?

10             THE WITNESS:  Yeah, in this document, as we said

11   earlier, there is this clause at the discretion of the chair

12   salaries -- the REF, I forget where it was.  But, we allowed

13   chair discretion for non-tenured faculty.

14             THE COURT:  My problem is that you and others have

15   testified about tenured versus non-tenured faculty.  But to

16   someone who is just reading this for the first time, it is not

17   clear at all what applies to only tenured faculty and what

18   applies only to non-tenured or what applies to both.

19             So I'm asking if somebody picks this up or it is sent

20   to them, how are they supposed to know what applies to them and

21   what doesn't?

22             THE WITNESS:  Right.  So I think it was sort in

23   answer -- so the way the school and the departments and the

24   majority of faculty know this, but it doesn't directly answer

25   your question.

G6F3TSE4                         Abramson - cross

1          What trumps this document, is the fact that

2    non-tenured faculty don't have a guarantee of sustained

3    funding.  Meaning that you could let a person go with proper

4    notice, with three months.  So that's -- that's basically based

5    on the documents, the bylaws of the school, that non-tenured

6    faculty -- which is why we send these letters out every spring

7    that if you have a non-tenured faculty member, give them three

8    months' notice.

9          THE COURT:  So then this doesn't apply to non-tenured

10   people?

11         THE WITNESS:  This document does not apply to

12   non-tenured faculty.

13         THE COURT:  Then if it were sent to a non-tenured

14   person, would they not have an expectation that it did apply to

15   them?

16         THE WITNESS:  If they weren't aware of the other

17   policy, which is that most -- the majority of non-tenured

18   faculty members know that they serve in this notion of an

19   annual reappointment.  And they are not guaranteed for salaries

20   for two years, as an example here.

21         THE COURT:  It leaves a lot to chance.  Maybe they

22   need to go to law school before they go to medical school or to

23   get their graduate degree in science.

24         THE WITNESS:  The only difference is, the reason that

25   tenure is so coveted at all schools, is people know that you're

1     not subject to being released after a year or less in fact.

2     That is embedded in the whole notion of getting tenure, versus

3     not having tenure.  At NYU, the faculty at NYU know they get

4     reappointed each year in September.  In these years, there used

5     to be an annual letter, as I recall it, that went from the

6     provost of the university to every faculty member that says you

7     have been reappointed for this coming academic year.  And

8     therefore, you needed to be reappointed in order to stay on in

9     employ.

10              If you're tenured, that letter didn't mean anything

11    because you were hired in perpetuity, as it were.

12              So everybody knew, so it was -- it would be fair to

13    say that if a non-tenured person knew they had annual -- people

14    who were not tenured knew, certainly should have known, that

15    they had an annual letter from the university saying

16    congratulations, you are hired again for the coming year.  And

17    that they were not guaranteed annual reappointment.

18              In fact, the reason that letter goes out in the spring

19    is we try as best we can to give at least three months' notice,

20    and where possible, synchronize it with the academic year of

21    appointment, September 1st.

22              That was the baseline, in my view, community knowledge

23    and standard before we came along with this document.  And this

24    document was then intended primarily for tenured faculty.

25    Q.  Dr. Abramson --

1          MR. CERASIA:  Are you done, your Honor?

2          THE COURT:  Yes, I am.  Thank you, Mr. Cerasia.

3   Q.   What is the faculty senators council?

4   A.   So, the governance, there is a faculty council at the

5   medical school, which has about 25 representatives from each of

6   the departments in the school.  And that's separate from NYU

7   the Washington Square, the university has a faculty senate.

8   And there is a small group or larger group, in fact, of

9   senators who sit on the senators council.  So processes are

10  reviewed by each of these bodies, these faculty bodies.

11  Q.   Are you aware of the faculty senators council in the school

12  of medicine ever raising any concerns that sometimes documents

13  aren't clear as to whether there are tenured or non-tenured --

14  or whether or not they're applicable to tenured or non-tenured

15  employees?

16  A.   It hasn't come up at the faculty council to my knowledge,

17  per se, until recently.  So there is a big discussion at the

18  university because of the adjunct so-called contract faculty.

19  And what the rights are of contract faculty at New York

20  University.  So, only in the past year have been a movement to

21  create protection for contract adjunctive faculty, and this

22  year for the first time they formed a senate, they became part

23  of the faculty senate council.  And at the medical school we've

24  had tenured and non-tenured faculty members represented on the

25  faculty council for years.  I'm not sure if that answers --

1          MR. CERASIA:  May I approach, your Honor?

2          THE COURT:  Certainly.

3     Q.  I am going to show you what Dr. Tse identified as

4     Plaintiff's Trial Exhibit 44.

5          MR. CERASIA:  May I stay up here, your Honor?  I don't

6     have another copy of it.

7          THE COURT:  Yes.

8     Q.  Have you seen that before?

9     A.  I may have, but I honestly don't recall specifics on it.

10    This is 2008, right?

11    Q.  Right.

12    A.  Okay.

13    Q.  So you don't know if you've seen it?

14    A.  I don't recall having specifically seen this document.

15    Q.  Okay.  I'll take it back then.  Thanks.

16         You were asked some questions on direct examination

17    that dealt with the term "reasonable accommodation."  Do you

18    remember those questions?

19    A.  Hmm-hmm, yes.

20    Q.  Within the school of medicine, are you the person who has

21    any responsibility for providing for reasonable accommodation

22    of those employees who are deemed disabled under the employment

23    laws?

24    A.  No, that's not the kind of situation that comes to my

25    office, which is more grievances of faculty, grievances related

1   to promotion for example.  Disability typically goes through

2   the HR department.

3   Q.  Thank you.  I think you have in front of you, too, if you

4   look at Plaintiff's Exhibit 13.

5   A.  Okay.

6   Q.  Which would be a June 8, 2007, memorandum that you sent to

7   department chairs?

8   A.  Hmm-hmm.  Yes.

9   Q.  A couple of minutes ago you testified to a three-month

10  notice that is usually given to non-tenured faculty members to

11  let them know that their employment is going to end?

12  A.  Hmm-hmm.

13  Q.  Is that the document that you're referring to?

14  A.  Yes.  And this is an important document because it does

15  refer to the bylaws regarding non-tenured faculty in the

16  handbook.  And so we -- our understanding, our approach has

17  been to give a minimum of three months, simply acting in good

18  faith with people.  There's no specific amount.  We try to

19  coordinate that with September 1st, but our lawyers don't feel

20  that we are obliged to do so.

21          MR. CERASIA:  Your Honor, may I have a minute because

22  I think I'm finished.

23          THE COURT:  Certainly.

24          MR. CERASIA:  Thank you.  I don't have any other

25  questions at this time, thank you.

G6F3TSE4                          Abramson – redirect

1              THE COURT:  Thank you, Mr. Cerasia.

2              Dr. Tse, do you have any questions that are limited to

3    what Dr. Abramson just testified about when he was examined by

4    Mr. Cerasia?

5              MS. TSE:  Yes, I do.

6              THE COURT:  Okay.

7    REDIRECT EXAMINATION

8    BY MS. TSE:

9    Q.  First of all, Dr. Blaser's expectations of 100 percent REF

10   for research faculty in his department.  And should Dr. Blaser

11   have informed the research faculty members exactly that that's

12   what was expected of them?

13   A.  I don't know that he's under any school-wide obligation to

14   have that specific discussion.

15   Q.  How were those research faculty members expected to know

16   what the department chair considers appropriate job

17   performance?

18   A.  Well, you know, I think when you look at even this

19   document --

20             THE COURT:  When you say "this document."

21             THE WITNESS:  I apologize.  The expectations for

22   funding for research faculty.

23   A.  If someone is bringing in research, and coming close to the

24   60 percent or more, it's one kind of discussion with a faculty

25   member.  If someone is not getting any grants, and only has

1    5 percent funding, it really puts a lot of stress on the

2    department chairs to know what to do.  And that's when these

3    conversations often happen.  But not abruptly.  I'm sure in

4    this case there were conversations between yourself and

5    Dr. Blaser about how to find collaborations, how to increase

6    the extramural funding via collaboration with other scientists.

7            So, you know, I think it's really when things get down

8    to that kind of level that it becomes a crisis, both for the

9    individual and the department, frankly.

10   Q.  You just stated and very, very clearly, as to what the

11   grant application process was about.  First of all, it would

12   take several months, it's arduous, and it's robust and

13   preliminary.  Dr. Tse found herself losing 65 percent of her

14   REF.  So according to your testimony, would it take at least

15   one year, if not more, for her to replace that?

16   A.  With NIH funding that's possibly so.  Depends on whether

17   one is collaborating with other scientists, that could

18   accelerate that.  So the way that most people would try and do

19   it while they're trying to get their own data, is to bring

20   their expertise to collaborators, and have 15, 20 percent on

21   other people's grants, multiple grants, to get up towards the

22   60-plus percent.

23   Q.  I'm referring you back to Exhibit 11, I don't know whether

24   you still have it in front of you.

25   A.  I do.

1    Q.  That's the Reibman-Tse collaborative in response to the

2    RFA.  Can you explain to the Court what an RFA is.

3    A.  It's a request for applications by the NIH soliciting

4    specific areas of study.

5    Q.  And chances of funding are a little bit better than

6    10 percent compared to other NIH applications?

7    A.  It depends on the NIH institute.  It varies.

8    Q.  Section 11, the descriptive title of the project.  "Injured

9    vaginal mucosa and D.C. promotion of H.I.V. transmission."

10           Do you know Dr. Reibman as someone who works on

11   vaginal mucosa or H.I.V. transmission?

12   A.  Dr. Reibman works on epithelial cells, which are another

13   kind of mucosal tissue.

14   Q.  Is this the sort of collaboration that you were referring

15   to?

16   A.  Well, it could be.  I mean, my question, obviously, this is

17   an RFA a while back.  Was it funded?

18   Q.  The RFA was dated July 2010.

19   A.  Hmm-hmm.  Did it get funded?

20   Q.  It was not funded, and the investigators were not notified

21   until November 2010.  Besides the one year that you just stated

22   with a lot of arduous effort and robust preliminary data that

23   one is expected to put together an application, particularly

24   one for the NIH, let's say Dr. Tse was not removed as the flow

25   cytometry core director.  Would she find out in a month or less

1    that she would lose her funding from the NIH?

2              And just to make it clear to the Court.  If you have

3    an ongoing funded project, and you apply to renew it, and the

4    NIH said "no, not approved," what is the time period between

5    getting the notice that you're going to lose your grant, you're

6    going to lose your extramural support, to the actual time that

7    the grant itself would run out?  It's not a month before the

8    grant would run out.

9    A.  It really depends, frankly, when you submit the grant.  So

10   I'm not sure exactly what the question is, but typically if you

11   put a grant in and you find out that it's not funded, in a

12   funding range, you'll find that out within a few weeks of the

13   study section.  Then you have the opportunity about five months

14   later to resubmit the grant.

15             I think what's important to note since you brought

16   this up, putting in a grant is different from getting a grant

17   funded.  Being a primary investigator, PD, PI in a grant that's

18   not funded doesn't mean one is a funded investigator or

19   fundable investigator.

20             So I think one has to look at this kind of document in

21   this context and say, the grant wasn't funded.  And why does

22   this document then say that there is a qualification to get a

23   funded grant.

24   Q.  What I was more or less trying to establish is --

25             THE COURT:  No, no.  Put a direct question to

1    Dr. Abramson based on his last answer, if that's what you want

2    to do.  But don't say what you're trying to establish.

3    Q.  In the case of the Reibman-Tse application, it was

4    submitted July 2010.  It was a new application, rather than

5    what is known as a renewal.  You find out essentially four

6    months later and RFAs -- would you confirm for the Court that

7    one of the features of an RFA is what they call a fast track in

8    terms of review and notification of award or no award?

9    A.  Yes.  An RFA is usually not resubmittable.  They're a

10   one-time effort by the NIH to bring in applications and not

11   like typical R01s, you can't typically respond to the comments

12   and submit it again six months later.

13   Q.  This particular RFA, in the RFA itself was resubmittable as

14   an R01.  When would the next resubmission deadline be for when

15   you find out that the grant that you submitted is not funded?

16   We are looking at November 2010.

17   A.  October, November, yeah.

18   Q.  When can you put in a resubmission?

19   A.  As I say, sometime -- it's either October or November.

20   Depending on the cycle.

21   Q.  Yes.  But you didn't find out until November.  As a matter

22   of fact, you know, it was pretty much in the second half of

23   November that your grant did not get funded, and you need to

24   put in a reapplication and address the NIH reviewer critiques.

25   Do you remember off the top of your head perhaps what the next

1    reapplication cycle would be?

2    A.  Typically February.  Typically February.

3    Q.  Since I have the document here as an exhibit, it's actually

4    for reapplication March 2011.

5    A.  Hmm-hmm.

6    Q.  Dr. Blaser notified Dr. Tse January 4, 2011, that her

7    appointment would be terminated.  And after receipt of that

8    notification, she would not have be able to do a resubmission.

9    Is that right?

10          MR. CERASIA:  Objection.  I don't know if she is

11   saying that's what Blaser told her or she's asking whether or

12   not after she gets notice she can resubmit something.

13          THE COURT:  Yes.

14          MS. TSE:  I will rephrase.

15   Q.  Dr. Tse received a notice from Dr. Blaser January 4, 2011,

16   that her employment at NYU or appointment as a research faculty

17   member would be terminated April 4, 2011.  Would she be able to

18   resubmit this grant with Dr. Blaser?

19   A.  Well, the answer is no.  But oftentimes chairs had to make

20   a decision of the likelihood of a grant getting funded.  And if

21   there has been no funding previously on this kind of grant,

22   then I would ask was the grant funded depends on the grant's

23   score.  Do you know what the score of the RFA was?

24   Q.  I don't recall.

25   A.  Was it scored?

1   Q.  I don't recall.

2   A.  Because sometimes putting in a grant doesn't mean that

3   you're close to ever getting that grant.  So grants are funded

4   on a scale of one to 100.  And anything above a 40 is sometimes

5   they're not even reviewed.  So, that one has to -- frankly,

6   Dr. Blaser had the right to make any decision that he wanted.

7   But sometimes the decision is made based on the review of the

8   grant that one might like to put in.

9              So if the grant was poorly scored or not reviewed, a

10  judgment could be made that that grant was not going to do

11  better or get funded on a second cycle.

12             So again, I don't know how he was evaluating the

13  decision, but, we have sometimes made a decision that a grant,

14  just because you can submit it, is not worthwhile to resubmit.

15  Q.  You mentioned application from non-NIH sources.  Can you

16  explain to the Court why NIH sources would be preferrable?

17             THE COURT:  Wait.  Was this on the examination by

18  Mr. Cerasia?

19             MS. TSE:  Yes, yes, because it was mentioned that

20  there are other sources of funding.  Like foundations and --

21             THE COURT:  That was on your direct.

22             MS. TSE:  Was it?  All right.  Then I won't ask the

23  question.

24             THE COURT:  Do you have anything else?

25  Q.  Do you recall off the top of your head pretty much from

G6F3TSE4                      Abramson - redirect

1   your own funding experience when NIH will not renew a project,

2   do you get more than three months' notice?

3   A.   The cycles are pretty much the same, to my knowledge.  The

4   cycle's twice a year you can put grants in.  If you don't do

5   well on one, you can come back six months later.  And it

6   doesn't matter whether it was a non-renewal, non-competitive

7   renewal, or a new grant.

8   Q.   Let's just say, take for example the CFAR grant.  We

9   received notice December 2009 that it was not approved for full

10  funding.  But, whatever funds that were awarded would not run

11  out until June 30, 2010.  So in essence, you would know six

12  months ahead of time what you have to deal with.  Is that

13  pretty typical?

14  A.   CFAR grants are very different, so I can't say what's

15  typical for a CFAR grant.

16  Q.   But, with an R01 is that timeline pretty much the same?

17  A.   Repeat the timeline because I forgot.

18          THE COURT:  Let me just ask where are you going with

19  this.

20          MS. TSE:  I'm going with, essentially, the three

21  months' notice that Dr. Tse had from the time she was removed

22  as the core to termination of her funding from the core.

23  April, May, June.  And it wasn't -- actually, it was not even

24  three months.  All right.  She was notified in March, and her

25  salary would be supported through May 31.  So, essentially,

1    that is at best three months' notice.

2          And my question to Dr. Blaser is would a principal

3    investigator have more notice that they're not going to be

4    funded.  They're not going to have any extramural funding.

5          MR. CERASIA:  Objection, your Honor.  Because the

6    removal of her as the core director by CFAR was an internal NYU

7    decision.  The NIH didn't do it and didn't say, hey, you're

8    being removed as core director, we're taking your funding away.

9    It was NYU who said you are being removed as core director, you

10   will not get the funding associated with core director from

11   April 1 to May 31.  These are two different concepts.

12         THE COURT:  I tend to agree with Mr. Cerasia.  Do you

13   have anything else for Dr. Abramson?

14         MS. TSE:  No.

15         THE COURT:  Based on -- no?  All right.  Do you have

16   anything?

17         MR. CERASIA:  I hope I have one question.

18   RECROSS EXAMINATION

19   BY MR. CERASIA:

20   Q.  Dr. Abramson, on redirect you referred to a non-tenured

21   research faculty member who works in collaboration who gets

22   15 percent here and 15 percent there and then it all adds up to

23   above 60 percent.  Do you remember that?

24   A.  Hmm-hmm.

25   Q.  Are you aware of any non-tenured research faculty member

G6F3TSE4

 1  who is self-supporting of his or her salary in the sense that

 2  they receive their own grant money from their own grants that

 3  they submitted?

 4  A.  I'm not aware of anyone.  That kind of person is typically

 5  on a tenured track.  I'm not aware of anyone in the medical

 6  school doing basic science who is fully funded on their own

 7  grants.  Those folks who are not fully funded are collaborative

 8  scientists and on other people's grants or running core

 9  facilities or having some administrative role in the medical

10  school, teachers and whatnot.  But no one meets that kind of --

11  100 percent funding.

12            MR. CERASIA:  Thank you.

13            THE COURT:  All right.  Dr. Abramson, thank you so

14  much for your time.  You are relieved.

15            THE WITNESS:  Thank you very much.

16            (Witness excused)

17            THE COURT:  Mr. Cerasia, the Court is in receipt of

18  your e-mail about the scheduling.

19            MR. CERASIA:  Yes.

20            THE COURT:  It is fine with the Court for us to

21  reconvene on Tuesday, the 21st, at 10 a.m.  And based on what

22  is before the Court now, Dr. Tse will testify at that time.

23  Does anyone want to raise with the Court the possibility of

24  additional witnesses that you want to call?

25            MS. TSE:  If there are no further issues or fact

G6F3TSE4

1     finding that is needed, regarding Tse's Unum applications, then

2     I do not feel the need to call additional witnesses.  But if

3     Mr. Cerasia does, then given that Ms. Meagher cannot mobilize,

4     perhaps he can look into an assistant that she feels would be

5     able to answer the questions that may come up.

6              THE COURT:  Well, did you yourself work with

7     Ms. Meagher about this?

8              MS. TSE:  Oh, yes.

9              THE COURT:  Well, then I don't know that anybody who

10    wasn't involved could be helpful.  It would be really what they

11    were told by Ms. Meagher.

12             MS. TSE:  What I'm referring to, your Honor, is the

13    Unum application portions itself.  Not issues specific to

14    myself.

15             THE COURT:  But that would be what would be relevant

16    for me.

17             MS. TSE:  I did find and it was disclosed in discovery

18    a series of e-mails between myself and Ms. Meagher that would

19    be supportive evidence.

20             THE COURT:  Are they already in evidence?

21             MS. TSE:  No, no.  It's after your Honor's

22    instructions to look for what we need.  I found the e-mails and

23    I believe that they were submitted during discovery and also

24    during Tse's counsel Risman in her response to summary

25    judgment.

1          THE COURT:  All right, then, if you plan on admitting

2     them, please make sure that Mr. Cerasia has a copy of them in

3     advance so he knows what it is that you want to put in.  And

4     that will hopefully resolve any issues about their

5     admissibility.

6          MS. TSE:  Yes.  Can I e-mail them both to the Court

7     and copy that to Mr. Cerasia, would that be appropriate?

8          THE COURT:  Yes, that would be fine.  Mr. Cerasia,

9     anything else?

10          MR. CERASIA:  First of all, thank you, your Honor, for

11     the courtesy on the scheduling.

12          As to the LTD, it would be helpful if I could get

13     these documents by the end of the week.  I don't really know

14     what the issues are that Dr. Tse believes to be in dispute with

15     respect to her LTD application.  And if there is some way she

16     could tell me, maybe we could stipulate.  Because I don't

17     really see much in the way of a dispute.

18          The applications were submitted, Unum conducted

19     whatever it does on its own, because it is a third party, and

20     then eventually issued a determination.

21          So, I really don't understand what's in dispute and

22     I -- Ms. Meagher, we've tried to contact, I believe she's now

23     out.  She was out of the office yesterday and Mr. Dreisen

24     wasn't able to reach her.  If there is not a dispute and it is

25     something we could stipulate to, that might be the most

G6F3TSE4

1    efficient way.  But I don't know what the dispute is right now.

2              MS. TSE:  Issues came up yesterday on the requirements

3    for six months salary continuation.  And --

4              MR. CERASIA:  That's not Unum.  The six months salary

5    continuation is something she addressed under the faculty

6    handbook.  So it would be really helpful because I think we

7    could be efficient about this if I knew what the issue was.  If

8    it's something that she says Ms. Meagher did or didn't do, that

9    would be helpful to me.

10             MS. TSE:  I was directed by Ms. Meagher -- I'm sorry.

11   I didn't mean to interrupt.

12             MR. CERASIA:  What we have right now in the record is

13   Dr. Tse writes, has communications starting in I think it's

14   April with Mr. Odom who then refers her to Ms. Meagher on

15   May 13, which I don't remember the exhibit number, she wrote to

16   Dr. Blaser, and then on May 18 she submitted the Unum form.

17   About eight to 10 days later I think the employer, NYU,

18   submitted its form, and then the next thing we saw in evidence

19   was Unum issued its determination letter in the spring of 2011.

20   I just don't know what the dispute is.  And if there is a way

21   that your Honor can ask Dr. Tse to narrow it with me over the

22   next two days, that would be great, and maybe we could come up

23   with some kind of stipulation, even under the e-mails that

24   she's referring to.  I'm trying to fill a hole but I don't know

25   what the hole is.

G6F3TSE4

1          THE COURT:  Exactly.  And you are at a disadvantage

2     because you have not had the opportunity to hear Dr. Tse's

3     testimony, although quite frankly, I think that she has been

4     testifying since day one.

5          But what she puts in as her testimony, and you will

6     obviously have a chance to cross-examine her on that, Dr. Tse,

7     is there an issue that you see relating to the Unum

8     application?

9          MS. TSE:  The issue was the request for long-term

10    disability which was very specific in my May 2010 letter to

11    Dr. Blaser.  And in the same letter, I articulated to him why I

12    need to go on long-term disability because I cannot fulfill the

13    expectations of my job without assistants.

14          And I believe, and I think I'm right on that, that the

15    issue of long-term disability leave came up.  And that it had

16    something to do with Unum.  And I myself was very confused

17    about how that came up.

18          But, the e-mails which I can send by e-mail tonight to

19    both the Court and copy it at the same time to Mr. Cerasia,

20    simply a string of e-mails between myself and Ms. Meagher,

21    because I applied for long-term disability leave on her

22    instruction.  Right.  She was the one who said as part of the

23    process to receive long-term disability benefits under Unum,

24    you have to ask long-term disability leave from your department

25    chair and from there it will go on to Dr. Abramson, and from

1    there, to the provost if they consider that necessary.  And

2    that's how that came about.

3              Now, if your Honor considers that insignificant or

4    irrelevant, then there is no need for me to submit that into

5    evidence or even submit it for the Court's consideration.

6              THE COURT:  I am not sure why it would be relevant

7    until you give me more information about is there an issue

8    about how you wound up applying?  Was it some misunderstanding

9    about what you were applying for?  I'm not exactly sure what

10   your position is in relation to this.  Are you suggesting that

11   you were not aware that the disability was through Unum?  I'm

12   not sure --

13             MS. TSE:  No.  The issue came up, I believe, with my

14   letter to Dr. Blaser.  That I was asking him for long-term

15   disability leave.

16             THE COURT:  I believe it was -- hold on one second.

17   You were asking for 65 percent.

18             MS. TSE:  Long-term disability leave and, actually,

19   more than one issue came up.  First, between Dr. Blaser and

20   Mr. Odom, they cannot confirm that Unum allows just 65 percent,

21   or rather, benefits pertaining only to 65 percent of the

22   insurer's income.  I believe that I brought up, which was an

23   exhibit in evidence, that as long as the employee's salary

24   falls below 20 percent, your insurance benefits can kick in,

25   and Mr. Odom was unable to confirm that.  And that was when we

G6F3TSE4

 1  said --

 2              THE COURT:  Could you refer me specifically to that?

 3  I remember seeing it, but I'm not sure which number it is.

 4              MS. TSE:  Sure.  All right.

 5              MR. CERASIA:  20, your Honor.

 6              MS. TSE:  Yes, that would be right.

 7              MR. CERASIA:  It is Unum's definition of disability.

 8  It's on 20 and it's page four of the letter.

 9              MS. TSE:  NYU 000900.

10              MR. CERASIA:  There is actually an "and" in there.

11              MS. TSE:  An "and"?

12              MR. CERASIA:  The definition of disability under the

13  Unum policy says:  You are limited from performing the material

14  and substantial duties of your regular occupation due to your

15  sickness or injury and you have a 20 percent or more loss in

16  your index monthly earnings due to said sickness or injury.

17              THE COURT:  So what was the question that you had?

18              MS. TSE:  I asked on direct Mr. Odom to confirm that.

19  Pretty much you do not need to be totally disabled.  You can

20  work up to 79 percent, not losing 79 percent of your salary and

21  still qualify for disability benefits.  And his response was

22  that he's not clear on that.  And the only person who would be

23  clear on that would be either Ms. Meagher or somebody she

24  considers under her supervision knowledgeable enough to provide

25  that answer.  If your Honor does not consider that

G6F3TSE4

1    significant --

2              THE COURT:  No, no, did you ever get an answer?

3              MS. TSE:  No, I didn't get an answer from Mr. Odom.

4    Because --

5              THE COURT:  I'm talking about -- forget the testimony.

6    I'm trying to get factually what happened here.  Did you have a

7    discussion about the definition of disability with someone?

8              MS. TSE:  With Ms. Meagher, because she was the one

9    who stepped me through the entire process.

10             THE COURT:  Is that after or before you asked for

11   65 percent disability?

12             MS. TSE:  At the same time.

13             THE COURT:  All right.  I can't tell what's relevant

14   and what's not relevant.

15             MR. CERASIA:  I'm not asking for relevance or not

16   relevance.  I just don't know what the issue is.

17             THE COURT:  I think that is part of my problem.  I am

18   trying to figure out from Dr. Tse what her issue is relating to

19   either disability benefits or to accommodation or what needs to

20   be explored here.  I don't know.

21             MR. CERASIA:  This is what I think happened.  When she

22   was removed as the core director, there are e-mails which said

23   I'm losing 65 percent of my salary.  So come June 1, I'm only

24   going to get paid 35 percent.  That wasn't the reality.  We

25   know she got paid 100 percent of her salary all the way

G6F3TSE4

1    through.

2            THE COURT:  She didn't know that was going to happen

3    because no one bothered to tell her.

4            MR. CERASIA:  But at some point in June she got her

5    paychecks at the very least, right, so she saw she got

6    100 percent.  I just don't know if it's in issue.  That's what

7    I'm saying.  I don't know that we have to bring in a woman who

8    is having mobility problems and is out of work.  If she has to

9    come in, she has to come in, we understand that.  I just don't

10   know what the issue is.  There doesn't seem to be a dispute to

11   me.

12           THE COURT:  The issue --

13           MR. CERASIA:  Because I don't understand.

14           THE COURT:  I'm not sure how we go from accommodation

15   to disability.  And I was hoping that someone could give

16   testimony or produce evidence that would show how the focus

17   shifted from accommodation to disability.  And all I get so far

18   is that when they were talking with Dr. Tse, that disability

19   was raised as a possible, but I don't know how, when, I don't

20   know if there were specific accommodations discussions.  It is

21   not clear.

22           But you know something, I am not ordering anybody to

23   produce any evidence that they are not feeling is necessary.  I

24   have expressed concerns.  If it is not a concern of the

25   parties, I will deal with the evidence that I have.  All right?

1          MS. TSE:  The reason why the disability benefits came

2     up was because NYU argued in their JPTS statement that they

3     considered facilitating Tse's application for disability

4     benefits a form of reasonable accommodation.  That is the

5     context in which the Unum disability benefits and the

6     application process, that was framed to address that.

7          And you know, I just stated very clearly, that there

8     is no need, first of all, for Ms. Meagher to come in because I

9     do have evidentiary material that was disclosed, Bate stamped,

10    submitted earlier in this case, that I at least would find

11    adequate.  And because there is this string of e-mails, there

12    is really no need to drag Ms. Meagher in here and make her

13    pretty much reiterate what the e-mail clearly showed had

14    happened.

15         And the other thing is that if that is not adequate,

16    then there's no problem with asking Ms. Meagher to delegate

17    somebody who was under her supervision, Janice Bailey who

18    signed NYU's part of the application, if she is still working

19    at NYU, would be very suitable.

20         But for my part I am not insisting to bring

21    Ms. Meagher in.

22         THE COURT:  I understand that.  I'm not dealing with

23    whether Ms. Meagher has to come in or not.  My question is,

24    what is the issue in terms of accommodation versus disability.

25         MS. TSE:  If I may be allowed one minute, your Honor.

1          THE COURT:  Let Mr. Cerasia, who has been extremely

2     patient.

3          MR. CERASIA:  The way Dr. Tse phrased this, I think,

4     your Honor, becomes a legal question and a legal issue.  And

5     that is whether or not as part of an interactive process an

6     employer offers somebody to apply for disability is in and of

7     itself one form of reasonable accommodation.

8          THE COURT:  All right.

9          MR. CERASIA:  That become a legal issue and not a

10     factual issue.  The second point is you may recall, your Honor,

11     Reggie Odom testified Ms. Meagher had nothing to do with the

12     interactive process of reasonable accommodation.  She was just

13     an LTD person.  If we're going to spend an hour or two hours on

14     LTD issues, I think the way Dr. Tse is framing it --

15          THE COURT:  The question the Court has does it have

16     enough factual information to make that determination.

17          MR. CERASIA:  I do understand that, Judge.

18          THE COURT:  Okay.  Let's just leave things open.

19          The next thing that happens on the 21st of June,

20     Dr. Tse, you will testify, you will be cross-examined.  After

21     that, let's see where we are.  Because I'm at a loss too.  I

22     don't have all the factual information, because I'm missing the

23     testimony of Dr. Tse.  I may not have a problem after I get

24     that.  I may have more problems after I get that.  But let's

25     not get there until after the testimony.  All right?

G6F3TSE4

1          So you all should be in touch over the weekend in

2     terms of getting these additional e-mails in the event that

3     they are necessary or would be relevant.  And I will look

4     forward to seeing you 10 a.m. Tuesday, the 21st of June.

5          MR. CERASIA:  Thanks.  I have one just procedural

6     issue.  Is Dr. Tse when she testifies, will she be asking

7     herself questions?  I want to understand how I will be able to

8     object.  Or will she give a narrative.

9          THE COURT:  She will give a narrative.  She will give

10    a narrative.  You will be able to cross-examine her on the

11    narrative.  And then you will be able, after the fact, to say

12    whether or not you see -- there aren't going to be questions to

13    object to.  It doesn't make sense for her to sit there and pose

14    a question and then answer it.

15         MR. CERASIA:  I'm asking, Judge.  I've seen it both

16    ways with pro ses.  That's why I'm asking.

17         THE COURT:  I think we would be better off with a

18    narrative and weaving in documents to support what her

19    narrative is, and then we'll see from there.

20         Well, I could ask Dr. Tse, how would you prefer to

21    proceed?  Would you like to ask yourself questions and then

22    answer them?

23         MS. TSE:  I have given it some thought.  But I think

24    I'll be comfortable with whatever your Honor thinks would --

25         THE COURT:  Then let me suggest this.  Let's start out

G6F3TSE4

1   with the traditional questions to which an objection can be

2   raised and I have to rule and then you can answer or not.  And

3   if this gets too cumbersome let's consider plan B.

4               MS. TSE:  Okay.

5               THE COURT:  All right?

6               MS. TSE:  All right.

7               MR. CERASIA:  Thank you.

8               MS. TSE:  Once again, I have your permission to e-mail

9   the --

10              THE COURT:  Additional documents, yes, yes.

11              MS. TSE:  Thank you, your Honor.

12              MR. CERASIA:  Your Honor, may I still store things

13  here until Tuesday or may I take them?

14              THE COURT:  Sure.  It will be fine.

15              MR. CERASIA:  Thank you.

16              (Adjourned until June 21, 2016, at 10 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                      Page

STEVEN ABRAMSON

Direct By Ms. Tse . . . . . . . . . . . . . . 249

Cross By Mr. Cerasia . . . . . . . . . . . . 320

Redirect By Ms. Tse . . . . . . . . . . . . 331

Recross By Mr. Cerasia . . . . . . . . . . . 339

                    PLAINTIFF EXHIBITS

Exhibit No.                                      Received

 43    . . . . . . . . . . . . . . . . . . . 249

 7   . . . . . . . . . . . . . . . . . . . . 271

 37    . . . . . . . . . . . . . . . . . . . 292

 39    . . . . . . . . . . . . . . . . . . . 310

 42    . . . . . . . . . . . . . . . . . . . 314