G6N3TSE1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DORIS TSE,

                Plaintiff,

           v.                          10 Civ. 7207 (DAB)

NEW YORK UNIVERSITY,

                Defendant.

------------------------------x
                                        June 23, 2016
                                        10:00 a.m.
Before:

                    HON. DEBORAH A. BATTS,

                                        District Judge

                            APPEARANCES

DORIS TSE, Pro Se

CERASIA & DEL REY-CONE, LLP
      Attorneys for Defendant
BY:  EDWARD CERASIA, II
          – and –
      DANIEL T. DREISEN, in-house counsel, New York University
```

G6N3TSE1

1           (Trial resumed)

2           THE COURT:  Mr. Dreisen, how are you feeling?

3           MR. DREISEN:  Very well, thank you, your Honor.

4           THE COURT:  Dr. Tse, how are you feeling?

5           MS. TSE:  I'm much better.

6           THE COURT:  Good.  Mr. Cerasia, how are you?

7           MR. CERASIA:  Very well, your Honor, and hope you are

8    too, thank you.

9           THE COURT:  Thank you.  All right.

10          MR. CERASIA:  I just hope this trial ends soon so

11   whatever is going around doesn't get to me.

12          THE COURT:  I guess you're next, right?  Well, we hope

13   not.

14          My schedule today, I have to stop at 2:30.  So we can

15   take two breaks and go until 2:30, if you can do that.  Or, we

16   can go until 1 and then adjourn for the day.  We'll see how

17   we're going and how everybody feels at that time.

18          We are now at the point, Dr. Tse, where you get to

19   testify.

20          MS. TSE:  Yes, your Honor.

21          THE COURT:  Now, I don't know that you need to come up

22   and sit in the witness box in that you're going to make use of

23   your computer.

24          Mr. Cerasia, can you hear Dr. Tse when she sits at the

25   table and uses the microphone?

1          MR. CERASIA:  I can, your Honor.

2          THE COURT:  If you want, you can sit in the jury box

3    so you can see her.  But, I think it probably makes more sense,

4    rather than to have her set up, up here, in a narrower space,

5    that she should be able to testify from her seat at plaintiff's

6    table, if that's all right with you.

7          MR. CERASIA:  That's fine with me.  If she's going to

8    sit there for cross-examination, then I guess I'd move the

9    lectern around.

10         THE COURT:  That --

11         MR. CERASIA:  I'd rather not talk speak to the back of

12   her head.

13         THE COURT:  You are not limited in where you can go.

14         Dr. Tse, you're ready to proceed?

15         MS. TSE:  Yes, your Honor.  Before I start, may I

16   submit the printed copies of the new exhibits to the Court?

17         THE COURT:  Have you given them to Mr. Cerasia?

18         MS. TSE:  I e-mailed him, and because I wasn't feeling

19   up to it, I asked him to print a copy for himself to use today.

20   But these are the printed copies for the Court.

21         THE COURT:  All right.  Mr. Cerasia, do you have them

22   with you?

23         MR. CERASIA:  I do, your Honor.

24         THE COURT:  Okay.  Yes, you may hand them up.

25         MS. TSE:  Thank you.

G6N3TSE1

1          MR. CERASIA:  I only had an issue with one document

2     she submitted, which was part of the long-term disability plan

3     and I raised this with Dr. Tse, it is not the complete plan.  I

4     have the complete plan, but she also just highlighted areas

5     that don't apply to her.  But I'm just trying to speed this

6     along.

7          THE COURT:  You say they don't apply to her because?

8          MR. CERASIA:  Because the plan covers two different

9     groups, it defines them as group one and group two.  Group one

10    is defined as all vice deans and above in active employment,

11    and group two is all regular full-time salary faculty with a

12    base salary of $30,000 or more.  And in her document, she

13    circled or blocked out stuff relating to group one, and I just

14    pointed out to her that she is not a group one person.  But I

15    have the whole plan here.

16         THE COURT:  All right.  Well, to the extent that

17    Dr. Tse's exhibit is incorrect because it doesn't apply to her,

18    I expect you to let me know that, and we'll see whatever the

19    differences are, and deal with that accordingly.  Okay.

20         MS. TSE:  I will make sure to correct that the wrong

21    box was highlighted and a correct box is actually there.  So we

22    won't need any additional pages.

23         THE COURT:  All right.  Dr. Tse.  Are you ready to

24    start your testimony?

25         MS. TSE:  Yes, I am, your Honor.

1              THE COURT:  Please proceed.

2      DORIS TSE,

3          called as a witness by the Plaintiff,

4          testified as follows:

5      DIRECT EXAMINATION

6              MS. TSE:  It will be a question and answer format.

7      And so, first question:  When did you start working at NYU?

8      1994.

9              Did you apply for the position?

10             No, I was recruited by Dr. Valentine to start up and

11     manage a cell sorting lab for the Center for AIDS Research.

12             Was Fred Valentine the director of CFAR at the time?

13             No, that would be David Ho.

14             Was the appointment --

15             THE COURT:  That would be David who?

16             MS. TSE:  Ho, H-O.

17             THE COURT:  Thank you.

18             MS. TSE:  Was your appointment as research assistant

19     professor in the department of medicine?

20             No, it was in the department of pathology.

21             THE COURT:  Let me ask you, Dr. Tse, now that I see

22     the speed with which this is going, Mr. Cerasia has a right to

23     object to questions.  So before you answer, pause a bit in case

24     he wants to object.  All right?

25             MS. TSE:  Understood.

1              MR. CERASIA:  Your Honor, is she reading her answers

2       off of the computer?

3              THE COURT:  I don't know.  She might be.

4              MS. TSE:  I am.

5              THE COURT:  Is that a problem?

6              MR. CERASIA:  It's --

7              MS. TSE:  Because I --

8              THE COURT:  Let me hear from Mr. Cerasia.

9              MR. CERASIA:  Your Honor has seen certainly more

10      trials than I have.  I just never seen a witness read answers

11      at a trial, including a plaintiff or a pro se.  I don't know if

12      it matters at all, but it seems as though it is just very

13      scripted and I guess a narrative.  Just a bit strange to me.

14             THE COURT:  Well, because Dr. Tse is pro se, and

15      because we want this to move as quickly and efficiently as

16      possible, unless you have a particular objection to that

17      format, then I have no problem with Dr. Tse reading her

18      answers.  If you do have a problem, let me know.

19             MR. CERASIA:  Okay.

20             MS. TSE:  Your Honor, thank you, your Honor.

21             The last question was:  Was your appointment as

22      research assistant professor in the department of medicine?

23             No, it was in the department of pathology.

24             Were you informed at the time that it was a

25      non-tenured appointment?

G6N3TSE1                    Tse - direct

1                It is generic to all universities in the United States

2       that research faculty are non-tenured, otherwise my title would

3       be assistant professor.

4                What is the inherent difference between the two?

5                An assistant professor is tenure track with teaching

6       obligations.

7                May I direct the Court's attention to page two of

8       Exhibit 44 and page three of Exhibit 45.

9                THE COURT:  Ms. Ackerman-Brimberg has pointed out

10      something that I think I would like to remedy.  While this is a

11      bench trial, and while Dr. Tse is pro se, she is a witness.  So

12      Dr. Tse, would you please stand and raise your right hand.

13               MS. TSE:  Of course.

14               (Witness sworn)

15               THE COURT:  Thank you.  You may be seated.

16               MS. TSE:  I believe that those exhibits were admitted

17      into evidence already.

18               THE COURT:  What are the exhibit numbers again,

19      Dr. Tse?

20               MS. TSE:  44 and 45.

21               THE COURT:  I'm not sure that they were.  I don't

22      believe that they were admitted into evidence.

23               MS. TSE:  May I ask the Court to admit them into

24      evidence?

25               THE COURT:  Mr. Cerasia?

G6N3TSE1                           Tse - direct

1            MR. CERASIA:  I have no objection to 45.  With respect

2       to paragraph 44, I guess my objection is to completeness of the

3       document.

4            THE COURT:  All right.  45 and 44 are received in

5       evidence.  The objection is noted to the lack of completion of

6       Exhibit 44.  And should it become necessary to substitute a

7       complete document, that will be done.

8            (Plaintiff's Exhibit 44 and 45 received in evidence)

9            THE COURT:  What is it you wish to turn my attention

10      to in 44?

11           MS. TSE:  44 is actually directing one to go to the

12      right pages on 45.  The issue about non-tenured track faculty

13      titles came up on more than one occasion during last week's

14      testimony.

15           THE COURT:  All right.

16           MS. TSE:  So, that's why 44 is not complete.  And 45,

17      which is excerpted from the faculty handbook, is not complete

18      either.  And on the second page, under faculty titles, the

19      titles between tenure track and non-tenure faculty is shown.

20      And --

21           THE COURT:  All right.

22           MS. TSE:  The non-tenured track position that applies

23      to the plaintiff is highlighted either by redline or a red bar

24      on the left margin.

25           THE COURT:  All right.  These are in evidence with the

1    noted objection to the completeness of both of these documents.

2    In order for me to follow you, since they are in evidence,

3    would you just point to the page and line that you wish to call

4    my attention to in both 44 and 45?

5             MS. TSE:  Yes.  44, it would be the second page,

6    paragraph B, roles and responsibilities of non-tenure track

7    full-time faculty, which is the position that was held by Tse

8    during the period in question.  And the underlined text directs

9    the reader to page 43 through 46 in the faculty handbook.  And

10   if we look at Exhibit 45, under 43, the handbook page, which is

11   Bates stamped NYU 003809, the section that pertains to Tse,

12   non-tenure positions, instruction or research service shall be

13   without tenure implications of any kind regardless of rank or

14   title, and Tse started with research assistant professor and

15   subsequently promoted to research associate professor.

16             THE COURT:  All right.

17             MS. TSE:  The important point, while we're here, that

18   I would like to point out to the Court, is any time you do

19   research, your service to the university is research, you are

20   non-tenure position.  That is a non-tenure position.  And when

21   research faculty encompasses all the faculty titles, when the

22   faculty member ran as research, and there is a long list of

23   them, on the following page, are listed three paragraphs down,

24   senior research scientist, research scientist, so, those are

25   assorted faculty-level research positions.  And I'm sure that

G6N3TSE1                        Tse - direct

1   will come up again later on in the testimony.

2              THE COURT:  All right.

3              MS. TSE:  What happens when tenure is achieved?

4              The appointment cannot be terminated by the university

5   without cause, and the salary is guaranteed from partial to

6   total guarantee, depending on the terms of the tenure.

7              Were you informed that you would be an at-will

8   employee?

9              I was given a faculty handbook by the pathology

10  administrator, Wayne Staffy.  I was taught by Dr. Valentine to

11  build an independent research program around the cell sorter

12  lab.  Once I succeeded to obtain extramural funding, financial

13  security would be guaranteed by the funding agency for the

14  duration of the grant.

15             How did you know that to be the case?

16             Common knowledge.  Any scientist who wants to build a

17  career with an independent lab to pursue his or her own

18  research knows that.

19             If you were informed that NYU was at liberty to remove

20  or reassign the grants that you applied for, would you have

21  accepted Dr. Valentine's offer?

22             MR. CERASIA:  Objection.

23             MS. TSE:  Absolutely not.

24             THE COURT:  Wait.  First of all, the prior question,

25  Dr. Tse, I don't think you answered that question, which was

1    were you informed.  And I think you gave a sort of a narrative

2    but I don't think you ever answered whether or not you were

3    informed that you were tenured or non-tenure.

4            Were you informed that you were non-tenured?

5            MS. TSE:  Oh yes, non-tenured.  Because my appointment

6    was a research assistant professor.  And inherent to that, I am

7    non-tenured track, because assistant professors are either

8    tenured track or non-tenured track.  So, I started out at NYU

9    non-tenured.

10           THE COURT:  All right.  And when you were hired at

11   NYU, it was for the CFAR?

12           MS. TSE:  I was hired, I was recruited there by

13   Dr. Valentine.  My appointment was not in the Department of

14   Medicine.  It was in the Department of Pathology.  And CFAR at

15   that point was not headed by Dr. Valentine.  It was headed by

16   Dr. David Ho.

17           THE COURT:  So, you weren't hired initially for CFAR.

18           MS. TSE:  Yes, I was.  Because I was hired by

19   Dr. Valentine to start up and manage a cell sorting lab for

20   CFAR.  The lab was funded by CFAR so --

21           THE COURT:  All right.  So, the question that

22   Mr. Cerasia objected to was sort of a speculative, perhaps

23   speculative.  You are phrasing it as if you were told that you

24   could be dismissed from this position, would you have taken the

25   job.  I don't think that that's an appropriate question, so I

G6N3TSE1                    Tse - direct

 1    will sustain his objection.  You can testify about what you

 2    were told and what you understood it to mean.

 3              MS. TSE:  That was not quite what the question was

 4    about, but we can move on from there.

 5              THE COURT:  No, I want you to do what you need to do,

 6    but I want you to understand that you're sort of throwing an

 7    extra condition in there, and I'm not sure that we have had

 8    testimony that supports that.

 9              MS. TSE:  Maybe we can come back to this question

10    after I go on further.

11              THE COURT:  All right.

12              MS. TSE:  How was your salary paid at the time you

13    joined NYU?

14              From Dr. Valentine's CFAR grant, and when the lab

15    became operational, from user fees.

16              THE COURT:  From what?

17              MS. TSE:  User fees.  The fees that users have to pay

18    for using the lab.  And those fees typically go to pay salaries

19    and supplies and any maintenance contracts that would be needed

20    for the instrument.  So once the cell sorting lab became

21    operational, my salary was paid out of the user fees in

22    addition to Dr. Valentine's grant from CFAR.

23              When did the cell sorting lab come online?

24              Not until late 1995.  The instrument Dr. Valentine

25    purchased was not suitably biocontained.  I worked with the NYU

1    legal department to return it to the manufacturer.  After NYU

2    received about $160,000 in refunds, I purchased a new

3    instrument, installed it, and put that into operation.

4              THE COURT:  Let me see if I understand what you're

5    trying to say here.  There was a machine when you came on

6    board?

7              MS. TSE:  There was a machine when I came on board.

8    It's not suitable for H.I.V. work because it's not

9    biocontained.  So, it had to be returned to the manufacturer,

10   and through the legal department, and we received a full

11   refund, and that money was used to purchase a different cell

12   sorter.

13             THE COURT:  All right.  Mr. Cerasia?

14             MR. CERASIA:  Your Honor, I'm just objecting to this

15   whole line of questioning because your Honor has ruled that her

16   funding before her -- while she was the core director, and I

17   assume previously, is really irrelevant to this case.  That's

18   what this seems to be about.  I know there is some leeway given

19   background facts, but the level of detail here seems to all be

20   about her support in 1994 and 1995.

21             The only question is, what was her funding support for

22   her salary from June 1 going forward to April of 2011.  I

23   understand there is some background, but it just seems to be a

24   level of detail that becomes very irrelevant.

25             THE COURT:  All right.  I agree that this is very

1    detailed background information.  And I'm not sure where you're

2    going with this, Dr. Tse.  But, it seems to me that I have

3    ruled and I've told you we're not going back to the question of

4    your being removed as CFAR director.  If this is going into

5    something relevant to the issue before me, let's get there.

6            MS. TSE:  It goes to plaintiff's state of mind, it

7    goes to her independent research funding and how that was

8    affected by her disability.  And it will become relevant with a

9    few more questions.

10           THE COURT:  All right.  You got a few more questions

11   to make it relevant.

12           MS. TSE:  I will not touch on how, why, or under what

13   circumstances I was removed as the core director.

14           THE COURT:  All right.  Continue.

15           MS. TSE:  So you sat idle for almost two years?

16           Not at all.  I was well connected, so I was able to

17   get a demo instrument cost free.

18           THE COURT:  You were able to do what?

19           MS. TSE:  A demo, like cars, it is a demo instrument.

20           THE COURT:  Okay.

21           MS. TSE:  Cost free that could analyze but could not

22   sort.

23           Did you have laboratory help at the time?

24           Not at all.  But after the new cell sorter was

25   operational, and things got busy, Dr. Ho hired a technician to

G6N3TSE1                              Tse - direct

1    facilitate the needs of CFAR users.

2              Tell us how you applied for and was awarded your first

3    NIH grant in 1997?

4              H.I.V. kill cells that provide immunity against the

5    viral infection, I developed a research plan, using a

6    fluorescent cellular marker that Dr. Ho suggested to track the

7    cells that were doomed in order to study the mechanisms behind

8    their destruction.

9              How long did it take to generate the preliminary data?

10             Six months or longer before the replacement cell

11   sorter arrived.  The application was submitted with the 1996

12   summer or fall NIH cycle and awarded the following year.

13             And that would be corroborated in Exhibit 42.  I'm not

14   sure whether that has been admitted into evidence.

15             THE COURT:  It is.

16             MS. TSE:  Thank you, your Honor.

17             When did you become the CFAR flow cytometry director?

18             When Dr. Valentine was appointed by the dean to be the

19   director of CFAR in 1998, he invited me to submit an

20   application to replace him as the flow cytometry core director

21   in 1999.  The application was funded from July 2000 through

22   June 2005.

23             Did you develop medical issues from 1997 to 1999?

24             I was in a car accident in 1997.  I was prescribed

25   Soma, S-O-M-A, a muscle relaxant for whiplash.  I developed a

1  severe reaction to this drug and presented with acute arthritis

2  in the finger joints of both hands.  Two years later, I came

3  down with lupus.

4         Were you awarded another NIH grant in 1998?  Yes.

5         That is also corroborated in Exhibit 42.

6         Why did you stop applying for independent research

7  support after that?

8         There were life threatening flairs from the lupus that

9  required hospitalization.  My anti-DNA auto antibody levels

10  were so high --

11         THE COURT:  Just a second.  You have to slow down when

12  you're talking science or medicine.

13         MS. TSE:  My anti-DNA auto antibody levels were so

14  high they fell off the chart.  Dr. Solitar, my rheumatologist,

15  could not put the lupus into remission until 2004.

16         Did you ask for sick leave?

17         No.  But I kept my team come over to Tisch Hospital

18  for group meetings to discuss lab work and review data during

19  the weeks I was admitted to the co-op.  The co-op is a

20  hotel-style facility where the patient stays in a private room

21  and goes to a treatment center at specific times for evaluation

22  and parenteral treatment.  P-A-R-E-N-T-E-R-A-L.  That's when

23  the medication has to be given via intravenous drip.

24         After that, I decided I had to devote my full

25  attention to the core so the scientific community at New York

G6N3TSE1                          Tse - direct

1      would be properly served as proposed in my 1999 application.  I

2      made that known to the NIH in the yearly progress reports and

3      in the 2004 renewal application.  I also gave up my adjunct

4      research scientist appointment at Columbia University.

5              Did the arthritis resolve?

6              No.  It developed into chronic osteoarthritis.  My

7      finger joints continued to degenerate to this day.

8              Were you transferred from Pathology to Medicine?

9              Yes.  Towards the end of 1999.

10             And that would be corroborated by Exhibit 48, a letter

11     from the pathology chair to the VP of faculty affairs.

12             THE COURT:  Is that in evidence?

13             MS. TSE:  No, that's new.

14             THE COURT:  Any objection to 48?

15             MR. CERASIA:  No, your Honor.

16             THE COURT:  All right.  Plaintiff's Exhibit 48

17     received in evidence.

18             (Plaintiff's Exhibit 48 received in evidence)

19             THE COURT:  You may continue, Dr. Tse.

20             MS. TSE:  Thank you, your Honor.

21             10 months later, you received a large increase in your

22     salary that was about one-third of your former salary.  How did

23     that happen?

24             THE COURT:  Bear with me just one second.  Okay.

25             MS. TSE:  I'll repeat the question.

G6N3TSE1                          Tse - direct

1              10 months later, you received a large increase that

2      was about one-third of your salary.  How did that happen?

3              I started at NYU part-time.  Dr. Valentine could only

4      come up with $35,000 for my salary in 1994.  I was paid $50,000

5      in my previous academic position, and even more as a

6      self-employed research consultant.  I told Dr. Valentine I

7      would not accept a position with such a large salary cut,

8      because it would be viewed as a career setback.  We

9      compromised.  I would work part-time.  When there were enough

10     funds to support my salary in 2000, I switched to full-time.

11             What were the sources of these funds?

12             The CFAR flow cytometry core grant, a grant awarded to

13     Dr. Rom on which I was a collaborator, and my independent

14     grants.

15             And that's corroborated by Exhibit 49.

16             THE COURT:  Mr. Cerasia?

17             MR. CERASIA:  It's irrelevant, Judge, but --

18             THE COURT:  Dr. Tse, why is this being offered?

19             MS. TSE:  It's a history of how my salary was paid up

20     to the time I was removed at the core.  And if I was terminated

21     for failing to meet the school's required extramural funding to

22     support my salary, I think the history of how I was paid is

23     quite important.

24             THE COURT:  I'm not sure why this goes to whether or

25     not you were denied an accommodation for your disability.  Will

G6N3TSE1                      Tse - direct

 1    you explain that?

 2            MS. TSE:  It was -- it doesn't go to that specific

 3    point.

 4            THE COURT:  That's what we're here for, Dr. Tse.

 5            MS. TSE:  All right.  Also, in particularly the next

 6    two letters, which is also pertaining to an increase in my

 7    salary, there are mechanisms, how salary can be adjusted if you

 8    failed to get extramural funding to support it.  If your Honor

 9    wants me to skip over that, I will definitely, you know, no

10    problem whatsoever.

11            THE COURT:  All right.  So let's move on.  I do agree

12    with Mr. Cerasia that we may be getting too much information

13    and not enough information that is addressing the issue before

14    the Court now.

15            MS. TSE:  All right.  Then I'll move on to a question

16    that would definitely address that issue.

17            When did you lose the ability to do lab work hands on?

18            After the first of many rounds of hand surgery in

19    2007.  The finger joints were fused or replaced with

20    prosthesis, which took care of the swelling and pain, but

21    following every operation, there was a serious loss of

22    dexterity and fine motor control.

23            Why would that make lab work difficult or impossible?

24            Lab work requires precise manipulations.  Most of the

25    specimens that I studied were derived from humans who were

1    often infected with H.I.V. or T.B. or both.  Even the specimens

2    from asthmatic patients that I studied with Dr. Joan Reibman

3    were considered biohazardous by the CDC.  If I insist on doing

4    experiments, I would not only produce flawed data, I would be a

5    hazard to myself and others because I could easily spill or

6    drop biohazardous materials.

7          Between 1999 and 2009, did you ask NYU for any

8    accommodations to your medical impairments?

9          I asked Dr. Blaser to provide a lab near my office to

10   house the FACSAria which was purchased by a grant from the NIH.

11         It's corroborated by Exhibit 5, which I believe is

12   contingent on being admitted as evidence.

13         THE COURT:  Exhibit 5?

14         MS. TSE:  Yes.

15         THE COURT:  Exhibit 5 was not offered.

16         MS. TSE:  It was brought up during Dr. Blaser's

17   testimony, but it was not considered essential.

18         MR. CERASIA:  Your Honor, my records show it was

19   brought up and your Honor excluded it from evidence because

20   it's from 2007.

21         THE COURT:  Bear with me just one second.  Exhibit 5

22   does not deal with the provision of lab technicians.

23         MS. TSE:  No.  It just goes to show that plaintiff had

24   asked for reasonable accommodation, and was granted her

25   request.  And I believe it was brought up in the context that I

1    wanted to show the Court that Dr. Blaser was well aware that I

2    was a disabled individual, but your Honor thought that Exhibit

3    3, which was a letter of recommendation from Dr. Blaser to the

4    dean to support my promotion to associate research professor,

5    was adequate because --

6            THE COURT:  He acknowledged and wrote in, I see.  So

7    why are you talking about 5 again?

8            MS. TSE:  5 goes to show that I had asked NYU for an

9    accommodation and was granted such an accommodation.

10           THE COURT:  All right.

11           MS. TSE:  And we will --

12           THE COURT:  What is the relevance of that in terms of

13   the situation before me in the time period before me?

14           MS. TSE:  All right.  Let me go on and it should

15   become obvious.

16           So, in 2007, plaintiff asked NYU for a reasonable

17   accommodation to her medical impairments which was granted.

18           The next question:  But you do not need, did not need

19   assistance with lab work?

20           That would be unnecessary as the flow cytometry core

21   grant provided for laboratory technicians and post-doctoral

22   fellows, and that would be corroborated by Exhibit 7, and I am

23   not sure if that was admitted into evidence.

24           THE COURT:  It is, it was.

25           MS. TSE:  Thank you, your Honor.

G6N3TSE1                         Tse - direct

1           How was your salary funded in March 2010?

2           The flow cytometry core grant and user fees provided

3  65 percent of my salary.  The rest came from collaborations

4  with Dr. Rom, Dr. Young, and Dr. Reibman.

5           Is that corroborated by your time and effort report?

6  Yes.

7           And may I direct the Court's attention to Exhibit 15,

8  page five to six.

9           THE COURT:  Are you offering 15?

10           MS. TSE:  I believe that came up during Dr. Abramson's

11  testimony.  But I am not sure.

12           THE COURT:  Wait.  Bear with me one minute.  I don't

13  believe it's in evidence.

14           MS. TSE:  May I ask the Court to admit Exhibit 15 into

15  evidence?

16           THE COURT:  Mr. Cerasia?

17           MR. CERASIA:  I object to everything but the last

18  page, your Honor, on the ground that it's irrelevant as to what

19  her funding was before March of 2010, which is what the last

20  page would reflect.

21           MS. TSE:  May I point out to Mr. Cerasia that a full

22  academic year is what the REF was based on, not the semester.

23  And that would be corroborated by both Exhibit 9 and Exhibit

24  10.

25           THE COURT:  Well, 9 is in evidence and 10 was received

G6N3TSE1                          Tse - direct

1        subject to connection.

2                MS. TSE:  Exhibit 9, first page, paragraph four, it is

3        a 12-month average, which is why I am referring to both five

4        and six.  Five is for the fall semester covering the period

5        from September 1st, 2009, to February 28, 2010.  And page six

6        is for the spring semester covering the period from March 1st,

7        2010, to August 31, 2010.

8                THE COURT:  So how does this relate to Exhibit 15?

9                MS. TSE:  The point that I want to make, and I can go

10       through the details as to how this system works, Dr. Abramson

11       did mention it in passing but did not go through the details.

12       What I would like to point out is on page five of Exhibit 15,

13       100 percent of my salary was obtained through extramural

14       funding.  On page six --

15               THE COURT:  Bear with me one minute.  Page five of 15?

16               MS. TSE:  Of 15.  There is a blue box.

17               THE COURT:  Is this exhibit, let's see, the page says

18       page two of two on page five of Exhibit 15?

19               MS. TSE:  No.  I would go to Plaintiff 0942.  And the

20       period --

21               THE COURT:  That's the page I'm on.

22               MS. TSE:  Okay.  The period that's covered is

23       September 1st through February 28 or the first half of the

24       academic year.  And on the left, there is a large blue box

25       showing that 100 percent of my salary came from grants, and the

G6N3TSE1                         Tse - direct

1    names of the grants are listed on the right of the blue box.

2    And how the system works --

3             MR. CERASIA:  May I interrupt, your Honor?

4             THE COURT:  Yes.

5             MR. CERASIA:  Dr. Tse gave me only black and white

6    copies, I don't know what the blue box is.

7             MS. TSE:  I'm sorry.  Let me -- just we are referring

8    to the account description and the first line was prenatal

9    prevention of heredity disorders, that was a collaboration with

10   Dr. Young.  CFAR flow cytometry core number two, and the reason

11   why I say service center is because that pertains to user fees.

12   Center for AIDS Research is direct funding from the NIH.

13   Longitudinal Studies of H.I.V., that's collaboration with

14   Dr. Rom.  And Ambient Particular Matter and Epidemiology of

15   Asthma, that was with Dr. Reibman.  And the Hoblin Research

16   Fund was with Dr. Young.

17            And the point that I want to make is better

18   illustrated actually on page six, which covers the period of

19   March 1st, 2010, through August 31, 2010.  And same columns,

20   account description, and it's highlighted in yellow and in

21   Mr. Cerasia's copy probably came out gray.

22            The first line, medicine infectious disease.  Type of

23   account, operating fund.  That would be the intracellular

24   source.

25            THE COURT:  I have no idea where you are, Dr. Tse.

1          MS. TSE:  Oh, I'm so sorry.  We moved on to the

2     following page.

3          THE COURT:  Right.  But, what I'm trying to do is

4     understand whether to overrule or sustain Mr. Cerasia's

5     objection to the admission of the entire document.

6          MS. TSE:  It is relevant, when we consider safe

7     harbor, because the qualifications for safe harbor goes back

8     three years.

9          THE COURT:  All right.  Bear with me.  Mr. Cerasia,

10     the safe harbor applies here?

11          MR. CERASIA:  No.  And Dr. Abramson testified that it

12     doesn't.  That's the language in paragraph -- or excuse me --

13     in Exhibit 10.  Plaintiff Exhibit 10.

14          THE COURT:  Yes, but the problem is that, if I recall,

15     Exhibit 10 on its face does not indicate what applies to

16     research faculty or non-tenured faculty and what doesn't.

17          MR. CERASIA:  Right.  His testimony was what the

18     practice was.

19          THE COURT:  What do you mean "the practice"?

20          MR. CERASIA:  What the practice, meaning that the

21     School of Medicine interpreted that document, and the intent of

22     drafting was it applied to tenured faculty and he testified

23     that --

24          THE COURT:  But you see, again, it is the same

25     problem.  That may have been the intent.  How is it set forth

1    in the document and why was this document sent to Dr. Tse if it

2    didn't apply to her?

3            MS. TSE:  It's not sent just to me.  It's something

4    that you receive an e-mail directing you to a website, and then

5    the document is posted on the website.

6            MR. CERASIA:  The other point I'll make is that

7    Dr. Abramson testified that the safe harbor provision was a

8    salary protection and was not an employment protection.  So if

9    somebody remained employed, their salary would be protected.

10   Here, Dr. Tse's salary was protected for one year from the

11   removal of her as the core director, April 1st, and her salary

12   was paid at 104,000 plus, 100 percent up until her date of

13   termination on April 4, 2011.

14           THE COURT:  Was she informed of this?

15           MR. CERASIA:  Was she informed that she was getting

16   100 percent?

17           THE COURT:  This is the same issue, Mr. Cerasia, I

18   pointed out last week.  I have a problem with being told after

19   the fact that paying her was the accommodation.  Even though

20   she wasn't told that was what that was, nor was she told that

21   she would be paid for the entire year.

22           MR. CERASIA:  I'm talking about two different things,

23   your Honor.  You asked about the safe harbor provision.  I am

24   saying Dr. Abramson testified that safe harbor provision dealt

25   with somebody's salary protection.  It did not deal with their

G6N3TSE1                          Tse - direct

1    employment protection.  Such that if they were kept on, they

2    were paid 100 percent of their salary.

3         All I'm saying is Dr. Tse was paid 100 percent of her

4    salary.  So I don't see the relevance of all this.  Her salary

5    was never changed.  If it is a salary protection provision, she

6    got the upside of that protection, assuming it applied to her.

7         MS. TSE:  your Honor, I distinctly recall when this

8    came up with Dr. Blaser, he was asked to read Exhibit 10 to

9    find the word "tenure" in the document.

10        THE COURT:  Yes, he couldn't do it.  It wasn't there.

11        MS. TSE:  He couldn't do it.  His stipulation was that

12   it does not apply to Tse because she is not tenured.

13        In addition, I would want to point out to the Court

14   that if you are tenured, your salary is protected by the terms

15   of the tenure, and you will not be referred to as research

16   faculty, which is what these documents say.  All right.

17        Both 9 is process for implementing research faculty

18   productivity, and 10 is policy on performance expectations for

19   research faculty.  And I combed through 9 and I couldn't find

20   the word "tenure" there either.  But, you know, we can stay

21   this issue, but what I do want to point out from page six, is

22   that yes --

23        THE COURT:  You can't point to something not in

24   evidence.  That's the whole point.

25        MS. TSE:  Oh, okay.

G6N3TSE1                        Tse - direct

1              THE COURT:  I understand.

2              MS. TSE:  I'm so sorry, your Honor.

3              THE COURT:  No.

4              MS. TSE:  It's my --

5              THE COURT:  No, I was trying to understand the

6     relevance of the preceding pages.  You're talking about the

7     RFP.  As a result, it goes by year and in three years, I

8     understand that.  So, I will accept Plaintiff's Exhibit 15 in

9     its entirety.

10             (Plaintiff's Exhibit 15 received in evidence)

11             MS. TSE:  Thank you, your Honor.  Then, let me point

12    out on page six of Exhibit 15, the top line shows that starting

13    with this period, I was supported by intramural funds from

14    medicine, specifically from the Division of Infectious Disease

15    to the tune of 37.76 percent.

16             THE COURT:  All right.

17             MS. TSE:  And simple math will show that for this

18    period, my REF was 62.24 percent, and for the period

19    calculated, according to Exhibit 9 and 10, would be greater

20    than 80 percent.  As a matter of fact, it was exactly

21    81 percent.  And for the 2009 to 2010 academic year, the REF

22    was 55 percent according to paragraph six of Exhibit 9.

23             THE COURT:  You may continue.

24             MS. TSE:  This goes to plaintiff's state of mind.

25             How did you feel when you received Dr. Valentine's

1   letter on March 4, 2010?

2            I had tremendous difficulty processing this event.  I

3   was devastated.  I spent 16 years building my career at NYU.  I

4   succeeded to attain the record of accomplishments that the NIH

5   considered commendable.  I was recognized as a leader in my

6   field.

7            THE COURT:  Bear with me one second.  You're referring

8   to which exhibit when you're talking about this letter?

9            MS. TSE:  That would be, I'm sorry, referring to

10  Exhibit 2.

11           THE COURT:  Okay.  Continue.

12           MS. TSE:  What became your immediate concern?

13           Losing 65 percent of my salary starting June 1st.  My

14  faculty appointment would end with the academic year on

15  August 31, but there was no salary guarantee.

16           And may I direct the Court's attention to the first

17  paragraph of Exhibit 13.  That was admitted into evidence.

18           THE COURT:  The June 8, 2007, letter, right?

19           MS. TSE:  Yes.

20           THE COURT:  You want to direct my attention to the

21  first paragraph?

22           MS. TSE:  Yes, where it states that appointment to a

23  non-tenure position shall be for a definite period of time not

24  exceeding one academic year, unless otherwise specified and

25  shall automatically terminate at the close of that period which

G6N3TSE1                        Tse - direct

for Tse would be August 31, 2010, unless there is official

notice of renewal.  I did not receive such a notice.

            THE COURT:  All right.

            MS. TSE:  Did you ask Mr. Odom for help?

            Yes.  I had worked with Reggie before over a separate

issue.  Reggie was well aware that I needed laboratory

assistants to accommodate my disability.

            Did Mr. Odom tell you that you would be allowed extra

time to get funding?  No.

            May I direct the Court's attention to Exhibit 26 which

shows that Odom recommended giving Tse as much time as possible

in an e-mail to Blaser, Cribben, amongst others, but I have no

record of direct communication with Odom on the extra time and

no such record was disclosed by NYU.

            Would an extra year be enough time?

            No.  It would take at least a year to put a new

research proposal together and six months for it to be reviewed

and approved for funding.  Besides that, no amount of time

would work if I did not have lab assistants to generate the

preliminary data that was needed.  The osteoarthritis would not

get better, it would only get worse with time.

            Did Mr. Odom ask you if you would consider a faculty

position that did not require lab work?  No.

            May I direct the Court's attention to Exhibit 19,

which shows that such accommodations would be common for

G6N3TSE1                        Tse - direct

1    Medicine.

2              Did you ask Mr. Odom to help you with long-term

3    disability benefits?

4              Yes.  From my conversations with Reggie, there was no

5    viable option available from NYU to prevent a 65 percent loss

6    in my salary in two months.

7              Did you specify to Mr. Odom that you could continue

8    with the other 35 percent because there were lab workers on

9    those projects?  Yes.

10             And that would be corroborated by Exhibit 25 which has

11   been admitted.

12             THE COURT:  I'm not sure it has.

13             MS. TSE:  I'm sorry, your Honor.

14             THE COURT:  You do not need to apologize.  Let me

15   figure out whether it has or not.  It has been admitted.

16             MS. TSE:  Thank you, your Honor.

17             THE COURT:  You may continue.

18             MS. TSE:  Did Mr. Odom send you to Margaret Meagher,

19   the head of benefits?

20             Yes.  Ms. Meagher was very helpful.  She provided me

21   with the Unum claim forms.  Since there was a six-month salary

22   continuation period in the Unum policy, she asked me to check

23   the faculty handbook to see if I qualified for paid long-term

24   disability leave.

25             And that would be corroborated by Exhibit 46, two

1   pages consisting of e-mail streams between Tse and Meagher.

2          THE COURT:  I do not believe that was received in

3   evidence.

4          MS. TSE:  I submitted the printed copy this morning.

5   That was not in the pretrial list.  But, I asked to have that

6   submitted because of Ms. Meagher's difficulty to be here to

7   testify.  And so that needs to be, with your Honor's

8   permission, admitted into evidence.

9          THE COURT:  Mr. Cerasia?

10          MR. CERASIA:  No objection.

11          THE COURT:  Plaintiff's Exhibit 46 received in

12   evidence.

13          (Plaintiff's Exhibit 46 received in evidence)

14          THE COURT:  All right.

15          MS. TSE:  What happened after that?

16          On or about May 12, Reggie instructed me to meet with

17   Allison Brehm, director of employee health service, to confirm

18   my disability.  After that, I was instructed to request

19   disability leave in writing from my department chair and copy

20   Dr. Abramson, the vice dean for faculty.  And that would be

21   corroborated by a new exhibit, 52 on page two.

22          THE COURT:  52, Mr. Cerasia?

23          MR. CERASIA:  No objection.

24          THE COURT:  Plaintiff's Exhibit 52 received in

25   evidence.

1              (Plaintiff's Exhibit 52 received in evidence)

2              THE COURT:  Let me ask you, Dr. Tse.

3              MS. TSE:  Yes.

4              THE COURT:  When you were talking with Mr. Odom about

5      what you needed, when did the possibility of disability come

6      up?

7              MS. TSE:  We basically explored options and there were

8      none.  I told him there is no way that I can put together a

9      grant application, first because I cannot do the lab work

10     myself to produce the preliminary data that I would need.  And

11     also because I would have to do it in three months.  It's just

12     impossible.  And he had no suggestions as to how I can prevent

13     that 65 percent salary loss.  He did not tell me that, oh, you

14     need not worry about that, because you were given extra time.

15     And he testified, when asked, that that was the case.  He did

16     not tell me that I would be given extra time.  And he did not

17     tell me that I would be provided laboratory assistants, and he

18     did not tell me that the school would find the different

19     position for me that would not require lab work.  All right.

20             So, he did not explore all those possibilities with

21     me.  And the only thing we can come up with is, yes, I would be

22     covered by long-term disability benefits and I definitely

23     qualified to claim for those benefits.

24             THE COURT:  What was your understanding about what it

25     would mean if you were to claim or ask for long-term

1    disability?

2              MS. TSE:  We will go through that in detail, but I can

3    tell you that my understanding was that I do not need to be

4    losing my entire income.  I can definitely apply for disability

5    benefits pertaining only to the 65 percent income that I would

6    be losing come June 1st.  And he testified to that as well.

7              THE COURT:  All right.  You may continue.

8              MS. TSE:  Is that why you sent the letter dated

9    May 13, 2010, to Dr. Blaser?  We are referring to Exhibit 6.

10             THE COURT:  Okay.

11             MS. TSE:  Did Dr. Blaser respond?

12             No.  I signed a Unum employee statement on May 18 and

13   sent it to Unum.

14             And we are referring to Tse's application to Unum, and

15   I'm sorry to be disorganized, but that would be Exhibit 16.

16   That has been admitted into evidence.

17             THE COURT:  You may continue.

18             MS. TSE:  Did Ms. Meagher provide you with a copy of

19   Unum's policy?  Yes.

20             And Exhibit 53, which is a new exhibit, contains

21   excerpts from the policy.

22             THE COURT:  Mr. Cerasia?

23             MR. CERASIA:  This is the document I identified

24   before, your Honor, before we started, and I don't have an

25   objection to the document.  It's incomplete, and I think on the

G6N3TSE1                        Tse – direct

1   copy your Honor has on the last page, for example, Dr. Tse

2   highlighted the top group one.  And actually it should have

3   been highlighted that she's group two which has different

4   definitions.

5           MS. TSE:  Yes.  We will correct that in the following

6   questions.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           THE COURT:  Received in evidence.

2           (Plaintiff's Exhibit 53 received in evidence)

3           MS. TSE:  Thank you, your Honor.

4           First question pertaining to Exhibit 53:  Did the

5    policy confirm that you can apply for benefits with only a 20

6    percent loss in income from your disability?  And that would be

7    on page 3.  Ignore the red box that is on your copy, your

8    Honor, and instead look at Group Two because, as Mr. Cerasia

9    pointed out, Group Two is the group that applies to me.

10          THE COURT:  Continue.

11          MS. TSE:  Next question.

12          MR. CERASIA:  Your Honor, I am going to have an

13   objection to the extent she is making an argument but she

14   mischaracterized the document.

15          MS. TSE:  I am just referring to the fact supported by

16   the document that the employee can apply for benefits with only

17   a 20 percent loss in income from his or her disability, and I

18   qualified because I had a 65 or I would be looking at a 65

19   percent loss in income.

20          THE COURT:  All right.  Let me hear from you,

21   Mr. Cerasia.

22          MR. CERASIA:  Your Honor, my only point is that the

23   definition of disability is two-part.  One is you have to be

24   limited from performing material substantial duties of your

25   regular occupation due to your sickness or injury, and you have

1    to suffer a 20 percent or more loss in your indexed monthly

2    earnings and so forth so it is a two-part definition.

3              I think her testimony was that she could apply for

4    disability if she just suffered a 20 percent loss of income.

5              MS. TSE:  I am sorry if that's the impression I gave.

6              THE COURT:  Are you saying, Mr. Cerasia, that she said

7    that all she had to do was loose 20 percent or more of her

8    indexed monthly earnings?

9              MR. CERASIA:  That's what I heard, your Honor.

10             THE COURT:  I don't think that's what she said.

11             MR. CERASIA:  Okay.

12             THE COURT:  I think she did talk about both of those.

13             MR. CERASIA:  All right.

14             THE COURT:  You may continue, Dr. Tse.

15             MS. TSE:  Thank you, your Honor.

16             Did the policy confirm that there was a six-month

17   salary continuation period?

18             Yes.  And I am referring to the bottom red box which I

19   believe is highlighted correctly in this case.

20             We are now moving to page 2 of the document.  It

21   appears that the premium is split between you and NYU; is that

22   right?

23             Yes.  And we are referring to the two red boxes under

24   options B, C, and D, and on the bottom under option C.

25             THE COURT:  I'm sorry.  What is the relevance of this?

G6N3TSE1                          Tse - direct

1              MS. TSE:  The premium; NYU paid for half of it and

2       plaintiff paid for half of it.  This is the premium that Unum

3       charged for the long-term disability insurance.

4              THE COURT:  Then read to me what you consider to be

5       the relevant part of this page.

6              MS. TSE:  You and your employer share the cost of --

7              THE COURT:  What is the heading of this?

8              MS. TSE:  Oh, that would be under options B, C, and D.

9              THE COURT:  All right.

10             MS. TSE:  And it says:  You and your employer share

11      the cost of your coverage.

12             THE COURT:  Okay.

13             MS. TSE:  And we can skip through the rest of the box

14      because it pertains to whether the benefit is taxable or not

15      and we can go to the box under option C, which is the option

16      that I took.  It would cover 60 percent of monthly earnings to

17      a maximum benefit of $8,000 per month.

18             THE COURT:  Did you have any discussion with anybody

19      about these documents?

20             MS. TSE:  No.  I was given the policy by Meagher when

21      I met with her, and the essence of what was covered by my

22      policy and how much benefit I would be receiving was presented

23      to me by a Unum representative.

24             THE COURT:  Was this in person?

25             MS. TSE:  Over the phone.  There were several such

G6N3TSE1                        Tse - direct

1       conversations because they really want to -- first, there were

2       conversations on the circumstances under which I applied for

3       the coverage, and then when they were going to approve the

4       benefits, which was nearly a year later, they called and

5       explained to me the benefits that I will be getting, the

6       contingencies which is if I get income from, let's say, taking

7       on a job outside of NYU, the income will be deducted from my

8       benefits.

9               THE COURT:  All right.

10              I think this would be a good time to --

11              MS. TSE:  How the Unum system works --

12              THE COURT:  This would be a good time for us to take

13      our first morning break.

14              (Recess)

15              THE COURT:  Dr. Tse?

16              MS. TSE:  Yes.

17              And we are continuing with Exhibit 53 to clarify a

18      couple -- one more issue, actually.

19              Did anyone at NYU discuss a return-to-work plan with

20      you in the event you could return after you started to

21      receiving long-term disability benefits?

22              And that is shown in the blue box --

23              THE COURT:  Well, did anybody discuss this with you is

24      your question.

25              MS. TSE:  Yes.  No.

G6N3TSE1                        Tse - direct

1              THE COURT:  Okay, so the answer is no?

2              MS. TSE:  No.

3              THE COURT:  Okay.

4              MS. TSE:  But I indicated to Reggie that I would be

5    willing to return to work if positions with accommodations

6    appeared, and that's corroborated by Exhibit 25.

7              THE COURT:  Continue.

8              MS. TSE:  What did you do after May 31st, 2010?

9              I went to work every day overwhelmed with anxiety over

10   the 65 percent pay cut at the end of the month.  I e-mailed

11   Reggie in early June about my concern but did not hear back

12   from him.  And that would be corroborated on page 1 of Exhibit

13   52.

14             THE COURT:  When you pause and wait for me to go on,

15   if you are citing to a particular document, Dr. Tse, read the

16   part that is relevant and just continue.

17             MS. TSE:  Yes.  I will definitely do that.

18             Are we good with Exhibit 52?

19             THE COURT:  I'm not sure we are.  What is it that you

20   want to --

21             MS. TSE:  That would be on page 1, and underlined in

22   red is the date that the e-mail was sent which is June 3rd,

23   2010, and the paragraph marked with red on the left margin.

24   There will be a 65 percent reduction in my monthly income

25   starting July 1st, 2010.  We get paid at the beginning of the

1   month for the previous month.  That's why it would be July 1st

2   and not June 1st.  If these benefits are not activated shortly

3   I am sure you can understand why my anxiety level is, slowly

4   but surely, rising with each passing day.

5           THE COURT:  Okay.

6           MS. TSE:  Did you receive approval for paid long-term

7   disability leave?

8           No.

9           What did you do at work?

10          I asked Dr. Rom and Dr. Reibman to pick up the stipend

11  for two work study research interns from my lab so they could

12  finish the experiments that they started on Dr. Rom's and

13  Dr. Reibman's projects.

14          THE COURT:  You say that you did not receive approval

15  for paid long-term disability leave?

16          MS. TSE:  No.  I never heard from anybody after I sent

17  the letter to Dr. Blaser with copies to Dr. Abramson.  I did

18  not hear from him and I did not hear from Dr. Abramson and I

19  did not hear from Reggie.

20          THE COURT:  But you did start to receive payments,

21  right?

22          MS. TSE:  I'm sorry?

23          THE COURT:  You did start to receive disability

24  payments?

25          MS. TSE:  No.

1              THE COURT:  Okay.

2              MS. TSE:  We will go through the whole --

3              THE COURT:  No, no, Dr. Tse.  When I ask you a

4    question, it is important for you to answer my question now as

5    opposed to putting me on your time table.  Okay?

6              MS. TSE:  I'm sorry, your Honor.

7              I did receive long-term disability benefits from Unum

8    but not until March.  I didn't get the notice until March 2011

9    and the benefits would start the day my employment was

10   terminated by NYU.

11             THE COURT:  Okay.  Thank you.

12             MS. TSE:  Sorry.  I'm very sorry, your Honor.

13             What did you do at work?

14             Okay, that was asked and answered.  Let's move on.

15             Did you think of asking Dr. Rom, Dr. Young or

16   Dr. Reibman to increase their salary support for you?

17             That was suggested in Dr. Valentine's termination

18   letter, Exhibit 2.

19             THE COURT:  But your question is did you ask them for

20   it.

21             MS. TSE:  My answer:  Changing effort for salary

22   support for key personnel in excess of 25 percent on a grant is

23   not a simple matter.  All funding agencies demand justification

24   such as loss of another key investigator or change in research

25   plan.

G6N3TSE1                        Tse - direct

1          THE COURT:  Are you reading from something?  Are you

2     reading from a document in evidence when you --

3          MS. TSE:  No, I'm not.  That was just my answer

4     because it came up during last week and also in NYU's pretrial

5     statement that that's what I should have done to remedy the

6     situation and it is not as simple as going up to Dr. Rom,

7     Dr. Young or Dr. Reibman and look, I'm losing 65 percent of my

8     income, can you make up for the difference?  It does not work

9     that way because any grant that is funded, there is a research

10    plan.  There is a list of people who would be working on that

11    grant and, in particular, when it comes to key personnel which

12    other people who have contributed to the preparation of the

13    grant and who would be seeing to how the grant is going to go

14    forward, anything in excess of 25 percent you have to go

15    through, basically, contacting the funding agency and

16    justifying to them why you want to increase that person's

17    effort by more than 25 percent.

18         So, in Dr. Rom's case, I was on his grants for 10

19    percent and for it to be changed, it cannot be changed beyond

20    12.5 percent without going through the justification process.

21    And while the grant is in funding and the research project is

22    going forward, there is just no room to, let's say, change

23    Dr. Tse's present effort from 10 percent to 30 percent unless

24    somebody has left for whatever reason, or Dr. Rom decided that

25    we need to have a change in research plan and we need to do

G6N3TSE1                    Tse - direct

1    more flow cytometry.  So, that was why I didn't pursue that

2    solution.

3              I'm sorry, that's -- (phone ringing)

4              And that's also corroborated by Exhibit 9 and 10 where

5    the school actually says that one needs to make sure that

6    effort from -- effort on extramural funding sources do not

7    change beyond a certain percentage.  That would be paragraph 13

8    in Exhibit 9 and if we can have a minute, I think Exhibit 10 is

9    even more specific and it mentioned the 25 percent piece.  In

10   Exhibit 10 it would be on page 4, NYU 003085 actually in the

11   footnote, footnote no. 20.

12             THE COURT:  All right.  You could read footnote 2.

13             MS. TSE:  Under federal grants requirements,

14   researchers must obtain federal agency approval for a 25

15   percent or greater reduction in effort from the level approved

16   at the time of award.

17             THE COURT:  Okay.

18             MS. TSE:  And if you want to increase you have to go

19   through the same process.

20             How come you did not use the flow cytometry core as

21   Dr. Valentine suggested, to generate the preliminary data that

22   you needed?

23             I did not have the necessary funds to pay user fees.

24             Did you think of using the data you collected when you

25   were the flow cytometry core director in your grant

G6N3TSE1                      Tse - direct

1   applications?

2              No.  The idea behind the experiments and the data

3   collected were the users' intellectual property.  Using them to

4   benefit myself would be plagiarism.

5              Cause of funding to provide service without

6   encumbrances.  Core personnel are not allowed to solicit users

7   to be co-authors or collaborate years.

8              Did you think of asking the NIH to interfere?

9              Yes, but that would compromise CFAR's chance of

10  getting the June 2010 resubmission approved.  I worked with the

11  other CFAR core directors for 10 years.  Some of them I

12  considered friends.  Researchers at NYU would also be deprived

13  of facilities they have counted on for years.

14             Did you apply for any grants in an effort to increase

15  your REF?

16             Yes.  Jones post-doctoral fellow Bertram Black worked

17  with me on a funded pilot project to study the effect of

18  vaginal injury on HIV transmission.  The data was collected

19  over the previous two years.  We used that as preliminary data

20  to prepare -- I'm sorry, that's my medication alarm which does

21  not seem to turn off with the airplane mode.  I'm sorry.

22             May I continue, your Honor?

23             THE COURT:  Please.  Please, do.

24             MS. TSE:  The data was collected over the previous two

25  years.  We used that as preliminary data to prepare an

G6N3TSE1                        Tse - direct

1    application as soon as I learned that there was an RFA.  I was

2    a joint program director, program investigator.  The proposal

3    was submitted to the NIH on July 19th, 2010 and 50 percent of

4    my salary support was proposed in that application and that

5    would be corroborated by Exhibit 11.

6            What is an RFA?

7            Request for application on defined research areas.  It

8    would allow us to submit outside the regular cycle which would

9    be early June or early October.  Even with the previously

10   acquired preliminary data, we could not put together a

11   respectable grant application for early June and I did not know

12   whether I would be unemployed by October.

13           Why was it that you did not apply for grants from

14   foundations?

15           I received a couple of foundation awards before

16   joining NYU.  These have a single submission date each year,

17   particularly of short duration and support; less than 20

18   percent of the principal investigator's salary and are not

19   renewable.  That would be corroborated on page 2 of Exhibit 39,

20   Tse's bio sketch.  I do not believe it was admitted.

21           THE COURT:  It was.

22           MS. TSE:  It was.  Oh, thank you, your Honor.

23           Did you meet with Dr. Blaser, Mr. Odom, and Lucy

24   Cribben in August?

25           Yes, we met on August 25th at 12:00 p.m. in a

G6N3TSE1                          Tse - direct

conference room in Bellevue Hospital.

            What was discussed at the meeting?

            I asked if my faculty appointment could be reduced to
50 percent effort while I continued to apply for grants.  I
would still qualify for benefits and I would need NYU's REF at
70 percent rather than 35 percent.  It was then that I was
informed by Lucy Cribben that extramural funding for my salary
had dropped to 5 percent.

            Were you aware that Dr. Young's grant would run out
August 31, 2010?

            Yes.  I also knew I was able to get funding.  I would
ask him to continue my salary support on the new grant if I was
allowed to change my appointment to part-time.

            did you find out why Dr. Rom removed your salary
support from his grant?

            He heard that I wanted to take --

            MR. CERASIA:  Objection.

            THE COURT:  Yes, yes.

            MS. TSE:  Very well.

            THE COURT:  Yes.

            MS. TSE:  All right.  We will move on.

            Did you ask Dr. Rom to provide a job description for
your long-term disability claim?

            No.  It was NYU's responsibility to have those forms
completed.  I only became aware that he provided one when I was

G6N3TSE1                          Tse - direct

1    going over the discovery materials with my first counsel, and

2    that would be Exhibit 54, that's a new exhibit.

3              THE COURT:  Mr. Cerasia?

4              MR. CERASIA:  Oh, I have no objection, your Honor.

5    Sorry.  I didn't know you were waiting for me.

6              THE COURT:  Plaintiff's Exhibit 54, received in

7    evidence.

8              MS. TSE:  Thank you, your Honor.

9              (Plaintiff's Exhibit 54 received in evidence)

10             MS. TSE:  Do you see anything amiss with your job

11   description?

12             That would be on page 2, and reading from the sections

13   that were filled out, DOD, flow cytometry, applying antibodies

14   to service receptors on cells and transfer to an instrument to

15   quantify the antibodies which leads to the quantification of

16   the receptors on the cells.

17             And the question is:  Do you see anything amiss with

18   your job description?

19             Dr. Rom would not know what I did in the flow

20   cytometry core lab.  That job description was more appropriate

21   for one of my lab technicians.  Dr. Rom was the Division Chief

22   for the Division of Pulmonary Critical Care and Sleep Medicine.

23   During our 12-year collaboration Dr. Rom came over to my lab

24   once or twice.  We saw each other at research group meetings

25   every Friday in the pulmonary critical care and sleep medicine

G6N3TSE1                          Tse - direct

1    wing in Bellevue Hospital which is in a different building.

2              So, minus Dr. Young's and Dr. Rom's salary support,

3    you were down to 5 percent salary support from Dr. Reibman; is

4    that right?

5              Yes.

6              THE COURT:  Dr. Tse, you did, I believe, testify that

7    at that August meeting you asked for your workload to be

8    reduced to 50 percent while you were looking for funding; is

9    that correct?

10             MS. TSE:  Yes.

11             THE COURT:  What was NYU's response?

12             MS. TSE:  That was when I was told that my extramural

13   funding had dropped to 5 percent and it's not possible to

14   consider a part-time appointment at 5 percent.

15             THE COURT:  Thank you.  You may continue.

16             MS. TSE:  What else was discussed at the meeting?

17             Dr. Blaser suggested that since I could not meet the

18   school's REF for the coming academic year, I should consider

19   long-term disability benefits as a source of income.

20             Did Dr. Blaser inform you at the meeting that the REF

21   for medicine was 100 percent for the coming school year?

22             No.

23             Previously, how do you know if you have met the

24   expected REF.

25             When I received a letter from Dr. Blaser around

G6N3TSE1                        Tse - direct

September of each year.  We are referring to Exhibit 8.  It is

dated September 18, 2009, and previous to 2009 I would receive

similar letters around September of each year.

          THE COURT:  So this was received subject to

connection, correct?

          MS. TSE:  I don't recall.

          THE COURT:  No --

          MS. TSE:  I'm sorry.

          THE COURT:  No, I'm sorry.  You are talking about

Exhibit 8?

          MS. TSE:  Yes.

          THE COURT:  Sorry.  Okay.

          MS. TSE:  And let's look at page 2, calculation of

required extramural funding, paragraph 2 for the 2008 to 2009

academic year, you are expected to obtain from extramural

funding at least 50 percent of the portion, 100 percent of your

total analyzed salary that is attributable to your research

responsibilities.  That is when I find out every year what the

REF was or what the minimum REF was.  It's not before the

school year started, it's after the school year ended.

          So, essentially you are informed after the fact

whether you have met the school's REF and for that particular

year?  My current salary for the 2008 to 2009 academic year is

$104,058 and my current support on extramural funding was the

same amount which meets the performance standards.

G6N3TSE1                         Tse - direct

1          The point is you are never informed before the school

2    year started what is expected of you by the department chair.

3    That's information that you need from essentially the policies

4    for research faculty.  And for the 2009 to 2010 school year, my

5    REF was greater than 80 percent or 81 percent to be exact.

6          The REF, as posted in Exhibit 9, was 55 percent and

7    that would be on page 2 of Exhibit 9 or actually the paragraph

8    starts on page 1, paragraph 6, and continues into page 2 just

9    before paragraph 7 it says:  The REF increases from 50 percent

10   to 55 percent effective September 1st, 2009.

11         Now, both Dr. Abramson and Dr. Blaser said that REF

12   varies from one department to another but if you are not

13   informed before the school year starts, you really do not have

14   any idea what it was supposed to be.

15         Going back to the August meeting, did you recall,

16   reminding Dr. Blaser at the meeting, that you were impaired

17   from your ability to apply for grants?

18         Yes.

19         Did Dr. Blaser refer you to funded investigators who

20   could use someone with your expertise?

21         No.

22         Since you have worked successfully on a project with

23   Dr. Blaser previously, did he offer you a position in his

24   research group?

25         No.

1          Since your REF for the prior three years was 100

2     percent, greater than 95 percent and greater than 80 percent,

3     did you ask Dr. Blaser for safe harbor with the research

4     supplement to pay for lab assistants at the meeting?

5     and we are referring to paragraph 16 and 17 on page 3, Exhibit

6     9.

7          No.

8          Why?  It did not apply to your appointment,

9          The process was issued.  The implement research

10    faculty productivity, I was a member of the research faculty.

11    I did not ask because the policy was not binding but offered at

12    the chair's discretion.  Dr. Blaser did not offer, even though

13    the process was there for him to do so.  And I am referring to

14    paragraph 18 on page 3 of Exhibit 9.

15         Did Dr. Blaser let you know how long your faculty

16    appointment would last at the August meeting?

17         No.

18         Did Dr. Blaser let you know whether you would be

19    approved or paid long-term disability leave at the meeting?

20         No.

21         Did you hear from Dr. Blaser or Lucy Cribben after the

22    August meeting?

23         No.

24         Did you reach out to Dr. Blaser after the August

25    meeting?

G6N3TSE1                    Tse - direct

           Yes.  I e-mailed on August 27.  I tried my best to
explain to him why I did not have independent extramural
funding.

           And, if I may direct the Court's attention to Exhibit
47, third paragraph of the e-mail?

           THE COURT:  Bear with me just one minute.

           MS. TSE:  That is a new exhibit that --

           THE COURT:  So it is not in evidence?

           MS. TSE:  No, it is not.

           THE COURT:  Mr. Cerasia?

           MR. CERASIA:  No objection, your Honor.

           THE COURT:  Plaintiff's Exhibit 47 received in
evidence.

           (Plaintiff's Exhibit 47 received in evidence)

           MS. TSE:  May I read from the relevant paragraph?

           THE COURT:  Please do.

           MS. TSE:  Prior to becoming a new patient, in 1999 I
was successful at obtaining NIH funding so there were two
grants, an RO-3 and an R-21 and a supplement to the R-21.
Since then I have prioritized my effort to watch the CFAR core
being fully aware of its impact on the greater than 40 research
projects that utilize this facility, including yours, from
April 2008 through March 2009.  Dr. Tse has mentioned that she
was medically incapacitated during most of her tenure as the
flow cytometry core director, however this does not seem to

G6N3TSE1                        Tse - direct

1    have a major impact on the performance of this facility.  It is

2    noted in the 2004 NIH critique.

3              Since 1999 I have also served as an investigator on --

4    there is a whole list of grants -- with Dr. Rom as the

5    principal investigator, and another with Dr. Reibman as the

6    principal investigator.  After making substantial contributions

7    to the research, design, the post independent funded grant

8    applications.  So, I was doing my best to convince Dr. Blaser

9    that I have what it takes to apply for independent funding.

10             Did you know that Dr. Blaser discussed your funding

11   situation with Dr. Reibman?

12             Joe mentioned that in passing.  And if I may direct

13   the Court's attention to Exhibit 55 which shows --

14             THE COURT:  Bear with me.  Not in evidence.

15             MS. TSE:  Not in evidence.  And it's an e-mail

16   string --

17             THE COURT:  Wait, wait, wait.

18             Mr. Cerasia?

19             MR. CERASIA:  No objection, your Honor.

20             THE COURT:  Plaintiff's Exhibit 55 received in

21   evidence.

22             (Plaintiff's Exhibit 55 received in evidence)

23             MS. TSE:  E-mail string between Blaser and Reibman and

24   he asked her for information to the extent that I am supported

25   on her grant but, most critically, was Dr. Blaser's

G6N3TSE1                          Tse - direct

1   acknowledgment which is towards the bottom of page 2 that Doris

2   has told us that she is unable to perform laboratory work.

3              (Continued next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Okay.

2              MS. TSE:  Was the Reibman grant funded?  No.  We

3        wanted to resubmit in March 2011, but Dr. Blaser terminated my

4        appointment at NYU on January 4, 2011.

5              What did you do after August 31, 2010 when your

6        faculty appointment ended?  I went to work every day, not

7        knowing if that would be my last day.  I reviewed and analyzed

8        data previously collected for studies with Dr. Rom, Dr. Young,

9        and Dr. Reibman in preparation for presentation of publication.

10             When did you hear from Unum about your long-term

11       disability benefits?  March 11, 2011.  Three weeks before I

12       would be unemployed.

13             Were you contacted by Unum's rehabilitation services

14       to assist you with getting back to work?  No.  The medical

15       records they requested would have shown that I had already

16       undergone every rehab treatment that the Hospital for Joint

17       Disease, an NYU affiliate, had to offer before and after my

18       first round of hand surgery in 2007.

19             The only accommodation that would allow me to work as

20       a member of the research faculty were laboratory assistants, or

21       a position that did not require lab work.

22             Did you apply for jobs before and after April 4, 2011?

23       I checked whether there were openings at local institutions for

24       someone with my training and experience.  I was restricted to

25       the New York metropolitan area.  Since 1997, I've assembled a

G6N3TSE3                      Tse - direct

1    small army of health care providers that would be difficult to

2    replace.

3              Have your medical problems improved or worsened since

4    April 4, 2011?  I had another three rounds of hand surgery to

5    remove a cyst in the right index finger and to fuse the joints

6    in both thumbs.  My lower back has degenerated considerably

7    over the last three years.  I require regular occupational and

8    physical therapy.  But Dr. Solitar declared that I was

9    lupus-free last year.

10             Were you able to work since I left NYU?  I continued

11   to work with some of my NYU collaborators, including Dr. Rom

12   and Dr. Reibman, and started a new collaboration with a

13   graduate school classmate at Columbia University.

14             That would be all, your Honor.

15             THE COURT:  Thank you, Dr. Tse.

16             Mr. Cerasia?

17             MR. CERASIA:  Your Honor, can you just give me a

18   minute.

19             THE COURT:  Sure.

20             MR. CERASIA:  Thank you.  Judge, logistically where

21   would you like me to go?

22             THE COURT:  Well, I have no problem if you would move

23   the lecturn up.  Where is Mr. Delaney?

24             Bear with me one second.

25             MR. CERASIA:  Can I just ask a question?  I know

1    before we started Dr. Tse said she could sit there if she just

2    moves her back brace.

3              MS. TSE:  As long as it won't be three hours.

4              MR. CERASIA:  It can't be more than an hour and 58

5    minutes, because the judge is leaving then.

6              THE COURT:  It can't be any more today.

7              MR. CERASIA:  Right.

8              THE COURT:  If you don't mind sitting up here.

9              MS. TSE:  No, I'll do that.  If I get uncomfortable,

10   I'll just say something.

11             THE COURT:  Please.  Can your back brace come up too?

12             MS. TSE:  Yes.  I can do that.  It's very portable.

13             THE COURT:  Whenever you're ready, Mr. Cerasia.

14             MR. CERASIA:  Thank, your Honor.

15   CROSS-EXAMINATION

16   BY MR. CERASIA:

17   Q.  Dr. Tse, are there any plaintiff exhibits up there or

18   they're all back?

19   A.  No, and I didn't bring any since I didn't have help and I'm

20   still under the weather.  So, my pile is not here.

21   Q.  Okay.  Do you have them on your computer?

22   A.  Yes, I do.

23             MR. CERASIA:  Because all of mine are written on, your

24   Honor.

25             THE COURT:  I understand.

G6N3TSE3                        Tse - cross

1              THE WITNESS:  If --

2              MR. CERASIA:  I thought the witness's copies were

3      still here.  I actually saw them here this morning.

4              THE WITNESS:  No, those are just a few odd ones.  The

5      whole set wasn't there, and the new ones I only brought two

6      printed copies for the Court.  Because, I mean, I can pull them

7      out from my computer.  Because you would want me to look at

8      them anyway.

9              MR. CERASIA:  I would, Dr. Tse.

10             THE COURT:  Bear with me one second.

11             Ms. Ackerman-Brimberg has agreed to relinquish her set

12     of the exhibits so that Dr. Tse may have them up here on the

13     witness stand as she's cross-examined.

14             MR. CERASIA:  Thank you.

15             THE WITNESS:  Thank you.

16             MR. CERASIA:  May I proceed, your Honor?

17             THE COURT:  You may.

18             MR. CERASIA:  Thanks.

19     Q.  Dr. Tse, you knew that as a non-tenured research faculty

20     member of NYU that your salary was paid through support from

21     extramural funding, correct?

22     A.  Yes.

23     Q.  I note from Plaintiff Exhibit 2, you were removed as the

24     core director on April 1st, 2010.  Right?

25     A.  Yes.

G6N3TSE3                    Tse - cross

1  Q.  At that time, NYU ended up employing you for another one

2  year and three days up to April 4, 2011, correct?

3  A.  I had no knowledge of that.

4  Q.  That's not what I'm asking.  From April 1st, 2010, you were

5  employed for one year and three days by NYU, correct?

6  A.  My employment was not terminated until April 4, 2011.

7  Q.  During that one-year-and-three-day period, you received

8  100 percent of your salary that existed as of April 1st, 2010,

9  right?

10  A.  Yes.

11  Q.  Which was approximately what, $104,500?

12  A.  That would be my annual salary.

13  Q.  After April 1st, 2010, you didn't know how your salary was

14  going to be funded, correct?

15  A.  I knew it would be funded 100 percent through May 31,

16  because it was stated in Dr. Valentine's letter.

17  Q.  Which is Plaintiff's Exhibit 2?

18  A.  Yes.

19  Q.  But effective June 1st, 2010, you didn't know how your

20  salary was going to be funded, correct?

21  A.  Yes.

22  Q.  You believed at that time that 35 percent of your funding

23  from Drs. Rom, Reibman, and Young would be used to support your

24  salary, correct?

25  A.  Yes.

G6N3TSE3                    Tse - cross

1   Q.  You knew that when you were removed as the core director,

2   that you would lose 65 percent of the funding that was used to

3   support your salary, correct?

4   A.  That's what is stated in Dr. Valentine's letter.

5   Q.  In Dr. Valentine's letter, which is Plaintiff Exhibit 2,

6   isn't it true that it does not say in that letter that your

7   salary would be decreased effective June 1st?

8   A.  It did say in the following sentence that I will need to

9   increase the number of hours supported from other sources to

10  maintain full NYU benefits from June 1st onwards.

11  Q.  Look at the last underlined sentence that you had I think

12  it's in red in the original.  It says funding for that portion

13  of your salary from CFAR budgets is scheduled to end on May 31,

14  and until that time you will report to me and to Dr. Michael

15  Dustin.

16           You see that?

17  A.  Yes, I see that.

18  Q.  And you understood that to mean that the funding to support

19  65 percent of your salary would end, correct?

20  A.  Yes.

21  Q.  With respect to the sentence you just read starting with

22  the word "therefore," isn't it true that you never asked

23  anybody at NYU whether or not your salary would decrease

24  starting June 1st, 2010?

25  A.  Who would I ask?

G6N3TSE3                         Tse - cross

1   Q.  Answer the question.

2            THE COURT:  No, no, actually, that's putting a

3   responsibility on Dr. Tse.  It's not clear that is appropriate

4   where the responsibility should be to make clear what the terms

5   of continued employment, if any, are.

6            But, did you ask anybody when no one said anything to

7   you, Dr. Tse?

8            THE WITNESS:  No.  I did not ask.  The person, first

9   person that I consulted was Reggie Odom.  I did complain to

10  Dr. Blaser about being removed as the flow cytometry core

11  director.  He did not respond to my e-mail which was dated, if

12  I remember correctly, around March 12, 2010.

13  Q.  Isn't it true that you never asked Dr. Blaser any question

14  about what the sentence starting with "therefore" meant in

15  Plaintiff Exhibit 2?

16  A.  No, I did not.

17  Q.  You didn't ask Mr. Odom either, did you?

18  A.  I made it very clear to Reggie that what I understand was

19  that I would lose 65 percent of my income starting June 1st.

20  Q.  So, when you take those two numbers, 65 percent and

21  35 percent, you agree with me they equal 100 percent, correct?

22  A.  Yes.

23  Q.  Okay.  So you knew at the time certainly that you needed

24  100 percent funding to support your salary.

25  A.  I don't understand what you mean by that.

G6N3TSE3                          Tse - cross

1    Q.  Okay.  Well, you testified I think on your own direct

2    examination that you thought maybe the number could have been

3    55 percent or 60 percent, depending on Plaintiff Exhibit 8 or

4    Plaintiff Exhibit 9.  Right?

5    A.  That is the required extramural funding.

6    Q.  Isn't it true that at no point did you ever say, for

7    example, to Dr. Blaser or Reggie Odom, that you only needed to

8    find 25 percent more funding because 25 percent plus 35 percent

9    equals 60 percent?

10   A.  It was never presented to me at that point the question of

11   REF.  And as I just explained, in my own testimony, my REF

12   until August 31, 2010, the last day that I was officially

13   notified that I had a faculty appointment, was 81 percent.  So

14   I do not understand where the question of my percent REF would

15   come in.

16   Q.  If you look at Plaintiff Exhibit 15, the last page.

17   A.  That would be page --

18   Q.  You Bates stamped it P943.

19   A.  No, I didn't Bates stamp that.  My counsel did.

20   Q.  Okay.  Do you see that?

21   A.  Yes, I'm looking at it.

22   Q.  Isn't it true that that document was a document you had

23   prepared to show what your time and effort was?

24   A.  No.

25   Q.  It wasn't based on data that you submitted?

G6N3TSE3                    Tse - cross

A.   All right.  I offered to explain to the Court how time and
effort reports work.  And since we are not clear on that, I
will explain it now.

          It's posted, you get an e-mail to say your time and
effort report needs ratification and it directs you to a link.
All right.  So, on the page, on the web page, after you log in,
something like or there you saw something exactly like this
shows up.  All right.  All the columns were filled in up to
where it says "certification section payroll allocation."  That
is all filled in.  And if you don't agree with the payroll
allocation, you would put in a different number, which I did.
All right.  And that would be under the column that says
"actual effort."
Q.   So you recorded the numbers in the "actual effort" column?
A.   Yes.
Q.   Okay.
A.   And then the web page does some calculation and comes up
with the change which is in the next column to the right.  And
if there are gross and drastic differences, I think there is an
example of that in the previous, in one of the previous
reports, yes.  That would be the first page of the exhibit.
For the time period September 2007 through February 2008.  If
there are gross differences, what the computer or the program
considers gross differences, a general comment would pop up and
it would specifically state what the difference was.

1   Q.   So if you can go back to the last page, right.

2   A.   Yes.

3   Q.   Under "actual effort" the last three entries, if you add

4   those up, they equal 35 percent of actual effort, correct?

5   A.   Yes.

6   Q.   Then the three above that are 65 percent, right?

7   A.   100 minus 65 is 35.  I'm not quick enough to add up the

8   percentages.

9   Q.   They all equal 100 percent in the end, all six of them?

10  A.   Yes.  And the payroll allocation is 100 percent and the

11  actual effort is also to add up to 100 percent.

12  Q.   I understand.  So but the top three, the 65 percent related

13  to the funding you had because you were the core director,

14  right?

15  A.   No.  If we are referring to March 1st through August 31,

16  the top line, as I tried to explain to the Court earlier, is

17  highlighted and in yellow, but in your copy it would probably

18  be gray.  The account description, medicine infectious disease,

19  that's an intramural source.  They call it operating funds.

20  And the payroll allocation for that was 37.76 percent.  And I

21  had actually used that number, rather than my adjusted actual

22  effort at the time, which was November 30, 2010, to come up

23  with the REF for that academic year of 81 percent.

24  Q.   If you look at Plaintiff Exhibit 13.  Let me know when

25  you're there, Dr. Tse.

G6N3TSE3                         Tse - cross

1    A.  Yeah, I'm there.

2    Q.  Okay.  I'm sorry.  I wanted you to look at Plaintiff

3    Exhibit 6 which is the May 13 letter.

4    A.  Yes.

5    Q.  Your reference in the first line there to 65 percent of

6    your time related to the fact that you knew that as of May --

7    at the end of May 31, 2010, you were going to lose 65 percent

8    of your funding for your salary, right?

9    A.  I interpreted that to mean that absent replacement sources

10   of funding, it would be a 65 percent loss in my paycheck.

11   Q.  Because you believed that you had a 65 percent loss of

12   funding to support your salary, right?

13   A.  That funding was removed, so yes, it would not be there

14   anymore.  And that I discussed with Reggie when I met with him.

15   Q.  You knew from Plaintiff Exhibit 2 with the sentence

16   starting "therefore," that your continued employment at NYU was

17   based on you getting extramural funding to support your salary

18   going forward, right?

19   A.  Can you point out to me exactly where?

20   Q.  Okay.  The sentence you read, the second-to-last sentence

21   of Exhibit 2 which says "Therefore you will need to

22   increase --"

23            THE COURT:  Slowly.

24   Q.  "Increase the number of hours supported from other sources

25   to maintain full NYU benefits from June 1st onwards."

G6N3TSE3                    Tse - cross

A.  What was your question?

Q.  Sure.  I'll ask again.  So you knew at that point that as

of June 1st, 2010, that you needed extramural funding to

support your salary going forward?

A.  Yes.

Q.  And as of July 1st, 2010, you received your first paycheck

after June 1st, 2010, right?

A.  Yes, I did.

Q.  It was a full salary paycheck, right?

A.  Yes.

Q.  You continued to receive that full salary, as you said,

until your date of termination, right?

A.  Yes.

        MS. TSE:  Your Honor, may I object?  Because I really

don't see where this is going.

        THE COURT:  Well, you are wearing two hats, Dr. Tse.

But, I think that I have to give Mr. Cerasia a little bit of

leeway here, so I overrule your objection and you already

answered the question so your answer will remain.

Q.  Dr. Tse, at the time you received your July 1st, 2010,

paycheck, for 100 percent of your salary, you knew at that

point that you only had extramural support for 35 percent of

your salary, right?

A.  Yes.

Q.  As of June 1st, 2010, you said that you didn't know how

G6N3TSE3                    Tse - cross

1    long you would remain employed at NYU, right?

2    A.  I knew that my faculty appointment would end August 31

3    because I received a letter from the provost saying that my

4    appointment as associate research professor would be in effect

5    for that academic year.  But, there is no salary guarantee

6    since I am non-tenure.

7    Q.  The letter you referred to from the provost, that's not an

8    exhibit here?

9    A.  No.

10   Q.  At any point after from -- excuse me.  At any point from

11   June 1st, 2010, until January 3 of 2011, did anybody at NYU

12   give you an employment end date?

13   A.  No.

14   Q.  Isn't it true that between June 1st, 2010, and January 3,

15   2011, you never asked Dr. Blaser how long your employment would

16   continue?

17   A.  I expressed my concern to him, clearly, in my letter dated

18   May 13, and I did so at the August meeting because that would

19   be less than a week before my faculty appointment would end.

20   Q.  But my question to you was, isn't it true that at no point

21   between June 1st, 2010, and January 3 of 2011, did you

22   specifically ask Dr. Blaser when your employment would end at

23   NYU?

24   A.  Specifically ask, meaning what?  In exactly those words?

25   Q.  Did you ask him if there was a date decided when your

G6N3TSE3                    Tse - cross

1   employment would end at NYU?

2   A.  No, I did not.  I just expressed to him that my faculty

3   appointment would end August 31.

4   Q.  Did he ever submit anything to you in writing after

5   August 25, 2010, saying that your faculty appointment did in

6   fact end on August 31, 2010?

7   A.  He would not have to.  Because according to common

8   knowledge, if you do not receive a letter from the provost,

9   which I would have by August 31, 2010, your appointment has not

10  been renewed.

11  Q.  But Dr. Blaser never sent you anything saying that.  That

12  was my question.

13  A.  It is not up to Dr. Blaser to send that letter.  And he

14  never has in prior years.  It comes from the provost.  And the

15  policy for that is pretty much stated in Dr. Abramson's notice

16  dated 2007.

17         I did bring up to Dr. Blaser at the meeting that I

18  have not received a renewal appointment letter.

19  Q.  But even though you didn't receive a renewal appointment

20  letter, your employment did continue after August 2010, right?

21  A.  No one told me in the exact words that I was no longer

22  employed.

23  Q.  You continued to receive a paycheck after August 31, 2010,

24  right?

25  A.  I did.

G6N3TSE3                          Tse - cross

1   Q.   Now, as a faculty member on the non-tenured track in the

2   School of Medicine, you knew it was your job to identify

3   research projects from which you would submit grant proposals,

4   right?

5   A.   No.

6   Q.   As a research scientist, you're not the one who comes up

7   with ideas and identifies subject matter for submitting

8   proposals?

9   A.   No.

10  Q.   You didn't believe --

11  A.   I did.

12  Q.   You didn't believe it was your job as a non-tenured

13  research faculty member to come up with an idea for a research

14  grant proposal?

15  A.   No.  As I have indicated in my letter to Dr. Blaser and

16  also indicated in my 35 percent extramural funding support at

17  the time in question, those are not independent extramural

18  funding sources.  I was what is known as a key personnel,

19  co-investigator, investigator, or collaborator on grants that

20  were obtained by other individuals at the school who served as

21  principal investigators on those grants.

22          The grant that was my original idea for the research

23  plan, and I am recognized by the NIH as having applied for the

24  grant, was the flow cytometry core grant.

25  Q.   Dr. Tse, as a non-tenured track research professor, if you

1    wanted to obtain your own funding and submit a grant

2    application, you would be the one to identify the subject

3    matter of the grant, correct?

4    A.  As the principal investigator, yes.

5    Q.  And in order for you to -- if you were to apply for a

6    grant, it would have been your responsibility to come up with

7    the scientific idea for that grant application, right, as the

8    principal investigator?

9    A.  Yes.

10   Q.  I think you said that when you applied for the long-term

11   disability through Unum in the spring or May of 2010, you

12   believed that your salary would not continue at 100 percent

13   beyond May 31, right?

14   A.  No.

15   Q.  No, you thought it would continue, or no, you didn't think

16   it would continue?

17   A.  I did not believe that it would continue.

18   Q.  Right.

19   A.  Not 100 percent.  But, I would be looking at a 65 percent

20   loss of income.

21   Q.  Right.  So at the time that you submitted Plaintiff Exhibit

22   16 to Unum on May 18, 2010, you didn't believe that your salary

23   would continue at 100 percent past May 31, right?

24   A.  That is absolutely not true.  Because in an e-mail

25   predating May 18 that I sent to Reggie, I clearly stated that I

G6N3TSE3                          Tse - cross

1   am looking at a 65 percent salary loss.  Nowhere did I say that
2   it would be 100 percent.
3   Q.  I didn't say that, Dr. Tse.  Please listen to my question.
4   Isn't it true that at the time you submitted Plaintiff Exhibit
5   16 on May 18, 2010, you did not believe that 100 percent of
6   your salary would be paid after May 31?
7   A.  Oh, yeah, if you frame it that way, yes.
8   Q.  You made the decision to sign Plaintiff Exhibit 16, right?
9   A.  That's my signature.
10  Q.  Isn't it true that nobody at NYU forced you to submit that
11  application to Unum?
12  A.  You have to be more specific about the word "force."
13  Q.  Isn't it true that Reggie Odom did not demand that you in
14  fact submit Plaintiff Exhibit 16 to Unum?
15  A.  He did not demand.  But he could not come up with
16  alternative options for me not to lose 65 percent of my salary.
17  Q.  Before you submitted Plaintiff Exhibit 16 on May 18, 2010,
18  isn't it true that you did not speak to Dr. Blaser about
19  long-term disability?
20  A.  No, I did not.  As a matter of fact, I was directed by
21  Reggie to write the letter that I did on May 13.
22  Q.  Just asking if you spoke to him, Dr. Tse.
23  A.  Mr. Cerasia, you have to understand that as Dr. Blaser
24  testified, he is the leader of more than 1,000 faculty members.
25  His office is not in the same wing as mine.  His lab is in the

G6N3TSE3                      Tse - cross

1   VA Hospital which is a couple of blocks away.  During the

2   entire period, including the time that I worked on his research

3   project, I believed that I can count on one hand the number of

4   times that we spoke to each other.

5   Q.  When you received your full paycheck on July 1st, 2010, and

6   saw that you were receiving 100 percent of your salary, you

7   never contacted Unum to withdraw your disability application,

8   did you?

9   A.  I have no indication or assurances that that would

10  continue.  Yes, I got a check on July 1st.  But, there was no

11  guarantee nor assurance that I would get a check on August 1st.

12  Q.  Just answer my question.  When you got the check on

13  July 1st, 2010, isn't it true that you did not contact Unum to

14  withdraw your LTD application?

15  A.  Why would I?

16  Q.  Is the answer yes or no?

17  A.  No.

18  Q.  When you received your full salary from July 1st, 2010

19  until the end of February or the beginning of March 2011, at no

20  point did you contact Unum to withdraw your LTD application,

21  did you?

22  A.  Why would I?

23  Q.  Is the answer yes or no?  Did you ask to withdraw it or

24  not?

25  A.  I was in contact with the Unum representative throughout

G6N3TSE3                         Tse - cross

1   this period of time.  They specified that there is a six-month

2   salary continuation which meant that from the date that NYU

3   approved of my application, I have to be salaried for six

4   months before my benefits would start.

5   Q.  That was under the term of the plan known as the

6   elimination period, correct?

7   A.  Yes.

8   Q.  So that was a Unum-imposed requirement, correct?

9   A.  I have no idea whether it's unique to Unum or it's

10  something they negotiated with NYU.

11  Q.  But you did know that under terms of the plan, that there

12  is something called an elimination period for 26 weeks, right?

13  A.  Yes.  As a matter of fact, Margaret Meagher was the one who

14  brought it to my attention.  And it was on her recommendation

15  that I looked up the faculty handbook to see if I would qualify

16  for six months of paid disability leave.  And I was also

17  directed by Reggie to write the letter that I did, and send it

18  to the attention of both Dr. Blaser and Dr. Abramson on May 13.

19  I did not hear from either one of them, and not knowing what

20  would happen, not knowing how long I would continue to be paid,

21  the best safeguard that I could come up with was the disability

22  insurance claim.

23  Q.  After you submitted your LTD application to Unum on May 18,

24  2010, you were then continued at 100 percent salary

25  continuation for over nine months, correct?

G6N3TSE3                          Tse - cross

1   A.  Yes, I was.

2   Q.  That, you would agree with me, that nine months is in

3   excess of 26 weeks?

4   A.  What specifically are you asking me?

5   Q.  I'm asking you a mathematical question.  That nine months

6   is greater than 26 weeks, right?

7   A.  Yes.  Nine months is greater than six months.

8   Q.  Okay.  And no time during the nine-month period that you

9   received 100 percent of your salary did you contact Unum and

10  say I want to withdraw my LTD application, did you?

11  A.  I have not started to receive benefits.

12  Q.  Just answer my question.

13          MR. CERASIA:  Your Honor, can she just answer the

14  question?  I just want to know if she withdrew the application.

15          THE COURT:  I think you asked it quite a bit.

16          Can you answer it just one more time.  Did you ever

17  withdraw your application to Unum for long-term benefits?

18          THE WITNESS:  I did not even know that there was such

19  a mechanism.  So, no, I did not.  I was not provided with a

20  form to do so.

21  Q.  Would you agree with me that after you started receiving

22  100 percent of your salary on July 1st, 2010, that that was

23  something that was favorable to you?

24  A.  Favorable in what sense?

25  Q.  Well, you weren't disadvantage by receiving 100 percent of

1    your salary, were you?

2    A.   Disadvantaged in what way?

3    Q.   Economically.

4    A.   No, I did not suffer salary loss every month I was paid

5    100 percent.  But I also did not know whether it would

6    continue.

7    Q.   Can you look at Plaintiff Exhibit 52, please.  Do you have

8    that in front of you?

9    A.   Yes, I do.

10   Q.   This relates to your June 3, 2010, e-mail to Reggie about

11   the Unum LTD application that you submitted, correct?

12   A.   Yes.

13   Q.   And the sentence that you have or sentences with the

14   redline on the left-hand side of it says "There will be a

15   65 percent reduction in my monthly income starting 7/1/2010 if

16   these benefits are not activated shortly."

17            Now, the reference to "these benefits" would have been

18   the LTD benefits under Unum, correct?

19   A.   It would, first of all, be the paid long-term disability

20   leave.  Six months later, if approved, the Unum disability

21   benefits would begin.

22   Q.   When you referred to "these benefits are not activated

23   shortly," what benefits are you referring to, the Unum

24   long-term disability benefits?

25   A.   The paid long-term disability leave.  I said that just a

1   minute ago.

2   Q.   Under the Unum policy?

3   A.   Unum does not provide for paid long-term disability leave.

4   NYU does.  That is why I requested paid long-term disability

5   leave from Dr. Blaser, not Unum.

6   Q.   Are you referring to the leave under the faculty handbook?

7   A.   Yes, I am.

8   Q.   Isn't it true that you never formally applied to Dr. Blaser

9   or the dean for leave of absence because of your disability?

10  A.   That would be my May 13 letter to Dr. Blaser.  I wrote that

11  letter and sent it to him because Reggie Odom instructed me to

12  do so.  And that would be on the second page of Exhibit 52.

13  Q.   Did you claim you made a formal application for leave of

14  absence under the handbook?  That's my question.

15  A.   I do not know.  Does the handbook specify what formal

16  application means?

17          MR. CERASIA:  May I approach, your Honor?

18          THE COURT:  You may.

19  Q.   I'm going to show you, Dr. Tse, what's part of your Rule

20  56.1 statement that was submitted to the Court in response to

21  summary judgment.  Particularly, I want to call your attention

22  to paragraph 72 in your response.  This was document 45 on the

23  court's docket sheet.  Okay?

24  A.   First of all, if you are talking about the response to

25  summary judgment, that was prepared by my second counsel Maya

1    Risman.

2    Q.  I understand.  And your response states:  Dr. Tse never

3    applied formally to Dr. Blaser or the dean for a leave of

4    absence because of her disability, and reported to work

5    full-time after she was removed as the FACS core director on

6    April 10 -- or excuse me -- April 1, 2010 until her faculty

7    appointment was terminated on April 4, 2011.

8                 Right?

9    A.  I did not apply formally, but I did send Dr. Blaser, copied

10   to the dean, a request for leave of absence.  And yes, I

11   reported to work full-time, because I never heard back from

12   them.

13   Q.  After the August 2010 meeting, you never requested a leave

14   of absence from the school, did you?

15   A.  I asked Dr. Blaser at the meeting whether my request would

16   be approved.  He did not say yes.

17                 THE COURT:  Which request?

18                 THE WITNESS:  That's the May 13 letter to Blaser, I

19   believe that's Exhibit 8.  But let me check before I direct

20   your Honor to the wrong exhibit.

21                 MR. CERASIA:  6.

22                 THE WITNESS:  Yes, sorry, 6.

23   Q.  Let me ask you this.  At the August 25 meeting, did you

24   ever say to Dr. Blaser or Lucy Cribben or Reggie Odom that I'm

25   seeking a six-month leave of absence under the handbook, and

1    I'm not referring to a leave of absence under the long-term

2    disability policy issued by Unum?

3              Did you ever make that distinction?

4    A.  No, I didn't, because I had already asked, requested, in

5    writing, on May 13.  I did ask him, I reminded him more than

6    once, that my faculty appointment would end in a few days.  And

7    his reply to me was that if you could not meet the school's

8    REF, then the best solution for you would be long-term

9    disability benefits as a source of income.

10   Q.  Did you understand that if you took a leave of absence

11   under the faculty handbook, that after six months of a leave of

12   absence that you would then have to go on Unum long-term

13   disability?

14   A.  That was why I requested the leave in the first place.  I

15   was directed first by Margaret Meagher, who provided me with

16   the Unum forms, the Unum policy, and the fact that my benefits

17   would not begin until the six-month salary continuation had

18   been met by the school.

19   Q.  Dr. Tse, if you had gone out on a long -- on a leave

20   absence starting June 1st for 6 months, that would have ended

21   at the end of November of 2010, correct?

22             Just a mathematical question.

23   A.  Yes.

24   Q.  Okay.  And if it ended in November of 2010, at the end of

25   that six months, you understood that you would have had to

1    start your Unum disability leave December 1st, 2010, right?

2    A.  I really don't see what you're driving at.

3           THE COURT:  If you don't understand the question, just

4    say so, and Mr. Cerasia will rephrase it.

5           THE WITNESS:  Okay.

6    Q.  I'm going to try.  You testified before that you understood

7    under the Unum policy there was a six-month elimination period,

8    which means you got salary continuation for six months, and

9    after that six months, the Unum disability benefits would kick

10   in.

11          That was your understanding, right?

12   A.  That was what I was told.

13   Q.  Okay.  And that was your understanding based on what you

14   were told.  Right?

15          Okay.  If you do the math from June 1st, six months

16   would be all the way up through November 30 of 2010.  Correct?

17   A.  I requested the leave.  It does not follow that it was

18   approved.  And it was never approved.

19   Q.  But if it was approved, you would have only been able to

20   stay at work for six months, right?

21          Six-month elimination period, correct?  That was your

22   understanding.

23   A.  Unum does not say, and unless I ignored excerpting the part

24   of the policy that pertains to that, that I have to start the

25   benefits which they were in the process of reviewing and

G6N3TSE3                          Tse - cross

1    approving in six months.  That was not my understanding at all.

2    I was -- I did what I was told to do, because the head of

3    benefits and the VP of employee relations were noting these

4    things a lot better than I did.

5    Q.  I'm going to show you, unless you have it in front of you,

6    Plaintiff's Exhibit 43.

7    A.  Yes, I do.  I have everything here.

8    Q.  I want you to look at page 53 of the handbook, the last

9    page of that exhibit.

10   A.  Yes.

11   Q.  Before you do that, I apologize.  Look at page 52, the box

12   that you have, the red box.

13   A.  Yes.

14   Q.  Okay.  You understood, based on this handbook that you

15   referenced in Plaintiff Exhibit 52, that you could receive your

16   salary for up to six months if you had been on an approved

17   leave of absence, correct?

18   A.  Can you please say that again?

19   Q.  Sure.  Didn't you understand, based on this policy, that if

20   you had requested a leave of absence that was approved under

21   the handbook, that you would be approved for up to six months?

22   A.  Yes.

23   Q.  Okay.  Then if you look on the next page, the red box, last

24   sentence, you understood that if you were disabled and out of

25   work for more than six months, that you then would have to go

G6N3TSE3                    Tse - cross

1    over to the long-term -- apply for long-term disability,

2    correct?

3    A.  No.  That is not my understanding.  My understanding is, as

4    directed by Margaret Meagher and Reggie Odom, I would have to,

5    if my salary continued, as it turned out, or go on paid

6    long-term disability leave for six months before the Unum

7    benefits would kick in.  That is my understanding of the

8    situation.

9    Q.  Let's talk about your work with Reggie Odom.  At all times

10   that you dealt with Reggie, he treated you professionally,

11   correct?

12   A.  Yes.

13   Q.  You felt that in your dealings with Reggie that he wanted

14   to help you resolve things, right?

15   A.  Yes.

16   Q.  Now, isn't it true that at the time that you were the core

17   director starting -- let's start with December 2009, until the

18   point where you were notified of your removal, that the only

19   accommodation that you had requested from Reggie Odom at that

20   time is the one reflected in Plaintiff Exhibit 24, the letter

21   from Dr. Solitar?

22   A.  Specifically, what is your question?

23   Q.  The letter from Dr. Solitar --

24   A.  What exhibit number?

25   Q.  24.  Your request at the time was you wanted a post-doc

G6N3TSE3                        Tse - cross

1    versus a lab technician to perform the work for you?

2              MS. TSE:  Objection, your Honor.  If plaintiff is not

3    allowed to visit events leading up to her removal as the core

4    director, then NYU should not be allowed to go there either.

5              THE COURT:  Well, I'll be the judge of that.  But I'm

6    sorry, I don't understand your question, Mr. Cerasia.

7              MR. CERASIA:  I'm referring to Plaintiff Exhibit 24.

8    I'm going to get into the issue of what accommodations, if any,

9    she requested after the removal.  But I want to establish that

10   the only request for an accommodation that she made while she

11   was a core director after December 2009 is the appointment of a

12   post-doc versus a lab technician to help her in the laboratory.

13   A.  Both technicians and post-docs do -- did lab work for me.

14   And my contention at the time was that I wanted a post-doc as a

15   reasonable accommodation instead of a technician.  And

16   Dr. Valentine was opposed to that.  And as a matter of fact,

17   Reggie was the one who explained to me we recognize the fact

18   that you cannot do lab work because of your osteoarthritis, and

19   you needed assistance, but you cannot choose what form the

20   assistance would come in.  So, when you're provided with a

21   technician, you cannot make a case out of not being provided

22   with a post-doc.  Because your needs have been accommodated.

23   Q.  But, my question really was simpler than that.  That the

24   only accommodation that you requested through Reggie while you

25   were the director of the core was for somebody to help you with

G6N3TSE3                         Tse - cross

1   laboratory experiments, correct?

2   A.  No.

3              THE WITNESS:  My -- if I may, your Honor, revisit,

4   there was a complaint filed with the EEOC, and Reggie was the

5   one who reached out to me in 2009.  That is how and I don't

6   have the list of contents here, oh, I managed to find it.  That

7   would be Exhibit 22 dated December 2009.  Reggie was the one

8   who reached out to me to try and resolve that issue.

9   Q.  But my question is --

10  A.  And that is how he became aware of the fact that I was a

11  disabled person and I need assistants to do lab work.

12  Q.  My question was, in dealing with Reggie during that finite

13  period from November or, excuse me, from December of 2009 until

14  you were notified of the removal as the lab director, that the

15  only specific accommodation that you requested of him was help

16  doing laboratory experiments, correct?

17  A.  The specific help that I asked for was a post-doc.

18             (Continued on next page)

19

20

21

22

23

24

25

G6N5tse4                       Tse - cross

1   BY MR. CERASIA:

2   Q.  I understand.  But that's it.  That was the only thing that

3   you requested of him at the time, right?

4   A.  As far as I can remember.

5   Q.  Now, isn't it true that at no time after March 3, 2010, did

6   you ever present to Reginald Odom any letter from a doctor

7   saying what, if any, reasonable accommodation, you required?

8   A.  When I met with Odom after I received the March 4th letter

9   from Dr. Valentine he had received the letter from Dr. Solitar.

10  Q.  Dr. Tse, I am moving beyond the letter from Dr. Solitar.  I

11  am asking, other than that letter, isn't it true that you never

12  submitted another doctor letter to Reginald Odom at any point

13  after March 3, 2010, requesting an accommodation?

14  A.  The doctor does not request the accommodation.  The

15  employee requests the accommodation.

16  Q.  Okay.

17         Isn't it true that Dr. Solitar's letter said I

18  recommend and fully support her request --

19  A.  Her request, not his request.

20  Q.  Okay.

21         Let me ask it this way, then.  At any point after

22  Dr. Solitar's March 3, 2010 letter, did you ever submit

23  documentation from a physician to Reggie Odom or anyone at NYU

24  in support of a request by you for reasonable accommodation?

25  A.  Reggie considered this letter adequate.

G6N5tse4                      Tse - cross

1   Q.  That's not my question.  The question is you did submit

2   anything or you didn't?

3   A.  No, I did not submit anything because there was no obvious

4   need for me to do so.

5   Q.  Let's focus on your work with Dr. Reibman which was

6   Plaintiff's Exhibit 11.

7             THE COURT:  Let me just ask you something,

8   Mr. Cerasia.  Are you suggesting that there was a requirement

9   that she submit multiple letters from doctors asking for an

10  accommodation?

11            MR. CERASIA:  I'm not saying that, your Honor, but it

12  is her obligation.  It is really a legal argument, it is her

13  obligation to identify request for accommodation.

14            THE COURT:  Are you discounting the March 3rd --

15            MR. CERASIA:  No, I am just asking if anything was

16  submitted after that.

17            THE COURT:  All right.

18  BY MR. CERASIA:

19  Q.  Do you have Plaintiff's Exhibit 11?

20  A.  Oh yes, I do.

21  Q.  The subject matter of that proposal which was related to

22  HIV and vaginal mucosa and dendritic cells?

23  A.  Yes.

24  Q.  That was not Dr. Reibman's area of expertise, was it?

25  A.  No, but as I testified earlier --

G6N5tse4                          Tse - cross

1   Q.  Okay, just a no then.  Thank you.

2   A.  That --

3            THE COURT:  Wait, wait, wait.  You know what?  We are

4   going until 2:30.  I suggest we take another break and if

5   anybody needs any refreshment, get it now.

6            (recess)

7            THE COURT:  Please, be seated.

8            And Dr. Tse, would you please resume the witness

9   stand?

10           THE WITNESS:  Yes, your Honor.

11           MR. CERASIA:  May I continue, your Honor?

12           THE COURT:  Mr. Cerasia, yes, please.

13  BY MR. CERASIA:

14  Q.  Dr. Tse, before we broke we were talking about Plaintiff's

15  Exhibit 11 but I just want to go back to Exhibit 53 for a

16  minute which is part of the Unum LTD policy.

17  A.  Yes.

18  Q.  If you look at the second page, the option C that you have

19  in the red box --

20  A.  Yes.  Go ahead.

21  Q.  That was an option that you got to choose, correct?

22  A.  Yes.  When they come by with the annual open enrollment

23  plans, yes.

24  Q.  So, NYU contributed a portion of their money to the LTD

25  benefit, correct, the premium?

1    A.  I actually did not know who paid for what.  I only know

2    that if I don't pay, I don't get to choose option C, which is a

3    higher coverage than the defendant coverage.

4    Q.  You understood that NYU provided for a premium that

5    provided a minimal amount of money as a benefit, correct?

6    A.  Yes.  That's the default.

7    Q.  And then you bought what was known as supplemental

8    disability insurance and paid more out of each paycheck towards

9    that supplemental policy?

10   A.  No.  It's not presented as a supplemental policy, it was

11   presented as a policy and that is your policy.

12   Q.  But you paid more money than you had to in order for

13   yourself to get option C if you did become disabled during your

14   employment?

15   A.  What do you mean more than you have to?

16   Q.  Well, you didn't have to pay any money out of your paycheck

17   towards LTD, correct?

18   A.  I -- it didn't even offer it to me.  It was a list of how

19   much you would be covered, and considering my salary and 60

20   percent of the monthly income I pick option C and it was

21   specified in the open enrollment plan brochure as to whether

22   you pay your premium pretax or post tax and that was it.  I did

23   not know, you know, what else.

24   Q.  But did you understand that you had to pay some portion of

25   the premium in order to get option C?

G6N5tse4                          Tse - cross

```
 1   A.  Oh yeah.  Yeah.  I didn't know that that was a portion of
 2   the premium or that was the whole premium until I got the Unum
 3   policy because, essentially, when you don't need the insurance
 4   and it is provided for you so it is not like you have to study
 5   it in detail and then make sure it's the right coverage like I
 6   would do for my car insurance, you pick what applies to you as
 7   far as the options go and that was it.
 8   Q.  And then when you finally did start receiving benefits you
 9   did receive the 60 percent of your monthly salary, right?
10   A.  I did.
11   Q.  Okay.
12           Now, going back to Plaintiff's Exhibit 11, HIV was one
13   of your areas of speciality in research, correct?
14   A.  Yes.
15   Q.  And Dr. Reibman, she focused on research related to lungs
16   primarily, right?
17   A.  Asthma.
18   Q.  Now, with respect to Plaintiff's Exhibit 11, isn't it true
19   that Dr. Reibman used her funding to do the laboratory
20   experiments for this grant proposal?
21   A.  Not at all.  I testified earlier that the post doc, through
22   basically my mentorship, got what is known as a pilot project
23   grant to study vaginal injury -- the role of vaginal injury in
24   what we call vertical HIV transmission and the data was
25   generated as the research plan that was proposed for this
```

1    funded pilot project.

2    Q.  And was that Bertrand Black?

3    A.  Yes, Bertrand Black.

4    Q.  Isn't it true that this proposal that was submitted was

5    primarily designed to obtain funding for both you and

6    Mr. Black?

7    A.  I don't recall.  I do have the complete grant application

8    but I recall that it would provide for as much as 50 percent of

9    my salary.

10   Q.  And you were optimistic that this would be funded?

11   A.  Let me point out to, again, the fact that it is an RFA

12   which is a request for funding and those are put out by the NIH

13   specifically for very defined research areas and in this case

14   it was towards developing a vaccine for HIV or a barrier for

15   HIV transmission.

16   Q.  Okay, that's not --

17   A.  No, let me finish.  The RFA specifically indicated that it

18   would encourage inclusion of previously non-HIV PI which means

19   investigator who had not previously been funded for HIV

20   research and Dr. Reibman fits the bill.

21   Q.  So my question was were you optimistic that this would be

22   funded, yes or no?

23   A.  Yes.

24   Q.  Now, you did work on this proposal between June 1st, 2010

25   and the submission date in July 19th, 2010, correct?

1   A.  Actually, to the best of my recollection we started way

2   before June 1st?

3   Q.  I'm just asking if during that time period you did work,

4   yes or no, on this proposal.

5   A.  Yes.

6   Q.  And during that time period of June 1st to July 19, 2010,

7   you were accommodated for your disability on the work you did

8   with respect to Plaintiff's Exhibit 11, correct?

9   A.  In what sense?

10  Q.  You didn't do any lab work, did you?

11  A.  I did not have to because the lab work was done before we

12  put the proposal together.

13  Q.  And you, yourself, didn't do any of the lab work, right?

14  A.  Bertram was there to do the lab work.  There was no need

15  for me to do any lab work except discuss experiments with him

16  and review the data.

17  Q.  And with respect to Plaintiff's Exhibit 11, isn't it true

18  that you came up with the idea for this research proposal

19  through collaboration and discussion with Dr. Reibman?

20  A.  That idea came up long ago when we --

21  Q.  I didn't ask you the time, I am just asking that it came up

22  based on a collaboration and discussion between you and

23  Dr. Reibman, correct?

24  A.  Specific to this grant application?

25  Q.  Yes.

G6N5tse4                          Tse - cross

1   A.   And what exactly was your question?

2   Q.   The question is is that the subject matter of this grant

3   application, the idea for it came up through collaboration and

4   discussion between you and Dr. Reibman?

5   A.   Yes.

6   Q.   And you understood that after June 1st, 2010, that that was

7   the type of collaboration that you needed to do with a PI in

8   order to obtain funding from either the NIH or any other

9   funding sources, right?

10  A.   June 1st has nothing to do with how collaborations come

11  about.  That is the essence of a collaboration, you share

12  ideas.

13  Q.   Dr. Tse, I would like to focus your time period because

14  that is what the Judge has said is relevant to this case, June

15  1st, 2010, through April 4th of 2011 and I am asking you, isn't

16  it true that during that time period that you were expected to

17  have collaborations with principal investigators to come up

18  with scientific ideas for research proposals similar to what

19  you did with Dr. Reibman with respect to Plaintiff's Exhibit

20  11?

21  A.   Then you have to define what exactly you mean by

22  collaborations.  All right?  A conversation discussing what you

23  can do is the beginning of a collaboration.  When you actually

24  have a funded research proposal like we did on asthma, that is

25  a funded collaboration.

1            So, I was collaborating with Dr. Reibman at the time

2      this proposal was put together and it was funded, specifically,

3      for this topic of research two years.  That was what produced

4      the preliminary data so I -- that is what collaborations are

5      about.

6      Q.  Okay.  When you refer to the project with Dr. Reibman and

7      it was funded, you are talking about the asthma project, you

8      are not talking about the HIV project that is part of

9      Plaintiff's Exhibit 11, correct?

10     A.  But as Dr. Abramson said --

11     Q.  Just at answer the question.

12            THE COURT:  No.  No, please.

13            MR. CERASIA:  I want to know what she's talking about,

14     Judge.

15            THE WITNESS:  I am trying to explain to you what I am

16     talking about.

17            Dr. Abramson explained it during his testimony.

18     Asthma involves a tissue known as the mucosa and so does

19     vaginal transmission of HIV.  That's how it came together.

20     Dr. Reibman's expertise was studying mucosal tissue, my

21     expertise was on HIV, and we put the two together two years ago

22     towards a pilot project on which Bertram Black -- neither me

23     nor Dr. Reibman -- was the PI and that's how the data that we

24     need to put together this application was generated.

25     BY MR. CERASIA:

G6N5tse4                        Tse - cross

1    Q.  So my question was, which had nothing to do -- your answer

2    had nothing to do with it, was when you had a reference to the

3    project you worked on with her that was funded, you were

4    referring to an asthma project and not Plaintiff's Exhibit 11,

5    correct?

6    A.  The pilot project was funded also, otherwise how would you

7    get the money, you know, to pay Bertram plus the supplies that

8    you need to do the experiments plus the user fees for core

9    facilities to do the work.

10         THE COURT:  All right.  Let me see if I can straighten

11   out some of this because I am also confused.

12         Looking at Plaintiff's Exhibit 11, was this an

13   application for funding to get preliminary data or was this an

14   application for funding for a project?

15         THE WITNESS:  Exhibit 11 is a full-fledged NIH grant

16   application to the tune of $250,000 a year for five years.

17         THE COURT:  So that's what this is.

18         THE WITNESS:  Yes.

19         THE COURT:  And in order to be able to make this

20   application or to make this proposal to NIH, was there another

21   proposal funding preliminary data?

22         THE WITNESS:  Yes.  That was a CFAR pilot project

23   grant that was awarded to Bertram Black and as his mentor -- he

24   is a post doctoral fellow in Dr. Reibman's lab and Dr. Reibman

25   and I mentored him when he wrote that pilot project proposal.

1    It was $50,000 and that provided for part of his salary and

2    part of the supplies and assorted fees that was needed to

3    collect that preliminary data.  And the essence of giving out

4    pilot project grants to junior researchers is to encourage them

5    to develop that into more serious, bigger, grant applications.

6              So, if I remember, Bertram's effort on the RFA that

7    was submitted July 19th was at least 50 percent, if not more.

8              THE COURT:  Let me turn it back to you, Mr. Cerasia.

9    BY MR. CERASIA:

10   Q.  Thank you, your Honor.

11             The pilot project that you referred to for Bertram,

12   isn't it true that that pilot project provided zero for your

13   salary?

14   A.  Oh yeah.  As a senior investigator I'm not supposed to

15   collect.

16   Q.  So that was money that was used for him to go do laboratory

17   work relating to Plaintiff's Exhibit -- that was used for

18   Plaintiff's Exhibit 11 proposal, correct?

19   A.  At the time the pilot project grant was awarded it was two

20   years before we put together the RFA and the RFA was

21   essentially put together because I was in desperate need to

22   replace the 65 percent extramural support that I had for my

23   salary.

24   Q.  But the underlying data was generated in the laboratory by

25   Bertram and for Plaintiff's Exhibit 11, right?

1    A.  It was generated without the intention of it becoming

2    preliminary data for Exhibit 11.  It was there and we made use

3    of it.

4    Q.  And that's not uncommon, is it, to make use of past data

5    and experiments to submit current or future grant proposals?

6    A.  No.

7    Q.  Isn't it true that after June 1st, 2010, that you were

8    collaborating and discussing with principal investigators in

9    the school on research projects which is your most promising

10   option to obtain funding to fund your salary?

11   A.  I'm confused by what you are trying to get at.

12   Q.  I am trying to get at a yes or no answer, Dr. Tse.

13           THE WITNESS:  Yes.

14           THE COURT:  Just a second, Dr. Tse.  She cannot give a

15   yes or no answer if she doesn't understand the question.

16           MR. CERASIA:  I understand.  That's why I said I will

17   rephrase it, Judge.

18   BY MR. CERASIA:

19   Q.  There were two ways for to you get funding to support your

20   salary after June 2010; one was for you, yourself, Dr. Tse, to

21   get your own funding through grants either from the government

22   or private sources, correct?

23   A.  Yes.

24   Q.  And the other way was for you to collaborate and work with

25   PIs to get funding and then that funding would help cover your

1   salary as well, correct?

2   A.  Yes.

3   Q.  Okay.  So those were the two ways you could get funding to

4   support your salary after June 1st, 2010, right?  Right?

5   A.  Yes.

6   Q.  So, isn't it true that the most promising way for you to

7   continue employment at NYU to get funding to support your

8   salary would be for you to collaborate with other PIs and get

9   funding with them either from the government or foundations?

10          THE COURT:  I'm sorry.  Lost here now too.

11          The question I'm having is you're talking about her

12  obligation to meet NYU requirements for funding herself as a

13  research professor.  That's really not what the focus here is.

14  The focus is what accommodations were provided to her by NYU

15  because of her disability.

16          MR. CERASIA:  And the manner in which she went about

17  trying to get research funding, your Honor, is to do that.  Her

18  testimony with respect to this project makes that clear which

19  is when she collaborated with PIs who had money to fund the lab

20  assistants, she was accommodated and she didn't have to do the

21  lab work.  Bertram did the lab work.  They utilized that lab

22  work to submit a proposal.  On the other hand, if she tried to

23  go solo and be herself, she then had to come up with money for

24  the laboratory.  And if she had no money for the laboratory

25  maybe she couldn't get entry to the laboratory.

1          So, it is tied to it, your Honor.  The different ways

2     that you get funding impact whether or not she needed to be

3     accommodated.

4          THE COURT:  That's your position?

5          MR. CERASIA:  That's one of the positions, sure.

6          She had to get funding.  There is not a question about

7     that.  She understood she had to get funding and there is two

8     ways to get funding, you either do it on your own or you do it

9     with collaborators, and if she did it with collaborators like

10    she did in the summer of 2010 there was no issue about whether

11    or not she was accommodated because she was, she did the

12    analytical and the writing based on prior data.  She was

13    accommodated on that project.

14         THE COURT:  Sure.  Okay.

15         THE WITNESS:  So, let me get a better understanding of

16    what you are driving at.

17         Are you saying that NYU expected me to go and approach

18    other faculty members and ask them to put me on their grants?

19    BY MR. CERASIA:

20    Q.  Dr. Tse, isn't it true that within the School of Medicine

21    that research faculty, whether it's non-tenured research

22    faculty and tenured research faculty, that they get together

23    and share ideas on research projects, right?

24    A.  Then provide me with what you mean by get together.

25    Q.  They sit down and they talk, they collaborate and they

1   brainstorm about potential research grants they can submit,

2   correct?

3   A.  No.

4   Q.  That doesn't happen?

5   A.  That happens with people you're already working with.

6   Q.  I didn't specify whether you were worthing with them or

7   not.  So, for example, Dr. Reibman, you did that with

8   Dr. Reibman over the time you were working with her, correct?

9   A.  Because I was already working with her so it is obligatory

10  to our funding collaboration that I spend time with her.

11  Q.  Well, nothing required you to spend time with her on future

12  grant applications, correct?

13  A.  But that's how, like you yourself said, those ideas spring

14  from.

15  Q.  Was there anything that prevented you from talking to any

16  other principal investigator or tenured faculty member in the

17  School of Medicine other than Dr. Reibman, Rom, or Young, to

18  come up with ideas for research proposal?

19  A.  And, like I say, are you suggesting that I should bang on

20  the doors of these putative, funded investigators and ask them

21  to put me on their salary support?

22  Q.  I'm asking you whether or not there was anything within the

23  School of Medicine that prevented you from contacting other

24  tenured professors or principal investigators to collaborate

25  with them to come up with new ideas for grant proposals, yes or

```
1      no.

2      A.  What exactly do you mean by prevent?

3      Q.  Prohibit you.

4      A.  In what way?

5      Q.  Was there anything that anybody ever said to you or you

6      received in writing which said that you cannot go and speak to

7      other tenured professors or principal investigators to talk

8      about research ideas that may turn into grant proposals?

9      A.  First of all, the people that I see as potential

10     collaborators did not have to be tenured.

11          Second, there are no think-tanks or round table

12     discussions that the Department of Medicine fosters to

13     encourage such collaborations.  And, as I testified to earlier,

14     when I was the flow cytometry core director, the NIH

15     specifically discourages, prohibits reaching out to your users

16     and solicit collaborations or co-authorships.  The idea is that

17     they are providing you with funds to operate a core facility

18     without encumbrances.  The only thing that the core user has to

19     come up with is the fees.  The only times that I tell them

20     that, no, you are not going to be given high priority in the

21     school is because their experiments are flawed.  And I cannot

22     ask them why are you doing these experiments or can we

23     collaborate?  Are you thinking of any grants that you are going

24     to be applying for?

25          All of those activities are banned.
```

1   Q.  Dr. Tse, as of June 1st, 2010 you were no longer the core

2   director, correct?

3   A.  Yes, but that --

4   Q.  Okay --

5          THE COURT:  Wait, wait, wait.

6   Q.  Just a yes or no answer.

7          So, isn't it true that there was nothing under the NIH

8   guidelines that prevented you, when you were no longer the core

9   director of reaching out to any PI, tenured or nontenured at

10  the School of Medicine, to talk about new research ideas?

11  A.  But I cannot use --

12  Q.  It is a yes or no --

13  A.   -- the information that I gathered from 10 years of being

14  the flow cytometry core director --

15         THE COURT:  Dr. Tse, that is not the question that

16  Mr. Cerasia asked.

17         THE WITNESS:  Okay, then he has to rephrase it.

18         THE COURT:  No, he can have it repeated.

19         THE WITNESS:  Yes, please.

20         THE COURT:  Would you read it back?

21         THE WITNESS:  Please repeat it because I really am

22  getting more and more confused as to what these questions are

23  about.

24         (Record read)

25         THE COURT:  Yes or no, Dr. Tse?

G6N5tse4                          Tse - cross

1              THE WITNESS:  Please explain to me what you mean by

2    new.

3    BY MR. CERASIA:

4    Q.  Isn't it true that there was nothing under the NIH rules or

5    regulations that prevented you, when you were no longer the

6    core director, of contacting any PI, whether tenured or

7    non-tenured in the school of medicine, to discuss a proposal

8    for grant funding?

9    A.  Yes.

10   Q.  There was a regulation that prevented you from doing that?

11   A.  My expertise is in flow cytometry.  That would be what I

12   would bring to the table when collaborations come up.  I cannot

13   use the information that I had access to when I was the core

14   director to promote such collaborations.

15             THE COURT:  Dr. Tse, I believe the reason that

16   Mr. Cerasia put in the question about new was to, moving

17   forward, the day after you were no longer the director of CFAR,

18   was there any prohibition from NIH or NYU that would prevent

19   you from talking to anybody about projects that had not been

20   conceived or worked on while you were the core director, in

21   other words a new project, brand-new day.

22             THE WITNESS:  No.

23   BY MR. CERASIA:

24   Q.  After you learned, I think you said in November of 2010,

25   that Plaintiff's Exhibit 11 proposal was not funded, did you

1   ever tell Dr. Blaser that you wanted to resubmit it?

2   A.  I don't recall speaking to him or sending him an e-mail but

3   I believed that it was conveyed to him by Dr. Reibman.

4   Q.  So you, yourself, never had a discussion or communication

5   with him about it, right?

6   A.  No.

7   Q.  No, I'm not right, or I am right?

8   A.  I don't recall any direct communications between Blaser and

9   myself about that project not being funded.

10  Q.  Other than Dr. Reibman, was there any other PI at NYU where

11  you had discussion with them about a scientific idea or

12  collaborated with them about getting a -- submitting a research

13  grant at any point after June 1st, 2010?

14  A.  As I mentioned earlier, to me there was no point because my

15  faculty appointment would end August 31st and contingent to my

16  faculty appointment is the privilege of submitting grants as a

17  principal investigator.

18  Q.  So, is the answer then, no, other than Dr. Reibman, June

19  1st 2010, you did not collaborate with any other PI?

20  A.  I was collaborating with Dr. Rom and Dr. Young.

21  Q.  Did you --

22  A.  And part of Dr. Rom's group would be Dr. Reibman, who was

23  an independently funded investigator.

24  Q.  Let me ask it this way.  Other than Dr. Reibman, at any

25  point after June 1st, 2010 did you ever collaborate with any

1    other PI at NYU about submitting a new grant proposal, either

2    to the NIH or other funding organization?

3    A.   The word collaborate, all right, we are looking at it from

4    different perspectives which may be why I have such difficulty

5    answering your questions.

6    Q.   Okay, I will try something else then.

7         At any point after June 1st, 2010, other than

8    Dr. Reibman, did you ever have any discussion with any

9    principal investigator in the School of Medicine about

10   submitting a new grant application?

11   A.   No, I did not, because I, aside from the information I had

12   as the flow cytometry core director, I truly was not aware of

13   who would be interested in someone with my expertise.

14        Dr. Blaser would know.

15   Q.   At any point before June 1st, 2010, did you ever go and sit

16   down with Dr. Blaser and ask him who you could speak with to

17   get funding?

18   A.   No.  I think the only communication I had with him was

19   bringing to his attention my removal as the CFAR flow cytometry

20   core director and when he did not respond I didn't think he

21   wanted to have anything to do with me.

22   Q.   Isn't it true that at no point after June 1st, 2010, did

23   you ever tell Dr. Blaser that you had a scientific idea for

24   submitting a new grant application?

25   A.   I was busy after June 1st or, as a matter of fact, after I

1   was removed of my duties as the flow cytometry core director on

2   April 1st I was quite busy putting this application together,

3   together with Dr. Reibman and Bertram Black.

4   Q.  Put aside Plaintiff's Exhibit 11, isn't it true that at no

5   point after June 1st, 2010, did you ever tell Dr. Blaser that

6   you had a scientific idea for which you wanted to submit a

7   grant application?

8   A.  I did not feel that it was my obligation to do so and

9   never, in the number of years since he was the department chair

10  and he wasn't the department chair when I transferred to

11  medicine, was it necessary for me to disclose such ideas to

12  him, nor did he ever ask.

13  Q.  But never before June 1st, 2010 did you lose 65 percent of

14  your funding, correct?

15  A.  It is a matter of expectations, Mr. Cerasia.

16  Q.  Yes or no, Dr. Tse.  Was there ever a point from 1994 until

17  May 31st, 2010, that you ever lost 65 percent of your funding?

18  A.  I would not know until about 2000 because I wasn't sure

19  whether I was paid a hundred percent out of Dr. Valentine's

20  CFAR grant or discretionary funds but since 2010, yes, I was

21  paid a hundred percent.

22  Q.  But my question was a little I different.

23  A.  Out of extramural funds.

24  Q.  Isn't it true that at no point between 1994 and May 31st of

25  2010, were you ever informed that you would lose 65 percent of

1  the funding for your salary?  You had never heard that before,

2  correct?

3  A.  I also heard that where my salary was coming from.

4  Q.  Well, based on the exhibits you submitted in your

5  testimony, you were worried as of May 31st, 2010 how your

6  salary was going to be paid, correct?

7  A.  Yes.

8  Q.  And at no point before May 31st, 2010, during your whole

9  time at NYU, did you ever have that worry before, right?

10 A.  Before then I was happily assuming that as long as the

11 grants were approved and funded, my salary would be paid out of

12 those grants and, no, before March 4th, 2011 when I received

13 the letter from Dr. Valentine, I did not think that there would

14 be any problems with salary continuation.

15 Q.  So, as of June 1st, 2010, you found yourself in a position

16 that you testified made you very anxious because you were

17 uncertain about your future, correct?

18 A.  I was not sure whether I would be looking at a 65 percent

19 salary cut.  As a matter of fact, I was quite sure that I would

20 be losing 65 percent of my salary and I know, as I testified, I

21 knew that the only instructions I got as to how I can make up

22 for that loss was to increase my effort on the grants of my

23 ongoing collaborators which is Dr. Rom, Dr. Reibman, and

24 Dr. Young, and I just testified to the Court how that could not

25 be done.  Beyond that, I did not receive any instructions from

1    Dr. Blaser as to how I should proceed.

2    Q.  If you look at Plaintiff Exhibit 2 --

3    A.  Yes.

4    Q.  -- the sentence which says:  Therefore, you will need to

5    increase the number of hours supported from other sources to

6    maintain full and NYU benefits from June 1st onwards.

7          Isn't it true that nothing in Exhibit 2 said that you

8    had increased the amount of funding you got from the current

9    PIs that you worked with?

10   A.  Supported from other sources at, on March 4th, 2010, the

11   other sources would be grants that I am already on and they

12   would be grants awarded to Dr. Rom, Dr. Reibman, and Dr. Young.

13   What other active sources are there?  I know of none and I

14   wasn't pointed to those sources.

15   Q.  And you never asked Dr. Blaser what other sources you could

16   tap into, potentially, to collaborate with --

17   A.  Like I said --

18   Q.  Excuse me.

19   A.  I sent a letter to him on March 12th bringing up the issue

20   of my being removed as the flow cytometry core director whereby

21   I lost 65 percent of my salary support.  He did not respond.

22   Q.  Going back to my question, isn't it true that you never

23   asked Dr. Blaser what other sources at NYU that you could tap

24   into to get a hundred percent funding support for your salary,

25   right?

G6N5tse4                      Tse - cross

 1   A.  I do not have that document in front of me and I do not

 2   recall it exactly.

 3   Q.  You don't have Exhibit 2 in front of you?

 4   A.  No.  That letter -- I did not include that letter as an

 5   exhibit because I was directed by the Court not to go there.

 6   Q.  Dr. Tse, it is a question I have for you which has nothing

 7   to do with an exhibit.  My question is, isn't it true that you

 8   never asked Dr. Blaser what other sources, as referenced in

 9   Plaintiff's Exhibit 2, you could tap into to get extramural

10   funding going forward?

11   A.  Mr. Cerasia, as I said just a minute ago, I do not recall

12   and what I said specifically in the letter is that I or it was

13   an e-mail that I sent to Dr. Blaser shortly after I received

14   the termination letter from Dr. Valentine, all I recall clearly

15   is that I asked him to look into the circumstances under which

16   I was removed as the CFAR flow cytometry core director whereby

17   65 percent of my salary was supported.

18               THE COURT:  You refer to this letter that you wrote to

19   Dr. Valentine about your being removed?

20               THE WITNESS:  No, I think that was --

21               THE COURT:  To Dr. Blaser.

22               THE WITNESS:  It was to Dr. Blaser and it was copied

23   to a bunch of other senior investigators and it was shortly

24   after March 4th but before April 1st.  And the reason why I

25   remember the time period quite clearly is because I was trying

G6N5tse4                          Tse - cross

1    to see if I can stop Dr. Valentine from removing me as the CFAR

2    flow cytometry core director.

3                THE COURT:  But I therefore don't see how that answer

4    is responsive to what Mr. Cerasia is asking.

5                THE WITNESS:  I may have asked Dr. Blaser to direct me

6    to potential investigators but I, without the document in front

7    of me, I do not recall.  It was a very long e-mail.  I cannot

8    say whether or not I asked him for advice or direction and in

9    order for me to come up with a 65 percent salary support by

10   June 1st, the other sources have to be other intracellular

11   sources which means that the funds would be sitting there or

12   active grants.

13               THE COURT:  I think this is a good time for us to

14   adjourn for the day.  We will continue on Monday, June 27th, at

15   10:00 a.m.

16               Do you have an idea, Mr. Cerasia, about how much more

17   cross-examination you have?

18               MR. CERASIA:  Well, it is a little difficult to

19   predict, your Honor, because I thought it was only going to be

20   a total of two hours.

21               THE COURT:  That's fine.

22               MR. CERASIA:  And I think I have done about an hour

23   and a half.  Based on how this is going, I think I have at

24   least two hours if not more.

25               THE COURT:  Fine.  Fine.

G6N5tse4                          Tse - cross

1              Let me ask the parties, do you expect to sum up or

2    merely submit proposed findings of fact and conclusions of law?

3              MR. CERASIA:  I anticipated, your Honor, submitting

4    proposed findings of fact and conclusions of law.

5              THE COURT:  All right.  Okay.  We will talk about that

6    then when I see you on Monday at 10:00 a.m.  Have a nice

7    weekend.

8              MR. CERASIA:  You too, your Honor.

9              MS. TSE:  Thank you, your Honor.

10             (Adjourned to 10:00 a.m., June 27, 2016.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                           INDEX OF EXAMINATION

2     Examination of:                              Page

3     DORIS TSE

4     Direct Ms. Tse . . . . . . . . . . . . . . . 358

5     Cross By Mr. Cerasia . . . . . . . . . . . . 411

6                           PLAINTIFF EXHIBITS

7     Exhibit No.                              Received

8      44 and 45  . . . . . . . . . . . . . . . . 361

9      48    . . . . . . . . . . . . . . . . . . . 370

10     15    . . . . . . . . . . . . . . . . . . . 381

11     46    . . . . . . . . . . . . . . . . . . . 385

12     52    . . . . . . . . . . . . . . . . . . . 386

13     53    . . . . . . . . . . . . . . . . . . . 389

14     54    . . . . . . . . . . . . . . . . . . . 401

15     47    . . . . . . . . . . . . . . . . . . . 406

16     55    . . . . . . . . . . . . . . . . . . . 407

17

18

19

20

21

22

23

24

25
```